## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| REZAC LIVESTOCK COMMISSION CO., INC. | ) ) ) | |
| | ) | **Case No.:  5:15-cv-04958-DDC-KGS** |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| | ) | |
| **PINNACLE BANK, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## SECOND AMENDED COMPLAINT

Rezac Livestock Commission Co., Inc. ("Rezac") for its Second Amended Complaint against Defendants Pinnacle Bank and Dinsdale Bros., Inc. a/k/a Dinsdale Brothers, Inc. ("Dinsdale Bros."), states as follows:

## PARTIES

1.      Rezac is a Kansas corporation with its main office in St. Marys, Kansas.

2.      Defendant Pinnacle Bank is a banking organization organized and existing under the law of the state of Nebraska.

3.      Defendant Dinsdale Bros. is a Nebraska corporation, and may be served through its president and agent, Chris Dinsdale at 219 S. 3rd St., Sterling, CO 80751.

4.      Although not a party to this action, Charles D. Leonard d/b/a Leonard Cattle Company ("Leonard") is an individual who is a disclosed agent of Dinsdale Bros.

## JURISDICTION AND VENUE

5.      Defendant Pinnacle Bank is authorized to and does in fact conduct business in the state of Kansas.

6.      Defendant Dinsdale Bros. entered into a sales transaction with a resident of Kansas, in the State of Kansas, for the purchase of approximately 668 head of cattle delivered from the State of Kansas. In the alternative, all events giving rise to the tort of conversion occurred in the State of Kansas.

7.      Venue is proper in this Court because the events giving rise to this Second Amended Complaint occurred in the State of Kansas.

<u>**GENERAL ALLEGATIONS**</u>

8.      Rezac is in the business of selling livestock at an auction in St. Marys, Kansas.

9.      Dinsdale Bros. engaged Leonard to act as its agent for purpose of purchasing livestock for and on behalf of Dinsdale Bros from Rezac's auction.

10.     On September 29, 2015, Leonard attended a livestock auction conducted by Rezac in St. Marys, Kansas, at the direction of Dinsdale Bros.

11.     Leonard disclosed himself to Rezac as having a large order from  Dinsdale Bros.

12.     Leonard had previously purchased livestock from Rezac for and on behalf of Dinsdale Bros., and Rezac knew of Dinsdale Bros.

13.     Dinsdale Bros. instructed Leonard to purchase no steers over 900 lbs. and no heifers over 800 lbs., but to otherwise purchase cattle for Dinsdale Bros.

14.     At the Rezac auction, Leonard purchased 10 loads, which is 668 head of cattle, for and on behalf of Dinsdale Bros. for $980,361.45 (the "Livestock").

15.     Leonard presented Rezac with a check for the $980,361.45 purchase price drawn on Pinnacle Bank.

16.     Leonard was a longtime banking customer of Pinnacle Bank.

17.     Leonard held a checking account at Pinnacle Bank.

18.     Pinnacle Bank provided business loans to Leonard.

19.     At the time of the September 29 auction, Leonard was indebted to Pinnacle Bank.

20.     Pinnacle Bank is owned by the Dinsdale family.

21.     The Dinsdale family that owns Pinnacle Bank is a part of the same family that owns Dinsdale Bros.

22.     Leonard advised Rezac that Dinsdale Bros. directed the Livestock to be delivered to Dinsdale Bros. at D & D Feed Yard, located at 26819 Cty Rd. 67.5, Iliff, CO 80736, and the OTR Feedlot, located in Proctor, Colorado.

23.     Leonard and Rezac arranged for the Livestock to be delivered to Dinsdale Bros. as directed.

24.     Because of the overlapping ownership ties between Dinsdale Bros, and Pinnacle Bank, Dinsdale Bros. knew Leonard was indebted to Pinnacle Bank at the time of the auction and that Leonard was behind in repaying his debts to Pinnacle Bank.

25.     In September and October, 2015, Dinsdale Bros. and Pinnacle Bank communicated about the overdue and overdrawn status of Leonard's accounts at Pinnacle Bank.

26.     Pinnacle Bank advised Dinsdale Bros. that Pinnacle Bank had been advancing funds to Leonard and covering insufficient checks to pay for Leonard's purchases of cattle.

27.     In fact, Dinsdale Bros.' bookkeeper and Chris Dinsdale had discussed that any payments for cattle purchased through Leonard would require payment directly to the sale barn (in this case Rezac).

