# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

REZAC LIVESTOCK COMMISSION
COMPANY, INC.,

      **Plaintiff,**

v.

PINNACLE BANK and
DINSDALE BROS., INC.,

      **Defendants.**

**Case No. 15-cv-04958-DDC-KGS**

## MEMORANDUM AND ORDER

Plaintiff Rezac Livestock Commission Company, Inc. accuses defendant Dinsdale Bros., Inc. of being a modern-day cattle rustler and also accuses defendant Pinnacle Bank of serving as Dinsdale's accomplice. Doc. 46. Plaintiff contends that it sold Dinsdale nearly $1 million worth of cattle in September 2015 but Dinsdale has never paid for them. So, trying to recover the money, plaintiff makes three claims against Dinsdale (breach of contract, conversion, and quantum meruit), one claim against Pinnacle Bank (conversion), and two claims against Dinsdale and Pinnacle Bank together (unjust enrichment and civil conspiracy).

Dinsdale has filed a Motion to Dismiss Second Amended Complaint seeking to extricate itself from this litigation entirely. Dinsdale's Motion argues that plaintiff's Second Amended Complaint states no claim against it and so the court should dismiss it under Federal Rule of Civil Procedure 12(b)(6). Doc. 48. After carefully reviewing the parties' submissions, the court denies Dinsdale's motion.

# I.       Background

Because Dinsdale brings its motion under Rule 12(b)(6), plaintiff's Second Amended Complaint ("Complaint") supplies the governing facts and the court must accept those facts as true.[1] *See S.E.C. v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014).

Plaintiff Rezac Livestock Commission Company, Inc. is a Kansas corporation that sells cattle in St. Marys, Kansas.[2] On September 29, 2015, a man named Charles D. Leonard attended one of plaintiff's livestock auctions at Dinsdale's direction. Dinsdale is a Nebraska corporation who buys and sells cattle. At the auction, Mr. Leonard told plaintiff that Dinsdale had sent him to the auction to fill a large order of cattle for Dinsdale. This was not uncommon for Mr. Leonard. He had purchased livestock from plaintiff on behalf of Dinsdale in the past—a fact that plaintiff knew well. For this auction, Dinsdale had given Mr. Leonard specific instructions about what cattle to purchase: "no steers over 900 lbs. and no heifers over 800 lbs." Doc. 46 ¶ 13. Mr. Leonard did as Dinsdale asked, purchasing 668 head of cattle for Dinsdale from plaintiff for a total cost of $980,361.45. Mr. Leonard wrote plaintiff a check for the full purchase price, drawn on Pinnacle Bank. He then told plaintiff that Dinsdale wanted the cattle shipped directly to two Colorado feedlots. Plaintiff complied and shipped the cattle to Colorado.

Around October 1, 2015—after plaintiff had shipped the cattle—Dinsdale wired funds to Pinnacle Bank to cover Mr. Leonard's check. But before Dinsdale wired the funds, it communicated with Pinnacle Bank about Mr. Leonard's financial status. Mr. Leonard owed Pinnacle Bank more than $1 million when he wrote plaintiff that $980,361.45 check. And Dinsdale knew it, because the same family owns Dinsdale and Pinnacle Bank. Plaintiff alleges

---

[1] Dinsdale attaches several documents to its Motion to Dismiss, and the court addresses, below, whether it can consider those documents in its analysis. The facts in this section do not draw from the attached documents.

[2] The court uses no apostrophe in St. Marys because the city itself does not use one.

that this common ownership gave Dinsdale access to information about Mr. Leonard's financial situation that it otherwise might not have had. *See id.* ¶ 24. Indeed, when the auction occurred, Dinsdale knew that Mr. Leonard was behind in repaying his debt to Pinnacle Bank. And, because of this knowledge, Dinsdale's bookkeeper had been told "that any payments for cattle purchased through [Mr.] Leonard would require payment directly to the sale barn," here, plaintiff. *Id.* ¶ 27. But Dinsdale did not pay plaintiff directly. Instead, Dinsdale decided to wire the funds to Pinnacle Bank—after Dinsdale and Pinnacle Bank "specifically discussed . . . timing . . . the wire to correspond with [plaintiff's] presentation of [Mr.] Leonard's check to Pinnacle Bank." *Id.* ¶ 29.

When Pinnacle Bank received Dinsdale's wire to Mr. Leonard's account, it "closed [Mr.] Leonard's account and set off the funds in the account against debts [that Mr.] Leonard owed to Pinnacle Bank." *Id.* ¶ 44. As a result, when plaintiff presented Mr. Leonard's check to Pinnacle Bank, his account had no money left in it to pay plaintiff. Plaintiff tried to cash Mr. Leonard's check twice, but both times Pinnacle Bank "refused to release the funds." *Id.* ¶ 36. Because no one had paid plaintiff for the cattle, it "attempted to reclaim the livestock and demanded [that] Dinsdale" return the cattle "for lack of payment." *Id.* ¶ 37. Dinsdale declined. In response, plaintiff filed this lawsuit on September 29, 2015, trying to recover the more than $900,000 that it claims Dinsdale still owes for the 668 head of cattle Mr. Leonard purchased.

On February 3, 2017, Dinsdale filed its Motion to Dismiss, arguing that plaintiff's Complaint fails to state a claim against it and thus should be dismissed under Federal Rule of Civil Procedure 12(b)(6). Doc. 48. The court considers Dinsdale's Motion to Dismiss under the legal standard outlined in the following section.

## II.  Rule 12(b)(6) Legal Standard

Rule 8(a)(2) provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Although this Rule "does not require 'detailed factual allegations,'" it demands more than "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "Under this standard, 'the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims.'"  *Carter v. United States*, 667 F. Supp. 2d 1259, 1262 (D. Kan. 2009) (quoting *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007)).

On a motion to dismiss like this one, the court assumes the complaint's factual allegations are true, but need not accept mere legal conclusions as true.  *Id.* at 1263.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are not enough to state a claim for relief.  *Iqbal*, 556 U.S. at 678.

## III.  Analysis

Dinsdale asks the court to dismiss all five of plaintiff's claims against it because they fail to state a claim.  The court considers each claim, separately, below.

### A.    Count I:  Breach of Contract

In count one, plaintiff asserts a breach of contract claim against Dinsdale.  But plaintiff never alleges that Dinsdale made any contract with it.  Instead, plaintiff alleges that a sale contract existed between plaintiff and Mr. Leonard, in which Mr. Leonard agreed to pay plaintiff $980,361.45 in exchange for 668 head of cattle.[3]  Plaintiff alleges that Dinsdale is bound to this contract just as if it were a party because Mr. Leonard had authority as Dinsdale's agent to enter into the sale contract on Dinsdale's behalf.  Finally, plaintiff alleges that Dinsdale has breached this contract by failing to pay for the cattle.

For its part in this controversy, Dinsdale contends that count one states no breach of contract claim.  It advances three arguments to support this position:  (1) plaintiff "lacks the contractual privity necessary to maintain a breach of contract claim against" Dinsdale; (2) "the statute of frauds bars the contract" that plaintiff alleges between it and Dinsdale; and (3) the Complaint "contains no indication of an agency relationship" between Dinsdale and Mr. Leonard.  Doc. 49 at 5, 9.

Dinsdale's privity and statute of fraud arguments rely on its agency argument.  In its privity and statute of fraud arguments, Dinsdale contends that plaintiff, to state a claim, must allege that a written contract exists, and that plaintiff and Dinsdale both signed the contract.  Dinsdale then characterizes the Complaint as alleging only two contracts:  one between Dinsdale and Mr. Leonard and one between Mr. Leonard and plaintiff.  But plaintiff can allege a contract exists between it and Dinsdale under an agency theory.  That is, if plaintiff alleges that Mr. Leonard acted as Dinsdale's agent and that he had authority to purchase the cattle on Dinsdale's behalf, then plaintiff need not allege a contract signed by plaintiff and Dinsdale.  Under that

---

[3] Plaintiff does not appear to allege the existence of a written contract containing the agreement's terms.  Instead, the Complaint's allegations reference Mr. Leonard's check to plaintiff but allege no other writing memorializing the purported sale agreement.

theory, such a contract would bind Dinsdale to the contract it admits exists between Mr. Leonard and plaintiff because "[a] contract executed by an authorized agent in his own name, but in fact in behalf of his principal, is the contract of the principal, and suit may be brought against him to enforce its provisions." *C. A. Karlan Furniture Co. v. Richardson*, 324 P.2d 180, 183 (Kan. 1958) (quoting *Edwards v. Gildemeister*, 59 P. 259, Syl. ¶ 2 (Kan. 1899)). So, if plaintiff has alleged that Mr. Leonard acted as Dinsdale's authorized agent for the purpose of buying the cattle, all three of Dinsdale's arguments against plaintiff's breach of contract claim would fail. The court thus begins its analysis with Dinsdale's agency argument.

