IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| REZAC LIVESTOCK COMMISSION CO., INC. | )<br>)<br>) |
| Plaintiff, | ) |
| v. | )   Case No.: 15-4958-DDC |
| PINNACLE BANK, et al., | )<br>)<br>) |
| Defendants. | ) |

# PRETRIAL ORDER

A pretrial conference was conducted in this case on June 15, 2018, by U.S. Magistrate Judge K. Gary Sebelius. Plaintiff Rezac Livestock Commission Company, Inc. ("Rezac"), appeared through counsel, Robert M. Thompson and Michelle M. Masoner of Bryan Cave Leighton Paisner LLP. Defendant Dinsdale Bros., Inc. a/k/a Dinsdale Brothers, Inc. ("Dinsdale"), appeared through counsel, Scott C. Sandberg, Spencer Fane LLP. Defendant Pinnacle Bank ("Pinnacle") appeared through counsel, T. Randall Wright, Baird Holm LLP, and Timothy A. Shultz, Goodell, Stratton, Edmonds & Palmer.

This pretrial order supersedes all pleadings and controls the subsequent course of this case. It will not be modified except by consent of the parties and the court's approval, or by order of the court to prevent manifest injustice. Fed. R. Civ. P. 16(d) & (e); D. Kan. Rule 16.2(c).

-1-

1.   **PRELIMINARY MATTERS.**

    a.   **Subject Matter Jurisdiction.**  Subject matter jurisdiction is invoked under 28 U.S.C. § 1332 and § 1441, and is not disputed.

    b.   **Personal Jurisdiction.**  The court's personal jurisdiction over the parties is not disputed.

    c.   **Venue.**  Venue in this court is not disputed.

    d.   **Governing Law.**  Subject to the court's determination of the law that applies to the case, the parties believe and agree that the substantive issues in this case are governed by the following law:  Plaintiff Rezac contends that Kansas law governs because the events giving rise to the claims occurred in the State of Kansas. In a diversity case, the court applies the substantive law of the forum state. Here, Kansas is the forum state. The Court has previously indicated that Kansas law applies. [ECF 55, p.6].  Defendant Pinnacle Bank contends that certain aspects of Nebraska law apply to the case, because Leonard resides in Nebraska, his bank account was with a bank located in Nebraska, events relating to that account occurred in Nebraska, and claims relative to that account therefore arise in Nebraska. Defendant Dinsdale Bros. reserves the right to contend that the agency law of Colorado applies.

2.   **STIPULATIONS.**

    a.   The following facts are stipulated:

1.   Rezac is in the business of selling livestock at an auction in St. Marys, Kansas.

2.   Dinsdale is in the business of feeding cattle. Dinsdale buys cattle from numerous sellers, including Charles D. Leonard d/b/a Leonard Cattle Company ("Leonard").

3. Pinnacle is a banking organization organized and existing under the law of the state of Nebraska with locations in Kansas.

4. Leonard used a business checking account at Pinnacle for his cattle business – known as Account 161.

5. On September 29, 2015, Leonard attended the livestock auction conducted by Rezac in St. Marys, Kansas.

6. At the Rezac auction, Leonard purchased cattle (the "Livestock").

7. Leonard shipped the Livestock to Dinsdale.

8. On October 1, 2015, Dinsdale wired $1,004,361.49 to Account 161.

9. On October 6, 2015, Pinnacle returned a check payable to Rezac for $980,361.45 for insufficient funds.

    **b.** The parties have stipulated to the admissibility of the following exhibits for purposes of summary judgment:

1. The Parties' written interrogatory responses.

2. The Parties' written responses to requests for admissions.

## 3. FACTUAL CONTENTIONS.

### a. Contentions of Plaintiff Rezac.

Dinsdale and Pinnacle share common ownership, and these Dinsdale-related entities communicated about a specific transaction involving the St. Marys Livestock purchased from Rezac on September 29, 2015.

