**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

Civil Action No.    15-CV-4958-DDC-KGS

REZAC LIVESTOCK COMMISSION CO., INC.

      Plaintiff,

v.

PINNACLE BANK; and DINSDALE BROS., INC.,

      Defendants.

---

**MEMORANDUM IN SUPPORT OF DEFENDANT DINSDALE BROS., INC.'S
MOTION FOR SUMMARY JUDGMENT**

---

Pursuant to Local Rule 56.1(a), Defendant, Dinsdale Bros., Inc. d/b/a Dinsdale Brothers, Inc. (**"Dinsdale Bros."**), submits this Memorandum in Support of Dinsdale Bros.' Motion for Summary Judgment.

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 2

STATEMENT OF MATERIAL UNDISPUTED FACTS ...................................... 3

Background ........................................................................................................... 3

The September 28-29, 2015 Telephone Conversations ................................... 4

The Rezac-Leonard Sale ..................................................................................... 5

The Leonard-Dinsdale Bros. Re-Sale ............................................................... 7

Leonard's Reporting of the Leonard-Dinsdale Bros. Re-Sale ...................... 10

ARGUMENT ......................................................................................................... 11

I.    EACH OF REZAC'S CLAIMS HINGE ON AN AGENCY RELATIONSHIP BETWEEN DINSDALE BROS. AND LEONARD (ALL COUNTS) ....................... 11

II.   THE UNDISPUTED FACTS SHOW THAT NO AGENCY RELATIONSHIP EXISTED BETWEEN DINSDALE BROS. AND LEONARD (ALL COUNTS) ..... 12

    A.   Principal-Agent Relationship ................................................................ 12

        1.   Control by the Principal .............................................................. 13

        2.   Assent ............................................................................................. 15

        3.   Benefit to the Principal ................................................................ 16

    B.   Authority ................................................................................................. 17

        1.   Actual Express Authority ............................................................ 17

        2.   Implied Actual Authority ............................................................. 18

        3.   Apparent Authority ...................................................................... 19

III.  REZAC CANNOT SHOW BREACH OF CONTRACT (COUNT I) ....................... 20

IV.  REZAC CANNOT SHOW CONVERSION (COUNT II) ......................................... 20

V.   REZAC CANNOT SHOW UNJUST ENRICHMENT OR QUANTUM MERUIT (COUNTS III & V) ....................................................................................... 22

VI.  REZAC CANNOT SHOW CONSPIRACY (COUNT VI) ......................................... 24

CONCLUSION ....................................................................................................... 25

i

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

AgriStor Leasing v. Meuli, 634 F. Supp. 1208 (D. Kan. 1986)....................................................12

Atkins v. Heavy Petroleum Partners, 86 F. Supp.3d 1188, 1208 (D. Kan. 2015) ........................25

Bomhoff v. Nelnet Loan Svcs., 109 P.3d 1241 (Kan. 2005) ...........................................................20

Brady Campaign v. Brownback, 110 F. Supp.3d 1084, 11001 ....................................................13

In re Bratt, 491 B.R. 572 (Bankr. D. Kan. 2013)........................................................................22

Bunge Milling v. City of Atchison, 310 P.3d 1064 (Kan. App. 2013)...........................................13

CIT Financial Servs. v. Gott, 615 P.2d 774 (Kan. App. 1980)......................................................13

Dixon v. CertainTeed, 944 F. Supp. 15011508 (D. Kan. 1996) ....................................................12

Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010)..........................................................................24

Golden Rule Ins. v. Tomlinson, 335 P.3d 1178 (Kan. 2014) ................................................. *passim*

Hammad v. Bombardier Learjet, 192 F. Supp.2d 1222 (D. Kan. 2002)..................................11, 14

Hughes v. Jones, 476 P.2d 588 (Kan. 1970)..................................................................................13

Ice Corp. v. Hamilton Sustrand, 444 F. Supp.2d 1165 (D. Kan. 2006).........................................24

Ireland v. Dodson, 704 F. Supp.2d 1128 (D. Kan. 2010) ..............................................................22

J.W. Thompson Co. v. Welles Products, 758 P.2d 738 (Kan. App. 1988)...............................23, 24

Kincaid v. Dess, 298 P.3d 358 (Kan. App. 2013)..........................................................................20

Meyer v. Christie, 634 F.3d 1152 (10th Cir. 2011) .......................................................................25

In re Motor Fuel Litigation, 534 F. Supp.2d 1214 (D. Kan. 2008)................................................25

Parsells v. Manhattan Radiology Group, 255 F. Supp.2d 1217 (D. Kan. 2003) ..........................21

Parsons v. Davis, 1997 WL 446264 (D. Kan. 1997) ....................................................21

Professional Lens Plan v. Polaris Leasing, 675 P.2d 887 (Kan. 1984)..........................20

Queen v. Lynch Jewelers, 55 P.3d 914 (Kan. App. 2002)..............................................21

Redmond v. Hassan, 523 B.R. 729 (Bankr. D. Kan. 2014) ............................................25

Regal Ware v. Vita Craft, 653 F. Supp.2d 1146 (D. Kan. 2006)....................................20

Ronald Odette Family Ltd. v. AGCO Finance, 129 P.3d 95 (Kan. App. 2005) ............21

School-Link Tech. v. Applied Resources, 471 F. Supp.2d 1101 (D. Kan. 2007)...........23

Shugar v. Antrim, 276 P.2d 372 (Kan. 1942) ................................................................18

Spires v. Hospital Corp., 2008 WL 2152402 (10th Cir. 2008)......................................23

Stoldt v. City of Toronto, 678 P.2d 153 (Kan. 1984) ...............................................24, 25

T.R., Inc. v. Brandon, 87 P.3d 331 (Kan. App. 2004) ..................................................22

Temmen v. Kent–Brown Chevrolet, 605 P.2d 95 (Kan. 1980) ......................................22

Theis v. duPont, 510 P.2d 1212 (Kan. 1973).........................................................17, 19

University of Kansas v. Board of Com'rs, 327 P.3d 430 (Kan. 2014) ..........................23

