## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **REZAC LIVESTOCK COMMISSION CO. INC.** | 5:15 04958 |
| **Plaintiff,** | **DEFENDANT PINNACLE BANK'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND STATEMENT OF MATERIAL FACTS** |
| **v.** | |
| **PINNACLE BANK AND DINSDALE BROS., INC.** | |
| **Defendants.** | |

## DEFENDANT PINNACLE BANK'S BRIEF IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT
## AND STATEMENT OF MATERIAL FACTS

T. Randall Wright
of  BAIRD HOLM LLP
1700 Farnam Street, Suite 1500
Omaha, NE  68102-2068
Phone:  402-344-0500
rwright@bairdholm.com

and

Timothy A. Shultz
Goodell, Stratton, Edmonds & Palmer, LLP
515 S. Kansas Ave.
Topeka, KS 66603
Phone:  (785) 233-0593
tshultz@gseplaw.com
**ATTORNEYS FOR PINNACLE BANK**

June 22, 2018

# TABLE OF CONTENTS

Page

STATEMENT OF MATERIAL FACTS ............................................................................. 1

    The Parties and Key People ...................................................................................... 1

    Leonard's Purchase and Sale of Rezac Cattle .......................................................... 2

    The Process of Check Handling by Pinnacle Bank ................................................... 3

    The Rezac Check ...................................................................................................... 5

    Daylight or Intra-day Overdrafts .............................................................................. 6

    Closing of the Leonard Account ............................................................................... 6

    The Bank Did Not Set Off Against the Account 161 ................................................ 7

ARGUMENTS AND AUTHORITIES............................................................................... 8

I.     Introduction and standard for summary judgment............................................... 8

II.    Although the banking aspects of this case took place almost entirely in
        Nebraska, Nebraska and Kansas law is the same as to most issues, but
        significantly different as to allowing punitive damages. ..................................... 9

III.   Plaintiff's cannot recover on any of its three causes of action against the
        Bank, as a matter of law........................................................................................ 10

      A.   Rezac's conversion claim against the Bank cannot succeed because
           it is uncontroverted that the Bank did not convert Rezac's property. ...... 10

           1.    A Bank Account is a Debt Between the Bank and its
               Customer.  It is Therefore Intangible Property and Not
               Subject to a Conversion Claim. .................................................... 11

           2.    The Court Recognized Two Exceptions to the Rule that a
               Third Party Cannot Make a Claim for Conversion of Funds
               in a Bank Account, but the Facts in this case Do Not Fall
               Within Either Exception. ............................................................. 13

           3.    The Bank Did Not Set-off or Take Funds from the Leonard
               Account During this Period.  The Rezac Check Bounced
               Because the Account Funds Were Used to Pay Other
               Checks Leonard Had Written, Consistent With The Bank's
               Standard and Common Practice.................................................... 14

           4.    This Case is readily distinguishable from Iola State Bank v.
               Bolan. ........................................................................................ 17

           5.    The funds at issue were not segregated or designated to be
               kept separate................................................................................ 17

# TABLE OF CONTENTS
### (continued)

Page

6.  A Daylight Overdraft Is Not A Loan to an Account Customer, and a Deposit by the Customer to Bring That Account Back to a Positive Balance Is Not a Loan Repayment Nor Is it a Set-off. ...................................................... 19

B.  There Was No Civil Conspiracy Because, Among Other Things, the Parties Did Not Engage in Any Unlawful Acts. ............................... 22

C.  Plaintiff's Claim for Unjust Enrichment Should Likewise Be Dismissed Because the Bank was Not Unjustly Enriched....................... 24

IV.  The Plaintiff Cannot Recover Punitive Damages in this Case, and Therefore Even if the Court Denies the Bank's Motion for Summary Judgment, it Should Strike Plaintiff's Claim for Punitive Damages................... 24

A.  The Kansas rules require that this Court Apply Nebraska law with respect to this issue, and Nebraska does not permit punitive damages................................................................................................. 25

B.  Even if Kansas law applies, there are no facts supporting Plaintiff's assertion that the Bank (or Dinsdale Bros.) acted with fraud, malice, oppression, or wanton disregard of plaintiff's rights. .................. 26

CONCLUSION..................................................................................................... 27

Defendant, Pinnacle Bank (the "Bank") has filed its Motion for Summary Judgment, and pursuant to Fed. R. Civ. Pro. 56 and the local rules of this court, submits this statement of material facts and brief in support of its motion for summary judgment with respect to all of Plaintiff's claims against it.

This case was brought by the Plaintiff based on a cattle sale transaction that took place in September of 2015.  For reasons set forth herein, the Plaintiff's claims against Pinnacle Bank should be dismissed.

## STATEMENT OF MATERIAL FACTS

### The Parties and Key People

1.      Charles A. Leonard ("Leonard") is a long-time cattle dealer who worked out of an office in Springfield, NE.  For a number of years prior to the fall of 2015, he was customer of the Bank.  He, with his wife, Margaret Leonard, had several bank accounts at the Bank.  He also borrowed money from the Bank.  Leonard filed bankruptcy in 2015, and is not a party to this case. Ex. A, Declaration of Spencer Kimball ("Kimball Decl."), ¶ 2.

2.      Leonard made his living buying and selling cattle. Ex. B, Deposition of Charles D. Leonard ("Leonard Depo."), 11:5-12.  He often purchased and sold cattle under the name "Leonard Cattle Company". Ex. B, Leonard Depo., 181:3-13.

3.      The Bank is a Nebraska-chartered bank, which has its principal offices in Lincoln, NE.  Ex. A, Kimball Decl., ¶ 3.

4.      Spencer Kimball is one of Pinnacle Bank's market presidents, and was one of the individuals responsible for managing the deposit accounts and a portion of the Bank's loan relationship with Leonard.  Ex. A, Kimball Decl., ¶1.

1

5.     "Account 161" was a Bank checking account owned by Leonard and his wife, Margaret.  The account was administered by the Bank out of its Gretna, NE office.  Leonard used his account at the Bank ending in numbers 161 ("Account 161") to pay for cattle and other expenses of his business, as well as for personal use. Ex. B, Leonard Depo., 156:20-157:9;  Ex. A., Kimball Decl., ¶3.

**Leonard's Purchase and Sale of Rezac Cattle**

6.     Leonard bought cattle from 150 different sources in 2014 and 2015, including various auction yards, feed yards and farmers/ranchers.  He estimated that he had 175 to 200 customers who would buy cattle from him.  All the money for these purchases and sales went through the 161 Account.  Ex. B, Leonard Depo., 156:6-23; Ex. A, Kimball Decl., ¶5.

