**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **REZAC LIVESTOCK COMMISSION** | ) | |
| **CO., INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No.:  5:15-cv-04958-DDC-KGS** |
| | ) | |
| **PINNACLE BANK, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
PINNACLE BANK'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Rezac Livestock Commission Company, Inc. ("Rezac") opposes Defendant

Pinnacle Bank's ("Pinnacle") Motion for Summary Judgment [ECF 104, 105] for all the reasons

set forth in Rezac's Motion for Summary Judgment [ECF 110, 111], which is incorporated by

reference.  Pinnacle's prior knowledge that the Dinsdale Bros. wire was for the purpose of

paying for cattle purchased from Rezac makes Pinnacle liable for conversion as a matter of law

because Pinnacle disposed of the funds in disregard of Rezac's rights.

The facts are not in dispute. Pinnacle knew Dinsdale Bros.'s wire was to pay for the St.

Marys Livestock[1] sold by Rezac. Pinnacle SOF 19, 27. Pinnacle claims its knowledge does not

matter. Kansas law says it does. Because Pinnacle knew specific, identifiable funds deposited

into its bank belonged to Rezac, Pinnacle converted the funds in concert with Dinsdale Bros.

when Pinnacle disposed of the funds in disregard of Rezac's prior claim.  Accordingly, Pinnacle's

Motion for Summary Judgment should be denied, and judgment entered in Rezac's favor on

Count IV for conversion and Count VI for conspiracy to convert.

---

[1]     Defined terms have the meaning provided in Rezac's Memorandum in Support of Motion for Summary
Judgment [ECF 111], and Rezac's Statement of Uncontroverted Material Facts shall be referenced herein as "Rezac
SOF." Pinnacle's Statement of Material Facts shall be referenced as "Pinnacle SOF."

## RESPONSE TO PINNACLE'S STATEMENT OF FACTS

For convenient reference, the paragraphs in this section are numbered to correspond with Pinnacle's numbered paragraphs. Rezac also adopts and incorporates Rezac's Statement of Uncontroverted Facts in its Motion for Summary Judgment [ECF 111]. Rezac only responds below to those paragraphs in Pinnacle's Statement of Facts that it believes are materially inaccurate or require further explanation.

17.     **The Rezac Check was presented to the Bank on October 6. On October 5, Leonard had provided the Bank with a list of his outstanding checks. It totaled some $5.8 million.** *As of October 6, Account 161 lacked sufficient funds to cover the Rezac Check.* **At this point, it was clear that Leonard was not able to make sufficient covering deposits.** *As a result***, the next day the Rezac Check was returned for insufficient funds.**

Additional Facts: Rezac disagrees with Pinnacle's characterization of the above-italicized fact. The evidence shows that on October 6, 2015, Account 161 held a positive balance of $1,598,433.80, which would have "covered" the Rezac Check in the amount of $980,361.45. *See* Rezac SOF 47, Kimball Dep. 67:9-69:6, Dep. Ex. 121, 114, page 9 of 10.  The evidence shows that Pinnacle gathered all the checks presented on Account 161 on October 6 and determined to whom each check was payable and the amount of each check. *See* Rezac SOF 48, Kimball Dep. 74:3-22, Dep. Ex. 123. Pinnacle then decided to honor 12 checks drawn on Account 161 totaling $1,344,253.51 ahead of Rezac's Check for $980,361.45. *See* Rezac SOF 49, Hock Dep. 139:6-141:21, Dep. Ex. 114, 117. The evidence shows that on October 6, 2015, Pinnacle received the Rezac Check for the payment of the St. Marys Livestock, which Pinnacle knew Dinsdale Bros. had received, and instead of honoring the check with the available funds in Account 161 in order to complete the St. Marys Livestock transaction, Pinnacle decided to pay

11869454.5

the remaining funds in Account 161 to holders of others checks. *See* Rezac SOF 51, Hock Dep. 68:2-69:14, 96:16-25, 130:3-19, Dep. Ex. 114. Pinnacle concedes it could have honored the checks in any order. Pinnacle Motion [ECF 105 at 16].

23.     **When the Dinsdale Bros. wire came into Leonard's account on October 1, the account reflected a positive balance at the end of that day of $762,139.66. The next day, Leonard deposited about $570,000, but nearly $3 million in checks that Leonard had written earlier were presented to the account that day. At the end of the day on October 2, the balance in the account was a negative $1,755,365.34. The next banking day (October 3 and 4 were weekend days), more funds came into the account, and more checks were honored, but the Rezac Check, being the largest, was dishonored because the account lacked sufficient funds.**

Additional Facts:  Rezac disagrees with Pinnacle's characterization of the events between October 1 and October 6. The evidence shows Pinnacle received the Dinsdale Bros. wire (identified as such) with notice that it was to pay the Rezac check. Pinnacle SOF 19, 27. The evidence further shows that Pinnacle instead used the Dinsdale Bros. wire to pay checks on October 1 and 2 that had previously been returned for insufficient funds on September 30, thereby perpetuating Leonard's float. Rezac SOF 45, Pinnacle SOF 10-11. Leonard's account held sufficient funds on October 6, but Pinnacle monitored Leonard's account, gathered all the checks presented on Account 161 on October 6, and then determined to pay 12 other checks presented after Rezac's check and returned Rezac's check NSF.  *See* Rezac's Response to Pinnacle SOF 17, *supra,* (Rezac SOF 47, Kimball Dep. 67:9-69:6, Dep. Ex. 121, 114, page 9 of 10; Rezac SOF 48, Kimball Dep. 74:3-22, Dep. Ex. 123; Rezac SOF 49, Hock Dep. 139:6-

141:21, Dep. Ex. 114, 117; Rezac SOF 51, Hock Dep. 68:2-69:14, 96:16-25, 130:3-19, Dep. Ex. 114).