28.     After directing Leonard to Rezac's auction for the purpose of purchasing the Livestock, and after Dinsdale Bros. directed the purchase and delivery of the Livestock costing

$980,361.45, Dinsdale Bros. did not pay the sale barn directly, as it knew it should, and instead wired the money to Pinnacle Bank.

29.     Prior to wiring the funds to Pinnacle Bank, Dinsdale Bros. and Pinnacle Bank communicated and specifically discussed the timing of the wire to correspond with Rezac's presentation of Leonard's check to Pinnacle Bank because both Dinsdale Bros. and Pinnacle Bank acknowledged that the wired funds were for the purchase of the Livestock bought for the benefit of Dinsdale Bros.

30.     On or about October 1, 2015, Dinsdale Bros. wired the funds to purchase the Livestock to Pinnacle Bank.

31.     As a result of the common ownership shared by Pinnacle Bank and Dinsdale Bros., and their prior communications, Pinnacle Bank knew the funds wired to Pinnacle Bank were Rezac's funds for the payment of the Livestock purchased by and delivered to Dinsdale Bros.

32.     Dinsdale Bros.'s wire of the funds to purchase the Livestock -- sent to Leonard in care of Pinnacle Bank -- was identified to Pinnacle Bank as originating from Dinsdale Bros.

33.     Leonard advised Spencer Kimball (Market President at Pinnacle Bank's branch in Gretna, Nebraska) that Dinsdale Bros. would be wiring the funds to Pinnacle Bank to cover the check presented to Rezac.

34.     Kimball advised Leonard that he talked to Roy Dinsdale, Chairman of Pinnacle Bank, who knew that Leonard had purchased the Livestock in St. Marys for Dinsdale Bros. and that Dinsdale Bros. would be wiring funds constituting the sale proceeds to Pinnacle Bank for payment to Rezac.

35.     Despite the fact that Pinnacle Bank, and Roy Dinsdale, knew the funds delivered to the Bank from Dinsdale Bros. belonged to Rezac, Pinnacle Bank refused to deliver the funds to Rezac upon Rezac's presentment of the check for said funds.

36.     Rezac twice attempted to claim the funds belonging to Rezac for payment of the Livestock from Pinnacle Bank, but Pinnacle Bank refused to release the funds to Rezac.

37.     Rezac attempted to reclaim the livestock and demanded Dinsdale Bros. return the Livestock for lack of payment.

38.     Dinsdale Bros. refused and continues to refuse to return the Livestock to Rezac or pay Rezac for the livestock.

39.     Pinnacle Bank refused and continues to refuse to release the funds to pay for the Livestock.

40.     Dinsdale Bros. obtained almost a million dollars' worth of cattle from Rezac, and Pinnacle Bank received almost a million dollar reduction of the credit it had extended to Leonard because they received the cattle and the cash, without the intent to pay for the Livestock.

41.     In late September, early October, 2015, Leonard owed Pinnacle Bank in excess of a $1 million in outstanding loans and overdrawn accounts.

42.     In early October, 2015, Pinnacle Bank took action to recover, or at least reduce, its losses caused by Leonard's debt owed to Pinnacle Bank.

43.     Pinnacle Bank applied and setoff funds in Leonard's accounts to outstanding credits and overdrafts Pinnacle Bank had allowed Leonard to obtain over several months.

44.     Pinnacle Bank closed Leonard's account and set off the funds in the account against debts Leonard owed to Pinnacle Bank.

45.     The funds set off by Pinnacle Bank included the funds wired by Dinsdale Bros. for the express purpose of paying for the Livestock delivered from the Rezac sale barn.

## COUNT I – BREACH OF CONTRACT AGAINST DINSDALE BROS.

46.     Rezac incorporates by reference the foregoing paragraphs above as though fully set forth herein.

47.     In consideration of the Livestock, Dinsdale Bros., through its agent Leonard, agreed to pay Rezac $980,361.45.

48.     Dinsdale Bros. is in breach of its obligation to pay Rezac for the Livestock.

49.     Despite demand, Dinsdale Bros. has not paid Rezac.

50.     Rezac has been damaged by Dinsdale Bros. failure to pay for the Livestock.

WHEREFORE Plaintiff Rezac Livestock Commission Co., Inc. prays for a monetary judgment against Dinsdale Bros., Inc. a/k/a Dinsdale Brothers, Inc. in the amount of $980,361.45 as of September 29, 2015, plus pre-judgment interest until judgment, attorney's fees and other costs and expenses, plus post-judgment interest at the maximum rate provided by law, and for such other and further relief as the Court deems just and proper.