Because this is a diversity case, the court "appl[ies] the substantive law of the forum state, including its choice of law rules." *Pepsi-Cola Bottling Co. of Pittsburgh, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005) (citations omitted). Here, Kansas is the forum state and the parties never contest the state law that should apply. Both party's papers rely on Kansas law. Because the parties have made the deliberate choice to rely on Kansas law, the court applies Kansas law throughout this Memorandum and Order, and the parties have waived any argument that some other state's law applies to this motion. *See Dr Pepper Co. v. Adams Inv. Co.*, 940 F.2d 1538, 1991 WL 148876, at *1 (10th Cir. 1991) (finding that the parties had waived a choice-of-law argument when both relied upon Texas law in their briefs); *McCammond v. Schwan's Home Serv., Inc.*, 791 F. Supp. 2d 1010, 1012 n.1 (D. Colo. 2011) ("The Court notes that the Motion was briefed pursuant to Colorado law and, at the hearing on the Motion, neither party argued that Minnesota law applies to this issue. Accordingly, any right to assert Minnesota law was arguably waived by the parties." (citing *Air Liquide Am. Corp. v. Cont'l Cas. Co.*, 217 F.3d 1272, 1275 n.2 (10th Cir. 2000))).

So, the court looks to Kansas agency law to settle the parties' dispute whether plaintiff has alleged facts sufficient to show that Dinsdale is bound to the sale contract between plaintiff and Mr. Leonard. But applying Kansas law is more difficult than one might anticipate. The difficulty arises from the murky state of Kansas agency law, a topic the Kansas Supreme Court has wrestled with recently. *Golden Rule Ins. Co. v. Tomlinson*, 335 P.3d 1178, 1187 (Kan. 2014).

In *Golden Rule Insurance Co. v. Tomlinson*, the Kansas Supreme Court set out "to improve upon the clarity of Kansas agency law," which, the court explained had been murky for years. *Id.* This lack of clarity arose from the existence of "some historical imprecision in Kansas agency law." *Id.* To explain this imprecision, the court must digress from its discussion of *Golden Rule* and briefly provide some background about general, common law agency law principles.

For many years, courts and commentators across the country have treated the questions whether a principal-agent relationship exists and whether an agent has authority to act as two separate questions.[4] As a consequence, they have utilized a two-step process to determine whether an alleged principal is liable for a contract signed by her alleged agent.[5] In step one,

---

[4] *See, e.g.*, Restatement (First) of Agency §§ 1, 8, 140 & cmt. a (Am. Law Inst. 1933), Westlaw (database updated Mar. 2017) (defining "agency" and "authority" as separate concepts and explaining that a principal is only liable for the contracts of her agent if the agent is authorized); *Villalpando v. Denver Health & Hosp. Auth.*, 181 P.3d 357, 362–63 (Colo. App. 2007) (referring to agency and authority as separate ideas, though referring to the agency relationship as one "based on" a particular type of authority); *Martin Fuel Distribs., Inc. v. Trans Gulf Fuel, Inc.*, 496 So.2d 473, 476 (La. Ct. App. 1986) (discussing agency and authority as separate ideas). *See also infra* note 5.

[5] *See, e.g.*, Ronald C. Wyse, *A Framework Analysis for the Law of Agency*, 40 Mont. L. Rev. 31, 33, 47–48 (1979) (explaining that "the initial step of any agency analysis must be to inquire if an agency relationship exists between the . . . person who entered into the contractual relationship and the putative principal," and then, once establishing that such a relationship exists, asking whether the agent was authorized to enter into the contract on the principal's behalf); Allan H. Fisher et al., *Essentials of Maryland Pleading* 142 (2d ed., 1922) ("There are two steps in the proof necessary if the plaintiff desires to hold the principal liable: first, the plaintiff must prove agency . . . ; second, that the act was within the scope of the agent's express, implied, or apparent authority."); *Time Warner City Cable v. Adelphi Univ.*, 27 A.D.3d 551, 552–53 (N.Y. App. Div. 2006) (holding that evidence created a question of fact about

courts ask whether an agency relationship exists.  *E.g.*, *Koricic v. Beverly Enters.-Neb., Inc.*, 773 N.W.2d 145, 150–51 (Neb. 2009).  If it does, the court moves to step two and asks whether the agent had the authority—either actual or apparent—to execute the contract at issue on the principal's behalf.  *See, e.g.*, *id.* at 151 (holding that "an agency relationship existed between" the alleged principal and alleged agent, but that the agent's "actual authority did not extend to signing an arbitration agreement").  But for many years, Kansas courts have not explicitly divided their agency inquiry into two steps.  Instead, they have asked just one question:  Did the alleged agent have one of the "two types of agency" recognized by the courts, "one actual and the other ostensible or apparent?"  *Greep v. Burns*, 159 P.2d 803, 808 (Kan. 1945) (citations omitted); *accord In re Scholastic Book Clubs, Inc.*, 920 P.2d 947, 954 (Kan. 1996); *Mohr v. State Bank of Stanley*, 734 P.2d 1071, 1075 (Kan. 1987).  Asking just this one question led to the historical impression that the Kansas Supreme Court set out to clarify in *Golden Rule*.  *See Golden Rule*, 335 P.3d at 1189 (explaining the difference between common law agency principles and Kansas agency law as arising from the fact that present-day Kansas case law has its "genesis in much older caselaw, which in turn relied on then current statements of agency law made in various treatises" (first citing *Greep*, 159 P.2d at 807–09; further citations omitted).

Before it began its analysis, *Golden Rule* explained that the court must ask and answer two questions to determine whether the alleged agent could bind the alleged principal to a contract.  *Id.* at 1186–87.  Those two questions were:  (1) "whether the evidence . . . supported the existence of an agency relationship between [the plaintiff] as principal and [the alleged agent] as agent" and (2) "whether [the agent's] acts were within the scope of his authority as agent or

---

whether a principal-agent relationship existed and a separate question of fact whether the agent "had actual, implied, or apparent authority to obligate" the principal to purchase airtime).

were otherwise binding on" the principal. *Id.* So, before the court even began its analysis in *Golden Rule*, it had signaled an intent to adopt the two-step process.

The court then reviewed the general common law agency principles enshrined in the Third Restatement of Agency and explained that those principles require "any agency analysis [to] begin[] by first identifying whether a principal-agent relationship exists and, if so, determining the nature and scope of the agent's authority." *Id.* at 1189. The court then reviewed Kansas's common law agency principles, arguing that "Kansas caselaw has been consistent with the general common law agency principles . . . in substance if not always in form." *Id.* The court explained that the most "notable difference between Kansas cases and the Restatements" was Kansas's "focus on 'types of agencies' rather than types of authority." *Id.* The court dismissed this difference as one consisting merely of "terminology" caused by the fact that present-day Kansas case law has its "genesis in much older caselaw, which in turn relied on then current statements of agency law made in various treatises." *Id.* (citations omitted). Then the court went on to employ the Restatement's two-step process, *id.* at 1193–95, but never explicitly replaced Kansas's previous one-step inquiry with that process.

Still, the court is convinced that the Kansas Supreme Court, by favorably discussing the Third Restatement of Agency and structuring its analysis on the principles recited in that Restatement, intended to adopt the Restatement's two-step process. The court thus employs this two-step process, and considers Kansas case law discussing "types of agencies" where they are applicable within this two-step framework. This means the court must ask two questions here: (1) Has plaintiff alleged facts sufficient to support a plausible inference that Mr. Leonard and Dinsdale had a principal-agent relationship when Mr. Leonard purchased the 668 cattle from plaintiff?; and, if so, (2) Has plaintiff alleged facts sufficient to support a plausible inference that

Mr. Leonard acted within the scope of his authority as Dinsdale's agent when he purchased the 668 cattle from plaintiff?

### 1.    *Principal-Agent Relationship*

In *Golden Rule*, the Kansas Supreme Court explained that a principal-agent relationship (also referred to as an agency relationship) is created "when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."  335 P.3d at 1188 (quoting Restatement (Third) of Agency § 1.01 (Am. Law Inst. 2005)).  And, a principal-agent relationship cannot exist unless the agent acts for the principal's benefit.  *See Merchant v. Foreman*, 322 P.2d 740, 745 (Kan. 1958) (explaining the duties of an agent to a principal, which require an agent "to act with the utmost good faith and loyalty for the furtherance and advancement of the interests of his principal" (citations omitted)); 2A C.J.S. *Agency* § 5, Westlaw (database updated Apr. 11, 2017) ("[T]here are three elements that are integral to an agency relationship:  the agent is subject to the principal's right of control; the agent has a duty to act, as a fiduciary, primarily for the benefit of the principal; and the agent holds the power to alter the legal relations of the principal."  (footnote omitted)).  So, a principal-agent relationship has three components:  assent by both parties, benefit to the principal, and control by the principal.