Dinsdale, through Dave Wahlert, sought out Leonard and gave him an order to buy for Dinsdale cattle from Rezac's auction in St. Marys, Kansas, on September 29,

2015. Dinsdale made the order for cattle subject only to the limitation that Leonard buy yearlings, with no steers over 900 lbs. and no heifers over 800 lbs. Acting as an actual agent of Dinsdale, Leonard purchased 668 head of cattle for Dinsdale and shipped them directly from Rezac to Dinsdale as instructed. The cost of the cattle was $980,361.45 at auction, and Leonard added transportation costs, veterinary charges for pregnancy checking, transit insurance and his fee/commission and billed Dinsdale $1,004,361.49. Dinsdale and Pinnacle are owned, in part, and run by Roy Dinsdale, Sid Dinsdale, and Chris Dinsdale.

Pinnacle had known since August that Leonard was frequently overdrawn in his Pinnacle checking account, sometimes for millions of dollars. Pinnacle also knew that Leonard's $400,000 loan was not sufficient to finance the purchase of the quantities of cattle that Leonard regularly purchased, and that he was operating his business on "float". Beginning in August, 2015, Pinnacle was closely monitoring Leonard's checking account and communicating often with Leonard about his deposits and checks because Leonard's checking account was becoming habitually overdrawn. On September 30, 2015, Pinnacle, for the first time, began returning checks drawn on Leonard's account for insufficient funds. Pinnacle was well aware of all of these "red flags" but ignored them, and instead of acting to stop the improper activity, that they were well aware of, Pinnacle assisted and facilitated Leonard doing business while insolvent, resulting in the conversion of funds due to Rezac.

On September 30, 2015, Leonard told Pinnacle that he would be receiving a deposit "from all places, Dinsdale." Pinnacle knew Leonard had issued a check to Rezac

for the St. Marys Livestock that were shipped to Dinsdale on September 30, 2015. As a result of Dinsdale's and Pinnacle's communications between September 30, 2015, and October 6, 2015, Dinsdale and Pinnacle knew Rezac was not going to be paid or at least was not likely to be paid for the St. Marys Livestock unless Dinsdale paid Rezac directly. Despite actual knowledge of Rezac's claim to the St. Marys Livestock or sale proceeds for the St. Marys Livestock, Dinsdale sent the sale proceeds to Pinnacle. Despite actual knowledge that the Dinsdale wire was deposited to pay for the St. Marys Livestock, Pinnacle used or allowed the money to be used for other purposes, despite being told by Dinsdale of the specific intent for the use of the funds. When the check was returned for insufficient funds, Dinsdale did not return the St. Marys Livestock for which it knew were not paid.  Pinnacle used the money specifically intended for Rezac to keep Leonard's checking account afloat for yet another week.  Pinnacle knew that Leonard purchased and sold cattle for himself and also on behalf of others

On September 30, 2015, Pinnacle bankers told Chris Dinsdale at Dinsdale that Leonard's account was overdrawn and Pinnacle was returning checks for insufficient funds.  On September 30, 2015, at least one Pinnacle banker cautioned Dinsdale not to send Leonard any money and instead to pay for the St. Marys Livestock directly to Rezac.  Dinsdale received the St. Marys Livestock on September 30, 2015, knowing the St. Marys Livestock had not been paid for and that Pinnacle was returning checks and about to "close Leonard down".  Nonetheless, Dinsdale wired the St. Marys Livestock sale proceeds to Pinnacle on October 1, 2015.  Dinsdale and Pinnacle both knew Rezac

-5-

was not going to get paid for the St. Marys Livestock, or at least was likely to not be paid, and thereby deprived Rezac of his property.

### b. Contentions of Defendant Dinsdale.

Dinsdale Bros. is in the business of feeding cattle. Dinsdale Bros. buys cattle from numerous sellers, including sellers acting dealers under the Packer & Stockyards Act. One of those dealers was Charlie Leonard of Leonard Cattle Company. In Dinsdale Bros.' cattle purchases from Leonard:

- Like other dealers, Leonard would converse with his customers like Dinsdale Bros. to gauge interest in purchasing from Leonard before Leonard purchased cattle for resale;
- Leonard, acting as a dealer, would purchase cattle for resale from sale barns or other sellers in a transaction solely between Leonard and the seller;
- Leonard, again acting as a dealer, would then resell the cattle to Dinsdale Bros. in a transaction solely between Leonard and Dinsdale Bros.