**Other Authorities**

2A C.J.S. Agency § 5.....................................................................................................13

Restatement of Restitution ............................................................................................23

Restatement of Restitution § 110..................................................................................23

**EXHIBIT LIST**

| EXHIBIT | DESCRIPTION |
| --- | --- |
| 1 | Affidavit of David Wahlert |
| 2 | Invoices from September 29, 2015 sale from Rezac to Leonard |
| 3 | Check from Leonard to Rezac |
| 4 | Invoices from September 29, 2015 sale from Leonard to Dinsdale Bros. |
| 5 | Deposition of Charles Leonard |
| 6 | Deposition of Rezac |
| 7 | 2015 Packers & Stockyards Report for Leonard |

# INTRODUCTION

Rezac entered a written cattle sale contract with Charlie Leonard of Leonard Cattle Company (**"Leonard"**).  Rezac documented the transaction listing only Leonard as the buyer and Rezac had no dealings with Dinsdale Bros.  Leonard then marked up the cattle and re-sold them to Dinsdale Bros. under another written sale contract that listed only Leonard as the seller. Dinsdale Bros. paid its seller over $1 million in the manner instructed by the seller.  Through all of this, Rezac and Dinsdale Bros. had no dealings.  Ultimately, Leonard bounced his check to Rezac because he had written checks to other creditors.

Rezac seeks to recover the money owed by Leonard from Dinsdale Bros.  Rezac anchors this effort to a theory that Dinsdale Bros. made Leonard its agent for the Rezac-Leonard sale. Rezac bears the burden of proving that theory by clear and convincing evidence.  But, as a matter of undisputed fact, the evidence does not exist.  And the existing evidence contradicts or bars Rezac's agency theory.  Rezac's other claims likewise crumble under the undisputed facts.

Rezac will no doubt tout its successful evasion of dismissal under Rule 12.  But the Court's Order (Doc. 55) on Dinsdale Bros.' Motion to Dismiss provides a summary judgment roadmap.  At that stage, the Court had to accept false claims as true and disregard documents that are now in the record and that undermine Rezac's claims.  With a record and without Rule 12's veneer, Rezac's claims cannot withstand Rule 56 scrutiny.

2

## STATEMENT OF MATERIAL UNDISPUTED FACTS

### Background

1.     Dinsdale Bros. feeds cattle and, to do so, it buys cattle from six or seven persons licensed as dealers under the Packer & Stockyards Act.  One of those dealers was Leonard. Exhibit 1, ¶ 2.

2.     From 1992 to 2015, Leonard was a "cattle dealer," meaning he bought and sold cattle on his own account and resold them to cattle feeders.  Exhibit 5 at 11:4-11, 17:22-171:1; Exhibit 1, ¶ 3; Exhibit 6, 24:17-19, 125:12-15.

3.     A "dealer transaction," according to Leonard, "is when a person buys cattle for their own account," even when purchased on commission.  Exhibit 5 at 180:19-25.

4.     Leonard arranged and paid for the trucking and insurance for transporting to cattle to Leonard's buyer.  Exhibit 5 at 23:5-13.  Leonard used the same trucking dispatch to transport livestock for all his sales, and his same insurance policy to insure the animals.  Exhibit 5, 197:8-199:14, 200:18-22.  Leonard paid for both the trucking and insurance himself.  Id.

5.     In Dinsdale Bros.' purchases from him, Leonard:

      a.     Purchased cattle from sale barns;

      b.     Paid the sale barn himself; and

      c.     Issued a separate invoice from Leonard to Dinsdale Bros.

Exhibit 1, ¶ 4.

6.     On September 29, 2015, like all other days before it, Leonard could purchase cattle for anyone he desired.  Depending on what Leonard purchased, Dinsdale Bros. could

3

purchase some or all the cattle from Leonard.  Dinsdale Bros. never suggested to Leonard that he had to purchase cattle for Dinsdale Bros.  Exhibit 1, ¶ 11.

7.     On September 29, 2015, like all other days before it, Dinsdale Bros. had no control over:

    a.     Whether Leonard attended an auction;

    b.     The location of any auction Leonard attended; or

    c.     Whether or under what terms Leonard purchased cattle.

Id., ¶ 10.

8.     Dinsdale Bros. never exercised control over how Leonard conducted his business. Whether and how often and at what quantities Leonard sold to Dinsdale Bros. was up to Leonard.  Exhibit 5, 355:16-356:15.

**The September 28-29, 2015 Telephone Conversations**

9.     On September 28, 2015, Leonard and Dinsdale Bros. employee David Wahlert spoke briefly on the telephone.  During that call Leonard and Mr. Wahlert discussed the cattle market and Leonard informed Mr. Wahlert that Leonard already planned to attend an auction in St. Marys, Kansas.  Mr. Wahlert informed Leonard that Dinsdale Bros. was in the cattle market but they did not discuss prices.  Mr. Wahlert planned to call Leonard the next day after checking the market.  Exhibit 1, ¶ 5; Exhibit 5 at 16:12-18:8.

10.     Before speaking with Leonard on September 28, 2015, Mr. Wahlert did not know whether Leonard planned to attend a cattle sale the next day or, if so, which auction Leonard planned to attend.  Exhibit 1, ¶ 6.

11.     Neither Mr. Wahlert nor anyone else representing Dinsdale Bros. instructed Leonard to attend the auction in St. Marys on September 29, 2015.  Id., ¶ 7.

12.     Rather, Leonard attended the auction almost every Tuesday and independently planned to attend on September 29, 2015, before he spoke with Mr. Wahlert on September 28. Exhibit 5, 172:20-173:1.  When they spoke on September 28, Leonard informed Mr. Wahlert that Leonard already planned to attend the Rezac auction on September 29.  Id., 16:17-20.

13.     Before this lawsuit, Mr. Wahlert had never heard of the Rezac sale barn in St. Marys or communicated with any Rezac representative.  Mr. Wahlert knew the location of some auctions Leonard attended, but Mr. Wahlert did not know Leonard previously attended the Rezac auction.  Exhibit 1, ¶ 8.