7.     On September 29, 2015, Leonard visited the Rezac Livestock Commission Co., Inc. ("Rezac") in St. Marys, KS, and purchased 668 head of cattle from Plaintiff Rezac.  Ex. 62, 63, 64, and 65, invoices and purchase paperwork (authenticated at Ex. B, Leonard Depo., 238:23-239:3; 250:20-24; 259:10-18; 262:13-20); Ex. 66, Buyers Recap (authenticated at Ex. B, Leonard Depo., 271:1-10.  The cost was $981,361.45, including trucking and other charges.  Once he obtained the paperwork for the cattle from Rezac, Leonard called in the information to his assistant back in Nebraska, Tammy Nichols, and she prepared and sent a check to Rezac for the purchase.  She wrote that check on Account 161.  Ex. 11, check issued to Rezac Livestock (authenticated at Ex. B, Leonard Depo., 66:13-19); Ex. B, Leonard Depo., 30:9-13. She mailed that check to Rezac on September 30—the day following the auction.  Ex. B, Leonard Depo., 129:8-24.

8.     On the same day he bought them, Leonard sold those same 668 head of cattle to Dinsdale Bros.  Leonard prepared an invoice and billed Dinsdale Bros. for the cost of the cattle,

plus certain additional costs, and a mark-up. Ex. 62-65, invoices and purchase paperwork; Ex. 66, Buyers recap.  As it had done with many prior purchases, Dinsdale Bros. wired the funds for those cattle to Leonard. Ex. B, Leonard Depo., 211:20-25.   The wire, in the amount of approximately $1,004,000, was sent by Dinsdale Bros. and received by the Bank and credited to Leonard's account on October 1, 2015. Ex. 1, Wire Transfer (authenticated at Ex. A, Kimball Decl. ¶12).

**The Process of Check Handling by Pinnacle Bank**

9.      When checks are written by one of the Bank's customers and sent to a payee, after they are cashed or deposited by that payee, they will be presented to the Bank as a debit against the customer's account for payment.  The checks normally come to the Bank from the Federal Reserve (the "Fed") or other clearing facility.  Typically, they reach the Bank in the evening, and if the amount of funds available in the account is not enough to cover all those checks, the bankers learn of the potential shortfall in morning.  If, as of that day, the account does not have sufficient funds to cover all checks that came into the bank the night before, the banker then makes a decision as to whether to honor the checks that have been presented.  Mr. Kimball was supposed to make that decision by 10 a.m. on the day after the checks came into the Bank.  Ex. A, Kimball Decl., ¶6.

10.      From time to time Account 161 lacked sufficient money to cover all the presented checks.  This occurred a number of times in September and early October of 2015.  On these occasions, Mr. Kimball would be notified in the morning of the checks that had been presented for payment on Account 161 which, if honored, would result in a negative balance.  He would contact Leonard to let him know, and ask him how he intended to cover the checks.  Leonard would respond by describing the deposits he would make that day in order to cover the deficit.

3

In every instance until September 30, 2015, Leonard told Mr. Kimball of deposits he would make on that day , which would be more than enough to cover the outstanding checks.  He was able to make good on those promised deposits.  Ex. A, Kimball Decl., ¶7.  If Kimball was satisfied by the anticipated deposits described to him by Leonard, he would normally decide that the Bank would honor the presented checks.

11.     Until the end of September of 2015, Leonard was able to make deposits that exceeded the negative ledger balance on the day that the Bank was required to decide whether to honor checks.  Ex. A, Kimball Decl., ¶8.

12.     The Bank's customers can make several different kinds of deposits—for example, in cash, by wire transfer, or checks from a third party.  Most of Leonard's deposits into Account 161 in September and October of 2015 were by wire transfer or by checks from third parties.  Ex. A, Kimball Decl., ¶9.

13.     The Bank extended to Leonard what bankers refer to as "provisional credit" in Account 161 for checks deposited into his account from third parties.  It is referred to as "provisional credit" because those checks from third parties would not have yet cleared the bank on which they were written at the moment they were deposited.  Those checks, once deposited, must go back through the Fed or other clearing agency before they are said to have cleared.  Out of the dozens of checks deposited by Leonard or his assistant into Account 161 in September of 2015, only one did not clear—a check for $221,818.39 which was deposited October 6, 2015 from Feller Co.  It did not clear due to Feller Co.'s action in stopping payment on it (the "Feller Check"). Ex. A, Kimball Decl., ¶10.

14.     When a Bank customer has checks that he or she has written, which post to his or her account, and when the sum of those checks exceeds the amount of cleared funds that are

4

shown in the account at that time, but there are uncollected funds on deposit, the Bank refers to this as a "daylight overdraft" or "intra-day overdraft".  It is called by those names because, assuming the deposited checks clear, the provisional credit solidifies and therefore the overdraft only lasts for the day.  Later—usually the next day—those third party checks clear.  Even though a daylight overdraft is of short duration, the Bank sends a notification to its customers to alert them.  Ex. A, Kimball Decl., ¶11.

15.     Attached to the Kimball declaration as Exhibits "1" and "2" are the online version of Leonard's Account 161 for the months of September and October, 2015.  Under the column called "Credits," the numbers that appear are deposits or other transactions that increase Account 161's balance.  Under the column called "Debits" are checks, outgoing wires, bank fees and other transactions that decrease Account 161's balance.  The last balance shown for a particular date is the balance as of the end of that day, taking into account all checks and other debits that have hit the account, and all deposits made to the account, even if those deposits include checks which have not yet cleared.  Ex. 1; Ex. 2, check issued to Rezac (authenticated at Ex. A, Kimball Decl., ¶16); Ex. A, Kimball Decl., ¶12.

**The Rezac Check**

16.     On September 30, Tammy Nichols, on behalf of Charles Leonard, prepared and signed a check written on Account 161, payable to Rezac for the cattle purchased by Leonard on September 29 (the "Rezac Check").  A copy of that check appears as Exhibit "2" to the Kimball Declaration.  Ex. 2, check issued to Rezac.

17.     The Rezac Check was presented to the Bank on October 6.  On October 5, Leonard had provided the Bank with a list of his outstanding checks.  It totaled some $5.8 million.  As of October 6, Account 161 lacked sufficient funds to cover the Rezac Check.  At this

point, it was clear that Leonard was not able to make sufficient covering deposits.  As a result, the next day the Rezac Check was returned for insufficient funds.  Ex. A, Kimball Decl.,¶ 16.

**Daylight or Intra-day Overdrafts**

18.      The Bank does not consider daylight or intra-day overdrafts to be "loans" or "debts" in the usual sense.  Because any negative balance becomes positive during the day with the deposit of cash or checks, and because the vast majority of deposited checks clear soon after deposit, the Bank does not make a loan decision when it honors checks on such an account.  It does not require a loan application and the decision to permit a daylight overdraft is not treated the same way as a bank loan. Ex. A, Kimball Decl., ¶14.

19.      The activity in Account 161, including the daylight overdrafts, came to the attention of various officers of the Bank in September of 2015.  They were also informed of the purchase, by Dinsdale Bros., of cattle which Leonard had purchased from Rezac.   In late September of 2015, they became aware that Dinsdale Bros. was going to pay for the cattle they had purchased from Leonard with a wire into Account 161.   That wire was deposited into Account 161 on October 1, 2015.  By the time the Rezac check was presented to the bank, five days later, those funds had been expended by Leonard to pay other checks that had been presented to the Bank earlier. Ex. 1; Ex. A, Kimball Decl., ¶¶12-16.