      26.     **Leonard never told the Bank which of the various checks that were outstanding that it should pay using the Dinsdale Bros. wire funds.**

      Additional Facts:  Controverted.  On September 30, 2015, at 7:30 AM, Leonard told Spencer Kimball at Pinnacle that he was going to receive a wire for the purchase of the St. Marys Livestock "from of all people, Dinsdale Bros." *See* Rezac SOF 28; *see also* Pinnacle SOF 19, 27. By 10 AM on September 30, 2015, Kimball had spoken to Roy Dinsdale, Chris Dinsdale, and Mark Hock about the fact that Dinsdale Bros. had purchased the St. Marys Livestock, that Leonard had written a check for the St. Marys Livestock, and that Dinsdale Bros. had a million dollar wire it was planning to send to Leonard to pay for the St. Marys Livestock. Rezac SOF 29. In fact, Pinnacle knew the Dinsdale Bros. wire was intended to pay the Rezac check before the check had even been written.  *See* Rezac SOF 28, Leonard Dep. 104:24-106:20, 133:9-134:7; 368:13-369:4. Leonard understood that by telling Pinnacle that the Dinsdale Bros. wire was matched-up to and was intended to pay the Rezac check, that Leonard <u>had directed</u> Pinnacle to pay the Rezac check with the Dinsdale Bros. wire because, "We had talked about this wire. They [Pinnacle] knew about it." *See* Id.*,* Leonard Dep. 133:23-24; s*ee also,* Rezac SOF 28, 30-39, Leonard Dep. 368:13-369:4. Dinsdale Bros. also told Pinnacle that its wire was "to cover cattle purchases from the St. Mary's [sic] Livestock auction." *See* Rezac SOF 38, Hock Dep. 59:9-63:24, Dep. Ex. 88 ("Dinsdale Brothers is going to wire in approximately $1mm to the Leonard Cattle Co account today to cover cattle purchases from the St. Mary's Livestock auction."); Hesser Dep. 34:12-17.

4

27.     **Various emails by the Bank indicate that the Bank was aware that the Dinsdale Bros. wire was related to Leonard's purchase of cattle from Rezac, that the bank was expecting that Leonard's check would be presented soon, and that the bank was aware that Leonard was having difficulty keeping his account at a positive balance. The Bank was expecting the Rezac check to be presented on Leonard's account several days before it was actually presented.** *One email referred to a suggestion that Dinsdale Bros. might want to wire the money to Rezac instead of wiring it to Leonard.*

Additional Facts:  Actually, <u>two</u> emails said Dinsdale Bros. should wire the sale proceeds directly to Rezac at critical points in the timeline.  On September 30, 2015, at 11:06 AM, Pinnacle told Dinsdale Bros. not to send a wire to Pinnacle and to pay Rezac directly.   *See* Rezac SOF 33, Hock Dep. 47:22-50:4, Dep. Ex. 84 ("Quick update – I suggested to Chris to not send the wire from DBI [Dinsdale Bros.] until we see the total number of checks that hit Leonard Cattle Co tomorrow morning. … DBI can pay the sale barn directly.") (Emphasis added); Chris Dinsdale Dep. 83:15-87:23, 118:7-119:21, 124:2-126:4. On October 1, 2015, Pinnacle again suggested that Dinsdale Bros. should pay Rezac directly.  *See* Rezac SOF 35, Hock Dep. 50:2-58:6, Dep. Ex. 86 ("Chris – do you want to wire money to Charlie [Leonard] or pay the sale barn directly? I'm guessing the return items from yesterday will hit for the 2nd time on Friday.").

## <u>CHOICE OF LAW</u>

This Court has previously found that Kansas law controls because, "[i]n Kansas, tort actions are governed by the law of the state in which . . . the wrong was felt," and in cases alleging financial harm the court looks to "the state in which . . . [plaintiff] felt that financial injury." [ECF 30 at 3 (*citing* <u>Doll v. Chicago Title Ins. Co.</u>, 246 F.R.D. 683, 690 (D. Kan. 2007) (*citing* <u>Ling v. Jan's Liquors</u>, 703 P.2d 731, 735 (Kan. 1985); <u>Fusion, Inc. v. Neb. Aluminum</u>

Castings, Inc., No. 95-2366-JWL, 1997 WL 51227, at *24 (D. Kan. Jan. 23, 1997))]. This Court concluded that in this case, Kansas is the state because Plaintiff Rezac is a Kansas corporation and sold Leonard the cattle in Kansas. Id. The court thus applied Kansas law. Id.