## COUNT II - CONVERSION AGAINST DINSDALE BROS.

51.     Rezac incorporates by reference the foregoing paragraphs above as though fully set forth herein.

52.     Defendant Dinsdale Bros. exercised unauthorized control of the Livestock without paying Rezac.

53.     The Livestock has a value of at least $980,361.45 as of September 29, 2015.

54.     Rezac was entitled to immediate possession of the Livestock as rightful owner, but Dinsdale Bros. took the Livestock of its own use in disregard of Rezac's rights.

55.     Dinsdale Bros. has, despite demands from Rezac, failed and refused to give up possession and deliver the Livestock to Rezac or pay for its value.

56.     Dinsdale Bros.'s failure to deliver possession of the Livestock to Rezac or to pay Rezac for the Livestock constitutes conversion.

57.     Rezac has been damaged in the amount of at least $980,361.45 as of September 29, 2015, as a direct and proximate result of Dinsdale Bros.'s conversion.

58.     Dinsdale Bros.'s conversion of Rezac's Livestock was willful, wanton and purposefully done for the purpose of enriching Dinsdale Bros. at the expense of Rezac, with full knowledge that the actions were improper.

WHEREFORE, Plaintiff Rezac Livestock Commission Co., Inc. respectfully prays for judgment against Dinsdale Bros., Inc. a/k/a Dinsdale Brothers, Inc. for fair and reasonable actual damages caused by the Dinsdale Bros.'s conversion of the Livestock, for pre-judgment and post-judgment interest, for its costs and expenses, including reasonable attorney's fees and legal expenses incurred herein, for punitive damages as necessary to punish them for their willful, wanton and intentional misconduct, and for such other and further relief as the Court deems just and appropriate.

## COUNT III -- CLAIM FOR QUANTUM MERUIT AGAINST DINSDALE BROS.

59.     Rezac incorporates by reference the foregoing paragraphs above as though fully set forth herein.

60.     Dinsdale Bros. intentionally sent Leonard to St. Marys, Kansas, to purchase the Livestock on Dinsdale Bros.'s behalf.

61.     Rezac, knowing that Leonard purchased the Livestock for the benefit of Dinsdale Bros., released possession of the Livestock to Dinsdale Bros.

62.     Dinsdale Bros. accepted delivery of the Livestock, knowing that payment for the Livestock was due to Rezac.

63.     Dinsdale Bros. had previously determined that payments for cattle purchased for Dinsdale Bros. by Leonard should be made directly to the sale barn from which they were purchased (in this case Rezac).  This is because they knew by virtue of information gained from their inside relationships at Pinnacle Bank that Leonard was experiencing financial difficulty.

64.     Rather than pay the sale barn directly as Dinsdale Bros. knew it should, Dinsdale Bros. instead wired the money to Pinnacle Bank.

65.     At the time Dinsdale Bros. wired the money, Dinsdale Bros. knew Pinnacle Bank would offset the funds and apply the funds to debts and overdrafts that Leonard owed Pinnacle Bank.

66.     The net result of the coordinated action between Dinsdale Bros. and Pinnacle Bank was that Dinsdale Bros. received the Livestock, and that Pinnacle Bank had its undersecured debt to Leonard reduced by the payment of almost one million dollars for cattle that both Pinnacle Bank and Dinsdale Bros. had previously internally conceded was owed to Rezac.

67.     Dinsdale Bros. accepted delivery of and retained the Livestock under circumstances by which it knew that Rezac would not be paid for the Livestock, even though Dinsdale Bros. had previously decided to make payments directly to the sale barn for cattle it commissioned from Leonard.

68.     It is not equitable for Dinsdale Bros. to retain the benefit of the Livestock under these circumstances.

69.     Dinsdale Bros.'s actions were willful, wanton and purposefully done for the purpose of enriching itself at the expense of Rezac, with full knowledge that the actions were improper.