Dinsdale contends that plaintiff has not alleged a principal-agent relationship between Dinsdale and Mr. Leonard for several reasons, all of which the court considers in the coming pages.  But one of Dinsdale's arguments transcends the three elements of a principal-agent relationship, so the court begins with it.  In this argument, Dinsdale attacks plaintiff's allegations of agency broadly, asserting that, "[i]n its entirety, the [Complaint] makes only three allegations

(¶¶ 4, 9, 47) that Leonard was Dinsdale Bros.' agent," and that "[n]one of these allegations are entitled to any deference or special treatment, especially since each such allegation is bald and conclusory, with no supporting facts." Doc. 49 at 6. To put it plainly, Dinsdale contends that plaintiff alleges no facts supporting its agency theory. This contention does not fairly portray plaintiff's Complaint. Although Dinsdale is correct that paragraphs 4, 9, and 47 of the Complaint allege legal conclusions—*i.e.*, that Mr. Leonard was Dinsdale's agent—and so need not be accepted as true, Dinsdale's argument ignores the rest of plaintiff's Complaint. In doing so, Dinsdale ignores many factual allegations that support plaintiff's legal conclusion of agency. The court thus disregards the allegations in paragraphs 4, 9, and 47 of the Complaint, but does consider whether plaintiff's factual allegations—if true—could support the elements of a principal-agent relationship. This analysis begins with the requisite assent.

<u>a.</u>    <u>Assent</u>

In *Golden Rule*, the Kansas Supreme Court explained that parties can manifest their assent to create a principal-agent relationship "through written or spoken words or other conduct." 335 P.3d at 1188 (quoting Restatement (Third) of Agency § 1.03). So, "[a] principal's manifestation of assent to an agency relationship may be informal, implicit, and nonspecific." Restatement (Third) of Agency § 1.01 cmt. d; *see also In re Scholastic*, 920 P.2d at 955 ("While an express contract may create an agency relationship, conduct implying an agency relationship serves just as well."). But, "it is not necessary to the formation of a relationship of agency that the agent manifest assent to the principal." Restatement (Third) of Agency § 1.01 cmt. d. For example, the court may find that an alleged agent has assented to a principal-agent relationship when the principal asks the alleged agent to act on its behalf, and the

11

alleged agent "performs the service requested by the principal following the principal's manifestation." *Id.*; *accord id.* § 1.01 cmt. c.

Here, Dinsdale contends that plaintiff fails to allege facts capable of supporting a plausible inference that Dinsdale and Mr. Leonard assented to a principal-agent relationship between them. Dinsdale asserts that plaintiff "may not salvage [its] theory [of agency] by claiming [plaintiff] assumed an agency relationship existed, or that [Mr.] Leonard acted as such, or that the circumstances made agency seem natural and probable." Doc. 49 at 8. This assertion faithfully summarizes Kansas law,[6] but the court finds no support for Dinsdale's characterization of plaintiff's Complaint. Instead, the court finds plaintiff's allegations sufficient to support its claim that Dinsdale and Mr. Leonard assented to a principal-agent relationship. Specifically, the Complaint alleges that Dinsdale sent Mr. Leonard to plaintiff's auction "for the purpose of purchasing livestock for and on behalf of Dinsdale," and that Mr. Leonard in fact attended the auction and purchased cattle on Dinsdale's behalf. Doc. 46 ¶¶ 9–11, 13–14. These allegations by themselves, provide a sufficient basis to support a plausible inference that Dinsdale and Mr. Leonard assented to a principal-agent relationship. *Cf. Blewett*, 8 P.2d at 358 (holding that a cattle buyer was the agent of a livestock company in part because the company "had sent him, or permitted him to go, on [the] particular trip" in question).

Nevertheless, Dinsdale seems to argue that plaintiff cannot allege assent without alleging or producing a written contract between Dinsdale and Mr. Leonard establishing Mr. Leonard's

---

[6] Kansas cases discussing "implied agencies" hold that an implied agency may not be inferred simply because a third person assumed that agency existed or because "the alleged agent assumed to act as such." *Shugar v. Antrim*, 276 P.2d 372, 375 (Kan. 1954) (citing *Greep*, 159 P.2d at 808). They also hold that an implied agency may not be inferred "from facts which show that the alleged agent was a mere instrumentality" or simply "because the conditions and circumstances were such as to make such an agency seem natural and probable, and to the advantage of the supposed principal." *Id.* (citing *Greep*, 159 P.2d at 808). Whether the court should rely on implied agency cases when it considers whether a principal-agent relationship exists or, instead, only when considering whether authority exists is a question discussed later in this Memorandum and Order. *See infra* pp. 23–24. The court need not resolve that question to assess Dinsdale's argument here.

agency.  This argument contradicts long-established principles of Kansas law:  "It is not essential

that any actual contract should subsist between the parties . . . ."  *Walker*, 251 P. at 1095 (citation

omitted); *see also In re Scholastic*, 920 P.2d at 955 ("While an express contract may create an

agency relationship, conduct implying an agency relationship serves just as well.").  The court is

not persuaded by Dinsdale's arguments and it evaluates the Complaint under the correct

statement of the substantive Kansas law governing this issue.  Plaintiff thus alleges facts that, if

proven, suffice to support an inference that Dinsdale and Mr. Leonard assented to a principal-

agent relationship.

b.        Benefit to the Principal

Dinsdale concedes that Mr. Leonard's actions at the September 29, 2015 sale were

"beneficial to Dinsdale."  Doc. 49 at 7; *see also id.* at 8–9.  By doing so, Dinsdale concedes that

plaintiff has alleged facts supporting the second element of an agency relationship.  *See id.* at 7

("Rezac asks the Court to imply Dinsdale Bros. as a party to the contract . . . because [Mr.]

Leonard's role in the contract was beneficial to Dinsdale Bros.");  *see also id.* at 9 ("Instead,

Rezac alleges a buyer-seller relationship between Dinsdale Bros. and [Mr.] Leonard . . . In

dealing with Rezac, [Mr.] Leonard acted for his own benefit and the benefit of his customer,"

Dinsdale).  Despite this concession, Dinsdale argues that plaintiff has failed to allege that Mr.

Leonard's actions were intended to benefit Dinsdale.  Dinsdale asserts two arguments trying to

support this contention.

First, Dinsdale asks the court to compare the facts of this case—such as they are at the

motion to dismiss stage—with those of *Shugar v. Antrim*, 276 P.2d 372 (Kan. 1942).  In *Shugar*,

the defendant's post-trial motion asked the Kansas Supreme Court to decide whether a principal-

agent relationship existed between a grain elevator owner, Howard Antrim, and Continental

13

Grain Company, a company who bought large amounts of grain from Antrim and had helped finance his purchase of the grain elevator. *Id.* at 374. The plaintiffs in *Shugar*—farmers who had stored their wheat at Antrim's elevator—alleged that Continental owed them for "the value of their wheat" when Antrim failed to pay them because Antrim was Continental's agent. *Id.* at 373. The court held that no principal-agent relationship existed between Antrim and Continental. *Id.* at 376. It based this holding in part on the fact that Continental's name did not appear on Antrim's checks or in the name of Antrim's business. *Id.* at 375–76. The court also relied on the fact that Antrim had not sold the plaintiffs' wheat to Continental, which showed that Antrim had acted to benefit himself, not Continental. *See id.* at 374–75.

Plaintiff's Complaint here alleges some facts similar to those in *Shugar*. But the facts alleged here and the facts of *Shugar* are not so similar that the court must dismiss plaintiff's Complaint for failing to state a claim. For instance, plaintiff alleges that the name of Mr. Leonard's company is "Leonard Cattle Company." Doc. 46 ¶ 4. So, as in *Shugar*, Dinsdale's name does not appear in the name of Mr. Leonard's company. But plaintiff also alleges that Mr. Leonard purchased the cattle at issue here specifically for Dinsdale. *Id.* ¶¶ 9–14. Thus, unlike *Shugar*, plaintiff alleges that Mr. Leonard acted to benefit Dinsdale, not himself. So far, then, the differences between *Shugar* and this case outpace their similarities.

Dinsdale tries to rally its argument on one final similarity, however. Dinsdale argues that the check Mr. Leonard used to pay plaintiff did not include Dinsdale's name, so the court should rule as a matter of law that no principal-agent relationship existed—the same outcome as *Shugar*. Doc. 49 at 9, 1; Doc. 49-1. Plaintiff has not attached the check to the Complaint, or incorporated it by reference in the Complaint. So the court may consider the check only if the Complaint's reference to the check makes it central to plaintiff's breach of contract claim and no dispute

exists about its authenticity. *See Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) (listing exceptions to the rule against looking outside the four corners of the pleadings). If not, the court may not consider the check without converting Dinsdale's motion to dismiss into one seeking summary judgment. *Id.*

The court concludes that it may not consider the check. Plaintiff bases its breach of contract claim on Dinsdale's failure to pay for 668 cattle that Mr. Leonard purchased—and not on any information contained in his check. So, yes, plaintiff's contract claim references Mr. Leonard's check but it does so only to provide context for its allegations. Because plaintiff's claim does not reference the check's terms or rest on those terms, it is not central to plaintiff's breach of contract claim. *E.g.*, *Capital Sols., LLC v. Konica Minolta Bus. Sols. USA, Inc.*, Nos. 08-2027-JWL, 08-2191-JWL, 2008 WL 3538968, at \*3 (D. Kan. Aug. 11, 2008) (finding loan documents not central to the plaintiff's claim because the plaintiff's "claims and allegations against [the defendant] [did] not rest on the terms and conditions set forth in the[] loan documents" (citing *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1385 (10th Cir. 1997))); *Chastain v. Hodgdon*, 202 F. Supp. 3d 1216, 1223 (D. Kan. 2016) (holding that a book was extrinsic evidence when attached to a motion to dismiss "despite plaintiff's mentioning of the evidence in the complaint"). Also, the court recognizes that Mr. Leonard's check may aid Dinsdale's arguments here,[7] but that does not make it central to plaintiff's claim. *See Capital Sols., LLC*, 2008 WL 3538968, at \*3 (explaining that extrinsic evidence that isn't