This same course of conduct transpired on September 29, 2015.

On that day, Leonard attended an auction at Rezac's sale barn at his own volition, as he did almost every Tuesday. The day before, Leonard spoke briefly on the telephone with Dinsdale Bros. employee Dave Wahlert. During that call, Mr. Wahlert indicated that Dinsdale Bros. was in the market for cattle and told Leonard the types of cattle Dinsdale Bros. would and would not consider purchasing from Leonard. That was the extent of that quick call. No quantity, price, or any other indication of an order was given to Leonard. The call contemplated a potential future sale from Leonard to Dinsdale Bros. and the call was consistent with prior dealings Leonard had with Dinsdale Bros.

As he did almost every Tuesday, Leonard attended the auction at Rezac's sale barn on September 29, 2015. And, as he frequently did, Leonard purchased cattle in his own name at the auction. Rezac documented the sale with Leonard—and only Leonard—as the buyer. Dinsdale Bros. was neither mentioned nor alluded to in any documentation or communications concerning this sale. When Leonard bought the cattle, Rezac had no inkling of Leonard's conversation with Mr. Wahlert or any potential sale to Dinsdale Bros. Well after the Leonard/Rezac sale was complete, Leonard instructed Rezac to send the cattle to D&D, another entity, in Colorado.

After buying the cattle from Rezac, Leonard did what dealers do: he resold the cattle. Leonard marked up the price he had paid Rezac and sold the cattle to Dinsdale Bros. All documentation of this transaction accurately stated that the transaction was solely a sale between Leonard as seller and Dinsdale Bros. as buyer. In his documentation, Leonard disclaimed any other kind of transaction. Dinsdale Bros. then did what buyers do: it paid the seller as instructed. Leonard specifically instructed Dinsdale Bros. to pay for the cattle by wiring payment to Leonard's bank account. Leonard told Dinsdale Bros. to pay for the cattle this way and never hinted that payment should go anywhere else. Dinsdale Bros. complied and paid for the cattle in full as instructed by Leonard.

Leonard knowingly wrote Rezac a hot check. Leonard did not keep enough money in his account to cover the check he wrote to Rezac on September 29. Based on a close friendship with Leonard, Rezac delayed in submitting and resubmitting the check for payment. By the time Rezac got around to submitting the check a second time, Leonard had depleted the account.

After that, Leonard and Rezac began working together to contrive an "agency" story. Rezac and Leonard began claiming that Leonard was Dinsdale Bros.' commissioned agent on

September 29 and that, after already paying Leonard for the cattle, Dinsdale Bros. was obligated to pay a second time, this time to Rezac. Rezac bases all its claims on this agency story.

Rezac has no knowledge of the dealings between Dinsdale Bros. and Leonard and Rezac relies entirely on statements from Leonard to support its claims. Leonard has repeatedly contradicted his agency story in sworn testimony. In regulatory and tax filings, Leonard has consistently and truthfully maintained that he was acting solely as a dealer buying cattle on his own account on September 29.

Rezac never owned any of the cattle bought by Leonard on September 29 (although some of the cattle were sold by Rezac insiders at their own auction). And Rezac has lost no money due to Leonard's actions—a separate entity covered any loss.

Dinsdale Bros. denies each of the claims set forth in Rezac's statement in this Pretrial Order and the claims set forth in Rezac's most recent Amended Complaint. Leonard was not any kind of agent for Dinsdale Bros. on September 29; Dinsdale Bros. paid for the cattle it purchased in good faith and has not been unjustly enriched; and Dinsdale Bros. neither conspired with Pinnacle Bank nor engaged in any other wrongful conduct.

### c. Contentions of Defendant Pinnacle.

Charles Leonard used a business checking account at Pinnacle Bank for his cattle business − known as Account 161. Leonard used Account 161 for all his livestock purchases and sales, which frequently totaled millions of dollars in a month. He also paid personal obligations from that account. Account 161 was a general deposit account.