14.     On September 29, 2015, Mr. Wahlert spoke with Leonard on the telephone and informed Leonard that Dinsdale Bros. was interested in purchasing heifers under 800 pounds and steers under 900 pounds.  Leonard and Mr. Wahlert did not discuss the price or quantity that Dinsdale Bros. would purchase from Leonard, which they left for future discussion.  No one other than Leonard and Mr. Wahlert participated in this call.  Id., ¶ 9; Exhibit 5 at 16:12-18:8.

**The Rezac-Leonard Sale**

15.     Leonard attended Rezac's auction almost every Tuesday and purchased cattle "[a]bout every time we went."  Exhibit 5, 172:20-173:1, 185:11-14.  Leonard's business dictated that he only attended the later part of the auction because that was when yearlings were sold. Exhibit 5, 188:16-189:21.

5

16.     On September 29, 2015, Leonard attended an auction at Rezac's sale barn and Rezac sold cattle to Leonard at the auction.  Exhibit 6, 128:8-11

17.     Rezac documented Leonard's September 29 cattle purchase in a "Buyer Recap" and invoices, copies of which are attached as Exhibit 2.  Exhibit 6, 128:8-17, 161:13-162:4.

18.     In 2015, both Leonard and Rezac kept licenses and bonds under the Packers & Stockyards Act (**"PSA"**), which required them to accurately document the September 29, 2015 sale.  Exhibit 5, 241:2-21; Exhibit 6, 25:3-26:5.

19.     Rezac's invoices for the September 29 sale listed "LEONARD CATTLE CO," and only "LEONARD CATTLE CO," as the buyer.   Exhibit 2.   Rezac's invoices for the September 29 sale do not mention Dinsdale Bros.  Id.

20.     Neither Rezac nor Leonard ever provided the Rezac invoice for the September 29 sale to Dinsdale Bros.  Exhibit 5, 243:15-17; Exhibit 1, ¶ 16.

21.     On September 29, 2015, Leonard bought several steers that weighed over 900 pounds at the Rezac auction.  Exhibit 5, 308:16-309:1.

22.     Before the sale on September 29, 2015, Rezac did not know that Leonard had spoken with a Dinsdale Bros. representative.  Exhibit 5 at 20:6-13; Exhibit 6, 174:5-9.  Rezac did not know the livestock's destination until after the sale's completion.  Exhibit 5, 204:7-205:17; Exhibit 6, 132:24-133:13.

23.     Nor did Leonard tell Rezac before the sale the weight or type of cattle Leonard was looking for.  Exhibit 6, 133:24-134:8.

24.     Well after the Leonard-Rezac sale, Leonard instructed Rezac to send the cattle to D&D, another entity, in Colorado.  Exhibit 5, 204:7-205:17.  Rezac's owner, Dennis Rezac, testified that he would have sold the cattle to Leonard regardless of whether Leonard had communicated with a buyer before the auction "because he had been doing it over time." Exhibit 6, 134:13-135:3.

25.     The morning after the sale, Leonard's office wrote Rezac a $980,361 check from Leonard's checking account to cover the purchase and mailed the check to Rezac.  Exhibit 5, 207:3-18, 277:2-25; Exhibit 6, 128:8-19.  A copy of that check is attached as Exhibit 3.  Dinsdale Bros.' name appeared nowhere on this check.  Exhibit 3; Exhibit 5, 279:25-280:2.  And Leonard never showed this check to Dinsdale Bros.  Exhibit 5, 280:7-12.

26.     By the time Rezac cashed Leonard's check, Leonard's checks to others left insufficient funds for Rezac.  Exhibit 5, 287:20-289:3; Exhibit 6, 128:8-22.

**The Leonard-Dinsdale Bros. Re-Sale**

27.     Leonard did not inform Dinsdale Bros. what he paid Rezac for the cattle because that transaction was between Leonard and Rezac.  Exhibit 5, 281:2-15.  No one ever provided Dinsdale Bros. with any invoice or other documentation of Leonard's purchase from Rezac. Exhibit 1, ¶ 16.

28.     After the September 29 sale, Leonard called Mr. Wahlert and informed him that Leonard had available cattle and they confirmed that Leonard would resell part of the cattle to Dinsdale Bros.  No one other than Leonard and Mr. Wahlert participated in that call.  Id., ¶ 12; Exhibit 5 at 196:24-197:5.

29.     Leonard then sold 668 head of cattle (the **"Cattle"**) to Dinsdale Bros. <u>Exhibit 1</u>, ¶ 13.

30.     Leonard did not sell all the cattle he purchased from Rezac on September 29 to Dinsdale Bros.  Rather, Leonard resold some cattle he purchased to other sellers.  <u>Exhibit 5</u>, 309:23-25.

31.     Leonard's office prepared invoices for the sale and sent them to Dinsdale Bros. <u>Exhibit 1</u>, ¶ 14; copies of the invoices are attached as <u>Exhibit 4</u>.

32.     Those invoices were issued solely from Leonard to Dinsdale Bros. <u>Exhibit 4</u>. Rezac's name appears nowhere on the invoices.  <u>Id.</u>  The invoices state no commissions paid to Leonard or orders given to Leonard.  <u>Id.</u>

33.     All of Leonard's invoices stated on their face that "100% of sales made by Leonard Cattle Company are on a sold to basis."  <u>Exhibit 4</u>.  Leonard testified that:

> Q. Okay. And then right below where it says DEL, for delivered, it says, "A hundred percent of sales made by Leonard Cattle Company are on a sold-to basis"?
> A. Right.
> Q. Okay. So that means that you, consistent with what it says at the top of the invoice, you sold these animals to Dinsdale Brothers?
> A. Right.
> Q. Okay. Not on a commission basis, but a sold-to basis is what your invoice says?
> A. Right.

<u>Exhibit 5</u>, 247:15-248:1.

34.     Those invoices were the only documents Leonard sent to Dinsdale Bros. for the sale.  <u>Exhibit 1</u>, ¶ 14.  Leonard never sent his internal worksheets or suggested to Dinsdale Bros. that he prepared internal worksheets.  <u>Exhibit 5</u>, 249:9-250:12.