**Closing of the Leonard Account**

20.      Due to Leonard's inability to cover checks he had written and the substantial number of large checks the Bank returned for insufficient funds, the bank decided to close Account 161.  The Bank's account closing mechanism will not allow an account to be closed until no items have "posted" to the account for at least a full day.  Because checks that Leonard had already written continued to be presented, and because he continued to make deposits even

after October 5 (although they were not sufficient to pay all presented checks), it took until October 15 for the bank account to be closed.  Just before it was closed, there had been a negative balance of $159,484.39 due to the return of a check written by an individual who apparently stopped payment on that check.  As a result, that deposit had to be reversed.  The Bank wrote off that debt in order to close Account 161.  That write off appears as a credit to the account on October 13. Ex. 3, Final Leonard Account Statement, (authenticated at Ex. A, Kimball Decl., ¶20).

21.     The problem Leonard had with getting his creditors paid was not that the account had been closed, but that he lacked the funds to pay them. (Ex. B, Leonard Depo., 144:2-14.)

**The Bank Did Not Set Off Against the Account 161**

22.     From October 1, 2015 (the day the Dinsdale wire was deposited into Account 161) until the day the Rezac Check was returned for insufficient funds, the Bank did not set-off against Account 161 to repay any loans or other debts owed by Leonard.  Ex. A, Kimball Decl., ¶20; Ex. B, Leonard Depo., 152:14-153:22.  Before the wire was deposited, and after the Rezac check was returned, the Bank assessed various fees on incoming wires and overdraft or NSF fees, totaling about $230.00.  It also charged overdraft interest on September 30, 2015, in the amount of $30,525.30.  Most of that fee was later refunded, but in any event, it was charged and collected prior to the receipt into Leonard's Account 161 of the Dinsdale Bros. wire on October 1, 2015.  Ex. A, Kimball Decl., ¶¶18-20.

23.     When the Dinsdale Bros. wire came into Leonard's account on October 1, the account reflected a positive balance at the end of that day of $762,139.66.  The next day, Leonard deposited about $570,000, but nearly $3 million in checks that Leonard had written earlier were presented to the account that day.  At the end of the day on October 2, the balance in

the account was a negative $1,755,365.34.   The next banking day (October 3 and 4 were weekend days), more funds came into the account, and more checks were honored, but the Rezac Check, being the largest, was dishonored because the account lacked sufficient funds.  Ex. 1; Ex. A, Kimball Decl., ¶ 16.

24.     Rezac never spoke to anyone from Pinnacle Bank about the Rezac Check. Ex. C, Deposition of Dennis Rezac ("Rezac Depo"), 235:3-14.

25.     Leonard never directed Spencer Kimball, or anyone else at the Bank, to wire funds to Rezac, nor did he attempt to obtain from the bank a cashier's check or certified check to pay Rezac.  Ex. A, Kimball Decl. ¶ 17.

26.     Leonard never told the Bank which of the various checks that were outstanding that it should pay using the Dinsdale Bros. wire funds. Ex. B, Leonard Depo. 135:22-136:15.

27.     Various emails by the Bank indicate that the Bank was aware that the Dinsdale Bros. wire was related to Leonard's purchase of cattle from Rezac, that the bank was expecting that Leonard's check would be presented soon, and that the bank was aware that Leonard was having difficulty keeping his account at a positive balance.  The Bank was expecting the Rezac check to be presented on Leonard's account several days before it was actually presented.  One email referred to a suggestion that Dinsdale Bros. might want to wire the money to Rezac instead of wiring it to Leonard.  Ex. D, Deposition of Marc Hock ("Hock Depo"), 34:19-95:13;  Ex. 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, and 104, various emails (authenticated at Ex. D, Hock Depo., 34:19-35:9; 37:9-12; 46:23-47:11; 52:5-15; 58:10-19; 59:9-15; 60:24-61:9; 62:9-18; 67:11-15; 70:9-16; 71:17-24; 72:12-19; 73:22-74:11; 74:15-22; 75:12-15; 78:14-79:8; 84:20-23; 87:8-17; 90:13-23; 95:9-13).

## ARGUMENTS AND AUTHORITIES

**I.      Introduction and standard for summary judgment.**

This case arises out of the stubborn and irresponsible conduct of Charles Leonard, a cattle dealer who refused to keep track of his checking account balance, and wrote millions of dollars of bad checks to his customers, including one to the Plaintiff.  Leonard filed bankruptcy to shed the many claims against him.

The Plaintiff, who was never paid by Leonard for the cattle that Leonard bought, went in search of a deeper pocket and sued the Bank and Dinsdale Bros.

The Bank's motion for summary judgment primarily relies on (a) the declaration of Spencer Kimball, a bank officer who had day-to-day contact with Leonard and Leonard's Account 161; (b) portions of Leonard's and Rezac's deposition testimony and exhibits; (c) portions of the deposition of Pinnacle Bank President Marc Hock, and (d) the Bank's account statements regarding Account 161.  The material facts are not in dispute and prove that the Bank has no liability to Rezac.

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(a).  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party." (Citation). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."  An issue of fact is "genuine" if "the evidence is such that a reasonable

jury could return a verdict for the non-moving party." *Thomas v. Metro Life Insurance Co.*, 631 F. 3d 1153, 1160 (10th Cir. 2011).

**II.**    **Although the banking aspects of this case took place almost entirely in Nebraska, Nebraska and Kansas law is the same as to most issues, but significantly different as to allowing punitive damages.**

The banking aspects of this case occurred in Nebraska.  Leonard, a Nebraska resident, lived in Nebraska and wrote checks out of his Nebraska bank account.  Nebraska bankers tracked that account and communicated with Leonard frequently.  The Dinsdale Bros. wire was deposited into Leonard's Nebraska checking account, and the dishonor of the Rezac check was in respect of that Nebraska account.  The only event significant to this case that took place in Kansas was the sale of the Rezac cattle to Leonard, which occurred in St. Marys, Kansas.  However, Kansas and Nebraska courts agree on most aspects of applicable law in this case—but they do not agree with the question of whether punitive damages are permissible. (See Part IV of this Brief)  We cite to the laws of both states on the banking-related issues.

**III**.    **Plaintiff's cannot recover on any of its three causes of action against the Bank, as a matter of law.**

Plaintiff's Second Amended Complaint sets out three claims for relief against Pinnacle Bank—for conversion, unjust enrichment, and civil conspiracy.  However, the undisputed facts of this case clearly show that Plaintiff cannot prevail on any of these claims.