## ARGUMENT

Rezac is not challenging "normal" banking procedures, so most of Pinnacle's cited case law and arguments are not relevant.  This case is not about normal banking because, at all relevant times, the Dinsdale family controlled the sale proceeds from all sides of the transaction and made decisions that intentionally kept Rezac from receiving its property. This case is about what Roy Dinsdale, Sid Dinsdale, Chris Dinsdale, Mark Hesser, Marc Hock, Spencer Kimball, Steve Zey, and Todd Roth knew, when they knew it, and what they did with that knowledge. Pinnacle concedes that both Dinsdale Bros. and Pinnacle knew that "the cattle Dinsdale bought from Leonard were the same cattle sold by Rezac."  Pinnacle Motion [ECF 105 at 19]. "Pinnacle bankers knew that a wire transfer from Dinsdale Bros. was coming to Leonard's account at Pinnacle Bank, and that it was for cattle Leonard purchased from Rezac." [Id.; Pinnacle SOF 19] Thus, Pinnacle admits it knew the Dinsdale Bros. wire belonged to Rezac. Proof of ownership in the funds placed in Leonard's account is all Rezac needs to prevail on conversion, and Pinnacle admits that knowledge, while attempting to avoid the accompanying legal obligation.

### 1.    Pinnacle Has Responsibilities When it Receives a Deposit Knowing it Belongs to Third-Party Rezac.

Pinnacle claims it is an innocent victim of its own "normal" banking protocols, but this case was not normal. The law holds a bank accountable when a bank knows that a particular deposit made into one of its customer's accounts actually belongs to a third party.  The bank does not take title to sale proceeds it knows belong to another.  Iola State Bank v. Bolan, 235 Kan. 175, 189, 679 P.2d 720, 732 (1984); Scoby v. Bird City State Bank, 112 Kan. 135, 211 P. 110,

113 (1922) ("[I]f the evidence shows that the proceeds of the sale of plaintiff's cattle were included in the $3,500 paid by the Woods–Egan Commission Company, and if the defendant bank was so informed before it devoted that money to the payment of Witham's overdrafts *or otherwise disposed of it*, defendant is liable." (Emphasis added.)).[2] Pinnacle argues that the Dinsdale Bros. wire became the bank's money when it was deposited.  Pinnacle Motion [ECF 105 at 11-13]. Pinnacle is wrong because this was no ordinary deposit.  This deposit came from the owner and director of the bank and with explicit notice that it was for Rezac. Pinnacle SOF 19, 27; Rezac SOF 33, 38, 40,[3] 44.

The presumption of a debtor-creditor relationship between a depositor and a bank is rebutted when the bank is put on notice of a third-party's interest in the deposited funds. Four Circle Co-op v. Kansas State Bank & Tr. Co., 771 F. Supp. 1144, 1149 (D. Kan. 1991); *see also* Smith v. Sec. Bank & Tr. Co., 119 S.W.2d 556, 561 (Ark. 1938). Normally, a general deposit passes title to the bank and establishes the relation of debtor and creditor between the bank and the depositor. Id. This debtor-creditor relationship requires the bank, by its contract with its

---

[2]    *See also*, Ballard v. Bank, 91 Kan. 91, 92, 136 P. 935 (1913); Humpert v. Citizens State Bank, 122 Kan. 101, 102, 250 P. 1077 (1926); Drumm-Standish Comm'n Co. v. Farmers' State Bank of Neosho Falls, 132 Kan. 736, 297 P. 725, 727 (1931).

[3]    Q. Okay. And you say you need to get back to Chris Dinsdale. Why did you need to get back to Chris Dinsdale?
        A. I wanted to let him know that if that check to St. Marys had cleared.
        Q. Okay. And why?
        A. Well, he's a director of our holding company and has had interest in the transaction.
. . .
        Q. Were you calling the people associated with any of those other companies that had checks in the queue?
        A. They weren't directors of my holding company, so no.
. . .
        Q. Okay. And you understand -- stood that the purpose of that wire was to pay for cattle that were purchased at St. Marys in St. Marys, Kansas, right?
        MR. WRIGHT: Object to the form.
        THE WITNESS: I understood that the cattle purchased were from St. Marys, and they were purchased from Charlie.
        BY MR. THOMPSON: Q. Right.
        A. Yes.
        Q. And that wire was being made for the cattle that originated in St. Marys, Kansas, correct?
        A. Yes.  *See* Marc Hock Dep. 62:19-63:2, 63:8-12, 65:18-66:7, 66:24-67:7.

depositor, to honor the depositor's checks to the extent of his deposits. Id. "However, there is an exception to this rule, that exception being that if the bank has notice that the funds deposited do not belong to the depositor, *it must dishonor a check drawn by the depositor on the account in payment of his individual debts*." Id. (Emphasis added.) If the bank decides to honor such checks knowing that it is doing so with the funds belonging to someone other than the depositor, the bank becomes liable to the rightful owner of the funds. Id. In other words, the bank cannot hide behind its contract with its depositor and claim that it had no choice but to use the funds in the account to pay the depositor's personal debts when the bank *knows* the funds belong to someone else and not the depositor.  This is exactly what Pinnacle is attempting to do here.

The *Smith v. Sec. Bank & Tr. Co.* case is instructive because its facts closely resemble what happened to Rezac.  The only difference is that the bank owners were not also personally involved in the cattle sale, as happened to Rezac.   In *Smith*, the depositor did business as a cattle auction sales and commission company. Id. After every auction, he deposited all the cattle sale proceeds into his account, and wrote checks out of the same account to the owners of the cattle sold at auction. Id. The bank knew the nature of his business and would cash all checks drawn on this account payable to the cattle owners for the full sale price of their respective cattle, less the depositor's 4% commission. Id. The depositor also wrote personal checks against this account. Id. The cattle sales continued over a period of several months until the depositor became overdrawn – having written more personal checks than his commission could cover.  Id. At that point, the bank appropriated the proceeds of the depositor's last cattle sale to the depositor's outstanding checks and to indebtedness to the bank.  Id. In *Smith*, the bank knew all along that the funds being deposited were sale proceeds that did not belong to its depositor beyond his commission. Id. The *Smith* court found that the bank knew it was dealing in funds that did not

belong to the depositor and that neither the bank nor the depositor had a lawful right to make an agreement to appropriate the funds in payment of depositor's personal debts. Id. When the agreement was actually carried out, the bank became liable to the third parties for the unlawful conversion of the funds. Id.