WHEREFORE, Plaintiff Rezac Livestock Commission Co., Inc. respectfully prays for judgment against Defendant Dinsdale Bros. for fair and reasonable actual damages caused by the actions of Dinsdale Bros. by virtue of its retention of the Livestock without payment to the rightful party, Rezac, for pre-judgment and post-judgment interest, for its costs and expenses, including reasonable attorney's fees and legal expenses incurred herein, for punitive damages as necessary to punish it for willful, wanton and intentional misconduct, and for such other and further relief as the Court deems just and appropriate.

## COUNT IV - CONVERSION AGAINST PINNACLE BANK

70.     Rezac incorporates by reference the foregoing paragraphs above as though fully set forth herein.

71.     Defendant Pinnacle Bank is in possession of at least $980,361.45 representing traceable proceeds of the sale of the Livestock.

72.     Defendant Pinnacle Bank at all times has known the funds wired into its bank by Dinsdale Bros. on October 1, 2015, belonged to Rezac for the purchase of the Livestock by Dinsdale Bros.

73.     After the wire was received, Pinnacle Bank closed the Leonard account and applied and set off the funds in the account, including the wire intended to pay Rezac, against the indebtedness that Leonard owed to Pinnacle Bank.

74.     Rezac is entitled to the sale proceeds so held by Pinnacle Bank.

75.     Pinnacle Bank, despite demands from Rezac, has failed and refused to deliver the sale proceeds to the rightful owner, Rezac.

76.     Pinnacle Bank seized the funds in Leonard's account that were identified for the purchase of the Livestock from the Rezac auction and applied and set them off against debts that Leonard owed to Pinnacle Bank.

77.     Pinnacle Bank's failure to deliver the sale proceeds to Rezac constitutes conversion.

78.     Rezac has been damaged in the amount of at least $980,361.45, as a direct and proximate result of Pinnacle Bank's conversion.

79.     The attempt by Dinsdale Bros. to coordinate with Pinnacle Bank the timing of the wire to correspond with the presentation of the check from Rezac is evidence that both knew that the funds were designated for the payment of Rezac.

80.     Pinnacle Bank's improper setoff and conversion of Rezac's funds was willful, wanton and purposefully done for the purpose of enriching Pinnacle at the expense of Rezac, with full knowledge that the actions were improper.

WHEREFORE, Plaintiff Rezac Livestock Commission Co., Inc. respectfully prays for judgment against Defendant Pinnacle Bank for fair and reasonable actual damages caused by Pinnacle Bank's conversion of Rezac's sale proceeds, for pre-judgment and post-judgment interest, for its costs and expenses, including reasonable attorney's fees and legal expenses incurred herein, for punitive damages as necessary to punish them for their willful, wanton and intentional misconduct, and for such other and further relief as the Court deems just and appropriate.

## COUNT V -- CLAIM FOR UNJUST ENRICHMENT
## AGAINST PINNACLE BANK AND DINSDALE BROS.

81.     Rezac incorporates by reference the foregoing paragraphs above as though fully set forth herein.

82.     Rezac, knowing that Leonard purchased the Livestock for the benefit of Dinsdale Bros. released possession of the Livestock to Dinsdale Bros.

83.     Dinsdale Bros. accepted delivery of the Livestock, knowing that payment for the Livestock was due to Rezac.

84.     Dinsdale Bros. had previously determined that payments for cattle purchased for Dinsdale Bros. by Leonard should be made directly to the sale barn from which they were purchased (in this case Rezac).  This is because they knew by virtue of information gained from their inside relationships at Pinnacle Bank that Leonard was experiencing financial difficulty.

85.     Senior officers at Pinnacle Bank and those responsible for the Leonard banking relationship with Pinnacle Bank knew that Leonard was purchasing the Livestock from Rezac for the benefit of Dinsdale Bros.

86.     Those same officers and responsible parties discussed the wire that was to be made for the Dinsdale Bros. Livestock before the wire was sent to Pinnacle Bank.

87.     A Pinnacle Bank officer asked Chris Dinsdale of Dinsdale Bros. if Dinsdale wanted to wire the money to Pinnacle Bank or to the sale barn (Rezac) directly.

88.     Rather than pay the sale barn directly as Dinsdale Bros. had previously decided, Dinsdale Bros. instead wired the money to Pinnacle Bank.

89.     Subsequently, Pinnacle Bank offset the funds wired from Dinsdale Bros. and applied them to debts and overdrafts that Leonard owed Pinnacle Bank.