---

[7] Although Dinsdale does not raise the issue in this context, the court notes that Mr. Leonard's check to plaintiff may be the only writing alleged in this case that could satisfy the statute of frauds. But, that does not make the check central to plaintiff's claims—Dinsdale asserts the statute of frauds as a defense. *See Augusta Bank & Tr. v. Broomfield*, 643 P.2d 100, 106 (Kan. 1982) ("When a defendant asserts the statute of frauds as an affirmative defense, the burden of proof is on him"); *Tyler v. Johnson*, 318 P.3d 1020, 2014 WL 802322, at \*1 (Kan. Ct. App. Feb. 28, 2014) ("K.S.A. 2011 Supp. 60-208(c) includes the statute of frauds as one of the affirmative defenses that must be asserted in an answer or a reply."); *Wolfson v. Nutt*, No. 08-3190-GLR, 2010 WL 4568152, at \*3 (D. Kan. Nov. 3, 2010) (applying Kansas law and stating that "the statute of frauds is an affirmative defense under Fed. R. Civ. P. 8(c)").

central to a plaintiff's claim is not properly considered in a Rule 12(b)(6) motion even if the evidence is central to the defendant's "theories of defense"). So, Dinsdale's argument based on Mr. Leonard's check tries to take the court outside the Complaint. The court, in its discretion, declines to turn Dinsdale's motion into one for summary judgment and so it disregards Mr. Leonard's check.

In its next argument, Dinsdale contends that plaintiff's agency theory fails as a matter of law because plaintiff "alleges a buyer-seller relationship between Dinsdale Bros. and [Mr.] Leonard: Dinsdale Bros. bought cattle from [Mr.] Leonard in a distinct transaction that did not involve [plaintiff]. In dealing with [plaintiff], [Mr.] Leonard acted for his own benefit and the benefit of his customer," Dinsdale. Doc. 49 at 9. But plaintiff's Complaint does not allege that Dinsdale bought cattle from Mr. Leonard in a separate transaction. Dinsdale's argument tries to add these allegations to the Complaint.[8] The court does not consider allegations made in parties' briefs when deciding a motion to dismiss. *See Frederick v. S. Star Cent. Gas Pipeline, Inc.*, No. 10-1063-JAR, 2011 WL 1430005, at *3 (D. Kan. Apr. 14, 2011) ("[T]he [c]ourt only evaluates the sufficiency of the pleadings on a motion to dismiss, rather than the statements of the parties in their briefs."). Instead, "'the court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted' under Rule

---

[8] As part of this argument, Dinsdale directs the court to Exhibit Three, which Dinsdale attached to its Motion to Dismiss. Exhibit Three appears to be a claim from Mr. Leonard's pending bankruptcy proceedings. Doc. 49-3. Dinsdale asks the court to take judicial notice of Exhibit Three. The court does so because Exhibit Three meets the requirements of Fed. R. Evid. 201, and so the court may consider the document without converting the motion to one for summary judgment. *Yeasin v. Durham*, –F. Supp. 3d–, 2016 WL 7014027, at *2 (D. Kan. Dec. 1, 2016). But, in taking judicial notice of Exhibit Three, the court may only consider it "to show [its] contents, not to prove the truth of the matters asserted therein." *Tal v. Hogan*, 453 F. 3d 1244, 1264 n.24 (10th Cir. 2006) (citation omitted). Exhibit Three merely informs the court that plaintiff filed a proof of claim in Mr. Leonard's pending bankruptcy proceeding. Doc. 49-3. Nothing about this fact establishes the proposition Dinsdale cites Exhibit Three for: "The [Complaint] alleges that [plaintiff] conferred a benefit on *Leonard*." Doc. 49 at 14. Therefore, nothing in Exhibit Three alters any of the court's conclusions.

8(a)(2)." *Phillips v. Bell*, 365 F. App'x 133, 137 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)). The court thus limits its discussion to the facts plaintiff alleged in its Complaint and does not consider those that Dinsdale asserts in its Motion.

Plaintiff alleges facts sufficient to support a plausible inference that Mr. Leonard acted to benefit Dinsdale. In its Complaint, plaintiff alleges that Dinsdale sent Mr. Leonard to plaintiff's auction "for the purpose of purchasing livestock for and on behalf of Dinsdale." Doc. 46 ¶¶ 9–11. Plaintiff also alleges that Mr. Leonard bought 668 head of cattle for Dinsdale at this auction, and that plaintiff sent the cattle directly to Dinsdale. *Id.* ¶¶ 14, 22–23. Plaintiff never alleges that Mr. Leonard purchased any cattle for himself, or that Dinsdale bought the cattle from Mr. Leonard in a separate transaction. These allegations provide a sufficient basis for a plausible inference that Mr. Leonard acted on Dinsdale's behalf and for Dinsdale's benefit at the September 29, 2015 auction. *Cf. Blewett*, 8 P.2d at 358 (holding that a cattle buyer was the agent of a livestock company in part because the company "had sent him, or permitted him to go, on [the] particular [purchasing] trip" in question); *C. A. Karlan Furniture Co.*, 324 P.2d at 182 (holding that a principal-agent relationship existed where the alleged agent purchased a television set for the alleged principal at the principal's request and had the set delivered to the principal's home directly). Plaintiff's Complaint thus alleges facts supporting the second element of a principal-agent relationship.

### c.    Control by the Principal

Dinsdale next contends that plaintiff's Complaint cannot possibly support the third element of a principal-agent relationship:  control.  Dinsdale makes three arguments on this front. First, Dinsdale argues that plaintiff does not allege that Dinsdale exercised any control over Mr. Leonard's business affairs and policies.  Doc. 49 at 8.  Second, Dinsdale argues that plaintiff, to

plead control properly, must allege the existence of a written contract between Dinsdale and Mr. Leonard. Doc. 53 at 5. And third, Dinsdale argues that plaintiff fails to allege facts showing that Mr. Leonard "was somehow subject to Dinsdale Bros.'s control." Doc. 49 at 7. The court considers all three arguments, in turn, below.

Dinsdale's first argument quotes *AgriStor Leasing v. Meuli*, a case decided by our court applying Kansas agency law, as support for the proposition that "[i]n sales transactions, agency does not arise unless the alleged principal 'exercised any control over the business affairs of [the alleged agent], or had any voice in setting policies.'" *Id.* at 8 (quoting *AgriStor Leasing v. Meuli*, 634 F. Supp. 1208, 1215 (D. Kan. 1986)). Relying on this proposition, Dinsdale contends that plaintiff cannot allege control because it does not allege that Dinsdale exercised any control over Mr. Leonard's business affairs and policies. But Dinsdale quotes *AgriStor Leasing* out of context and, in doing so, misapprehends Kansas law.

In his opinion in *AgriStor Leasing*, Judge Kelly considered whether an independent dealer acted as a finance lessor's agent. 634 F. Supp. at 1215. He held that it did not do so because, in part "no evidence . . . indicate[d]" that AgriStor, the alleged principal, "exercised any control over the business affairs of [the alleged agent], or had any voice in setting its policies." *Id.* But Judge Kelly did not hold that such evidence was necessary to allege a principal-agent relationship. The alleged principal's lack of control over the alleged agent's business affairs and policies was just one of several facts Judge Kelly cited to explain why no principal-agent relationship existed in that case. *See id.* Indeed, Judge Kelly never discussed why these facts mattered to his analysis or what characteristics are necessary for a principal-agent relationship to exist. *Id. AgriStor Leasing* thus stands for the proposition that an alleged principal's control

over an alleged agent's business affairs and policies is just one more fact tending to establish a principal-agent relationship. It does not hold that such control is an essential fact.

Dinsdale cites no other authority to support its argument that plaintiff must allege facts showing that Dinsdale controlled Mr. Leonard's policies or business affairs generally. The court cannot find any. The court thus finds no fault with the absence of such allegations in plaintiff's Complaint.