On September 29, 2015, Leonard purchased the cattle referred to by Plaintiff. Leonard sent a check written on Account 161 for $980,361.45 the following day to Rezac for the purchase.

Leonard shipped those cattle to Dinsdale Bros., and issued invoices to Dinsdale Bros. for them. As it had done in the past, Dinsdale Bros. wired the funds to pay for those cattle to Leonard's Account 161 at Pinnacle Bank. The wired funds ($1,004,361.49) arrived into Account 161 on October 1, 2015.

The check payable to Rezac was presented to the Bank five days later--October 6. Between the arrival of the Dinsdale wire and the presentment of the Rezac check, many other checks were presented and honored by the Bank. As of October 6, Account 161 lacked sufficient funds to cover the Rezac Check. Leonard was unable to make sufficient covering deposits. As a result, the next day the Rezac Check was returned for insufficient funds.

From time to time during September and October of 2015, Account 161 lacked sufficient money to cover all the presented checks. On these occasions, a Pinnacle banker, Spencer Kimball, would be notified in the morning of the checks that had been presented for payment on Account 161 which, if honored, would result in a negative balance. He would then contact Leonard by phone or text and ask him how he intended to cover the checks. Leonard would respond by describing the deposits he would make that day in order to cover the deficit. In every or nearly every instance until September 30, 2015, Leonard told Mr. Kimball of deposits he would make on that day, which would be more than enough to cover the outstanding checks. He made good on those promised deposits. If Kimball was satisfied by the anticipated deposits described to him by Leonard, he would typically decide that the Bank would honor the presented checks. On September 30, 2015, Leonard could not promise sufficient deposits to cover the checks that had been presented that day. As a result, the Bank returned some checks the next day, and in succeeding days.

When a Bank customer has checks that he or she has written, which post to his or her account, and when the sum of those checks exceeds the amount of cleared funds that are shown in the account at that time, but there are uncollected funds on deposit, it can be referred to as a "daylight overdraft" or "intra-day overdraft  Later—usually the next day—those third party checks clear, and the provisional credit becomes final.  Even though a daylight overdraft is of short duration, the Bank sends a notification to its customers to alert them of the overdraft.  A "true overdraft" occurs when the account has a negative balance for a longer period of time.

The activity in Account 161, including the daylight overdrafts, came to the attention of various officers of the Bank in September of 2015.  They were also informed of the purchase, by Dinsdale Bros., of cattle which Leonard had purchased from Rezac.  In late September of 2015, they became aware that Dinsdale Bros. was going to pay for the cattle they had purchased from Leonard with a wire into Account 161. However, their knowledge did not change any outcome.

From October 1, 2015 (the day the Dinsdale wire was deposited into Account 161) until October 6 (the day the Rezac Check was returned for insufficient funds) the Bank did not set-off against Account 161 to repay any loans or other debts owed by Leonard.  The Bank did charge ordinary wire fees and NSF check fees, in the total amount of $231.00 during that period.

Leonard never asked or directed the Bank to segregate the Dinsdale wire funds, and the Bank never agreed to do so.

**4.     LEGAL CLAIMS AND DEFENSES.**

   **a.  Legal Claims of Plaintiff Rezac.**

Rezac asserts that it is entitled to recover upon the following theories:

Dinsdale and Pinnacle conspired to convert Rezac's property. Dinsdale converted Rezac's property when it took possession of the St. Marys Livestock with

-10-

knowledge that the St. Marys Livestock had not been paid for and would not be paid for if the sale proceeds were sent through Pinnacle.  Pinnacle converted Rezac's property when it received the sale proceeds with actual knowledge that the specific Dinsdale wire was intended to pay Rezac, but Pinnacle used the money to pay other debts of Leonard instead. Because Dinsdale took the St. Marys Livestock with prior knowledge of Rezac's claims, and Pinnacle used the sale proceeds for other than their intended purpose, Dinsdale and Pinnacle assumed the unauthorized exercise of the right of ownership over property belonging to Rezac to the exclusion of the Rezac's rights. The conversion and the conspiracy to convert occurred because Dinsdale and Pinnacle shared information before, during and after the sale and by their actions, Dinsdale and Pinnacle, together, knowingly took control over Rezac's property to the exclusion of Rezac's rights. Rezac was damaged in the amount of $980,361.45 plus interest.