35.     Leonard did not send Dinsdale Bros. any information about how he calculated his markup on the Cattle because that was none of Dinsdale Bros.' business.  Exhibit 5, 257:19-259:6, 264:4-265:5, 330:7-331:1.

36.     Leonard instructed Dinsdale Bros.—as he did with all his customers—to pay by wire, which Dinsdale Bros. did.  Exhibit 5, 211:18-212:23.  Wiring instructions appeared on the invoice.  Id., 212:15-16; Exhibit 4.

37.     Dinsdale Bros. paid Leonard $1,004,351.49 for the Cattle by wiring it to Leonard's bank account.   Exhibit 1, ¶ 15.   Leonard instructed Dinsdale Bros. to wire the purchase price to Leonard's account and Leonard never suggested that Dinsdale Bros. should send the purchase price anywhere else.  Id.

38.     After reselling the livestock to Dinsdale Bros., Leonard's office prepared invoices for the sale and sent it to Dinsdale Bros., the same way Leonard invoiced his other customers.  Exhibit 5, 209:14-211:12.

39.     In these invoices, Leonard listed himself, and only himself, as the seller.  Leonard listed himself as the seller in compliance with the PSA, which required Leonard to accurately identify the seller.  Exhibit 5, 244:19-245:12.

40.     Leonard used his same trucking dispatch to transport the livestock, and his same insurance policy to insure the animals, and Leonard bore the risk of transportation loss.  Exhibit 5, 197:8-199:14, 200:18-22, 201:17-21, 246:24-247:14, 276:10-16.

41.     Leonard confirmed that Dinsdale Bros. could refuse to purchase the Cattle from Leonard, for instance, based on price or condition.  Exhibit 5, 337:11-20, 338:10-12, 341:5-13.

42.     Leonard has never received:

a.  Check writing authority for Dinsdale Bros. or a Dinsdale Bros. checkbook Exhibit 5, 219:19-21, 348:11-13.

b.  Signatory authority from Dinsdale Bros.  Exhibit 5, 348:18-20.

c.  Vehicles from Dinsdale Bros.  Id., 348:21-23;

d.  Dinsdale Bros. letterhead, logos, business cards, or apparel.  Id., 349:13-350:5.

e.  Mileage or fuel reimbursements from Dinsdale Bros.  Id., 350:6-10.

f.  A 1099 or W-2 from Dinsdale Bros.  Id., 341:14-17.

43.     Leonard kept his own books and records.  Exhibit 5, 351:7-21.  Leonard's business was separate from Dinsdale Bros.' business and Leonard's business with Dinsdale Bros. ended when he sold Dinsdale Bros. cattle.  Id., 354:5-8.

**Leonard's Reporting of the Leonard-Dinsdale Bros. Re-Sale**

44.     Leonard paid federal income taxes for the September 29, 2015 sale based on the difference between his purchase price from Rezac and his resale to Dinsdale Bros.  He reported the transaction to the IRS as a dealer markup, not an agent's commission.  Exhibit 5, 342:3-25.

45.     The PSA required Leonard to file annual reports with the Packers & Stockyards Administration, including delineations of transactions undertaken as a dealer and as an agent. Exhibit 5, 344:13-21.  A copy of his 2015 report is attached as Exhibit 7.  Rezac reported that he undertook the September 29, 2015 to Dinsdale Bros. as a dealer, not a commissioned agent. Exhibit 5, 345:12-346:4; Exhibit 7.  In Section 3 of his 2015 PSA Report, Leonard listed all of

his purchases as "Livestock Dealer Purchases" and none of his purchases as "bought on commission for the account of others."  Exhibit 4 at 2, Section 3.

## ARGUMENT

Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "The usual and primary purpose of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses."  Hammad v. Bombardier Learjet, 192 F. Supp.2d 1222, 1227 (D. Kan. 2002).  While Dinsdale Bros. "must initially show both an absence of a genuine issue of material fact, as well as entitlement to judgment as a matter of law," Dinsdale Bros. "need not 'support its motion with affidavits or other similar materials *negating* [Rezac's] claims or defenses.  Rather, [Dinsdale Bros.] can satisfy its obligation simply by pointing out the absence of evidence on an essential element of [Rezac's] claim."  Id. (citation omitted).

## I.   EACH OF REZAC'S CLAIMS HINGE ON AN AGENCY RELATIONSHIP BETWEEN DINSDALE BROS. AND LEONARD (ALL COUNTS)

As this Court recognized, Rezac does not allege a direct contractual relationship with Dinsdale Bros.  Doc. 55 at 5-6 ("plaintiff never alleges that Dinsdale made any contract with it"). Instead, Rezac claims that any such relationship arises solely from Leonard's alleged status as Dinsdale Bros.' agent.  Id.  So, without the alleged agency relationship Rezac's contract claims fail.  Nor does Rezac allege that Dinsdale Bros. directly took cattle from Rezac—that was Leonard as well.  So Rezac's conversion and unjust enrichment/quantum meruit claims likewise fail without the alleged agency relationship.  Id. at 29, 32.

II.   **THE UNDISPUTED FACTS SHOW THAT NO AGENCY RELATIONSHIP EXISTED BETWEEN DINSDALE BROS. AND LEONARD** (ALL COUNTS)

The undisputed facts show a buyer-seller relationship—and nothing more—between Leonard and Dinsdale Bros.  "'What constitutes agency and whether there is competent evidence reasonably tending to prove the relationship is a question of law.'"   Golden Rule Ins. v. Tomlinson, 335 P.3d 1178, 1187 (Kan. 2014)(citation omitted).[1]  So the Court may decide this issue on summary judgment.

In Kansas, "the party relying on agency to establish his claim has the burden of establishing its existence by clear and convincing evidence, and whether there is any competent evidence tending to prove the relationship is a question of law for the court." AgriStor Leasing v. Meuli, 634 F. Supp. 1208, 1215 (D. Kan. 1986)(citing CIT Financial Servs. v. Gott, 615 P.2d 774, 779 (Kan. App. 1980)).   In making this determination, the Court answers two questions: (1) "whether the evidence . . . supported the existence of an agency relationship between [Dinsdale Bros.] as principal and [Leonard] as agent" and (2) "whether [Leonard's] acts were within the scope of his authority as agent or were otherwise binding" on Dinsdale Bros.  Golden Rule, 335 P.3d at 1186-87.   Rezac bears the burden of proving, by clear and convincing evidence, an affirmative answer to both questions.