**A.**    **Rezac's conversion claim against the Bank cannot succeed because it is uncontroverted that the Bank did not convert Rezac's property.**

Rezac's first claim against Pinnacle Bank alleges that the Bank converted its money.  The tort of conversion has the following elements:

1.      A distinct act of dominion

2.      Wrongfully asserted over another's goods or chattels

3.      In a manner that is in denial of or inconsistent with that person's rights.  *Carmichael v. Halstead Nursing Center,* 237 Kan. 495, 701 P. 2d 934 (1985); *Temmen v. Kent Brown Chevrolet*, 227 Kan. 50, 605 P. 2d 95 (1980)); *United General Title Insurance Company v. Malone*, 289 Neb. 1006, 858 N.W. 2d 196 (2015).

Rezac sold 668 head of cattle to Leonard at Rezac's weekly auction on September 29.  In payment for that purchase, Leonard sent Rezac a check, the next day, for $980,361.45, through the mail.  It took several days to arrive at Rezac's business office.  In the meantime, Dinsdale Bros. bought the cattle from Leonard, and paid him with a wire transfer to Leonard's bank account at Pinnacle Bank.  That wire arrived on October 1, 2015, just two days after the Rezac sale of the cattle to Leonard.  But by the time Leonard's check to Rezac was presented to Pinnacle Bank as a debit against Leonard's account, the account had insufficient funds.  The Bank did not honor the check.  The Bank did not set off against the account.  Nevertheless, Rezac claims that the Bank converted its money.

**1.      A Bank Account is a Debt Between the Bank and its Customer.  It is Therefore <u>Intangible</u> Property and Not Subject to a Conversion Claim.**

Money deposited in a general bank account is not a tangible asset.  The funds are not segregated or physically maintained in a particular place.  Rather, after deposit of funds in a bank account, *those funds cease to be the money of the depositor and they become the bank's money*.  The depositor does not own the funds, but rather becomes a creditor of the bank to extent of that deposit. *Farm Bureau Mutual Insurance v. Carmody*, 32 Kan.App.2d 754, 760, 88 P.3d 1250, 1255 (2004). See also *Moore v. State Bank of Burden*, 240 Kan. 382, 386, 729 P.2d 1205 (1986), <u>cert. denied</u> 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 376 (1987); *Glass v. Nebraska St. Bank*, 175

Neb. 673, 122 N.W. 2d 882 (1963).  *Peter Kiewit & Sons, Inc. v. Douglas County*, 172 Neb. 710, 111 N.W. 2d 734 (1961).  In a general deposit account, title to the money deposited passes to the bank upon deposit.  *Citizens St. Bank of Petersburg v. Worden*, 95 Neb. 53, 144 N.W. 1064 (1914).

An ordinary bank deposit is not a bailment—that is, the bank is not considered to be a bailee with a duty to watch over the funds:

> Although one might think of the bank as the bailee of the depositor's money, that would be wrong.  The bank has no obligation to keep one depositor's money segregated from another's; rather the law regards the bank's relation to its depositor as a debtor-creditor relation, with the customer as the creditor and the bank as the debtor.

White and Summers, Uniform Commercial Code, 886 (6th Ed. 2010).

As the Court recognized in its August 26, 2016 Order dismissing Plaintiff's Complaint, because of the intangible nature of a bank account, an action will not lie for conversion.  A bank account is a mere debt or chose in action.  Where there is no obligation to return identical money, but only a relationship of debtor and creditor, an action for conversion of the funds representing the indebtedness will not lie against the debtor." *Temmen v. Kent Brown Chevrolet*, 227 Kan. 45, 50, 605 P.2d 95, 99 (1980) (citing 18 Am.Jur.2d, Conversion § 10; *Baker, Administrator v. Brial*, 185 Kan. 322, 341 P.2d 987 (1959) (additional citations omitted).

Moreover, when a deposit is made to a general account, as opposed to a special or custodial account, the funds in the account do not "belong" to the payees of checks just because those payees sold goods, the resale of which generated the funds in the account.  Bailey, Brady on Bank Checks: The Law of Bank Checks, §18.12[2] (2009).  Money deposited, unless segregated into a special account and designated to be kept separate, becomes the property of the bank. *Chilson v. Capital Bank of Miami,* 237 Kan. 442, 444, 701 P.2d 903 (1985).

A check is not an assignment in favor of the check payee of the funds in the hands of the drawee bank . *Torkelson v. Bank of Horton*, 208 Kan. 267, 491 P.2d 954 (1971) *Anderson v. Elem*, 111 Kan. 713, 208 P. 573 (1922).  As a result, a check payee has no claim to particular funds in the payer's account.

Generally it is the duty of a bank –owed to its customer--to honor checks drawn on it by a depositor if the drawer has on deposit sufficient funds when the check is presented which are not subject to some lien or claim.  For an improper refusal to honor the check, the *depositor* has an action against the bank for damage which may have been sustained by reason of such refusal.  However, the same liability does not inure to the benefit of a holder or payee of a check and the bank is generally not liable to the holder unless and until it accepts or certifies the check. *Torkelson v. Bank of Horton*, 208 Kan. 267, 491 P.2d 954 (1971); *Galyen Petroleum Co. v. Hixson*, 213 Neb. 683, 331 N.W. 2d 1 (1983)( holding that a check is not a legal or equitable assignment of drawer's funds in the hands of the drawee and gives the holder of the check no right of action against the drawee, even though the drawer has on deposit sufficient funds to pay it.)

The Uniform Commercial Code (Neb. UCC 3-408, K.S.A. Section 84-3-408) sets out the same principal in a slightly different way.  It states:  "A check or other draft does not of itself operate as an assignment of funds in the hands of the drawee available for its payment, and the drawee is not liable on the instrument until the drawee accepts it."  In other words, a check does not transfer to the payee funds on deposit at the drawee bank.

**2.** **The Court Recognized Two Exceptions to the Rule that a Third Party Cannot Make a Claim for Conversion of Funds in a Bank Account, but the Facts in this case Do Not Fall Within Either Exception.**

In its order of August 26, 2016, dismissing Plaintiff's claims against the Bank, this court recognized that a claim for conversion will generally not lie to recover funds in a bank account, and dismissed Plaintiff's First Amended Complaint for failure to state a claim. [Doc. 30]  In so doing,

13

the court stated that there are two exceptions to the rule that "money deposited in a bank ordinarily cannot be the subject of an action for conversion", and noted that the Plaintiff had pleaded neither one:

First, when the bank has *taken funds from a customer's account to pay debt owed the bank* if the bank knows (or should know) that the seized funds belong to someone else, (Doc. 30 at p. 4) citing *Iola State Bank v. Bolan*, 679 P.2d 720 (Kan. 1984); and

Second, when funds are "segregated into a special account and designated to be kept separate," citing *Moore*, 729 P.2d at 1210,

In response to the Court's order, Plaintiff amended its Complaint to add allegations in order to try to fit within the above exceptions.  So, for example, we see these allegations in the Plaintiff's Second Amended Complaint:

> 43.    Pinnacle Bank applied and setoff funds in Leonard's accounts to outstanding credits and overdrafts Pinnacle Bank had allowed Leonard to obtain over several months.
>
> 44.    Pinnacle Bank closed Leonard's account and set-off the funds in the account against debts Leonard owed to Pinnacle Bank.
>
> 45.    The Funds set-off by Pinnacle Bank included the funds wired by Dinsdale Bros. for the express purpose of paying for the Livestock delivered from the Rezac sale barn.
>
> 72.    Defendant Pinnacle Bank at all times has known the funds wired into its bank by Dinsdale Bros. on October 1, 2015, belonged to Rezac for the purchase of the Livestock by Dinsdale Bros.
>
> 76     Pinnacle Bank seized the funds in Leonard's account that were identified for the purchase of the Livestock from the Rezac auction and applied and set them off against debts that Leonard owed to Pinnacle Bank.
>
> 77.    Pinnacle Bank's failure to deliver the sale proceeds to Rezac constitutes conversion.
>
> 100.    After the wire was received, Pinnacle Bank closed the Leonard account and applied and set-off the funds in the account, including the wire

14

intended to pay Rezac, against the indebtedness that Leonard owed to Pinnacle Bank.

Plaintiff's Second Amended Complaint [Doc. 46]

The common thread in these allegations is the incorrect assertion that the Bank seized or set off funds in Leonard's account. The uncontroverted evidence proves that no set-off occurred with respect to Account 161 and that the account was general and not special.

**3.      The Bank Did Not Set-off or Take Funds from the Leonard Account During this Period. The Rezac Check Bounced Because the Account Funds Were Used to Pay Other Checks Leonard Had Written, Consistent With The Bank's Standard and Common Practice.**

The uncontroverted facts and testimony in this case clearly prove that no setoff of Leonard's 161 Account occurred after the deposit of the Dinsdale wire. Leonard was unable to point to a set off, the bank statements from Account 161 do not reflect a set off, and the Kimball declaration affirmatively states that no such set off occurred. The Bank did assess some ordinary course wire transfer fees and insufficient funds fees—amounting to about $231.00 in the first week of October of 2015. Although it also assessed interest on the account at the end of September, 2015, this was assessed and collected before the Dinsdale wire was ever deposited in Account 161, and therefore that assessment did not affect the money Rezac claims. (The bank later cashed two certificates of deposit that Leonard had pledged as collateral on his agricultural line of credit, but those CD's were separate and unrelated to Leonard's Account 161, and were pledged by Leonard specifically for that line of credit.)

The absence of a set off is most easily seen from the account statements that are attached to the Kimball Declaration as Exhibits 1 and 3. They show that the Rezac Check bounced because a number of other checks that Leonard wrote were presented to his account and were honored prior to presentment of the Rezac check, leaving no funds in the account to cover the Rezac check. They do

not show any withdrawal in favor of the bank, except for ordinary wire and NSF fees.  When the Dinsdale Bros. wire came into Leonard's account on October 1, the account reflected a positive balance at the end of that day of $762,139.66.  The next day, October 2, Leonard deposited another $570,000, but nearly $3 million in checks that Leonard had written earlier were presented against Account 161.  At the end of the day on October 2, the balance in the account was a <u>negative</u> $1,755,365.34.  Thus, the Dinsdale wire funds were already expended as of October 2—prior to presentment of the Rezac check.  The next banking day (Monday, October 5) more funds came into the account, and more checks were honored.  The Rezac check was finally presented on October 6, after the Dinsdale funds were clearly exhausted.  The Bank honors checks received during any given day in order from lowest in amount to highest. (Ex. A, Kimball Decl., ¶16)  The Rezac check, being the largest, was dishonored because the account lacked sufficient funds that day after smaller checks were honored.[1]

In *Four Circle Co-op v. Kansas State Bank and Trust*, 771 F. Supp. 1144 (D. Kan. 1991), this court, in a case similar to this one (except that unlike this one it involved a bank set-off) ruled that the Plaintiff, which held a check from a grain buyer that had been returned due to insufficient funds in the grain buyer's account, had *no claim in conversion* against the bank on which the check was drawn.  In that case, the Bank had set off against the grain buyer's account, and had applied more than a million dollars from the account to that indebtedness otherwise owed to the bank prior to dishonoring the plaintiff's check.

The court discussed the nature of bank accounts and the problem with the check-holder's conversion claim. (Note that UCC 3-408 was, at that time, UCC 3-409(1) in the Kansas statutes.) The court said:

---

[1] The UCC of both Kansas and Nebraska permit a bank to honor checks in any order.  UCC §4-303(b); KS/NE?

The plaintiffs urge the court to accept its argument that once the checks were issued to the plaintiffs, the funds in Fleming's [the grain buyer] account were converted from proceeds of accounts receivable (from grain buyers) into funds committed for accounts payable (to plaintiffs) in which KSBT had no interest, and that KSBT agreed to this transition in form, particularly when Fleming was "holding the money close." This argument simply ignores K.S.A. 84–3–409, which provides in pertinent part: (1) A check or other draft does not of itself operate as an assignment of any funds in the hands of the drawee available for its payment, and the drawee is not liable on the instrument until he accepts it.

*Id.* at 1153.   The Four Circle Court further noted that the payee of a check (Rezac) has no recourse against the drawee bank (Pinnacle Bank) for the dishonor of a check.  *Id.* at 1153 (there is "not one ounce of privity between the holder of a check and the drawee bank, assuming no certification and no retention beyond the midnight deadline."  Neither certification nor retention beyond the midnight deadline occurred here.  Nor, said the Four Circle court "can the holder sue the drawee bank for wrongful dishonor of an insolvent depositor's check just because the bank dishonored the item in order to protect its own interests."

The court went on to hold in favor of the bank, rejecting the Plaintiffs' claims.  It based its holding, in part, on the inability of the Plaintiff to show that the funds it was claiming as its own were in the account at the time of the set off.  The Defendant here has the same problem.

### 4.      This Case is readily distinguishable from *Iola State Bank v. Bolan*.

*Iola State Bank v. Bolan*, 235 Kan. 175, 679 P. 2d 720 (1984), on which the Plaintiff may rely , is distinguishable from this case because in *Bolan*, the bank set off funds in the account that *Bolan* claimed belonged to him, and applied them to an outstanding loan. In the court's view, that setoff served as the basis for the liability of the bank. The court held:

"[W]hen a bank knows sums deposited in the account of one of its depositors belongs to a third party, it does not act in good faith *when it applies the funds of the third party against the depositor's debts to the bank.*  Under such circumstances, the third party has an action directly against the bank for conversion of the third party's funds from the debtor's bank accounts.

235 Kan. At 189, 679 P. 2d at 732

17

In the case at bar, of course, there was no set off affecting Account 161 other than ordinary wire transfer and insufficient funds fees, and therefore the holding in *Bolan* does not apply.  The *Bolan* court also recognized the law that applies here:  "A holder [of a check] cannot sue the drawee bank for wrongful dishonor of an insolvent depositor's check just because the bank dishonors the check in order to protect its own interest." 235 Kan. at 187.