Applying the logic of *Smith* to the facts of this case:  (1) both Pinnacle and Leonard knew the Dinsdale Bros. wire was to pay for the St. Marys Livestock; (2) neither Pinnacle nor Leonard could lawfully claim ownership of the funds so identified; therefore, (3) neither Pinnacle nor Leonard could lawfully make the decision to deposit the wire in Leonard's general account to pay his personal debts because that decision violated Rezac's known rights to the sale proceeds. *Smith* is strikingly similar to what happened to Rezac with the additional insult that the bank's owners were also the purchasers and had control over the sale proceeds before they even reached the bank. *See* Pinnacle SOF 27; Rezac SOF 5-7, 43. Pinnacle and Dinsdale Bros. knew that Leonard would only receive a commission or "fee" for purchasing the cattle. Rezac SOF 26.  The Dinsdale Bros. wire came with advance notice that it was sale proceeds to pay for the St. Marys Livestock. Pinnacle SOF 19; Rezac SOF 30 ("The St. Marys check [to Rezac] should be in the presentments tomorrow. Chris said [Dinsdale Bros.] was going to wire funds **for their purchase today**.") (Emphasis added)). Here, both Leonard, the bank customer, and Dinsdale Bros., the actual party making the deposit, told Pinnacle that the wire was **"to cover cattle purchases from the St. Mary's [sic] Livestock auction."** *See* Pinnacle SOF 27; Rezac SOF 28, 38, 44. Pinnacle's own correspondence shows it was informed that the Dinsdale Bros. wire was for a designated recipient, Rezac. Pinnacle SOF 27. With this knowledge, Pinnacle could not make any decision to divert those identifiable funds from their rightful owner, Rezac. The account services agreement between Pinnacle and Leonard gave neither the right to use third-party funds

to satisfy Leonard's personal debts. Pinnacle knew when it received the Dinsdale Bros. wire that it did not belong to Leonard; thus, the deposit was not a general deposit, did not transfer title to the funds to Pinnacle, and could not be used to cash other checks.

> **2.     Pinnacle's Knowledge That the Dinsdale Bros. Wire Was Earmarked for Rezac's Check Constitutes an Assignment and Gives Rezac Ownership Interest in the Sale Proceeds.**

Special circumstances (such as the bank owner depositing the sale proceeds of his own purchase into his own bank with notice of what the funds were for), impose liability on a bank for ignoring the rights of the known, rightful owner. This is no ordinary insufficient funds check case, and it does not create a new form of liability on a bank to a non-customer. This is a special circumstances case. Pinnacle relies primarily on two cases, which both hold that, *ordinarily*, a check is not an assignment of particular funds to a particular payee. *See* Torkelson v. Bank of Horton, 208 Kan. 267, 271, 491 P.2d 954, 958 (1971) [Pinnacle Motion, ECF 105 at p. 13]; and Four Circle Co-op, 771 F. Supp. at 1152-53 [Pinnacle Motion, ECF 105 at p. 16]. However, both cases also acknowledge the long-standing Kansas exception to the rule that says special circumstances, or facts apart from the mere issuance of a check, give rise to liability for the bank. Torkelson, 208 Kan. at 271; Four Circle Co-op, 771 F. Supp. at 1152. In other words, if the bank knows what the money is for when it accepts the deposit, the bank cannot convert it to another use. Four Circle Co-op, 771 F. Supp. at 1152. When a deposit and a check are complementary, and the bank knows it, the check is deemed to be an assignment pro tanto of the funds called for. Torkelson, 208 Kan. at 271. Both *Torkelson* and *Four Circle Co-op* cite *Ballard* as the foundation for a long line of Kansas decisions culminating in *Iola State Bank* which hold that banks cannot disregard known third-parties' rights.[4]  In *Ballard*, as here, the "action was not

---

[4]      *Torkelson* lost because the plaintiff was neither the payee nor the holder of the check, nor were there special facts or circumstances attending the drawing or delivery of the check which could make it a pro tanto

11869454.5

brought upon the checks alone but upon the entire transaction, of which the giving of the check forms a part." <u>Iola State Bank</u>, 235 Kan. at 190 (*citing* <u>Ballard</u>, 91 Kan. at 92 (by virtue of special circumstances in addition to the mere issuance of the check, the check is deemed to be an assignment pro tanto of the funds called for – vesting the check holder with ownership over the funds); <u>Humpert</u>, 122 Kan. at 102). Similarly, Rezac is not claiming a right to the funds based solely on the check. Rezac is claiming ownership rights in the Dinsdale wire because Dinsdale Bros. delivered the wire to Pinnacle saying, the wire was **"to cover cattle purchases from the St. Mary's [sic] Livestock auction."** *See* Rezac SOF 28, 38, 44. Pinnacle offers no legal justification for not using the Dinsdale Bros. wire to pay for the St. Marys Livestock when Pinnacle knew was the wire was for.