90.     The net result of the coordinated action between Dinsdale Bros. and Pinnacle Bank was that Dinsdale Bros. received the Livestock, and that Pinnacle Bank had its undersecured debt to Leonard reduced by the payment of almost one million dollars for cattle that both Pinnacle Bank and Dinsdale Bros. had previously internally conceded was owed to Rezac.

91.     Pinnacle Bank accepted the benefit of the funds that it knew were owed to Rezac.

92.     Dinsdale Bros. accepted delivery of and retained the Livestock under circumstances by which it knew that Rezac would not be paid for the Livestock, even though Dinsdale Bros. had previously decided to make payments directly to the sale barn for cattle it commissioned from Leonard.

93.     It is not equitable for Dinsdale Bros. and Pinnacle Bank to retain the benefit of the Livestock and payment due Rezac under these circumstances.

94.     Pinnacle Bank's and Dinsdale Bros.'s actions were willful, wanton and purposefully done for the purpose of enriching themselves at the expense of Rezac, with full knowledge that the actions were improper.

WHEREFORE, Plaintiff Rezac Livestock Commission Co., Inc. respectfully prays for judgment against Defendant Pinnacle Bank and Dinsdale Bros. for fair and reasonable actual damages caused by the unjust enrichment  of  Pinnacle Bank and Dinsdale Bros. by virtue of their retention of the cattle and the payment due for the cattle, for pre-judgment and post-judgment interest, for its costs and expenses, including reasonable attorney's fees and legal expenses incurred herein, for punitive damages as necessary to punish them for their willful, wanton and intentional misconduct, and for such other and further relief as the Court deems just and appropriate.

<u>COUNT VI - CIVIL CONSPIRACY AGAINST</u>
<u>PINNACLE BANK AND DINSDALE BROS</u>

95.     Rezac incorporates by reference the foregoing paragraphs above as though fully set forth herein.

96.     Dinsdale Bros. and Pinnacle Bank coordinated together to wire the payment due to Rezac into the Leonard account at Pinnacle Bank instead of making payment to Rezac directly, as Dinsdale Bros. had previously recognized was necessary to see that the sale barns received payment.

97.     Officers and owners of Dinsdale Bros. and Pinnacle Bank coordinated timing and reached a meeting of the minds as to when the payment would be sent to Leonard's account at Pinnacle Bank.

98.     Upon information and belief, Dinsdale Bros. knew at the time the wire was sent to Pinnacle Bank that it would not return the Livestock if payment was not made to Rezac.

99.     Upon information and belief, Pinnacle Bank knew at the time the wire was sent that it would not allow the funds to reach Rezac.

100.    After the wire was received, Pinnacle Bank closed the Leonard account and applied and set off the funds in the account, including the wire intended to pay Rezac, against the indebtedness that Leonard owed to Pinnacle Bank.

101.    As a result of the civil conspiracy between Dinsdale Bros. and Pinnacle Bank, Rezac was damaged.

102.    Pinnacle Bank's and Dinsdale Bros.'s actions were willful, wanton and purposefully done for the purpose of enriching themselves at the expense of Rezac, with full knowledge and appreciation that the actions were improper.

KC01DOCS\1230969.4

WHEREFORE, Plaintiff Rezac Livestock Commission Co., Inc. respectfully prays for judgment against Defendant Pinnacle Bank and Dinsdale Bros. for fair and reasonable actual damages caused by their civil conspiracy to convert, misappropriate, and inequitably retain amounts due Rezac, and for pre-judgment and post-judgment interest, for its costs and expenses, including reasonable attorney's fees and legal expenses incurred herein, for punitive damages as necessary to punish them for their willful, wanton and intentional misconduct, and for such other and further relief as the Court deems just and appropriate.

Respectfully Submitted,

**BRYAN CAVE LLP**

By: ____/s/ Michelle M. Masoner_____
        Robert M. Thompson        KS #14673
        Michelle M. Masoner        KS #18424
        Stephanie C. Bradshaw      KS #26716
        1200 Main Street, Suite 3800
        Kansas City, Missouri 64105
        Telephone:      (816) 374-3200
        Facsimile:      (816) 374-3300
        rmthompson@bryancave.com
        michelle.masoner@bryancave.com
        stephanie.bradshaw@bryancave.com

ATTORNEYS FOR
REZAC LIVESTOCK COMMISSION CO., INC.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was served via the Court's Electronic Case Filing System, which served all counsel of record, on January 23, 2017.

/s/ Michelle M. Masoner_____
Attorney for Plaintiff