Dinsdale next argues that plaintiff alleges no facts tending to show that Dinsdale had control over Mr. Leonard because plaintiff does not allege "a contract establishing the agency." Doc. 53 at 5. According to Dinsdale, "[s]imply alleging general instructions or directions" is insufficient to allege "plausible control." *Id.* The court disagrees. As noted above, a principal-agent relationship can exist without a written contract between the principal and agent. Indeed, a principal-agent relationship can exist even if a contract provides that no such relationship exists. *E.g.*, *In re Scholastic*, 920 P.2d at 956 (holding that teachers were agents of Scholastic despite a contract stating that the teachers were not Scholastic's agents). So, plaintiff's Complaint may allege control sufficiently without alleging the existence of a contract between Dinsdale and Mr. Leonard.[9]

In its final control argument, Dinsdale argues that plaintiff fails to allege that Mr. Leonard "was somehow subject to Dinsdale Bros.'s control." Doc. 49 at 7. This assertion takes a fanciful view of the Complaint. In its Complaint, plaintiff alleges that Mr. Leonard attended the September 29, 2015 auction "at the direction of Dinsdale." Doc. 46 ¶ 10. Plaintiff also

---

[9] Dinsdale also argues that the Complaint "alleges a written contract between [plaintiff] and [Mr.] Leonard that never mentions Dinsdale Bros.—consideration, mutuality, or meeting of the minds by Dinsdale Bros. are wholly absent from the [Complaint]." Doc. 49 at 7. This argument is misdirected. Plaintiff need not allege a contract between plaintiff and Dinsdale if it alleges facts showing that Mr. Leonard was Dinsdale's agent and had the authority to make the sale contract on Dinsdale's behalf. So, Dinsdale's argument about "consideration, mutuality, or meeting of the minds" has no proper place in the agency analysis.

alleges that Dinsdale gave Mr. Leonard specific orders about what kind of steers and heifers to purchase—"no steers over 900 lbs. and no heifers over 800 lbs." *Id.* ¶ 13. Plaintiff alleges still more control by Dinsdale when the Complaint explains that Mr. Leonard told plaintiff that Dinsdale wanted the cattle delivered to two Colorado feedlots after the sale. *Id.* ¶ 22. These allegations, jointly and perhaps even separately, suffice to support an inference that Mr. Leonard acted subject to Dinsdale's control.

In sum, the Complaint alleges facts supporting all three elements of a principal-agent relationship. Plaintiff therefore has alleged that a principal-agent relationship existed between Mr. Leonard and Dinsdale when Mr. Leonard purchased the 668 head of cattle at issue in this case.[10] This conclusion leaves only the question whether plaintiff has alleged facts sufficient to support a plausible inference that Mr. Leonard possessed authority to purchase the cattle on Dinsdale's behalf. The next section takes up that question.

### 2. Authority

Kansas "law recognizes two distinct types of [authority], one actual and the other ostensible or apparent." *Theis v. duPont, Glore Forgan Inc.*, 510 P.2d 1212, 1216 (Kan. 1973). Actual authority "may be either express or implied," *id.*, and "determining the scope of an agent's actual authority will often require looking at the same evidence that established the existence of the relationship in the first place," *Golden Rule*, 335 P.3d at 1195. Apparent authority is a little different. It is invoked "when a third party has dealt with an ostensible agent and then seeks to bind the principle to a transaction despite the fact that the agent had no actual authority to bind him." *Theis*, 510 P.2d at 1217 (citations omitted). But, actual authority and

---

[10] The court concludes only that Mr. Leonard was Dinsdale's agent for the purposes of the transaction with plaintiff; it need not consider Mr. Leonard and Dinsdale's relationship beyond that transaction. *See In re Scholastic*, 920 P.2d at 955 (explaining that parties may assent to an agency for a limited purpose where the agent "has power to act with reference to the [limited] subject matter" only).

apparent authority are not mutually exclusive of one another. *Golden Rule*, 335 P.3d at 1190, 1195.

Because the parties do not separate their arguments into the two steps required by *Golden Rule*, the court must consider whether plaintiff has alleged facts showing either actual or apparent authority. If plaintiff alleges that Mr. Leonard had authority to enter into the sale contract with plaintiff on Dinsdale's behalf, then Dinsdale is bound to the contract as if it were a party to it.

a.    <u>Actual Express Authority</u>

In a principal-agent relationship, express authority exists when "the principal has delegated authority to the agent by words which expressly authorize the agent to do a delegable act." *Id.* at 1189 (quoting *Prof'l Lens Plan, Inc. v. Polaris Leasing Corp.*, 710 P.2d 1297, 1303 (Kan. 1985)); *see also id.* at 1188 (defining express authority as "stated in very specific or detailed language" (quoting Restatement (Third) of Agency § 2.01 cmt. b)). The Complaint here alleges that Dinsdale sent Mr. Leonard to plaintiff's September 29, 2015 auction with express instructions to purchase certain types of cattle on Dinsdale's behalf. Doc. 46 ¶¶ 9–11, 13. These allegations support a plausible inference that Dinsdale gave Mr. Leonard express authority to buy the cattle in question on Dinsdale's behalf.

Dinsdale tries to disagree. It argues that plaintiff alleges no authority because plaintiff never alleges "that Dinsdale Bros. had any kind of agency contract with" Mr. Leonard. Doc. 53 at 5. According to Dinsdale's argument, this omission precludes plaintiff from ever establishing any type of authority because an agent does not have authority unless "a contract [exists] establishing the agency that gives . . . the agent 'authority to bind' the alleged principal." *Id.* (citations omitted). For support, Dinsdale cites *Scholastic Book Clubs*. But to no avail.

Nothing in *Scholastic Book Clubs* suggests that an agent lacks authority to act when no contract exists establishing his power to bind the principal. Indeed, the case stands for the opposite proposition: "While an express contract may create an agency relationship, conduct implying an agency relationship serves just as well." *In re Scholastic Book Clubs, Inc.*, 920 P.2d at 955. Nothing in Kansas agency law requires plaintiff to allege the existence of an agency contract granting Mr. Leonard the ability to bind Dinsdale. The court thus finds no fault with the absence of such allegations in the Complaint.

Accordingly, the court concludes that plaintiff has alleged facts sufficient to show that Mr. Leonard had actual, express authority from Dinsdale to purchase the 668 head of cattle at issue on Dinsdale's behalf.

**b.**     Implied Actual Authority

Even if plaintiff had not alleged express actual authority, it alleges facts sufficient to support a plausible inference that Mr. Leonard had implied actual authority to enter into the sale contract on Dinsdale's behalf.

In *Golden Rule*, the Kansas Supreme Court explained that Kansas agency principles were "consistent" with those of the Restatement in "substance," even though they use different terms. 335 P.3d at 1189. But Kansas cases before *Golden Rule* define implied actual authority quite differently than the Restatement. In the Restatement (Third) of Agency, an agent has implied actual authority to act

> "either (1) to do what is necessary, usual, and proper to accomplish or perform an agent's express responsibilities or (2) to act in a manner in which an agent believes the principal wishes the agent to act based on the agent's reasonable interpretation of the principal's manifestation in light of the principal's objectives and other facts known to the agent."

*Id.* at 1188–89 (quoting Restatement (Third) of Agency § 2.01 cmt. b; further citations omitted).

According to Kansas cases before *Golden Rule*, however, an "implied agency" allowing an agent

to act and so bind his principal exists when, from the parties' statements, conduct, "and other relevant circumstances, it appears the intent of the parties was to create a relationship permitting the assumption of authority by an agent which, when exercised by him, would normally and naturally lead others to believe in and rely on his acts as those of the principal." *Shugar*, 276 P.2d at 375; *accord Prof'l Lens Plan, Inc.*, 710 P.2d at 1303. The court thus considers the Kansas Supreme Court's statement that Kansas agency principles are "consistent" with the Restatement as tacit recognition that there are places where the substance of Kansas agency law before *Golden Rule* differs from the Restatement to some small degree.

But *Golden Rule* does not tell future courts how its holdings affect prior cases, and *Golden Rule* is not an implied actual authority case. So, the court is unsure whether to apply the Restatement's definition of implied authority or the definition used by Kansas cases before *Golden Rule*. When facing such a conundrum general principles of federalism are helpful. "A federal court sitting in diversity must apply state law as propounded by the forum's highest court." *Royal Maccabees Life Ins. Co. v. Choren*, 393 F.3d 1175, 1180 (10th Cir. 2005) (citing *Rancho Lobo, Ltd. v. Devargas*, 303 F.3d 1195, 1202 n.2 (10th Cir. 2002)). "Absent controlling precedent, the federal court must attempt to predict how the state's highest court would resolve the issue." *Id.* (citing *F.D.I.C. v. Schuchmann*, 235 F.3d 1217, 1225 (10th Cir. 2000)) (footnote omitted). Because *Golden Rule* did not overrule or clearly abrogate the Kansas Supreme Court's prior implied authority rulings, and because *Golden Rule* is not an implied authority case itself, the court concludes that it must rely on pre-*Golden Rule* implied authority cases from the Kansas Supreme Court to decide whether plaintiff has alleged implied authority here.

Thus, the court asks whether, from the parties' statements, conduct, "and other relevant circumstances," it appears that the parties intended to "create a relationship permitting the

assumption of authority by an agent which, when exercised by him, would normally and naturally lead others to believe in and rely on his acts as those of the principal." *Shugar*, 276 P.2d at 375. But, the court may not infer implied authority simply because a third person assumed it existed or because "the alleged agent assumed to act as such." *Id.* (citation omitted). Also, it may not infer that implied authority existed "from facts which show that the alleged agent was a mere instrumentality," or simply "because the conditions and circumstances were such as to make such an agency seem natural and probable, and to the advantage of the supposed principal." *Id.* (citation omitted). However, implied authority "may exist notwithstanding either a denial of the agency by the alleged principal or a lack of mutual understanding of agency between the parties." *In re Scholastic*, 920 P.2d at 955 (citations omitted).