In the alternative, Dinsdale breached its contract to purchase cattle from Rezac when it sent its agent, Leonard, to purchase the cattle on its behalf at the cattle auction and failed to thereafter pay Rezac for the cattle.

In the alternative, Rezac conferred a benefit of $980,361.45 worth of cattle upon Dinsdale. Dinsdale took the St. Marys Livestock knowing Rezac was not paid, and was not going to be paid for the St. Marys Livestock.  Despite this, and despite being advised by Pinnacle to pay the sale barn (Rezac) directly to make sure Rezac was paid, Dinsdale kept the St. Marys Livestock and sent the money to Leonard and Pinnacle, with full knowledge that it would not reach Rezac. Dinsdale was thereby unjustly enriched at the expense of Rezac.

**b. Defenses of Plaintiff Rezac to Dinsdale's Counterclaim:** Dinsdale cannot be a good faith purchaser for value because Dinsdale obtained the St. Marys Livestock, with full knowledge of Rezac's claim for the value of the St. Marys Livestock, and did not ensure Rezac was paid. In recognition of the duty to see that Rezac was paid, Dinsdale and Pinnacle initially tried to manage the timing of the Dinsdale wire to make sure that it coincided with the Rezac check.   Later, Pinnacle or Dinsdale decided to disregard the recommendation that the funds be paid directly to Rezac, and instead directed that the wire be made to Leonard.   This was done with full knowledge that it was likely, if not certain that the result would be that Rezac would not be paid. Accordingly, Dinsdale cannot be a good faith purchaser of the cattle.

**c. Defenses of Defendant Dinsdale.**

In addition to denying each of the facts alleged by Rezac, Dinsdale Bros. states that Rezac alleges a contract barred by lack of privity and consideration and by the statute of frauds.  Rezac's prior statements and documentation amounts to a waiver or estoppel barring Rezac's claims.  Rezac seeks equitable relief with unclean hands including, without limitation, abetting a violation of the Packers & Stockyards Act, 7 U.S.C. § 181 *et seq*.  If it has suffered any damages, Rezac could have easily mitigated them by among other actions, acting more diligently in dealing with Leonard.

**d. Legal Claims of Defendant Dinsdale.**

Dinsdale Bros. is entitled to a order of the court that it has good title to the cattle in question, free and clear of any junior reclamation right or interest of Rezac in and to the cattle.

-13-

### e. Defenses of Defendant Pinnacle.

A bank account is a debt between the bank and its customer, incurred according to its account agreement with its customer. As such it is intangible property and not subject to a conversion claim by a third party. The Bank did not convert Rezac's money or property, since Rezac can claim no property interest in a deposit, and further because even if it could, the funds it claims belonged to it were expended by Leonard prior to the time the Rezac check was presented to the Bank.

There may be two situations where a third party can make a claim for conversion of funds in a bank account. One is where the bank set off against the account for a debt owed to it by the customer. The second is where the funds have been segregated in a special account and the bank has agreed with the customer to keep them separate. Neither exception is proved here. The Bank's agreement with its customer is set out in the Terms and Conditions of the account and/or its signature card. Attempts by Plaintiff to modify that agreement should not be permitted. Because Rezac was never Pinnacle Bank's customer and it had no contractual relationship with Rezac, Pinnacle Bank did not owe a duty to Rezac with respect to Account 161 or otherwise.

The Bank has no liability to Rezac on an unjust enrichment claim. The Bank was not enriched in this transaction, but in fact took a loss on Account 161 of nearly $160,000. Moreover, the Plaintiff cannot prove the elements of such a claim.

The Bank did not conspire with Dinsdale Bros. to commit any illegal or actionable act.

Plaintiff's Complaint fails to state a claim upon which relief can be granted against the Bank.