A.   **Principal-Agent Relationship**

An agency relationship requires that "one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the

---

[1] See also Dixon v. CertainTeed, 944 F. Supp. 15011508 (D. Kan. 1996)("The question of what constitutes an agency is a question of law for the court.").

principal's control, and the agent manifests assent or otherwise consents so to act." <u>Golden Rule</u>, 335 P.3d at 1188 (citing <u>Restatement (Third) of Agency</u> § 1.01). The relationship must obligate Leonard "to act with the utmost good faith and loyalty for the furtherance and advancement of the interests of his principal." <u>Id.</u> <u>See also</u> 2A C.J.S. <u>Agency</u> § 5. So a principal-agent relationship has three components: assent by both parties, benefit to the principal, and control by the principal. <u>See</u> <u>Golden Rule</u>, 335 P.3d at 1186-88. "An agency will not be inferred because a third person assumed that it existed, nor because the alleged agent assumed to act as such, nor because the conditions and circumstances were such as to make such an agency seem natural and probable." <u>Bunge Milling v. City of Atchison</u>, 310 P.3d 1064, 1070 (Kan. App. 2013). And a "buyer-seller relationship between" and alleged principal and agent cannot support an agency finding. <u>CIT Financial v. Gott</u>, 615 P.2d 774, 779 (Kan. App. 1980).

### 1.     Control by the Principal

The absence of Dinsdale Bros.' control over Leonard is among the most glaring shortcomings in Rezac's agency claim. "'Indeed, the essential feature of agency is the right of control, which right includes the right to dictate the means and details of the agent's performance.'" <u>Brady Campaign v. Brownback</u>, 110 F. Supp.3d 1084, 11001 n.73 (D. Kan. 2015)(quoting 3 Am.Jur.2d <u>Agency</u> § 2); <u>Hughes v. Jones</u>, 476 P.2d 588, 592 (Kan. 1970).

Dinsdale Bros. undisputedly exercised no control over Leonard, let alone the right to dictate the means and details of his performance. At no time did Dinsdale Bros. control whether

or where Leonard attended an auction.  Nor did Dinsdale Bros. control whether or under what terms Leonard bought cattle at whatever auction he attended.

On September 29, 2015, Leonard was going to attend the Rezac auction no matter what Dinsdale Bros. said—regularly attending the auction was Leonard's personal practice.  It was also his personal practice—not Dinsdale Bros.' instruction—to bid only on yearlings.  Far from instructing him to attend the auction, Dinsdale Bros. had never heard of the auction.  If he went to the September 29 auction, Leonard could purchase whatever type or quantity of cattle he desired.  Leonard did so, purchasing a head count that he alone determined.  And he purchased some cattle outside the weight parameters for which Dinsdale Bros. expressed interest.  Leonard could re-sell the Cattle to whomever he pleased.  And he did so, selling some cattle purchased on September 29 to Dinsdale Bros. and some to other buyers.  When re-selling the Cattle to Dinsdale Bros., Leonard hand-picked—with no Dinsdale Bros. involvement—the truckers and insurance for the Cattle's transportation.  And he picked his own markup.  Leonard also dictated the method of payment Dinsdale Bros. made.

Rezac must prove control by clear and convincing evidence and Dinsdale Bros. "need not 'support its motion with affidavits or other similar materials *negating* [Rezac's] claims . . . .  Rather, [Dinsdale Bros.] can satisfy its obligation simply by pointing out the absence of evidence on an essential element." Hammad, 192 F. Supp.2d at 1227.  The undisputed facts both negate Rezac's control claim and point out the absence of control.  Leonard did whatever he wanted and Dinsdale Bros. dictated nothing.  Rezac indisputably cannot show control, meaning it cannot show agency, meaning its claims all fail.

14

2.      **Assent**

Nothing about their undisputed communications and conduct supports assent to an agency relationship by either Dinsdale Bros. or Leonard.  Assent to an agency relationship requires "written or spoken words or other conduct" by the principal and agent.  <u>Golden Rule</u>, 335 P.3d at 1188 (quoting <u>Restatement (Third) of Agency</u> § 1.03).

Leonard came to the September 29, 2015 auction as a dealer buying cattle on his own account.  That was what he reported to Packers & Stockyards and what he confirmed in his testimony.  Mr. Wahlert had the same understanding and simply expressed a desire to buy cattle from Leonard.  Beyond that, assent or lack thereof boils down to two telephone conversations.

By both their accounts, before the auction Leonard and Mr. Wahlert had two casual telephone conversations about the market and Dinsdale Bros.' interest in purchasing cattle from Leonard.  Leonard informed Mr. Wahlert that he already planned to go to the St. Marys auction, which Mr. Wahlert had never heard of.  According to Leonard, Mr. Wahlert stated that "we want to try to get something done" and that Dinsdale Bros. was not interested in steers over 900 pounds or heifers over 800 pounds.  Quantity and price—the most important terms—were not discussed and remained open to future negotiation.

Nowhere in these two conversations did Dinsdale Bros. state or imply assent to having Leonard contractually bind Dinsdale Bros. to Rezac for some unknown cattle quantity and price.  Nor did Leonard assent in these two conversations to act as Dinsdale Bros.' fiduciary at the auction.  The conversations were casual and equivocal and impossible to support assent to an

agency for a seven-figure cattle purchase.  Rather, Leonard confirmed Dinsdale Bros.' right to refuse to purchase cattle from Leonard.

Leonard's ensuing actions confirmed this lack of assent:  he bought steers exceeding 900 pounds, sold cattle to buyers other than Dinsdale Bros., accepted a Rezac invoice that listed only himself as buyer, and issued a re-sale invoice on a "sold-to basis."  Dinsdale Bros.' ensuing actions likewise confirmed lack of assent:  it never requested or received any details or documents from the Rezac auction and accepted and paid Leonard's "sold-to" invoice.