      **5.**      **The funds at issue were not segregated or designated to be kept separate.**

Bank accounts are assumed to be general accounts unless the parties can establish that the account was a special account under an agreement with the bank that those particular deposits would be kept separate from the bank's other funds.  See *West Legal Foundation v. Texas Equal Access to Justice Foundation*, 86 F.Supp.2d 624 (W. D. Tex. 2000).  The presumption is that a deposit account is general and not special.  *Glass v. Nebraska State Bank*, 175 Neb. 673, 677, 122 N.W. 2d 882 (1963), in which the court stated:

> "The general rule is well stated in 7 <u>Am.Jur.</u>, Banks, s. 419, p. 294, as follows: '* * * the burden devolves on the party who claims that the deposit is a special one to show that it was received by the bank with the express or clearly implied agreement that it should be kept separate from the general funds of the bank and that it should remain intact.' (See note 13 citing approximately 22 cases.) See, also, Annotations, 86 <u>A.L.R</u>. 375, 16 A.L.R. 516).

122 N.W. 2d 887; See also, *Miracle Hills Centre L.P. v. Nebraska National Bank of Omaha,* 230 Neb. 899, 434 N.W. 2d 304 (1989).

The funds claimed by Rezac were not segregated or kept separate from the bank's other funds—nor were they separated from Leonard's other funds.  They were instead commingled with Leonard deposits from many different sources.  Leonard deposited into the account payments from various customers, and used it to pay dozens of different creditors.  He also used the account for payment of personal obligations, such as for dry cleaning, life insurance and other household bills. (Ex. A, Kimball Decl., ¶ 5; Ex. B, Leonard Depo., p. 156 line 6- p. 157 line 23).  Moreover,

Leonard never told he Bank which of the many outstanding checks he had written that he wanted paid when the Dinsdale funds came into the Bank.   When questioned in this regard, Leonard testified:

> Q.  And so as of September 30, you had $5.3 million in outstanding checks when you wrote the Rezac check.  How was it that—who on that list did you not want to have paid?
>
> A.  I didn't get to make that decision.
>
> Q.  Well, you didn't have enough money to cover those checks, so you knew someone wasn't going to get paid, right?
>
> A.  Again, I didn't get to make that decision.  It was a decision made at the bank.
>
> Q.  And how was the bank to know who you wanted to pay?  Out of this list of all the checks outstanding as of 9/30/2015, how was the bank to know how many of those people you wanted to pay?  <u>You didn't tell them, did you</u>?
>
> A.  <u>No I did not</u>.

Ex. B, Leonard Depo., 135:22-136:15 (emphasis added).

Leonard had written more than a dozen checks totaling more than $5 million that were outstanding when the Dinsdale Bros. wired funds were deposited into Leonard's account.  The Bank did what it always did—it honored the checks from lowest to highest in amount until the funds ran out. There is no evidence in this case that the Account 161 was in any sense a "special account."

Rezac Livestock may argue that common ownership between Dinsdale Bros. and Pinnacle Bank, and the Bank's knowledge that the cattle Dinsdale bought from Leonard were the same cattle sold by Rezac, gives way to some duty by the Bank to channel those funds to Rezac.  Although various Pinnacle bankers knew that a wire transfer from Dinsdale Bros. was coming to Leonard's account at Pinnacle Bank, and that it was for cattle Leonard purchased from Rezac, that does not change the "ownership" of the funds. Deposited funds did not "belong" to Rezac.  That knowledge does not matter in the absence of a set off.

The Kansas Supreme Court described what are sometimes referred to as "special deposits." *Bloomheart v. Foster*, 114 Kan. 786, 221 P. 279, 280 (1923).  The court said:

> A special deposit of money in a bank is made where moneys, such as bills in packages or specie in boxes, are entrusted to the bank, not to be used, but to be kept safely, and *specifically* returned. An ordinary bank deposit is made when a voluntary credit is taken with the bank, and for which no bank note, bill, or similar evidence of debt is given, and for which there exists a right to draw unconditionally."

(Emphasis added.)

In the case at bar, there was no "special deposit".  There is no evidence that Leonard gave bills in package or specie in boxes, and no evidence that he entrusted the bank to keep the Dinsdale funds segregated or specifically returned.  Rather, the Dinsdale wire was deposited in the same account he used to pay all of his business as well as personal obligations.  The Bank treated them as any other general deposit, and was not asked by its customer to do otherwise.

> **6.  A Daylight Overdraft Is Not A Loan to an Account Customer, and a Deposit by the Customer to Bring That Account Back to a Positive Balance Is Not a Loan Repayment Nor Is it a Set-off.**

Rezac may argue that by accepting deposits at a time when Account 161 had a negative ledger balance (also known as a "daylight overdraft") it effectively set off against Leonard's account.  But the courts that have addressed that and similar arguments have held that daylight overdrafts, such as those in Account 161 during September of 2015, do not constitute "loans" by the bank.  It follows that a subsequent deposit into that account by the account customer is not a loan repayment or set-off.

"Routine advances against uncollected deposits do not create a 'debt' to the bank." *Laws v. United Missouri Bank of Kansas City*, 98 F.3d 1047, 1051 (8th Cir. 1996).  More recently, the United States District Court for the Northern District of Iowa, following the Laws Court's holding and noting that most courts confronting the issue have reached the same conclusion, also held intraday overdrafts do not give rise to a debt.  *Sarachek v. Luana Sav. Bank* (In re

Agriprocessors, Inc.), 547 B.R. 292, 308 (N.D. Iowa 2016) (hereinafter referred to as "Agriprocessors I"), aff'd on other grounds, Agriprocessors II.

The Laws Court stated that "[M]ost bank deposits do not create claims against the bank customer.  Quite the opposite.  'A person with an account at a bank enjoys a claim against the bank for funds in an amount equal to the account balance.'"  *Id.* at 1050 (quoting *Barnhill v. Johnson*, 503 U.S. 393, 398 (1992) (emphasis in original)).  The Laws Court dismissed the assertion that a debt is created at the time the bank gives its customer a provisional credit for a deposit, noting that provisional credit is nothing more than an opportunity to obtain funds—like a credit card or a line of credit—and does not result in a debt until the customer uses the funds. *Id.*

The vast majority of deposits are collected and, as a result, banks do not view the decision to allow a customer to use uncollected funds as a loan or credit decision, but rather as a "service decision, driven by laws such as the Expedited Funds Availability Act, and by the financial demands of bank customers." *Id.* at 1051.  The court acknowledged a debt would arise if a customer's deposited check was dishonored "[b]ut until dishonor, a bank that advances funds in the expectation that deposits will routinely be collected acts as a conduit for the depositor's financial transactions, not as a creditor." *Id.* (citing *Nordberg v. Societe Generale* (*In re Chase & Sanborn Corp.*), 848 F.2d 1196, 1201 (11th Cir. 1988)).  The Laws Court also noted that bank regulators do not consider intraday overdrafts to be "debts" owed to a bank.  Referencing the Code of Federal Regulations, the Laws Court identified, "[t]he Office of the Comptroller of Currency in calculating whether a bank has exceeded its lending limit defines 'extensions of credit' to exclude 'amounts paid against uncollected funds in the normal process of collection.'" *Id.* (emphasis added) (citations omitted).  By current regulation, the Office of the Comptroller of

Currency continues to exclude "amounts paid against uncollected funds in the normal process of collection" from the definition of "loans and extensions of credit."  12 C.F.R. § 32.2(q)(2)(v).