### 3.       The Rezac Transaction is the Ultimate Exception to the Rule.

Almost every known exception to the general rule that a bank cannot be held liable for conversion of funds in a deposit account applies to the facts of this case.  Pinnacle argues only setoff and segregated funds provide an exception to the general rule, and that neither applies in this case. Pinnacle Motion [ECF 105 at 13].  Pinnacle's arguments ignore the unique inside information and control Pinnacle had in this case.  There are many grounds to hold a bank liable for conversion, and they all involve the bank's actual knowledge of the nature of an identifiable deposit. A deposit may be equitably deemed a special deposit, a trust created for a specific purpose, a bailment, or an assignment upon proof of the bank's actual knowledge of the true owner of the funds.  <u>Dean Witter Reynolds Inc. v. Variable Annuity Life Ins. Co.</u>, 373 F.3d 1100, 1107–08 (10th Cir. 2004); <u>Ballard</u>, 91 Kan. at 92. In each case, the third party has an

---

assignment. <u>Torkelson</u>, 208 Kan. at 271. *Four Circle Co-op* lost because plaintiffs could not trace their ownership to the funds deposited into the account. <u>Four Circle Co-op</u>, 771 F. Supp. at 1151. *Torkelson* and *Four Circle Co-op* are distinguishable and do not apply to the facts of this case.

11869454.5

action directly against the bank for conversion of the third party's funds from the depositor's account. Dean Witter, 373 F.3d at 1108.

### a.      Setoff is Not an Element of Conversion.

Pinnacle argues it is not liable because it claims it did not set off the Dinsdale Bros. wire against a debt to the bank. Pinnacle Motion [ECF 105 at 13-18]. However, setoff is not an element of conversion, and it is *not* necessary for a party liable for conversion to have personally benefited. Drumm-Standish, 297 P. at 727; Ford v. Guarantee Abstract & Title Co., 220 Kan. 244, 266, 553 P.2d 254, 271 (1976) (party charged with conversion does not have to retain the money or profit from it). Conversion is defined as an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another. Carmichael v. Halstead Nursing Ctr., Ltd., 237 Kan. 495, 500, 701 P.2d 934, 938 (1985). The essence of conversion is not acquisition of property by the wrong-doer, but a wrongful deprivation of it to the owner. Baker v. Craig, 128 Kan. 676, 280 P. 771, 772 (1929). It does not matter whether the converter kept the property or disposed of it. The victim of conversion is not concerned with what the converter did with the property – only that he was denied his own property rights. A bank can and does convert funds in a depositor's account when the bank knows the funds are the property of a third party. Moore v. State Bank of Burden, 240 Kan. 382, 387, 729 P.2d 1205, 1211 (1986) (a bank commits "conversion of funds in a depositor's account *if the bank knows the funds are the property of a third party*.") (Emphasis added) (*citing*, Iola State Bank v. Bolan, 235 Kan. 175). *Moore* did not find that the setoff was the exception to the rule.  The *Moore* exception refers only to the bank's knowledge of ownership of the funds.  Id. *Moore* acknowledges that a bank deposit may be an identifiable and traceable fund that can be converted as opposed to a mere debt or chose in action. Id.; *see e.g.,* Four Circle Co-op, 771 F. Supp. at 1151 (*cited by* Pinnacle Motion [ECF 105 at 16]). The *Four Circle Co-op* plaintiffs did not prevail because the

payees of the checks drawn on the depositor's account could not trace the funds to sale proceeds of their grain.  Thus, the plaintiffs did not prove they held any ownership interest over any funds in the depositor's account. Id. *Moore*, and Kansas conversion law in general, do not require a setoff or a personal benefit to be the act of conversion. It is the deprivation of property. In order to prevail, Rezac need only show that Pinnacle had knowledge of Rezac's claims and acted so as to deprive Rezac of its rights to the sale proceeds. Iola State Bank, 235 Kan. at 184, 679 P.2d at 729; Scoby, 211 P. at 113; Emporia Nat'l Bank v. Layfeth, 63 Kan. 17, 64 P. 973, 974 (1901).

This case is exactly on point and consistent with *Iola State Bank*. Just like *Iola State Bank*, Pinnacle had actual knowledge of the manner in which Leonard conducted livestock sales, and in particular, Pinnacle had actual knowledge of the Rezac sale and that it involved its sister-company, Dinsdale Bros. Pinnacle SOF 7-8, 10, 19, 27; Rezac SOF 5-7, 13, 16, 28-30. The Dinsdale Bros. wire was identifiable and was put into Leonard's account with specific notice of what it was for. Id.; Rezac SOF 30-32, 37-41, 44; Rezac's Response to Pinnacle SOF 23-26, *supra*.  Pinnacle had the identifiable sale proceeds, but decided to dishonor Leonard's check to Rezac. Pinnacle SOF 23; Rezac SOF 45-51. At the time, Pinnacle knew the Dinsdale Bros. wire belonged to Rezac. Id. Thus, where a bank actually knows the deposit in the account of one of its debtors belongs to a third person, it cannot apply such funds against the debtor's other obligations. Iola State Bank, 235 Kan. at 191; Smith, 119 S.W.2d at 561.[5] Whether Pinnacle applied Rezac's funds to Leonard's debts to other creditors or to his indebtedness to Pinnacle is a distinction without a difference under Kansas conversion law.