Here, plaintiff alleges that Mr. Leonard attended the September 29, 2015 auction "at the direction of Dinsdale" and with specific orders for what kind of steers and heifers to purchase for Dinsdale: "no steers over 900 lbs. and no heifers over 800 lbs." Doc. 46 ¶¶ 10, 13. Plaintiff also alleges that Mr. Leonard directed plaintiff to ship the cattle directly to Dinsdale's desired feedlots. *Id.* ¶¶ 22–23. Moreover, plaintiff alleges that Mr. Leonard "had previously purchased livestock from [plaintiff] for and on behalf of Dinsdale Bros., and [plaintiff] knew of Dinsdale."[11] *Id.* ¶ 12. Taken together, these facts normally and naturally could lead others to believe that Mr. Leonard's act of buying the cattle was, in fact, Dinsdale's act. The court thus concludes that plaintiff has alleged facts that, if proven true, could support a plausible inference that Mr. Leonard had implied actual authority to purchase the 668 head of cattle at issue on Dinsdale's behalf.

---

[11] *See Mohr*, 734 P.2d at 1076 ("While the [agency] relation[ship] may be implied from a single transaction, it is more readily inferable from a series of transactions." (quoting 2A C.J.S. *Agency* § 52)).

"[T]he apparent authority doctrine has relevance only when a third party has dealt with an ostensible agent and then seeks to bind the principle to a transaction despite the fact that the agent had no actual authority to bind him." *Theis*, 510 P.2d at 1217 (citations omitted).  So, apparent authority exists when "the principal has intentionally or by want of ordinary care induced and permitted third persons to believe [a person] to be his agent even though no authority, either express or implied, has been conferred upon him." *Id.* at 1216 (citation omitted).

*Blewett v. Errickson* demonstrates, in a way that is helpful to the analysis here, when an agent has apparent authority to act.  In *Blewett*, the Kansas Supreme Court held that the alleged agent—a cattle buyer—had apparent authority to bind his principal—a livestock company—to a sale contract with the plaintiff.  8 P.2d at 359.  There, the principal had sent his agent on a trip to plaintiff's area to buy cattle.  *Id.* at 358.  While on this cattle buying trip, the agent met the plaintiff's son and bought some cattle from him.  *Id.*  The agent paid for the cattle by drawing "a draft" on his principal, which his principal paid.  *Id.*  Apparently, the agent engaged in several other similar transactions in the area near the plaintiff.  And the plaintiff knew about the agent's other purchases.  *Id.*  The plaintiff also had received a card from the agent—as had many other cattle buyers in the area—that the principal had furnished to the agent and which "indicated that [the agent] was a member of, or the representative of" the principal.  *Id.*  A few months later, the agent returned to plaintiff's area.  This time, he bought cattle from the plaintiff on the same principal's behalf.  *Id.*  Again, the agent paid for the cattle by drawing a draft on his principal. *Id.*  But, this time, the principal refused to pay for the cattle, arguing that the agent had no

authority to purchase the cattle on its behalf. *Id.* The Kansas Supreme Court rejected the principal's argument. *Id.* at 359.

The supreme court held that the principal had "held [the agent] out as his representative to transact business for him, including the buying of cattle, and had permitted him to buy cattle, which he received and for which he paid" during the earlier trip, but failed to give "plaintiff, or cattle men generally," any notice that the principal had revoked or limited the agent's authority to buy cattle on the principal's behalf during the later trip. *Id.* So, the court held that the evidence supported a finding that the agent had apparent authority to purchase the cattle on his principal's behalf. *Id.*

One allegation in plaintiff's Complaint here closely resembles the facts of *Blewett*, but this one allegation is not enough to bring the Complaint within *Blewett*'s holding. Here, plaintiff alleges that Mr. Leonard "had previously purchased livestock from [plaintiff] for and on behalf of Dinsdale Bros., and [plaintiff] knew of Dinsdale." Doc. 46 ¶ 12. So, plaintiff alleges facts equivalent to the agent's two trips in *Blewett*. But, unlike *Blewett*, plaintiff never alleges that Dinsdale took any steps to hold Mr. Leonard out as its agent on those previous occasions, nor does plaintiff allege that Dinsdale paid plaintiff directly on those previous occasions. Other factual differences between *Blewett* and plaintiff's allegations here exist, but the court finds it unnecessary to delve into them. Suffice it to say, plaintiff's lone allegation in common with the facts of *Blewett* is not enough to support a finding of apparent authority.

Because plaintiff does not allege that Dinsdale took any step to hold Mr. Leonard out as its agent before the September 29, 2015 auction, plaintiff has not alleged any intentional or negligent act by Dinsdale that would permit a reasonable person to believe that Mr. Leonard had authority to bind Dinsdale to the sale contract. The court thus concludes that plaintiff has alleged

facts sufficient to support an inference that Mr. Leonard had both express and implied actual authority to purchase the 668 cattle in question on Dinsdale's behalf, but not apparent authority.

### 3.    Conclusion

To summarize, the court concludes that plaintiff has alleged sufficient facts that, if proven true, could support a plausible finding of a principal-agent relationship between Mr. Leonard and Dinsdale and that Mr. Leonard had authority to enter into the sale contract with plaintiff on Dinsdale's behalf. So, plaintiff has alleged sufficient facts to support its claim that Dinsdale is bound to the sale contract between plaintiff and Mr. Leonard and therefore may be held liable to plaintiff for a breach of that contract under an agency theory. Because plaintiff alleges these facts, the court assumes, for the purposes of this motion, that Dinsdale is bound to the sale contract. Dinsdale's arguments based on the statute of frauds and privity thus fail. At this stage of the litigation, Dinsdale is just as much a signatory to the sale contract as Mr. Leonard is. The court thus denies Dinsdale's motion to dismiss count one of the Complaint.

### B.    Count II:  Conversion Against Dinsdale

Next, Dinsdale's motion asks the court to dismiss plaintiff's conversion claim against Dinsdale because it fails to state a claim for relief. Dinsdale advances four arguments to support this request, two of which contend that plaintiff's claim is barred as a matter of law. The court begins by addressing these arguments.

### 1.    Is Plaintiff's Conversion Claim Barred as a Matter of Law?

Dinsdale first argues that plaintiff bases its conversion claim on a debt and that a debt cannot provide the basis for conversion under Kansas law. *See* Doc. 49 at 10 ("[Plaintiff's] conversion claim seeks to compel Dinsdale Bros. to pay the debt owed by [Mr.] Leonard to [plaintiff]."). Although Dinsdale is correct under Kansas law that a debt cannot provide the

predicate property interest for a conversion claim,[12] it is incorrect that plaintiff bases its conversion claim on a debt. Plaintiff alleges that Dinsdale's "failure to deliver possession of the [cattle] to [plaintiff] or to pay [plaintiff] for the [cattle] constitutes conversion." Doc. 46 ¶ 56. These words in the Complaint make it clear that plaintiff bases its conversion claim on Dinsdale's failure to return the cattle, and not on a debt. The fact that plaintiff seeks the value of the cattle as damages for Dinsdale's alleged conversion does not alter this conclusion. Indeed, conversion plaintiffs commonly seek money damages equal to the property's value. 18 Am. Jur. 2d *Conversion* § 66, Westlaw (database updated Feb. 2017). Dinsdale's first argument thus fails.

Dinsdale next argues that Kansas law bars plaintiff's conversion claim because the cattle "were not converted or stolen, [but] . . . were transferred pursuant to valid contracts." Doc. 49 at 11. Dinsdale rests this argument on a line of Kansas cases holding that, "when parties enter into a contract which defines their respective rights and duties, tort causes of action concerning the same subject matter as the contract are precluded." *Regal Ware Inc. v. Vita Craft Corp.*, 653 F. Supp. 2d 1146, 1152 (D. Kan. 2006) (citing *Ford Motor Credit Co. v. Suburban Ford*, 699 P.2d 992, 998 (Kan. 1985)); Doc. 49 at 10. But, as the Kansas Supreme Court explained in *Burcham v. Unison Bancorp, Inc.*, courts must construe this rule narrowly. 77 P.3d 130, 145 (Kan. 2003). "[W]hen conduct could satisfy the elements of both a breach of contract or of an independent tort, unless the conduct is permitted by the express provisions of a contract, a plaintiff may pursue both remedies." *Id.* (quoting *Bittel v. Farm Credit Servs. of Cent. Kan.*, 962 P.2d 491, 498 (Kan. 1998)). Dinsdale asserts that it "took possession of the cattle pursuant to specific provisions of lawful sales contract" and "paid for the cattle in the manner agreed upon in that contract." Doc. 49 at 11. Thus, Dinsdale argues, the conduct plaintiff alleges may not provide the basis for a conversion claim.

---

[12] *Temmen v. Kent-Brown Chevrolet Co.*, 605 P.2d 95, 99 (Kan. 1980).