Plaintiff's Complaint is barred, in whole or in part, by estoppel, waiver and/or release.

Plaintiff's Complaint is barred, in whole or in part, due to Plaintiff's failure to mitigate its damages or otherwise act in a reasonably prudent manner in its business dealings.

Plaintiff's alleged damages, if any, were not the proximate cause of any act or failure to act taken by the Bank; rather, Plaintiff's damages were proximately caused by the actions or omissions of Plaintiff and/or Charles D. Leonard

Various third-parties were bona fide payees entitled to receipt of the funds in controversy.

The Bank held a security interest in deposit items and proceeds of them, made to the Leonard account pursuant to UCC Section 4-210 (as adopted in Kansas and/or Nebraska) and the Bank's interest in the funds in Leonard's deposit accounts is superior to any right, title, or lien claimed by Plaintiff.

To the extent any setoff is deemed or found to occur, the Bank had the legal right to do so.

**5.    DAMAGES AND NON-MONETARY RELIEF REQUESTED.**

> Rezac was damaged in the amount of $980,361.45 for the value of the St. Marys Livestock as of September 30, 2015, plus interest, less $48,110.72 received in partial payment. Rezac is also seeking punitive damages as necessary to punish Defendants for their willful, wanton and intentional misconduct.

**6.     AMENDMENTS TO PLEADINGS.**

None.

**7.     DISCOVERY.**

Discovery is complete.

Unopposed discovery may continue after the deadline for completion of discovery so long as it does not delay the briefing of or ruling on dispositive motions or other pretrial preparations.  Although discovery may be conducted beyond the deadline for completion of discovery <u>if</u> all parties are in agreement to do so, under these circumstances the court will <u>not</u> be available to resolve any disputes that arise during the course of such extended discovery.

**8.     MOTIONS.**

   **a.  Pending Motions.**

None.

   **b.  Additional Pretrial Motions.**

After the pretrial conference, the parties intend to file the following motions:

Plaintiff will file a motion for summary judgment on Dinsdale's Counterclaims and a Motion for Partial Summary Judgment on the issue of liability.

Plaintiff will file a motion in limine to exclude expert testimony that is in the substance of legal conclusions.

Pinnacle Bank will file a motion for summary judgment and will also file one or more motions in limine to exclude certain expert testimony and to exclude other evidence it considers to be irrelevant and potentially confusing or misleading, including evidence as to the Timmerman CD, the so-called RJ Obrien account, and possibly other items.

Dinsdale Bros. will file a motion for summary judgment.

The dispositive-motion deadline, as established in the scheduling order and any amendments, is **June 22, 2018**.

The parties should follow the summary-judgment guidelines available on the court's website:

*http://ksd.uscourts.gov/wp-content/uploads/2015/10/Summary-Judgment-Guidelines.pdf*

Consistent with the scheduling order filed earlier in this case, the arguments and authorities section of briefs or memoranda must not exceed 30 pages, absent an order of the court.

**c.   Motions Regarding Expert Testimony.**  All motions to exclude testimony of expert witnesses pursuant to Fed. R. Evid. 702-705, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), or similar case law, must be filed in accordance with the dispositive-motion deadline stated above.

**9.   TRIAL.**

The trial docket setting, as established in the scheduling order and any amendments, is **February 26, 2019, at 9:00 AM, in Topeka, Kansas.**  This case will be tried by jury.  The court will attempt to decide any timely filed dispositive motions approximately 60 days before trial.  If no dispositive motions are timely filed, or if the case remains at issue after timely dispositive motions have been decided, then the trial judge will convene another pretrial conference to discuss, among other things, the setting

of deadlines for filing final witness and exhibit disclosures, exchanging and marking trial exhibits, designating deposition testimony for presentation at trial, motions in limine, proposed instructions in jury trials, and proposed findings of fact and conclusions of law in bench trials.

IT IS SO ORDERED.

Dated June 15, 2018, at Topeka, Kansas.

s/ K. Gary Sebelius  
K. Gary Sebelius  
U. S. Magistrate Judge