Like control, the assent element of Rezac's agency theory lacks evidence and the undisputed facts only undermine assent.  Again, the agency theory fails on this essential element.

### 3.    Benefit to the Principal

Like he did most Tuesdays, Leonard came to the September 29, 2015 Rezac auction to benefit Leonard.  According to his testimony and his sworn Packers & Stockyards report, Leonard bid at the auction as a dealer buying cattle for his own account.  Leonard could, and did, purchase cattle outside Dinsdale Bros.' weight preferences.  Leonard could, and did, resell to buyers other than Dinsdale Bros.  Far from giving Dinsdale Bros. some benefit of his bid at the auction, Leonard concealed all the details of that bid.  Neither the bid nor the invoice nor Leonard's markup were revealed to Dinsdale Bros.  Nor did Dinsdale Bros. expect such benefits:  Dinsdale Bros. entered a separately-documented "sold-to" transaction in which disclosed only Leonard as the seller. As with the other elements of an agency relationship, the benefit element is fatally missing.

16

**B.**     **Authority**

Kansas "law recognizes two distinct types of [authority], one actual and the other ostensible or apparent."   Theis v. duPont, 510 P.2d 1212, 1216 (Kan. 1973).   Rezac can show neither, and certainly not by clear and convincing evidence.

**1.**     **Actual Express Authority**

Dinsdale Bros. indisputably delegated no authority to Leonard.   In a principal-agent relationship, express authority exists when "'the principal has delegated authority to the agent by words which expressly authorize the agent to do a delegable act.'"   Golden Rule, 335 P.3d at 1189 (citation omitted).   Express authority must be "'stated in very specific or detailed language.'"   Id. at 1188 (quoting Restatement (Third) of Agency § 2.01 cmt. b)).

Dinsdale Bros. did not delegate authority for Leonard to attend the September 29 auction; Leonard was already planning to go and Dinsdale Bros. had never heard of the auction.   Dinsdale Bros. did not delegate authority to purchase at any quantity or price; those details were not discussed before the auction.   Dinsdale Bros. did not suggest that Leonard could attend the auction as Dinsdale Bros.' representative and bind Dinsdale Bros. to untold cattle quantities and prices.   No specific and detailed language supports such grants of authority.

Rather, the specific and detailed language supports the absence of authority.   The invoices provided by Rezac to Leonard do not even hint at delegation of authority by Dinsdale Bros.   Nor does the check written by Leonard to Rezac.   Nor do the invoices later provided by Leonard to Dinsdale Bros. hint at such delegation.   Nor does Dinsdale Bros.' wire to Leonard.

17

Once again, an essential element of Rezac's agency claim is missing and eviscerated by undisputed facts.

### 2.     Implied Actual Authority

In determining the existence of implied actual authority, the Court asks whether, from the parties' statements, conduct, "and other relevant circumstances," the parties intended to "create a relationship permitting the assumption of authority by an agent which, when exercised by him, would normally and naturally lead others to believe in and rely on his acts as those of the principal." Shugar v. Antrim, 276 P.2d 372, 375 (Kan. 1942). See also Golden Rule, 335 P.3d at 1189; Prof'l Lens Plan, 710 P.2d at 1303.

Dinsdale Bros. told Leonard that it was in the market for cattle below certain weight and nothing more.  Dinsdale Bros. had no communication at all with Rezac, let alone communication indicating Leonard was its agent.  Dinsdale Bros. neither requested nor received documentation of Leonard's purchase from Rezac.  Dinsdale Bros. followed Leonard's instruction to wire money to Leonard, not Rezac.

Meanwhile, Leonard undisputedly had no check-writing or signatory authority from Dinsdale Bros. and received no reimbursements or 1099s from Dinsdale Bros.  Leonard never used Dinsdale Bros.' logos, letterhead, business cards, or apparel.  He wrote checks from his own account and Dinsdale Bros.' name appeared nowhere on those checks.  He accepted invoices from Rezac that listed Leonard as the buyer and never mentioned Dinsdale Bros.  He kept his own insurance and made his own trucking arrangements.  He did not report his income from the September 29 sale as 1099 or W-2 income.  He reported to

18

Packers & Stockyards, under oath, that he was a dealer buying on his own account, not an agent buying for someone else, on September 29, 2015.  Leonard never mentioned Dinsdale Bros. to Rezac until well after Leonard had already purchased the Cattle.

Not surprisingly, Rezac did not rely on some notion that Leonard was acting as Dinsdale Bros.  Dennis Rezac had no idea that Leonard had spoken with Dinsdale Bros. until after the auction.  Dennis Rezac testified that he would have sold Leonard cattle on September 29 based on Rezac's past dealings with Leonard, not on some Dinsdale Bros. agency.

### 3.  Apparent Authority

"[T]he apparent authority doctrine has relevance only when a third party has dealt with an ostensible agent and then seeks to bind the principal to a transaction despite the fact that the agent had no actual authority to bind him."  <u>Theis</u>, 510 P.2d at 1217 (citations omitted).  So apparent authority exists when "the principal has intentionally or by want of ordinary care induced and permitted third persons to believe [a person] to be his agent even though no authority, either express or implied, has been conferred upon him."  <u>Id.</u> at 1216.

This Court previously found that Rezac's Second Amended Complaint did not allege facts sufficient to support an inference that Leonard had apparent authority to purchase the Cattle as Dinsdale Bros.' agent.  Doc. 55 at 26-27.  Rezac has not improved its lot with discovery. Rezac does not and cannot claim that Dinsdale Bros. induced Rezac to believe that Leonard was a Dinsdale Bros. agent.  This element of agency can be dispensed with as quickly as the others.

19

III.    **REZAC CANNOT SHOW BREACH OF CONTRACT** (COUNT I)

"Privity of contract is . . . essential to the maintenance of a lawsuit based on a contract."

Kincaid v. Dess, 298 P.3d 358, 366 (Kan. App. 2013).   "'Ordinarily there is no privity of

contract between the original vendor of personal property and third persons who may purchase or

acquire the property from the original vendee.'"   Professional Lens Plan v. Polaris Leasing, 675

P.2d 887, 891 (Kan. 1984)(citation omitted).