Other courts are in agreement.  See, e.g., *In re Frigitemp Corp.*), 34 B.R. 1000 (Bankr. S.D.N.Y. 1983).  The *Frigitemp* Court recognized that a bank's willingness to allow a debtor to run large negative ledger balances bore some indicia of a loan or extension of credit. *Id.* at 1019. However, it determined that those balances did not constitute loans.  See also, *In re Summit Financial Services Inc.*  240 B.R. 105 (Bankr. N. D. Ga. 1999).   More recently, in Agriprocessors I the United States District Court for the Northern District of Iowa, relying heavily on Laws, affirmed the bankruptcy court's holding that intraday overdrafts do not create an antecedent debt.

To summarize, because intraday overdrafts are not "loans" to the Bank's customer, it follows that deposits made by that customer are not payments on loans.  Therefore, when a bank accepts deposits against an account where the collected funds balance is negative, it is not "setting off" those deposits to pay down a loan.

**B.    There Was No Civil Conspiracy Because, Among Other Things, the Parties Did Not Engage in Any Unlawful Acts.**

The elements of a civil conspiracy are:

1.  Two or more persons;

2.  An object to be accomplished;

3.  A meeting of the minds in the object or course of action;

4.  One or more unlawful overt acts; and

5.  Damages as the proximate result

See *Citizens State Bank v. Gilmore*, 226 Kan. at 662, 603 P.2d 605 (1979) Conspiracy is not actionable without commission of some wrong giving rise to a cause of action independent of the conspiracy. *Id.*

The evidence does not support any of the elements, with the possible exception of "two or more persons".  For purposes of this motion and brief, we focus on whether or not there were any "unlawful, overt acts."  In short, there were none and therefore the claim of civil conspiracy must be dismissed.

As previously established, the Bank did not convert Rezac's money, because funds in a bank account do not belong to depositor, nor to the payee of a check.  They are a debt owed by the bank to its customer.  The Bank dishonored Leonard's check payable to Rezac due to insufficient funds in that Account.  The Bank did not convert money in Leonard's account because 1) conversion will not lie for funds in a bank account (see Part III.A of this brief) and 2) the Bank did not seize or set off money in the Leonard account.  Dinsdale Bros., who paid Leonard for cattle it agreed to buy from Leonard, certainly committed no illegal act.  Lacking an overt, unlawful act by the Bank, the civil conspiracy claim must be dismissed.

Plaintiff may argue that various emails among the bankers, some of which included representatives of Dinsdale Bros. indicate the Bank had knowledge of the transaction between Dinsdale Bros., Leonard and Rezac, and that it knew a check to Rezac was going to be presented. Assuming without conceding that knowledge, there is no evidence that Dinsdale Bros. or the Bank took any unlawful actions based on or in relation to those conversations.  Rather, all that happened is that the Bank dishonored the Rezac check because, in the ordinary course, Leonard's account lacked the funds to pay it when it was presented to the Bank.

Rezac may argue that the Bank, having knowledge that the Dinsdale wire was intended for payment of the same cattle that Rezac sold, had a duty to make sure that those funds made it into Rezac's hands.  We find no authority for this proposition when the funds are deposited in a general account and the bank's customer has given no instruction and reached no agreement with the bank to that effect.  Generally, Banks do not have a duty of care to non-customers.  9 C.J.S. Banks and Banking, §246 (citing *Quintero Community Assoc. v. F.D.I.C.*, 792 F. 3d 1087 (8th Cir. 2015).  See also, *IBP v. Mercantile Bank of Topeka*, 6 F. Supp 2d 1258, (D. Kan. 1998) (…"nearly every court has reasoned that a bank owes no duty of care to a non-customer with whom it has no relationship.")  The reasoning behind this rule is simple and sensible-- if banks owed duties to noncustomers, they would be exposed to unlimited liability for unforeseeable fraud."  *Driessen v. Woodforest National Bank*, 940 F. Supp. 2d 584 (S.D. Ohio 2013).

It is Leonard, not Pinnacle Bank, that bears responsibility for the debt owed Rezac .  It is Leonard, who recklessly disregarded the balance in his checking account and who wrote checks with no assurance that he could make them good, who caused Plaintiff's loss.

## C.    Plaintiff's Claim for Unjust Enrichment Should Likewise Be Dismissed Because the Bank was Not Unjustly Enriched.

The elements of an unjust-enrichment claim are: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant knows of the benefit; and (3) the defendant retains the benefit inequitably.  *Great Plains Trust Co. v. Union Pac. R.R. Co.*, 492 F.3d 986, 994 (8th Cir. 2007).  *Quantum meruit* is an equitable doctrine. "Restitution and unjust enrichment are modern designation for the older doctrine of quasi-contracts." *Peterson v. Midland Nat'l Bank*, 242 Kan. 266, 275, 747 P.2d 159 (1987). "The theory of quasi-contract is raised by the law on the basis of justice and equity regardless of the assent of the parties." *Holiday Development Co. v. Tobin*

*Construction Co.*, 219 Kan. 701, 708, 549 P.2d 1376 (1976). "The substance of an action for unjust enrichment lies in a promise implied in law that one will restore to the person entitled thereto that which in equity and good conscience belongs to him [or her]." *Peterson*, 242 Kan. at 275 [747 P.2d 159]. *Pioneer Operations Co. v. Brandeberry*, 14 Kan.App.2d 289, 299, 789 P.2d 1182 (1990).

It is clear that in this case Plaintiff conferred no benefit on the Bank. Rezac gave the bank nothing. Even if Rezac could claim ownership of the funds deposited by Dinsdale Bros. into the Leonard account, the Bank did not take those funds. No set-off occurred. Since Plaintiff did not confer a benefit on the Bank under the facts alleged in Plaintiff's Complaint, it follows that the Bank could not have been unjustly enriched by Plaintiff.