---

[5]      The approved jury instructions in the *Emporia Nat'l Bank v. Layfeth* case also refer to payment of the depositor's personal debts as opposed to setoff. The question was defined as whether the bank, after having notice of the payee's claim, had intentionally applied the sale proceeds to the payment of depositor's other debts drawn on his account.  Emporia Nat'l Bank, 64 P. at 974.

### b.        Pinnacle Could and Should Have Segregated the Dinsdale Wire.

Pinnacle argues that the Dinsdale wire was not kept separate from Leonard's general account, so Rezac cannot prevail. Pinnacle Motion [ECF 105 at 18]. Pinnacle's argument ignores the undisputed facts that Pinnacle had both the knowledge of and control over the Dinsdale Bros. wire, yet made the decision to use it for Leonard's general checking, anyway. Pinnacle should not be rewarded for this decision because everything about the Dinsdale Bros. wire deposit shows it was a special deposit as a matter of law. A special deposit is made with express information that it is for a particular purpose.  Dean Witter, 373 F.3d at 1108. It is not necessary, in order for this rule to apply, that there shall be what is strictly and technically known as a "special deposit." It is enough that there is an agreement for a particular application of the fund. Drumm-Standish, 297 P. at 727. As a matter of law, how much more direction does a bank need when the bank customer *and* the party actually making the deposit, *who is the bank's owner*, tell the bankers what the deposit is for? Under these special circumstances, the law does not allow Pinnacle to deposit the wire into a general account in disregard of Rezac's known rights.[6]

Pinnacle's excuse that the Dinsdale Bros. wire was deposited into general checking is a situation of its own making. Pinnacle knew in advance that the Dinsdale Bros. wire was coming for this specific cattle purchase. *See* Pinnacle SOF 19, 27; Rezac SOF 28. Dinsdale Bros. and Pinnacle are both owned by Sid and Chris Dinsdale, and the two entities remained in constant contact before, during, and after the sale about Leonard and the payment owed to Rezac. *See* Rezac SOF 5-7, 16-18, 29-44, 52-54, 56. In fact, Pinnacle knew from Leonard that the Dinsdale Bros. wire was intended to pay the Rezac check before the check had even been written.  *See* Rezac SOF 28 (**Leonard understood that by telling Pinnacle that the Dinsdale Bros. wire**

---

[6]        As set forth in Section 1, *supra,* neither Pinnacle nor Leonard had legal ownership of the funds to direct that they be applied to Leonard's general account and dispensed for his personal debts because they both knew the wire contained sale proceeds earmarked for Rezac. Pinnacle SOF 8, 19, 27.

was matched-up to and was intended to pay the Rezac check, that Leonard **had directed Pinnacle to pay the Rezac check with the Dinsdale Bros. wire because, "We had talked about this wire. They [Pinnacle] knew about it."** Leonard Dep. 133:23-24). Dinsdale Bros. delivered the wire to Pinnacle with notice that it was **"to cover cattle purchases from the St. Mary's [sic] Livestock auction."** *See* Pinnacle SOF 27; Rezac SOF 28, 38, 44. The Dinsdale Bros. wire was readily identifiable as originating from "Dinsdale Brothers Inc." Rezac SOF 39. Pinnacle president Marc Hock saw the problem with diverting the Dinsdale Bros. wire from its rightful owner and urged his boss not to send the wire to Pinnacle. *See* Rezac SOF 33-35("[p]ay the sale barn directly"), *see also* Rezac SOF 52, 55.[7] Chris Dinsdale took a day to think about it, but then wired the sale proceeds to Pinnacle anyway. *See* Rezac SOF 34, 36, 37. Accordingly, Pinnacle's own failure to segregate the Dinsdale Bros. wire, which was sent for an explicitly stated special purpose, can be no defense for Pinnacle. To the contrary, Pinnacle's decisions are further proof that Pinnacle took intentional actions to deprive Rezac of its property.

### c.      This Transaction Was Not Standard.

Pinnacle's motion does not cite one case where the bank prevails when it had actual knowledge of a third-party's ownership interest in deposited funds. Whether a special deposit, a trust created for a specific purpose, a bailment, or an assignment, courts uniformly hold the bank liable for conversion upon proof of the bank's actual knowledge of the true owner of the funds. Pinnacle made all the decisions after October 1, 2015, and each decision led to keeping Rezac from its property. General banking law does not apply to the facts of this case because this case is not about anonymous and autonomous check processing. This transaction happened under the

---

[7]       Q. [I]t says here you suggested to Chris don't send the wire right now?
         A. Yes.
         Q. Why did you suggest that to him?
         A. I knew it was a large purchase and I wanted to make sure the cattle got paid for. I didn't know. I didn't want -- I just wanted those cattle to get paid for. *See* Hock Dep. 49:14-22.

micro-scrutiny of the highest levels of management and ownership at Pinnacle. Pinnacle concedes it received the Dinsdale Bros. wire with knowledge it was Rezac's sale proceeds. Pinnacle SOF 27. Pinnacle concedes that it used Leonard's deposits to fill negative account balances in Account 161. Pinnacle SOF 10-11, 13-15, 17. Pinnacle concedes it dispensed the Dinsdale Bros. wire to Leonard's other creditors to keep the Leonard float going. Pinnacle SOF 17, 23; Pinnacle Motion [ECF 105 at 16]. Pinnacle concedes that it decided to close Leonard's account on October 5 *only after* Pinnacle determined Leonard would not be able to cover the float that Pinnacle had facilitated. Id.; Pinnacle SOF 10-11, 13-15, 17-23. Pinnacle concedes it could have paid Leonard's checks in any order. Pinnacle Motion [ECF 105 at 16 *citing* K.S.A. § 84-4-303]. Despite this knowledge and control, Pinnacle at every turn, made a decision to deprive Rezac its property.