Dinsdale fails to identify—specifically—the contract that authorized its possession of the cattle. Because plaintiff alleges conversion based on Dinsdale's failure to pay for or return the cattle, plaintiff may allege a contract and conversion claim unless Dinsdale's failure to pay for or return the cattle is permitted by the express provisions of a contract. Surely, though, Dinsdale does not mean to argue that plaintiff agreed to sell the cattle to Mr. Leonard on Dinsdale's behalf for free and reduced this agreement to writing. And indeed, Dinsdale appears to concede that no such contract exits. *See* Doc. 49 at 11 ("Once again, [plaintiff] must rely upon a breach of contract claim against [Mr.] Leonard, not a conversion claim against Dinsdale Bros.").

On what "lawful sales contract," then, does Dinsdale rely? As best the court can tell, Dinsdale means to rely on a contract—or contracts—between it and Mr. Leonard. *See id.* (citing to Exhibits 4 and 5, which appear to be invoices from Mr. Leonard to Dinsdale). But plaintiff never alleges that it is a party to any contract between Mr. Leonard and Dinsdale, so no contract between Dinsdale and Mr. Leonard can define Dinsdale and plaintiff's respective rights and duties. Moreover, the court views this argument by Dinsdale as yet iteration of its argument that Mr. Leonard was Dinsdale's agent. The court already has decided that issue.

Nevertheless, the court briefly addresses Dinsdale's attempt to rely on evidence outside plaintiff's Complaint to support its motion to dismiss the conversion claim. Hoping to establish that Dinsdale received and paid for the cattle according to the terms of a lawful contract with Mr. Leonard, Dinsdale points to two exhibits attached to its Motion to Dismiss. These exibits seem to be invoices from Mr. Leonard to Dinsdale and what looks to be Mr. Leonard's account statement from Pinnacle Bank. Doc. 49 at 11, Exs. 4–5. As with Mr. Leonard's check, plaintiff attached neither of these documents to its Complaint and does not incorporate them into the Complaint by reference. And, neither document is central to plaintiff's conversion claim against

Dinsdale.  To be sure, proof that Dinsdale paid Mr. Leonard for the cattle may be central to Dinsdale's defense.  But that does not make it central to plaintiff's claims.  *See Capital Sols., LLC*, 2008 WL 3538968, at *3.

Dinsdale argues that the court nonetheless should consider these documents because plaintiff is trying to "play[] shell games" with the court by "spinning" the Complaint's claims.  Doc. 53 at 2.  This accusation is not persuasive.  Plaintiff's conversion claim rests not on the terms of any contract, but instead on Dinsdale's failure to pay for or return the cattle purchased on its behalf by Mr. Leonard.  The court cannot consider the exhibits Dinsdale references in its motion without converting the motion to dismiss into one for summary judgment.  The court declines to do so.

Because plaintiff never alleges a contract that allows Dinsdale to retain possession of the cattle without paying for them, plaintiff properly may plead both a breach of contract claim and conversion claim based upon Dinsdale's failure to pay for or return the cattle.  *Cf. Burcham*, 77 P.3d at 146 (holding that the plaintiffs could plead both a contract claim and an independent tort claim because "the duties and liabilities [the] plaintiffs attempt[ed] to impose were not those bargained for in the . . . [contract].  Nor were duties, such as a fiduciary duty, negated by the contract"); *Regal Ware*, 653 F. Supp. 2d at 1152 (holding that the plaintiff there could not plead both a contract and conversion claim because it based its conversion claim on the allegation that the defendant "was obligated to return the Advance Royalty" to it, but the defendant's obligation to return the Advance Royalty was controlled by the contract between the parties).

> 2.     *Does Plaintiff Allege Facts Sufficient to Plead a Claim for Conversion?*

Dinsdale also contends that plaintiff has failed to allege facts sufficient to plead a conversion claim.  In Kansas, "[c]onversion is the 'unauthorized assumption or exercise of the

right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights.'" *Armstrong v. Bromley Quarry & Asphalt, Inc.*, 378 P.3d 1090, 1095 (Kan. 2016) (quoting *Bomhoff v. Nelnet Loan Servs., Inc.*, 109 P.3d 1241, 1246 (Kan. 2005)); *see also Guernsey v. Fulmer*, 71 P. 578, 578 (Kan. 1903) ("[I]n an action for conversion, the petition must allege that at the time of the conversion the plaintiff was either in possession, or had a right to the possession, of the property converted."). To allege the elements of a conversion claim, then, plaintiff must allege that the cattle belonged to plaintiff, but that Dinsdale exercised ownership over them without authorization and to the exclusion of plaintiff.

In the Complaint, plaintiff alleges that it was the rightful owner of the cattle because Dinsdale failed to pay for them, and that Dinsdale retained possession of the cattle even though plaintiff asks Dinsdale to return them. Doc. 46 ¶¶ 52, 54–55. These facts are sufficient to state a claim for conversion. *Cf. Res. Ctr. for Indep. Living, Inc. v. Ability Res., Inc.*, 534 F. Supp. 2d 1204, 1212–13 (D. Kan. 2008) (holding that the plaintiff stated a conversion claim when the complaint alleged that the defendants retained use of the plaintiff's equipment without authorization).

Still, Dinsdale contends that because plaintiff shipped the cattle to Dinsdale before cashing Mr. Leonard's check, plaintiff cannot allege that it is the rightful owner of the cattle or that Dinsdale exercised unauthorized control over the cattle. Doc. 49 at 11–12. Kansas law holds otherwise: "One in possession of a chattel, as a bailee or otherwise, who, on demand, refuses without proper qualification to surrender it to another entitled to its immediate possession is subject to liability for conversion." *Sells v. Muncie Auto Salvage, Inc.*, 178 P.3d 688, 2008 WL 762520, at *3 (Kan. Ct. App. Mar. 21, 2008) (quoting *Queen v. Lynch Jewelers, LLC*, 55 P.3d 914, 921 (Kan. Ct. App. 2002)). Plaintiff thus alleges facts that, if true, could support its

claim for conversion.  The court denies Dinsdale's motion to dismiss count two of the Complaint.

### C.    Counts III and V: Quantum Meruit Against Dinsdale and Unjust Enrichment Against Dinsdale and Pinnacle Bank

Dinsdale next asks the court to dismiss counts three and five of the Complaint.  In count three, plaintiff asserts a quantum meruit claim against just Dinsdale.  In count five, plaintiff asserts an unjust enrichment claim against Dinsdale and Pinnacle Bank.

Dinsdale makes six arguments in support of this part of its motion to dismiss.  The court can deal with three of these arguments quickly.  They are:  (1) plaintiff "cannot recover in unjust enrichment against Dinsdale Bros. for [Mr.] Leonard's failure to pay" plaintiff; (2) plaintiff alleges that it conferred a benefit on Mr. Leonard, not on Dinsdale; and (3) plaintiff fails to state a claim because plaintiff does not allege that it relied on any promise by Dinsdale.  Doc. 49 at 13–15.  All of these arguments assume that plaintiff has failed to allege that Mr. Leonard was Dinsdale's agent and authorized to purchase the cattle on Dinsdale's behalf.  The court already has ruled to the contrary and so none of these arguments can prevail.  Dinsdale's benefit and promise arguments—(2) and (3)—also fail for a second, independent reason:  They rely on exhibits attached to Dinsdale's Motion to Dismiss, s*ee id.* at 14, that the court already has declined to consider, *see supra* p. 16.  Nothing about counts three or five alters the court's decision not to consider these exhibits at this stage.  The court thus denies Dinsdale's motion to dismiss based on these three arguments.

 Dinsdale's other three arguments deserve more discussion and the court addresses them now.

### 1. May Counts Three and Five Coexist?

Dinsdale contends that plaintiff may not assert a claim for quantum meruit while also asserting a claim for unjust enrichment because Kansas courts do not recognize quantum meruit and unjust enrichment as separate causes of action. *See* Doc. 49 at 12. Dinsdale cites no Kansas state authority directly supporting this proposition. Instead, Dinsdale cites cases from our court noting that "[i]n Kansas, quantum meruit and restitution are recognized as equivalent theories." *Fusion, Inc. v. Neb. Aluminum Castings Inc.*, 934 F. Supp. 1270, 1275 (D. Kan. 1996) (citations omitted); Doc. 49 at 12. Although it is tempting to assume that the Kansas courts' tendency to use the terms "unjust enrichment" and "quantum meruit" interchangeably means that they do not consider the two as separate causes of action, the court cannot rest its decision on an assumption. The court is especially hesitant to rely on such an assumption because commentators and courts from other states have opined for decades that "the two doctrines"—quantum meruit and unjust enrichment—"are not interchangeable." 66 Am. Jur. 2d *Restitution* § 33 (footnote omitted).[13]

"[U]njust enrichment applies only in the absence of any quasi-contractual relationship; quantum meruit requires proof that services were rendered under circumstances consistent with contract relations." *Id.* So, without Kansas Supreme Court authority—or other persuasive Kansas state authority—expressly holding that Kansas does not recognize the two doctrines as separate causes of action, the court will not dismiss count five as duplicative. *See Choren*, 393 F.3d at 1180 ("A federal court sitting in diversity must apply state law as propounded by the forum's highest court." (citation omitted)); *see also Progressive Cas. Ins. Co. v. Engemann*, 268

---

[13] *See also Danforth v. Ruotolo*, 650 A.2d 1334, 1335 n.2 (Me. 1994) ("The parties erroneously labeled the theory of recovery in this case 'unjust enrichment.' Admittedly we have contributed to their confusion. *See, e.g.*, *A.F.A.B., Inc. v. Town of Old Orchard Beach*, 610 A.2d 747, 748–49 (Me. 1992) (using terms "unjust enrichment" and "*quantum meruit*" interchangeably); *Estate of Boothby*, 532 A.2d 1007, 1010 (Me. 1987) (stating that *quantum meruit* rests on doctrine of unjust enrichment) . . . . As we have recently noted, the two theories are not the same. Unjust enrichment applies only in the absence of any quasi-contractual relationship." (citations omitted)); *32nd St. Surgery Ctr., LLC v. Right Choice Managed Care*, 820 F.3d 950, 955 (8th Cir. 2016) ("Under Missouri law, quantum meruit and unjust enrichment are separate, but related, remedies in quasi-contract." (citations omitted)).