Rezac faces this precise situation:  Rezac has a written contract with Leonard, and no

contract with Dinsdale Bros., meaning Rezac has no privity of contract with Dinsdale Bros.

IV.    **REZAC CANNOT SHOW CONVERSION** (COUNT II)

Conversion claims are barred when a "contract created and defined the rights to the

property which was subject matter of the conversion claim." Regal Ware v. Vita Craft, 653 F.

Supp.2d 1146, 1152 (D. Kan. 2006).   When property is transferred "pursuant to specific

provisions of" a contract, the plaintiff "must rely upon its breach of contract claim, rather than a

conversion claim."   Id.   See also Bomhoff v. Nelnet Loan Svcs., 109 P.3d 1241, 1246 (Kan.

2005)(no claim for conversion lies when property taken under contract terms).

The Cattle were not rustled away from Rezac.  Rezac undisputedly transferred the Cattle

voluntarily under express provisions of Rezac's own written contracts.  Those contracts (attached

as Exhibit 2) list Rezac as the Cattle's seller and Leonard as the Cattle's buyer.  So Rezac can

only recover for breach of contract against Leonard.  It cannot maintain a conversion claim to

recover amounts undisputedly set forth and owing under its own contracts.

And, in "order to establish a claim of conversion, the plaintiff must prove that the defendant's exercise of ownership over the chattel is unauthorized." Ronald Odette Family Ltd. v. AGCO Finance, 129 P.3d 95, 100 (Kan. App. 2005). When taking "the property was authorized by law, an essential element of the conversion claim [is] missing." Id. at 101. To show conversion of the Cattle, Rezac must show "that Dinsdale exercised ownership over them without authorization." Doc. 55 at 31. See also Parsells v. Manhattan Radiology Group, 255 F. Supp.2d 1217, 1238 (D. Kan. 2003)(property validly purchased by defendant is "not 'converted' or 'stolen'"); Parsons v. Davis, 1997 WL 446264, *5 (D. Kan. 1997)(dismissing conversion claim). As this Court noted, a plaintiff may not maintain tort claims when "'the conduct is permitted by the express provisions of a contract.'" Doc. 55 at 28 (quoting Burcham v. Unison Bancorp, 77 P.3d 130, 145 (Kan. 2003).

Dinsdale Bros. undisputedly received the Cattle pursuant to valid written contracts with Leonard *after* Leonard had undisputedly purchased the Cattle from Rezac. And Dinsdale Bros. undisputedly paid for the Cattle in the manner instructed by the seller, Leonard. In other words, Dinsdale Bros. lawfully received the Cattle. Dinsdale Bros. entered and performed a valid purchase contract which expressly permitted Dinsdale Bros. to possess the Cattle. These undisputed facts bar Rezac's conversion claim against Dinsdale Bros.

Also, to "'maintain an action for conversion, a plaintiff must have actual possession of the property or a right to immediately take possession of the property.'" Queen v. Lynch

21

Jewelers, 55 P.3d 914, 921 (Kan. App. 2002).[2]   Rezac voluntarily relinquished the Cattle to Leonard under written contracts prepared by Rezac.   When Dinsdale Bros. later received the Cattle, Leonard—not Rezac—had actual possession rights.   In other words, Rezac gave up possession and its conversion claim when it turned the Cattle over to Leonard.

Rezac's conversion claim amounts to an effort to morph dashed contractual expectations and a bounced check by Leonard into a tort claim against a party that Rezac never dealt with.[3] Conversion law does not permit thinly-veiled contract claims, especially against defendants like Dinsdale Bros. who take and pay for property in compliance with their contracts.   The conversion claim should be dismissed.

## V.   REZAC CANNOT SHOW UNJUST ENRICHMENT OR QUANTUM MERUIT (COUNTS III & V)

Since it conferred a benefit on Leonard, not Dinsdale Bros., Rezac cannot maintain its unjust enrichment or quantum meruit claims against Dinsdale Bros.   The "question of whether one party can recover damages from another based upon the theory of unjust enrichment is a question of law."   T.R., Inc. v. Brandon, 87 P.3d 331, 336 (Kan. App. 2004).[4]   The claims require proof that "(1) the plaintiff conferred a benefit on the defendant; (2) the defendant

---

[2] See also In re Bratt, 491 B.R. 572, 578 (Bankr. D. Kan. 2013)("The plaintiff must have a general property right in the converted property and the right to immediate possession of it.").

[3] If nothing else, Rezac's conversion claim cannot coexist with its breach of contract claim.   "'An action will not lie for conversion of a mere debt or chose in action.'"   Temmen v. Kent–Brown Chevrolet, 605 P.2d 95, 99 (Kan. 1980)(quoting 18 Am.Jur.2d Conversion § 10).   If Rezac somehow had a contract with Dinsdale Bros. via Leonard, then Rezac would have a claim for a debt, not conversion.

[4] See also Ireland v. Dodson, 704 F. Supp.2d 1128, 1142-43 (D. Kan. 2010).

appreciated and has knowledge of the benefit; and (3) the defendant accepted and retained the benefit under circumstances that make the retention unjust." <u>University of Kansas v. Board of Com'rs</u>, 327 P.3d 430, 441 (Kan. 2014).

"'A person who has conferred a benefit upon another as the performance of a contract with a third person is not entitled to restitution from the other merely because of the failure of performance by the third person.'" <u>J.W. Thompson Co. v. Welles Products</u>, 758 P.2d 738, 744 (Kan. App. 1988)(quoting <u>Restatement of Restitution</u> § 110).  Kansas courts routinely decide unjust enrichment/quantum meruit claims under the <u>Restatement of Restitution</u>, which states that a "person who has conferred a benefit upon another as the performance of a contract with a third party is not entitled to restitution from the other merely because of a failure of performance by the third person." <u>Restatement of Restitution</u>, § 110 at 455.

Rezac's unjust enrichment/quantum meruit claims against Dinsdale Bros. undisputedly arise from the failure of a third person, Leonard, to perform his contract with Rezac.  As a matter of law, that is an invalid basis for these claims and they should be dismissed.