**IV.    The Plaintiff Cannot Recover Punitive Damages in this Case, and Therefore Even if the Court Denies the Bank's Motion for Summary Judgment, it Should Strike Plaintiff's Claim for Punitive Damages.**

**A.    The Kansas rules require that this Court Apply Nebraska law with respect to this issue, and Nebraska does not permit punitive damages.**

The basis for Plaintiff's claim that it is entitled to punitive damages is the alleged tort of conversion. In tort cases such as this one, Kansas courts have long applied the *lex loci delicti* choice of law rule. *Anderson v. Commerce Construction Services, Inc.* 531 F 3d 1190 (10th Cir. 2008), citing *Ling v. Jan's Liquors*, 237 Kan. 629, 703 P. 2d 731 (1985). See also, *Miller v. Dorr*, 262 F. Supp. 2d 1233, 1238 (D. Kan. 2003). According to this rule, the law of the state where the tort occurred governs the merits of the litigation.

In this case, it is clear that the alleged tort occurred in Nebraska. All the events involving the alleged conversion of funds took place in Nebraska. Leonard resided in Nebraska, and his

Nebraska address was on the bank statements.  Pinnacle Bank is headquartered in Nebraska, and Leonard used the Gretna, NE branch for his banking.  Plaintiff claims that the Bank converted the funds that were wired into that Nebraska Account 161.  Leonard had his assistant write the check to Rezac, and she did that from his office in Nebraska.  As a result, the events constituting the alleged conversion clearly took place in Nebraska.  Although the cattle were in Kansas when Leonard bought them at auction, the alleged conversion did not take place at that sale.  The Plaintiff does not, and cannot allege that the Bank converted the cattle themselves—rather Plaintiff asserts the conversion was of the monies which Plaintiff contends were deposited into the Leonard bank account.

Once Nebraska law is applied, it is clear that Plaintiff's claim for punitive damages must be dismissed or stricken.  Pursuant to Nebraska's Constitution, punitive damages are unavailable to private plaintiffs. Nebraska Constitution, Article VII § 5, requires that any "fines, penalties, and license money arising under the general laws of the state" be paid to the public schools. Neb. Const, art. VII, § 5. The Nebraska Supreme Court has interpreted this as a ban on punitive damages.  *Distinctive Printing & Packaging Co. v. Cox*, 232 Neb. 846, 857, 443 N.W.2d 566, 574 (1989) ("[P]unitive, vindictive, or exemplary damages contravene Neb. Const. art. VII, § 5, and thus are not allowed in this jurisdiction.")

This court has, as a result, declined to award punitive damages when Nebraska law applies to the claims.  *In Ayres v. AG Processing Inc.*, No. CIV.A. 04-2060-DJW, 2005 WL 1799261, at *3 (D. Kan. 2005) the court (Waxse, Magistrate Judge) denied plaintiff's motion for leave to amend its complaint to add a claim for punitive damages for claims that were governed by Nebraska law. The court held that under Nebraska law plaintiffs could prove no set of facts that would entitle them to punitive damages since they are prohibited by the Nebraska

Constitution.  The US District Court for the Northern District of Iowa has also held similarly and denied Plaintiffs claims for punitive damages when the case was governed by Nebraska law. *Harlan Feeders, Inc. v. Grand Labs., Inc.*, 881 F. Supp. 1400, 1413 (N.D. Iowa 1995) (finding Plaintiff could not bring punitive damage claims because Iowa choice-of-law rules held that Nebraska law governed both the tort and contract claims).

As a result, Plaintiff's claim for punitive damages in this case should be stricken.

**B.      Even if Kansas law applies, there are no facts supporting Plaintiff's assertion that the Bank (or Dinsdale Bros.) acted with fraud, malice, oppression, or wanton disregard of plaintiff's rights.**

Even if the court finds that Kansas law applies to the punitive damages issue, the court should dismiss the claim for punitive damages.  There are no allegations of fraud or negligence, and there is no evidence in the case that the Bank acted with malice, oppression, or wanton disregard of Plaintiff's rights.  Included in the Bank's Index of Evidence are portions of the deposition of the Bank's president, Marc Hock, and various emails between and among the bankers, and between and among Dinsdale Bros.  Those emails indicate that the Bank was aware that the Dinsdale Bros. wire was related to Leonard's purchase of the Rezac cattle, and the bank was further aware that Leonard was having difficulty keeping his account at a positive balance. The emails reflect that the bankers were expecting the Rezac check to be presented on Leonard's account several days before it was actually presented.  One email referred to a suggestion that Dinsdale Bros. might want to wire the money to Rezac instead of wiring it to Leonard.

But none of those emails evince the malicious, oppressive or wanton intent that is a prerequisite to an award of punitive damages.  In fact, they suggest the opposite-- that the Bank was trying to avoid any impropriety.  Nor did any of those emails change what occurred in the

case.  The Dinsdale wire came into the Leonard bank account, but a dozen or more checks were presented at that time and over the next several days.  The result would have been the same if the Dinsdale wire had arrived a day earlier or a day later.  It was Leonard—by writing checks for much greater amounts than he could ever cover, that that determined how the Dinsdale funds were used.  The Bank merely honored or dishonored checks according to its ordinary procedures.

Plaintiffs are required to show specific facts that support the claim for punitive damages, but they cannot do so here.  See *Whittenburg v. L.J. Holding Co.*, 830 F. Supp. 557, 565–66 (D. Kan. 1993).  In *Whittenburg*, the court granted defendant's motion for summary judgment when plaintiffs failed to demonstrate any specific facts that supported a claim for punitive damages.

## CONCLUSION

A trial on this matter is unnecessary and would cost both Rezac and the Bank significant amounts of legal fees and costs which neither should have to incur.  The uncontroverted facts prove that Plaintiff has no viable claim against the Bank.  When Banks simply honor and dishonor checks based on the standard protocol, they must not be subject to claims by frustrated creditors of their customers, and the law does not make them liable.  For all these reasons, the court should grant Pinnacle Bank's motion for summary judgment and dismiss this case as to the Bank.

Respectfully submitted,

By:  /s/Timothy A. Shultz
        Timothy A. Shultz
        Goodell, Stratton, Edmonds & Palmer, LLP
        515 So. Kansas Ave.,
        Topeka, KS 66603
        Phone:  (785) 233-0593
        tshultz@gseplaw.com

        and

        T. Randall Wright
        BAIRD HOLM LLP
        1500 Woodmen Tower
        Omaha, NE  68102-2068
        Phone:  402-344-0500
        rwright@bairdholm.com
        **ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 22nd day of June, 2018, I electronically filed the foregoing pleading with the Clerk of the United States District Court using CM/ECF system which sent notification of such filing to the following parties:

Michelle Masoner
Robert Thompson
Bryan Cave, LLP
1200 Main St., Ste. 3800
Kansas City, MO 64105
michelle.masoner@bryancave.com
rmthompson@bryancave.com
**ATTORNEYS FOR PLAINTIFF**

Scott Sandberg
John O'Brien
Spencer Fane, LLP
1700 Lincoln St., Ste. 2000
Denver, CO 80203
ssandberg@spencerfance.com
jobrien@spencerfane.com
**ATTORNEYS FOR DEFENDANT**
**DINSDALE BROS.**

                    /s/ Timothy A. Shultz

29