**4. Pinnacle's and Dinsdale Bros.'s Communications Show a Conspiracy to Convert.**

Evidence of communications between conspiracy defendants is sufficient to create an inference that they agreed to deprive plaintiff of his rights. Wilson v. City of Chanute, 43 F. Supp. 2d 1202, 1216 (D. Kan. 1999). Pinnacle's argument for summary judgment on conspiracy depends on Pinnacle prevailing on its legal conclusion that its knowledge of Rezac's ownership rights in the sale proceeds did not matter. Pinnacle Motion [ECF 105 at 23]. Pinnacle says "all that happened is that the Bank dishonored the Rezac check because, *in the ordinary course*, Leonard's account lacked the funds to pay it when it was presented to the Bank." Id. (Emphasis added). As set forth above, the evidence shows this transaction was *not* in the ordinary course, and Pinnacle concedes that its emails with Dinsdale Bros. show shared knowledge and information about the Rezac transaction that kept Rezac from getting paid. Pinnacle Motion

16

[ECF 105 at 23]. Pinnacle's and Dinsdale Bros.'s shared communications interfered with Pinnacle's "normal" protocols and Rezac's rights. For example:

a.      Pinnacle concedes it told Dinsdale Bros. that Leonard was operating on a float and was overdrawn. Rezac SOF 14, 18, 53 ("**Q. When did you first talk to Chris Dinsdale about Charlie Leonard and his overdrafts? A. It would have been in the late summer, early fall when Charlie started experiencing – or we started seeing large overdrafts inside Charlie's account.**" Hock Dep. 99:1-6).

b.      Pinnacle told Dinsdale Bros. that Leonard had written a check for the St. Marys Livestock, and at the time, Leonard was a million dollars overdrawn on his account. Pinnacle SOF 19; Rezac SOF 42.

c.      Pinnacle knew Dinsdale Bros. was concerned about shutting down Leonard Cattle if Pinnacle returned checks prior to Dinsdale Bros. sending the wire. Rezac SOF 29, 42 ("**Q. All right. So if you go to the next page, second paragraph, were Chris -- it says, Chris commented that if we returned checks, we were effectively shutting down Leonard Cattle. Do you recall having that discussion with Chris Dinsdale? A. I do after reading my notes, yes.**" Kimball Dep. 30:21-31:2).

d.      Pinnacle concedes that it and Dinsdale Bros. became personally involved in and interfered with the payment for the St. Marys Livestock. Pinnacle Motion [ECF 105 at 24]; Rezac 16-18, 29-52 ("**Had you ever in your banking experience tried to have conversations with someone to time -- try and time the presentment of a check with the deposit that was tied to that check? A. No, I didn't have any other relationships similar to this where I was speaking with a director. Q. Right. So it's a pretty unique situation which you got a director on one side, a director of the bank also being the party that bought the cattle and**

**that was sending the wire is the only time that's happened? A. In my experience.**" Hock

Dep. 136:2-14).

The result of this deviation from normal banking and interference with the Rezac

transaction ensured that Rezac was denied his property. The evidence shows Defendants

conferred and agreed to this course of action.

>    5.    **Rezac Presents Evidence of Willful Conduct Sufficient to Present Punitive Damages to the Jury.**

To warrant an award of punitive damages, one party must prove that the other party acted

with willful or wanton conduct, fraud, or malice. K.S.A. 60–3702(c); <u>Wilson v. Wilson</u>, 37 Kan.

App. 2d 564, 578, 154 P.3d 1136, 1147 (2007). One who with knowledge of existing conditions

and aware from such knowledge that injury will likely or probably result from his or her conduct,

and with reckless indifference to the consequences, consciously does some act, which produces

the injurious result, is guilty of willful or wanton conduct. <u>Reeves v. Carlson</u>, 266 Kan. 310, 313,

969 P.2d 252, 256 (1998). Wanton conduct is an act performed with a reckless disregard or

complete indifference to the probable consequences of the act. <u>Id.</u> A wanton act is more than

ordinary negligence but less than a willful act. Wantonness refers to the mental attitude of the

wrongdoer rather than a particular act. <u>Id.</u> Existence of malice is ordinarily a question of fact,

unless the evidence is undisputed. <u>Werdann v. Mel Hambelton Ford, Inc.</u>, 32 Kan. App. 2d 118,

130, 79 P.3d 1081, 1090 (2003); <u>Iola State Bank</u>, 235 Kan. at 192.

Here, Rezac has presented undisputed evidence that Dinsdale Bros. and Pinnacle acted in

concert and, with full knowledge that Rezac was likely to be injured by their actions, made

willful and wanton decisions to deny Rezac his property.  Rezac SOF 13-18, 29-55. Pinnacle

concedes it allowed Leonard to operate on a float in exchange for significant fees and interest.