F.3d 985, 988 (10th Cir. 2001) (explaining that, absent controlling precedent, federal courts must attempt to predict how the state's highest court would resolve the issue and should do so by "consider[ing] a number of authorities, including analogous decisions by the [state] Supreme Court, the decisions of the lower courts in [the state], the decisions of the federal courts and of other state courts, and 'the general weight and trend of authority'" (citation omitted)).

Dinsdale provides no such authority and the court has not located any. Without a definitive answer from Kansas law,[14] plaintiff, at this stage, may allege counts three and five as alternative (or even inconsistent) legal theories, which Rule 8(d) permits.[15] Neither party has addressed the separate-cause-of-action or Rule 8(d) issues to the degree that informs a definitive conclusion on this question. *See, e.g.*, *Mr. Elec. Corp. v. Khalil*, No. 06-2414-CM, 2013 WL 451584, at *7 (D. Kan. Feb. 6, 2013) (finding that the plaintiff cited no authority to support its argument and so declining to address the argument for the moment); *Cease v. Safelite Glass Corp.*, 911 F. Supp. 477, 483 (D. Kan. 1995) (finding the parties' briefing insufficient to answer the question before the court and so declining to rule on the issue); *Voelkel v. Gen. Motors Corp.*, 846 F. Supp. 1482, 1483 n.1 (D. Kan. 1994) (denying summary judgment in part because "of the defendant's failure to brief [one of its] claim[s] properly").

_____

[14] The court located one case that is seemingly on point but not addressed in either parties' papers—*Tommey v. Computer Sciences Corporation*, No. 11-cv-02214-EFM-GLR, 2013 WL 1000659 (D. Kan. Mar. 13, 2013). In *Tommey*, our court held that the plaintiff's unjust enrichment claim was duplicative of her FLSA claim and so dismissed the unjust enrichment claim. *Id.* at *3. *Tommey* mentions that quantum meruit and unjust enrichment may be duplicative under Kansas law, but it does so only in dicta. *Id.* Thus, *Tommey* does not provide the definitive, Kansas state-law answer that the court requires here.

[15] *See Campbell v. Barnett*, 351 F.2d 342, 344 (10th Cir. 1965) (explaining that Rule 8(d) allows plaintiffs to plead as many "alternate, hypothetical and inconsistent claims"); *Blazer v. Black*, 196 F.2d 139, 144 (10th Cir. 1952) ("[Although] the substantive right to recover on [plaintiff's] claim is governed by state law, the form or mode of [its] claim for relief is a matter of Federal procedure." (first citing *Cont'l Collieries v. Shober*, 130 F.2d 631, 634 (3d Cir. 1942); then citing Fed. R. Civ. P. 8(e)(1))); *W. Mach. Co. v. Consol. Uranium Mines, Inc.*, 247 F.2d 685, 686 (10th Cir. 1957) ("It is enough that both counts, considered separately or together, state a claim on which relief can be granted, and we are therefore interested to know whether the proof supports either or both theories, whether inconsistent or not." (citations omitted)); *Rajala v. Allied Corp.*, 66 B.R. 582, 597 (D. Kan. 1986) (allowing the plaintiff to proceed with two counts that sought "to recover under alternate theories of unjust enrichment and quantum meruit for [the defendant's] royalty-free access to General Poly's extrusion technology").

At this stage, too much theory exists to terminate either count. The court thus declines to dismiss either count three or count five of the Complaint based on Dinsdale's argument that the two are duplicative.

### 2. Does the Existence of a Written Contract Preclude Plaintiff's Quantum Meruit and Unjust Enrichment Claims?

Dinsdale next argues that plaintiff may not assert its unjust enrichment and quantum meruit claims because a written contract exists. In Kansas, a plaintiff may not recover under quantum meruit when a contract "control[s] the relationship between the parties." *Wolfert Landscaping Co., LLC v. LRM Indus., Inc.*, 287 P.3d 300, 2012 WL 5392143, at *4 (Kan. Ct. App. Nov. 2, 2012). The same is true for unjust enrichment. *Orica New Zealand Ltd. v. Searles Valley Minerals Operations Inc.*, No. 04-2310-KHV, 2005 WL 387659, at *3 (D. Kan. Feb. 17, 2005) (applying Kansas law). But Dinsdale contends that it is not a party to the contract plaintiff alleges, so Dinsdale cannot rely on the terms of that contract as the reason to dismiss counts three and five of the Complaint. *See id.* (granting dismissal only because the defendant stipulated that it was a party to the express contract). Indeed, as explained by one of the cases Dinsdale cites, Rule 8(d) allows a plaintiff to plead the existence of a breached contract and unjust enrichment as alternative claims. *ICE Corp. v. Hamilton Sundstrand, Inc.*, 444 F. Supp. 2d 1165, 1171 (D. Kan. 2006). The court thus denies Dinsdale's motion to dismiss on this basis.

### 3. Should the Court Accept Plaintiff's Allegations in Count Five as True?

In its final argument, Dinsdale instructs the court not to accept the Complaint's "allegations concerning recovery based upon unjust enrichment" as true because "the 'question whether one party can recover damages from another based upon the theory of unjust enrichment is a question of law.'" Doc. 49 at 12 (quoting *T.R., Inc. of Ashland v. Brandon*, 87 P.3d 331, 336 (Kan. Ct. App. 2004); and citing *Shields*, 744 F.3d at 640). Dinsdale's argument appears to

assert that all allegations supporting plaintiff's claim for unjust enrichment are legal conclusions because recovering on that claim presents a question of law. Dinsdale's argument misapprehends what constitutes a "legal conclusion" in the context of a Rule 12(b)(6) motion.

Whether part of a claim is a question of law or fact does not matter to the Rule 12(b)(6) standard, and so has no bearing on whether a plaintiff's allegation is a "legal conclusion." Allegations that are legal conclusions and therefore need not be accepted as true are those that allege no facts but instead allege the ultimate legal conclusion necessary for the plaintiff to recover on its claim. The court accepts allegations as true that are meant to serve as factual support for legal conclusions. Beyond asserting that all of plaintiff's unjust enrichment allegations are legal conclusions, Dinsdale makes no argument against their sufficiency. The court thus denies Dinsdale's motion to dismiss based on this argument.

Accordingly, the court denies Dinsdale's motion to dismiss counts three and five of plaintiff's Complaint.

### D. Count VI: Civil Conspiracy Against Dinsdale and Pinnacle Bank

In its final argument, Dinsdale asks the court to dismiss plaintiff's civil conspiracy claim. To allege a civil conspiracy claim under Kansas law, plaintiff must allege facts supporting the following five elements: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds in the object or course of action; (4) one or more unlawful overt acts; and (5) damages proximately caused by those acts." *York v. InTrust Bank, N.A.*, 962 P.2d 405, 422 (Kan. 1998) (citing *Kansas ex rel. Mays v. Ridenhour*, 811 P.2d 1220, 1226 (Kan. 1991)).

Dinsdale challenges only the fourth element, contending that plaintiff fails to allege "any claims against Dinsdale" and so, according to Dinsdale, "alleges no wrong giving rise to a tortious cause of action independent of the alleged conspiracy." Doc. 49 at 16. Because the

court has denied Dinsdale's motion to dismiss plaintiff's breach of contract, conversion, quantum meruit, and unjust enrichment claims, Dinsdale's argument necessarily fails. Plaintiff has pleaded the commission of wrongs that give rise to at least three, if not four, causes of action independent of the conspiracy claim. *Cf. Res. Ctr. for Indep. Living*, 534 F. Supp. 2d at 1213 (holding that the plaintiff stated a claim for conspiracy under Kansas law over the defendant's argument that "the [complaint's] independent tort claims fail as a matter of law" because the court had not dismissed the claims and so the "plaintiff ha[d] pled the commission of wrongs that give rise to five causes of action independent of the conspiracy claim"); *accord In re Motor Fuel Temperature Sale Practices Litig.*, 534 F. Supp. 2d 1214, 1236 (D. Kan. 2008). The court denies Dinsdale's motion to dismiss count six of the Complaint.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Dinsdale Bros., Inc.'s Motion to Dismiss (Doc. 48) is denied.

**IT IS SO ORDERED.**

**Dated this 6th day of June, 2017, at Topeka, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**