Also Rezac cannot show one of the "basic elements of an unjust enrichment claim under Kansas law . . . 'a benefit conferred upon the defendant **by the plaintiff**.'" <u>School-Link Tech. v. Applied Resources</u>, 471 F. Supp.2d 1101, 1116 (D. Kan. 2007)(citation omitted; emphasis added).  "'One prerequisite for unjust enrichment is a benefit conferred on the defendant by the plaintiff.'" <u>J.W. Thompson</u>, 758 P.2d at 744 (citation omitted).[5]

---

[5] <u>See also</u> <u>Spires v. Hospital Corp.</u>, 2008 WL 2152402, *273 (10th Cir. 2008)(affirming dismissal of unjust enrichment claim where complaint "failed to allege that [the plaintiffs] had actually conferred a benefit on" the defendant).

Whatever benefit Dinsdale Bros. received from the Cattle came from Leonard. Dinsdale Bros. had no dealings with Rezac at all, let alone dealings in which Rezac conferred a benefit on Dinsdale Bros. Since it conferred no benefit on Dinsdale Bros., Rezac cannot maintain its unjust enrichment/quantum meruit claims.

Finally, there are no inequitable circumstances supporting unjust enrichment when the plaintiff "did not change its position to its detriment as a result of any promise implied by law on the part of" the defendant. J.W. Thompson, 758 P.2d at 745. Dinsdale Bros. undisputedly had no dealings at all with Rezac and Dinsdale Bros., let alone dealings involving a promise on which Rezac relied. The absence of such inequitable circumstances once again leaves Rezac without unjust enrichment/quantum meruit claims.[6]

## VI.   REZAC CANNOT SHOW CONSPIRACY (COUNT VI)

Rezac's conspiracy claim is a derivative claim that lacks anything from which to derive. An "'allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy.'" Gee v. Pacheco, 627 F.3d 1178, 1183 (10th Cir. 2010)(citation omitted).[7] "Conspiracy is not actionable without commission of some

---

[6] As with its conversion claim, Rezac's unjust enrichment/quantum meruit claims cannot coexist with any contract claims remaining after summary judgment. Courts "'applying Kansas law have concluded that quantum meruit and restitution are not available theories of recovery when a valid, written contract addressing the issue exists.'" Ice Corp. v. Hamilton Sustrand, 444 F. Supp.2d 1165, 1170 (D. Kan. 2006)(citing cases).

[7] In Kansas, "the elements of a civil conspiracy include: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds in the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof." Stoldt v. City of Toronto, 678 P.2d 153, 161 (Kan. 1984).

wrong giving rise to a cause of action independent of the conspiracy."  <u>Stoldt v. City of Toronto</u>, 678 P.2d 153, 161 (Kan. 1984).[8]  "The claim must be based on a valid, actionable underlying tort."  <u>In re Motor Fuel Litigation</u>, 534 F. Supp.2d 1214, 1236 (D. Kan. 2008).  So where "there are no allegations of a valid, underlying cause of action independent of the conspiracy" and "all of the previous causes of action . . . fail to state a claim and thus they cannot be the underlying independent action," the "conspiracy claim fails."  <u>Atkins v. Heavy Petroleum Partners</u>, 86 F. Supp.3d 1188, 1208 (D. Kan. 2015).

As detailed above, Rezac cannot show an actionable tort independent of its conspiracy claim.  So the conspiracy claim should be dismissed along with the other claims.

## **<u>CONCLUSION</u>**

Like many others, Rezac was harmed by Leonard.  But Rezac chose to deal with Leonard based on years of prior dealings and on written contracts.  Those dealings and those contracts were solely between Rezac and Leonard.  Dinsdale Bros. simply entered a contract to buy cattle and paid the amount owing to the seller.  Dinsdale Bros. never assumed the role of babysitter or surety of the Rezac-Leonard relationship.  Against this backdrop, Rezac has no available legal theory to make Dinsdale Bros. pay twice for the Cattle.  The claims against Dinsdale Bros. should be dismissed.

---

[8] <u>See also</u> <u>Meyer v. Christie</u>, 634 F.3d 1152, 1156 (10th Cir. 2011).  This is because "'the existence of a civil conspiracy is not an actionable wrong by itself; it is really a means for impos[ing] vicarious liability for concerted action.'"  <u>Redmond v. Hassan</u>, 523 B.R. 729, 743 (Bankr. D. Kan. 2014).

Dated:  June 22, 2018.

s/ Thomas Hiatt
Scott C. Sandberg, Admitted Pro Hac Vice
John O'Brien, Admitted Pro Hac Vice
Spencer Fane LLP
1700 Lincoln Street, Suite 2000
Denver, CO  80203
Telephone:  303.839.3800 / Fax:  303.839.3838
ssandberg@spencerfane.com; jobrien@spencerfane.com

Thomas Hiatt
1000 Walnut Street, Suite 1400
Kansas City, MO 64106
thiatt@spencerfane.com

**Attorneys for Defendant Dinsdale Bros., Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that on June 22, 2018, a copy of the foregoing was served via the Court's Electronic Case Filing System on the following:

Robert M. Thompson
Michelle M. Masoner
Stephanie C. Bradshaw
Bryan Cave LLP
1200 Main Street, Suite 3800
Kansas City, Missouri 64105
Telephone:  816-374-3200
rmthompson@bryancave.com;
michelle.masoner@bryancave.com;
stephanie.bradshaw@bryancave.com
**Attorneys for Rezac Livestock Commission Co.**

Timothy A. Shultz, KS #16060
Goodell, Stratton, Edmonds & Palmer, LLP
515 S. Kansas Ave.
Topeka, KS 66603
Phone: 785-233-0593
tshultz@gseplaw.com
*and*
T. Randall Wright *PRO HAC VICE*
Baird Holm LLP
1700 Farnam Street, Suite 1500
Omaha, NE 68102
Phone: 402-344-0500
rwright@bairdholm.com
**Attorneys for Pinnacle Bank**

s/Pamela Thede
for Spencer Fane LLP

26