Pinnacle SOF 10-11, 13-15, 22. Dinsdale Bros. also knew about the float and wanted to avoid

11869454.5

shutting Leonard down by having checks returned for insufficient funds. Rezac SOF 28, 29, 42. Pinnacle concedes it knew about the Dinsdale Bros. cattle purchase and that Dinsdale Bros. was going to pay for the cattle with a wire into Leonard's account.  Pinnacle SOF 19. Pinnacle concedes the Leonard account was known to be overdrawn when Dinsdale Bros. sent the wire. Pinnacle SOF 27. Pinnacle knew the Dinsdale Bros. wire contained the sale proceeds to pay Rezac for the St. Marys Livestock.  Rezac SOF 44. Pinnacle knew Rezac was not going to get paid if the wire went into Leonard's general account.  Pinnacle SOF 27; Rezac 52 ("**Q. So it's fair to say that there's a real possibility that there's not going to be enough money to cover that St. Marys check? A. There was a chance, yes.**" Hock Dep. 137:17-20). Dinsdale knew it, too. Rezac SOF 43 ("**Q. And you considered paying the sale barn directly because you knew that there was a chance that Charlie's check was going to – his account was going to have insufficient funds to cover the check; correct? A. I thought there was a possibility.**" Chris Dinsdale Dep. 61:17-22).  Despite this, and against the advice and counsel of Mark Hock, President of Pinnacle Bank, that Dinsdale Bros. should wire the funds directly to Rezac (Rezac SOF 33, 35), Sid and Chris Dinsdale decided to do otherwise, and as predicted, Rezac was not paid.

Thus, Rezac presents specific facts that show: (1) Defendants had full knowledge of Leonard's overdraft circumstances, the complementary Dinsdale Bros. wire and Rezac check, and Rezac's claim to identifiable sale proceeds; (2) Defendants knew that Rezac would probably not get paid the sale proceeds if the Dinsdale Bros. wire went through Leonard's general account; and (3) Defendants intentionally controlled the sale proceeds in order to keep Leonard's account afloat at Rezac's expense.

**6.    Genuine Issues of Material Fact Preclude Summary Judgment on Count V for Unjust Enrichment.**

Rezac pursues this quasi-contractual claim in the alternative to its conversion claim. To establish an unjust enrichment claim Rezac must establish: (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge of the benefit by the defendant; and (3) acceptance _or_ retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value.  The Superlative Grp., Inc. v. WIHO, L.L.C., No. 12-1468-JWL, 2014 WL 1385533 (D. Kan. Apr. 9, 2014) (Emphasis added).

Unjust enrichment as to Pinnacle should go to the jury because of Pinnacle's actual knowledge and acceptance of the Dinsdale Bros. wire which it knew belonged to Rezac. Pinnacle SOF 19, 24.  The evidence shows that Pinnacle had been floating Leonard for weeks in exchange for fees and interest in the tens of thousands of dollars. Pinnacle SOF 10-11, 13, 22; Rezac SOF 13-15. The evidence shows Dinsdale Bros. also knew about the float, and Pinnacle and Dinsdale Bros. conferred and agreed to keep Leonard operating. Rezac SOF 28, 29, 42 ("**Q. All right. So if you go to the next page, second paragraph, were Chris -- it says, Chris commented that if we returned checks, we were effectively shutting down Leonard Cattle. Do you recall having that discussion with Chris Dinsdale? A. I do after reading my notes, yes.**" Kimball Dep. 30:21-31:2). So, Pinnacle accepted the Dinsdale Bros. wire and diverted it away from Rezac to pay Leonard's other checks on October 1 and 2 thereby perpetuating the float. Rezac SOF 35, Pinnacle SOF 10-11, 23; Pinnacle Motion [ECF 105 at 16]. Pinnacle concedes that it decided to close Leonard's account on October 5 _only after_ Pinnacle determined Leonard would not be able to cover the float that Pinnacle had facilitated. Id.; Pinnacle SOF 10-11, 13-15, 17-23. Thus, Rezac has presented sufficient evidence that Pinnacle received the Dinsdale Bros. wire,

which it knew in advance belonged to Rezac, and accepted the wire to keep Leonard in business and continue the float. The circumstances of Dinsdale Bros.'s and Pinnacle's communications about the payment owed to Rezac, but never paid, makes it inequitable for Pinnacle to avoid liability to Rezac.

## **CONCLUSION**

For the reasons set forth above, Defendant Pinnacle Bank's Motion for Summary Judgment should be denied and judgment entered in favor of Plaintiff Rezac Livestock Commission Company, Inc. on Count IV as to liability for Pinnacle's conversion and on Count VI for conspiracy to convert, with punitive damages to be determined at trial.

**Respectfully submitted,**

**BRYAN CAVE LEIGHTON PAISNER LLP**

By:    /s/ Michelle M. Masoner
Robert M. Thompson        KS #14673
Michelle M. Masoner        KS #18424
Stephanie C. Bradshaw       KS #26716
1200 Main Street, Suite 3800
Kansas City, Missouri 64105
Telephone:   (816) 374-3200
Facsimile:     (816) 374-3300
rmthompson@bclplaw.com
michelle.masoner@bclplaw.com
stephanie.bradshaw@bclplaw.com

Attorneys for Plaintiff

21

## <u>CERTIFICATE OF SERVICE</u>

     This certifies that, on July 13, 2018, the foregoing was served via the Court's Electronic Case Filing System to all counsel of record:

s/ Michelle M. Masoner            
**Attorney for Plaintiff**

11869454.5