**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **REZAC LIVESTOCK COMMISSION CO., INC.** | ) |
| | ) |
| **Plaintiff,** | ) |
| **v.** | )   **Case No.:  5:15-cv-04958-DDC-KGS** |
| | ) |
| **PINNACLE BANK, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DINSDALE BROS.'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Rezac Livestock Commission Company, Inc. ("Rezac") opposes Defendant

Dinsdale Brothers Inc.'s ("Dinsdale Bros.") Motion for Summary Judgment [ECF 102, 103] for

all the reasons set forth in Rezac's Motion for Summary Judgment [ECF 110, 111], which is

incorporated by reference. The facts are not in dispute as to Rezac's conversion and conspiracy

claims. Dinsdale Bros. received advance notice from Pinnacle Bank that Leonard did not have

the funds to pay Rezac for the St. Marys Livestock,[1] knew Rezac was not paid, and kept the St.

Marys Livestock, anyway. Dinsdale Bros. knew of the defect in its title to the St. Marys

Livestock, shared inside information with its sister-company, Pinnacle, and thereby converted

and conspired to convert Rezac's property.

As to Rezac's breach of contract, quantum meruit, and unjust enrichment claims, genuine

issues of material fact exist.  First, several witnesses testified as to Leonard's purchase of the St.

Marys Livestock on behalf of Dinsdale Bros. Second, Chris Dinsdale himself testified that

Dinsdale Bros. gave Leonard an order to purchase the St. Marys Livestock. Third, Dinsdale Bros.

---

[1]      Defined terms have the meaning provided in Rezac's Memorandum in Support of Motion for Summary
Judgment [ECF 111], and Rezac's Statement of Uncontroverted Material Facts shall be referenced herein as "Rezac
SOF". Dinsdale Bros.'s Statement of Material Undisputed Facts shall be referenced as "DB SOF"

concedes it knew the St. Marys Livestock came from Rezac and that it should have paid the sale

barn directly to make sure Dinsdale Bros. received good title to the St. Marys Livestock, but

Dinsdale Bros. did not do so.  Rezac provides the specific facts supporting each element of each

of its claims and prevails on conversion and conspiracy as a matter of law. Accordingly, Dinsdale

Bros.'s Motion for Summary Judgment should be denied in its entirety, and judgment entered in

Rezac's favor on Count II for conversion, Count VI for conspiracy to convert, and judgment

entered in Rezac's favor on Dinsdale Bros.'s Counterclaim declaring that Rezac has superior title

to the St. Marys Livestock or its value.

## <u>RESPONSE TO DINSDALE BROS.'S STATEMENT OF FACTS</u>

For convenient reference, the paragraphs in this section are numbered to correspond with

Dinsdale Bros.'s numbered paragraphs.[2]  Rezac only responds below to those paragraphs in

Dinsdale Bros.'s Statement of Facts that it believes are materially inaccurate or require further

explanation.

6.      **On September 29, 2015, like all other days before it, Leonard could purchase**

**cattle for anyone he desired. Depending on what Leonard purchased, Dinsdale Bros. could**

**purchase some or all of the cattle from Leonard. Dinsdale Bros. never suggested to**

**Leonard that he had to purchase cattle for Dinsdale Bros.**

Response:  Controverted. Leonard had an order from Dinsdale Bros. to buy cattle on

September 29, 2015.  Dinsdale Bros. through Dave Wahlert called Leonard and gave Leonard

specific instructions on what cattle to buy. Wahlert knew Leonard was buying cattle for Dinsdale

Bros. from Rezac on September 29, 2015. *See* Rezac SOF 19-20; Leonard Dep. 17:4-19:2,

22:11-21, 24:14-27:10; Wahlert Dep. 23:18-24:18; 25:10-30:20; Rezac SOF 59-63, *infra*.

---

[2]      References to Rezac SOF 1 - 58 are located in Rezac's Memorandum in Support of Summary Judgement
[ECF 111]. References to Rezac SOF 59 *et seq.* are located herein under Rezac's Statement of Additional
Uncontroverted Material Facts.

7.     **On September 29, 2015, like all other days before it, Dinsdale Bros. had no control over: a. Whether Leonard attended an auction; b. The location of any auction Leonard attended; or c. Whether or under what terms Leonard purchased cattle.**

Response:  Objection, legal conclusion. Controverted. The facts show Dinsdale Bros. placed an order with Leonard for September 29, 2015. *See* Rezac SOF 19-20; Leonard Dep. 17:4-19:2, 22:11-21, 24:14-27:10; Wahlert Dep. 23:18-24:18; 25:10-30:20; Rezac SOF 59-63, *infra*.

8.     **Dinsdale Bros. never exercised control over how Leonard conducted his business. Whether and how often and at what quantities Leonard sold to Dinsdale Bros. was up to Leonard.**

Response:  Objection, legal conclusion. Controverted. The facts show Dinsdale Bros. placed an order with Leonard for September 29, 2015. *See* Rezac SOF 19-20; Leonard Dep. 17:4-19:2, 22:11-21, 24:14-27:10; Wahlert Dep. 23:18-24:18; 25:10-30:20; Rezac SOF 59-63, *infra*.

9.     **On September 28, 2015, Leonard and Dinsdale Bros. employee David Wahlert spoke briefly on the telephone. During that call Leonard and Wahlert discussed the cattle market and Leonard informed Wahlert that Leonard already planned to attend an auction in St. Marys, Kansas. Wahlert informed Leonard that Dinsdale Bros. was in the cattle market but they did not discuss prices. Wahlert planned to call Leonard the next day after checking the market.**

Response:  Rezac clarifies that Dinsdale Bros. initiated the call to Leonard and said Dinsdale Bros. wanted to buy some yearlings. *See* Rezac SOF 19, Leonard Dep. 16:7-25.

11.     **Neither Wahlert nor anyone else representing Dinsdale Bros. instructed Leonard to attend the auction in St. Marys.**

Response:  Rezac clarifies that after Leonard told Wahlert he was going to the Rezac livestock auction in St. Marys, Wahlert told Leonard to call him before the sale because Dinsdale Bros. wanted Leonard to buy some cattle for it. *See* Rezac's SOF 19-20, 22; Leonard Dep. 15:13-17:10, 17:4-19:2; Wahlert Dep. 23:18-24:18, 25:15-30:22.

14.     **On September 29, 2015, Wahlert spoke with Leonard on the telephone and informed Leonard that Dinsdale Bros. was interested in purchasing heifers under 800 pounds and steers under 900 pounds. Leonard and Wahlert did not discuss the price or quantity that Dinsdale Bros would purchase from Leonard, which they left for future discussion. No one other than Leonard and Wahlert participated in this call.**

Response:  Rezac clarifies that Leonard and Wahlert had an understanding as to quantity and price. Leonard's and Wahlert's testimony shows that each understood that Leonard would purchase Rezac's entire supply of cattle that fit Wahlert's specifications. *See* Rezac SOF 19-23, 60, *infra.*

15.     **Leonard attended Rezac's auction almost every Tuesday and purchased cattle "[a]bout every time we went." Leonard's business dictated that he only attended the later part of the auction because that was when yearlings were sold**.

Response:  Rezac clarifies that, on this particular occasion, Dinsdale Bros. specifically told Leonard that Dinsdale Bros. wanted Leonard to buy some yearlings on September 29, 2015. *See* Rezac SOF 19, Leonard Dep. 16:7-25.

21.     **On September 29, 2015, Leonard bought several steers that weighed over 900 pounds at the Rezac auction.**

11925077.5

Response:  Immaterial, Leonard testified that he bought one package that weighed 902, and it is common in the business to put the packages together and average the weight. Leonard followed all the instructions Wahlert gave him. *See* Rezac SOF 62, Leonard Dep. 26:18-27:10, *infra*. Dinsdale Bros. accepted all of the St. Marys Livestock as ordered. *See* Rezac SOF 67, *infra*.

**25.     The morning after the sale, Leonard's office wrote Rezac a $980,361 check from Leonard's checking account to cover the purchase and mailed the check to Rezac. Dinsdale Bros.' name appeared nowhere on this check. And Leonard never showed this check to Dinsdale Bros.**

Response:  Immaterial. Dinsdale Bros. knew about the check before it was even written. *See* Rezac SOF 29-32 (By 10 AM on September 30, 2015, Pinnacle had spoken to Chris Dinsdale about the fact that Dinsdale Bros. had purchased the St. Marys Livestock, that Leonard had written a check for the St. Marys Livestock, that Leonard was a million dollars overdrawn on his account, and that Dinsdale Bros. had a million dollar wire it was planning to send to Leonard to pay for the St. Marys Livestock.) Pinnacle told Dinsdale Bros. to "pay the sale barn directly." Rezac SOF 33, 35.

**27.     Leonard did not inform Dinsdale Bros. what he paid Rezac for the cattle because that transaction was between Leonard and Rezac. No one ever provided Dinsdale Bros. with any invoice or other documentation of Leonard's purchase from Rezac.**

Response:  Partially controverted. Dinsdale Bros. knew the details about the sale before it even received the St. Marys Livestock. *See* Rezac SOF 53-54. By 10 AM on September 30, 2015, Pinnacle had told Chris Dinsdale at Dinsdale Bros. that Leonard had written a check for the St. Marys Livestock and that Leonard was a million dollars overdrawn on his account. Rezac

11925077.5

SOF 29-32. Dinsdale Bros. received the health papers showing the origin of the St. Marys Livestock and the transfer of the St. Marys Livestock from Rezac directly to Dinsdale Bros. at its feedlot, D&D.  *See* Rezac SOF 65, Leonard Dep. 65:14-66:7, Dep. Ex. 10, *infra*.

28.     **After the September 29 sale, Leonard called Wahlert and informed him that Leonard had available cattle and they confirmed that Leonard would resell part of the cattle to Dinsdale Bros. No one other than Leonard and Wahlert participated in that call.**

Response:  Controverted and factually incorrect.  The testimony cited by Dinsdale Bros. does not say that Leonard would *resell part* of the cattle. *See also* ECF 103, Ex. 5 Leonard Depo. 309:23-25, which is misquoted in DB SOF 30: "Q (By Mr. O'Brien) You transported to Dinsdale the same 668 head that you bought at Rezac that day, didn't you? A. Yes, I did." All the St. Marys Livestock that Dinsdale Bros. ordered was shipped to Dinsdale Bros. Id.; Rezac SOF 19-27.

30.     **Leonard did not sell all the cattle he purchased from Rezac on September 29 to Dinsdale Bros. Rather, Leonard resold some cattle he purchased to other sellers.**

Response:  Controverted and factually incorrect.  Dinsdale Bros. seems to have misread or misrepresented Leonard's testimony. While Dinsdale Bros. cites to the Leonard deposition at 309:23-25, the cited exchange says "Q (By Mr. O'Brien) You transported to Dinsdale the same 668 head that you bought at Rezac that day, didn't you? A. Yes, I did." ECF 103, Ex. 5, Leonard Depo. 309:23-25.

37.     **Dinsdale Bros. paid Leonard $1,004,351.49 for the Cattle by wiring it to Leonard's bank account. Leonard instructed Dinsdale Bros. to wire the purchase price to Leonard's account and Leonard never suggested that Dinsdale Bros. should send the purchase price anywhere else.**

Response:  Rezac adds to this fact that Pinnacle twice told Dinsdale Bros. to "pay the sale barn directly" before Dinsdale Bros. sent the wire. *See* Rezac SOF 33, 35. Dinsdale Bros. knew Rezac was not paid and would not get paid when it sent the wire to Pinnacle. *See* Rezac SOF 43-44 ("Q. And you considered paying the sale barn directly because you knew that there was a chance that Charlie's check was going to – his account was going to have insufficient funds to cover the check; correct? A. I thought there was a possibility." Chris Dinsdale Dep. 61:17-22).

41.     **Leonard confirmed that Dinsdale Bros. could refuse to purchase the Cattle from Leonard, for instance, based on price or condition.**

Response:  Immaterial and misleading.  Dinsdale Bros. cites testimony in response to a hypothetical question about whether Dinsdale Bros. could reject cattle *that did not comply with its order*.  In fact, Dinsdale Bros. accepted all of the St. Marys Livestock as ordered.  *See* Rezac SOF 67, *infra,* Chris Dinsdale Dep. 118:5-9, 132:19-133:1.

DB SOF 19-20, 31-36, 38-40 are also immaterial. Dinsdale Bros. appears to be attempting to create an inference that it did not know the details of the sale or about Rezac. Other, material facts show Dinsdale Bros. received very specific information about the sale from Leonard and its sister-company Pinnacle. *See* Rezac SOF 29-32, 53-54. Dinsdale Bros. knew the details about the sale and that it was purchasing the St. Marys Livestock from Rezac before it even received the invoices or the St. Marys Livestock. *See* Rezac SOF 29-32, 53-54.

<u>**REZAC'S STATEMENT OF ADDITIONAL UNCONTROVERTED MATERIAL FACTS**</u>

For convenient reference, the paragraphs in this section are numbered in continuing sequence with Rezac's Statement of Uncontroverted Facts in its Motion for Summary Judgment [ECF 111], which is incorporated herein by reference.

59.     **Dinsdale Bros. gave Leonard an order to buy cattle on September 29, 2015**. *See* Deposition of Chris Dinsdale ("Chris Dinsdale Dep."), 45:1-24, attached as **Exhibit A;** Deposition of Charles Leonard ("Leonard Dep."), 22:11-21, 23:21-27:10, attached as **Exhibit B.**

60.     **Leonard understood from Wahlert that Leonard should purchase Rezac's entire supply of cattle that fit Dinsdale Bros.'s specifications**. *See* Leonard Dep. 19:19-20:6, 25:20-26:22.

61.     **Leonard arranged for the trucks to transport the St. Marys Livestock to Dinsdale Bros.** *before* **the Rezac sale because Leonard knew he had an order to fill for Dinsdale Bros.** *See* Deposition of Terry Morsett ("Morsett Dep."), 10:4-11:20; 12:1-13:7, attached as **Exhibit C.**

62.     **Leonard specifically purchased cattle to comply with Dinsdale Bros.'s order.** *See* Leonard Dep. 17:19-20:6; 25:22-27:10, 31:6-12.

63.     **Leonard turned down an offer from another buyer for some of the St. Marys Livestock because he bought them for Dinsdale Bros.** Leonard Dep. 24:14-25:6; Deposition of Alan Neuberger ("Neuberger Dep."), 78:2-79:4, attached as **Exhibit D.**

64.     **Leonard would not have bought the St. Marys Livestock without the order from Dinsdale Bros.** Leonard Dep. 27:19-28:20; 370:5-9.

65.     **Dinsdale Bros. knew before it sent the wire that it had purchased the St. Marys Livestock from Rezac**. Chris Dinsdale Dep. 136:16-137:1, Dep. Ex. 82, 139:3-12; Leonard Dep. 65:14-66:7, Dep. Ex. 10, 368:13-369:4.

66.     **Dinsdale Bros. knows to pay sale barns, like Rezac, directly to avoid a dispute over title to the cattle it purchases**.  Chris Dinsdale Dep. 115:3-116:4, Dep. Ex. 159.

67.     **Dinsdale Bros. accepted the St. Marys Livestock before it wired the money to pay for them, knew when it sent the wire that Leonard was overdrawn, knew Rezac would likely not get paid, and could have paid Rezac directly, but chose not to do so**. *See* Chris Dinsdale Dep. 92:2-93:23, 118:5-119:21; 124:2-24, Dep. Ex. 84.

## CHOICE OF LAW

In a diversity case, the court applies the substantive law of the forum state. This Court has previously indicated that Kansas law applies. [ECF 55, p. 6]. Kansas law controls because, "[i]n Kansas, tort actions are governed by the law of the state in which . . . the wrong was felt," and in cases alleging financial harm the court looks to "the state in which . . . [plaintiff] felt that financial injury." [ECF 30 at 3 (*citing* Doll v. Chicago Title Ins. Co., 246 F.R.D. 683, 690 (D. Kan. 2007) (*citing* Ling v. Jan's Liquors, 703 P.2d 731, 735 (Kan. 1985); Fusion, Inc. v. Neb. Aluminum Castings, Inc., No. 95-2366-JWL, 1997 WL 51227, at *24 (D. Kan. Jan. 23, 1997))]. This Court concluded that in this case, Kansas is the state because Plaintiff Rezac is a Kansas corporation and sold Leonard the cattle in Kansas. Id. The court thus applied Kansas law. Id.

## ARGUMENT

Rezac's Complaint is about the special relationship and inside information shared between Dinsdale Bros. and its sister-company and co-Defendant, Pinnacle Bank. Dinsdale Bros. attempts to skirt the real issues by suggesting an arms-length transaction with Leonard, but the reality is that Chris Dinsdale and Leonard had been friends for decades, had partnered on prior cattle purchases, Chris had loaned Leonard money, and Chris knew that Leonard was operating his business on "float" at Chris's family-owned bank.  Dinsdale Bros.'s and Pinnacle's shared decisions caused the actionable injury to Rezac. Pinnacle told Dinsdale Bros. that Leonard was overdrawn, and even though Dinsdale Bros. could have purchased cattle from a number of

sources, Dinsdale Bros. sought out Leonard and placed an order with him to have him buy cattle

on its behalf. Dinsdale Bros. knew Leonard purchased the St. Marys Livestock from Rezac on its

behalf. Dinsdale Bros. also knew Leonard did not have his own funds to pay for the St. Marys

Livestock because Pinnacle had already told Dinsdale Bros. that Leonard's checking account

was a million dollars overdrawn. Pinnacle told Dinsdale Bros. to pay Rezac directly. Despite this

knowledge and control, Dinsdale Bros. sent the wire to Pinnacle even though it knew Rezac

would not get paid. When Rezac did not get paid, Dinsdale Bros. kept the St. Marys Livestock,

anyway.

1. **Rezac Prevails on Its Conversion Claim Because Dinsdale Bros. Converted Rezac's Property When It Knew about Rezac's Prior Claim and Chose to Ignore It.**

Rezac prevails on its conversion claim because Dinsdale Bros. knew Rezac was not paid

and was not going to be paid at all relevant times during which Dinsdale Bros. exercised

ownership over the St. Marys Livestock. Dinsdale Bros.'s entire pretense that it had a separate,

"valid" purchase contract with Leonard divorced from its knowledge that Rezac was not paid

ignores the material fact that Dinsdale Bros. had actual notice of the defect in the chain of title.

*See* Rezac's Memorandum in Support of Summary Judgment, [ECF 111 at p. 14-19].[3] A

purchaser is not an innocent third-party when it knows a prior owner was not paid. Id. A

purchaser with knowledge of a defect in title obtains what it knows it is buying – voidable title

subject to the prior owner's claims. Id.

Dinsdale Bros.'s arguments make little sense when it fails to acknowledge that it acted

with notice of Rezac's claim to the St. Marys Livestock and sale proceeds. Nonetheless,

---

[3]      Ranchers & Farmers Livestock Auction Co. v. Honey, 552 P.2d 313, 317 (Colo. App. 1976); Dick Hatfield Chevrolet, Inc. v. Bob Watson Motors, Inc., 238 Kan. 41, 45, 708 P.2d 494, 497 (1985); Iola State Bank v. Bolan, 235 Kan. 175, 679 P.2d 720 (1984); Salisbury v. Barton, 63 Kan. 552, 66 P. 618, 619–20 (1901); Louis v. McMinn, 189 Kan. 270, 273, 369 P.2d 221, 223 (1962).

Dinsdale Bros. attempts to make three arguments. First, Dinsdale Bros. argues that Rezac cannot pursue both a breach of contract claim and a conversion claim. Second, Dinsdale Bros. argues it lawfully received the St. Marys Livestock from Leonard. Third, Dinsdale Bros. argues Rezac had no right to possession of the St. Marys Livestock. Dinsdale Motion [ECF 103 at p. 20-22]. Each argument fails because Dinsdale Bros. was not a good faith purchaser when it acted with prior knowledge of Rezac's claims.

### a.   Rezac Has Established Conversion Against Dinsdale Bros. Independent of a Contract Claim.

"[W]hen conduct could satisfy the elements of both a breach of contract or of an independent tort, unless the conduct is permitted by the express provisions of a contract, a plaintiff may pursue both remedies." Burcham v. Unison Bancorp, Inc., 276 Kan. 393, 414, 77 P.3d 130, 145 (2003) (*quoting* Bittel v. Farm Credit Servs. of Cent. Kansas, 265 Kan. 651, 660, 962 P.2d 491, 498 (1998)). Rezac is not relying on conversion to avoid the consequences of a contract. *See e.g.,* Burcham, 276 Kan. at, 414, 77 P.3d at, 145. Rezac establishes conversion based on Dinsdale Bros.'s failure to pay for or return the St. Marys Livestock. *See* Rezac's Motion [ECF 111].

Dinsdale Bros. incorrectly argues that Rezac's only remedy is for breach of contract against Leonard. [ECF 103 at 20]. But Dinsdale Bros. knew the sale of the St Marys Livestock violated Rezac's rights because Rezac was never paid. Rezac SOF 29, 35, 36, 43, 54, 65-67. Dinsdale Bros. knew Leonard bought the St. Marys Livestock for Dinsdale Bros. *See* DB SOF 9, 14; Rezac SOF 59, 61, 64, 66. Dinsdale Bros. received the St. Marys Livestock on September 30, 2015, with advance notice that its own bank was dishonoring Leonard checks. Rezac SOF 16, 18, 27, 30, 54. On September 30, 2015, the following Pinnacle bankers and Dinsdale family members knew that Leonard had written a check to Rezac for the purchase of the St. Marys

Livestock that was delivered to Dinsdale Bros.:  Roy Dinsdale, Sid Dinsdale, Chris Dinsdale, Mark Hesser, Marc Hock, Spencer Kimball, Steve Zey, and Todd Roth. Rezac SOF 31. Dinsdale Bros. knew Leonard did not have his own cash to pay for the St. Marys Livestock. Rezac SOF 29-30. Dinsdale Bros. knew Rezac had a claim to both the St. Marys Livestock and their sale proceeds, both of which were in Dinsdale Bros.'s hands on the evening of September 30, 2015. Rezac SOF 43. In fact, Pinnacle told Dinsdale Bros. to pay Rezac directly. Rezac SOF 33, 35. Chris Dinsdale himself considered paying Rezac because in that way he knew the cattle would be paid for. Rezac SOF 36, 65, 66.  Dinsdale Bros. knew the Rezac check had not been presented for payment and would not get paid when it sent the wire to Pinnacle on October 1, 2015. Rezac SOF 35, 37, 43. On October 12, 2015, Rezac demanded reclamation of the St. Marys Livestock from Dinsdale Bros. Rezac SOF 56. At that time, Dinsdale Bros. knew Rezac had not been paid for the St. Marys Livestock in its possession. Rezac SOF 40. The undisputed facts show Dinsdale Bros. was not a good faith purchaser, knew it had voidable title to the St. Marys Livestock, but continued to exercise ownership over and dispose of the St. Marys Livestock to the exclusion of Rezac's rights. Dinsdale Bros. thereby converted Rezac's property independent of any breach of contract claim against Leonard.

> **b.      Dinsdale Bros. Was Never Authorized to Take the St. Marys Livestock Without Paying Rezac for Them.**

Dinsdale Bros. argues its "separate" contract with Leonard gave Dinsdale Bros. lawful possession of the St. Marys Livestock. [ECF 103 at 21]. While a person with voidable title, such as Leonard, has the power to transfer a good title to a good faith purchaser for value, a purchaser with actual knowledge of the voidable title can only purchase the same, voidable title. When the purchaser knows, or has reason to know, that the seller has only a voidable title, the purchaser is not authorized to take the goods free of the prior owner's claims. <u>Ranchers & Farmers Livestock</u>,

552 P.2d at 317; <u>Dick Hatfield</u>, 708 P.2d at 497; <u>Iola State Bank</u>, 679 P.2d at 731. Dinsdale Bros. was not authorized to keep the St. Marys Livestock when it knew a prior owner was not paid. Rezac SOF 42, 43, 54, 55, 66.

<blockquote>

**c.     Rezac Had an Immediate Right of Possession Because Rezac Did Not Transfer the St. Marys Livestock for Free.**

</blockquote>

Dinsdale Bros. argues Rezac gave up its rights when Leonard took possession of the St. Marys Livestock. [ECF 103 at 22]. Dinsdale Bros. is wrong because its premise is based on the mistaken legal conclusion that Leonard had good title. <u>Id.</u> Even under Dinsdale Bros.'s version of the sale, Leonard had only voidable title because he paid by check that was subsequently dishonored. K.S.A. 84-2-403. Under such circumstances, Rezac retains its reclamation rights as against Leonard *and* against subsequent purchasers that had knowledge of Rezac's claim. <u>Ranchers & Farmers Livestock</u>, 552 P.2d at 317; <u>Dick Hatfield</u>, 708 P.2d at 497; <u>Iola State Bank</u>, 679 P.2d at 731 (when the purchaser knows, or has reason to know, that the seller has only a voidable title, the purchaser is not entitled to the benefits of K.S.A. 84-2-403). Dinsdale Bros., at all relevant times, knew the sale of the St Marys Livestock violated Rezac's rights because Rezac was never paid. DB SOF 9, 14; Rezac SOF 29, 35, 36, 43, 54, 65-67. The undisputed facts show Dinsdale Bros. took the St. Marys Livestock with advance notice of a defect in title and converted the St. Marys Livestock when it refused to return the cattle or their value to Rezac. Rezac has established it is entitled to judgment on Count II for conversion as a matter of law.

**2.     Rezac Prevails on Its Conspiracy to Convert Claim Because Dinsdale Bros. Acted With Pinnacle to Knowingly Deprive Rezac of its Property.**

Conspiracy is "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds in the object or course of action; (4) one or more unlawful overt acts; and (5) damages proximately caused by those acts." [ECF 55 (*quoting* <u>York v. InTrust Bank, N.A.</u>, 962 P.2d 405, 422 (Kan. 1998) (*citing* <u>Kansas ex rel. Mays v. Ridenhour</u>, 811 P.2d 1220, 1226 (Kan. 1991)))].

Evidence of communications between conspiracy defendants is sufficient to create an inference that they agreed to deprive plaintiff of his rights. <u>Wilson v. City of Chanute</u>, 43 F. Supp. 2d 1202, 1216 (D. Kan. 1999). Dinsdale Bros. argues only that there is no underlying wrong to support the conspiracy claim. [ECF 103 at 25]. However, the undisputed evidence shows that Pinnacle and Dinsdale Bros. are intermingled, but separate, entities represented by individuals who collaboratively monitored Leonard's account and communicated and agreed to handle the St. Marys Livestock transaction so as to deprive Rezac its rights to the St. Marys Livestock and sale proceeds. *See* Rezac SOF 2-7, 16-18, 29-30, 32-33, 35, 38, 41-42, 52-56. Dinsdale Bros.'s and Pinnacle's shared communications showed there was an intentional, coordinated effort that interfered with Rezac's known rights. For example:

a.　　Pinnacle told Dinsdale Bros. that Leonard was operating on a float and was overdrawn. Rezac SOF 14, 18, 53 ("**Q. When did you first talk to Chris Dinsdale about Charlie Leonard and his overdrafts? A. It would have been in the late summer, early fall when Charlie started experiencing – or we started seeing large overdrafts inside Charlie's account.**" Hock Dep. 99:1-6).

b.　　Pinnacle told Dinsdale Bros. that Leonard's account was a million dollars overdrawn at the time Dinsdale Bros. was contemplating how to pay for the St. Marys Livestock. Rezac SOF 16, 29, 42.

c.　　Dinsdale Bros. told Pinnacle it was more concerned about keeping Leonard operating than getting Rezac paid. Rezac SOF 29, 42 ("**Q. All right. So if you go to the next page, second paragraph, were Chris -- it says, Chris commented that if we returned checks, we were effectively shutting down Leonard Cattle. Do you recall having that discussion with Chris Dinsdale? A. I do after reading my notes, yes.**" Kimball Dep. 30:21-31:2, Dep. Ex.

82); Rezac SOF 54 ("**I'm sure I was wondering if Rezac's check had ever come through. … I was hoping so, but…I had the cattle, yeah. … I wasn't thinking about Rezacs at this point. ... I was thinking about Leonard Cattle Company.**" Chris Dinsdale Dep. 99:4-100:13).

      d.     Dinsdale Bros. was contacting Pinnacle directly to get inside information. *See* Rezac SOF 40.[4]

      e.     Dinsdale Bros. became personally involved in and interfered with Pinnacle and the decisions regarding payment for the St. Marys Livestock. *See* Rezac SOF 16-18, 29-52 ("**Had you ever in your banking experience tried to have conversations with someone to time -- try and time the presentment of a check with the deposit that was tied to that check? A. No, I didn't have any other relationships similar to this where I was speaking with a director. Q. Right. So it's a pretty unique situation which you got a director on one side, a director of the bank also being the party that bought the cattle and that was sending the wire is the only time that's happened? A. In my experience.**" Hock Dep. 136:2-14); Rezac SOF 52, 55[5].

---

[4]     Q. Okay. And you say you need to get back to Chris Dinsdale. Why did you need to get back to Chris Dinsdale?
     A. I wanted to let him know that if that check to St. Marys had cleared.
     Q. Okay. And why?
     A. Well, he's a director of our holding company and has had interest in the transaction.
. . .
     Q. Were you calling the people associated with any of those other companies that had checks in the queue?
     A. They weren't directors of my holding company, so no. Marc Hock Deposition, 62:19-63:2, 63:8-12

[5]     Q. Okay. And what do you recall Chris saying about that?
     A. That he had purchased cattle and – from Charlie related to the St. Marys auction and that he owed Charlie money.
     Q. And so did you -- did -- and it says here you suggested to Chris don't send the wire right now?
     A. Yes.
     Q. Why did you suggest that to him?
     A. I knew it was a large purchase and I wanted to make sure the cattle got paid for. I didn't know. I didn't want -- I just wanted those cattle to get paid for.
     Q. And did Chris agree with you, that he wanted the cattle to be paid for?
     A. Well, at the time, Chris didn't say one way or the other. He just said keep me in the loop.
     Q. Okay. So he held -- he decided to hold the wire and not send it?
     A. He did. The wire wasn't sent until later. Hock Dep. 49:9-50:4.

11925077.5

The result of these communications and interference with the Rezac transaction ensured that Rezac was denied his property. Rezac SOF 43 ("**Q. And you considered paying the sale barn directly because you knew that there was a chance that Charlie's check was going to – his account was going to have insufficient funds to cover the check; correct? A. I thought there was a possibility.**" Chris Dinsdale Dep. 61:17-22). The evidence shows Defendants conferred and agreed to apply the sale proceeds to Leonard's other debts at the expense of Rezac. Rezac has established it is entitled to judgment on Count VI for conspiracy to convert as a matter of law.

3.      **Genuine Issues of Material Fact as to Whether Leonard Acted as Dinsdale Bros.'s Agent Preclude Summary Judgment on Count I for Breach of Contract.**

Rezac claims breach of contract in the alternative to its conversion claims based on certain evidence that Leonard acted as an agent for Dinsdale Bros. A breach of contract claim requires:  (1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to plaintiff caused by the breach. Jones v. Culver, 329 P.3d 511 (Kan. App. 2014).  "A contract executed by an authorized agent in his own name, but in fact in behalf of his principal, is the contract of the principal, and suit may be brought against him to enforce its provisions." [ECF 55 at 6-7 (*citing* C. A. Karlan Furniture Co. v. Richardson, 324 P.2d 180, 183 (Kan. 1958) (*quoting* Edwards v. Gildemeister, 59 P. 259, Syl. ¶ 2 (Kan. 1899)))]. In determining questions of agency, this Court has previously held that it will consider two questions: (1) whether there is sufficient evidence to support a principal-agent relationship; and, if so, (2) whether there is sufficient evidence that the agent acted within the scope of his authority.  [Id. at 9-10]. Resolution of conflicting evidence is for the finder of fact. Aetna Cas. and Sur. Co. v. Hepler State Bank, 6 Kan.App.2d 543, 548, 630

P.2d 721, 726 (1981). "The weight to be given evidence and resolution of conflicts therein are functions of the trier of facts in the determination of whether there is a relationship of principal and agent. Where the existence of agency is disputed, its existence or nonexistence is ordinarily a question of fact for the jury, to be determined upon proper instructions." <u>Golden Rule Ins. Co. v. Tomlinson</u>, 300 Kan. 944, 954, 335 P.3d 1178, 1187 (2014).

### a.   Sufficient Evidence Shows Leonard Was Dinsdale Bros.'s Agent on September 29, 2015.

A principal-agent relationship has three components: assent by both parties, benefit to the principal, and control by the principal. [ECF 55 at 10 (*citing* <u>Golden Rule</u>, 335 P.3d at 1188 (2014))].

### i.   Assent

Parties can manifest their assent to create a principal-agent relationship "through written or spoken words or other conduct." [Id. at 11 (*quoting* <u>Golden Rule</u>, 335 P.3d at 1188)]. Here, Dinsdale Bros. initiated the contact with Leonard and told Leonard that Dinsdale Bros. was in the market for a sizable buy – just no steers over 900 lbs. and no heifers over 800 lbs. DB SOF 9, 14; Rezac SOF 19-23, 59. Leonard then went to the St. Marys, Kansas, cattle auction at the Rezac barn, and did as he was told.  He bought 10 truckloads and shipped them directly to Dinsdale Bros. in Colorado. DB SOF 16, 24, 29; Rezac SOF 24-27, 60.  Leonard had already arranged for the trucks to transport the St. Marys Livestock to Dinsdale Bros. *before* the Rezac sale because Leonard knew he had an order to fill for Dinsdale Bros. Rezac SOF 61. Leonard only purchased cattle for Dinsdale Bros that day and only purchased cattle that complied with Dinsdale Bros.'s specifications. *See* Rezac Response to DB SOF 28 and 30, *supra*, DB SOF 29; Rezac SOF 62. In fact, Leonard turned down an offer from another buyer for some of the St. Marys Livestock because he bought them for Dinsdale Bros. Rezac SOF 63. Leonard testified he

11925077.5

would not have bought anything on September 29, 2015, without the order from Dinsdale Bros. Rezac SOF 64. Dinsdale Bros. knew the St. Marys Livestock came from Rezac as ordered and accepted all of the cattle.  Rezac SOF 65, 67. Rezac has presented sufficient evidence of the parties' mutual assent.

### ii.       Benefit to the Principal

An agent benefits his principal when he buys goods at the principal's request and delivers the goods directly to the principal. [ECF 55 at 17 (*citing* Blewett v. Errickson, 134 Kan. 690, 8 P.2d 357, 358 (1932) (holding that a cattle buyer was the agent of a livestock company in part because the company "had sent him, or permitted him to go, on [the] particular [purchasing] trip" in question); C. A. Karlan Furniture, 182 Kan. at 757, 324 P.2d at 182 (holding that a principal-agent relationship existed where the alleged agent purchased a television set for the alleged principal at the principal's request and had the set delivered to the principal's home directly))].

Here, Dinsdale Bros. called Leonard and asked him to buy cattle for Dinsdale Bros. DB SOF 9, 14; Rezac SOF 19-23, 59. Leonard did so and delivered them directly to Dinsdale Bros. DB SOF 16, 24, 29; Rezac SOF 24-27, 60-61. The St. Marys Livestock complied with Dinsdale Bros.'s specifications. *See* Rezac SOF 62. Dinsdale Bros. accepted the St. Marys Livestock as delivered.  Rezac SOF 67. Leonard did not purchase any other cattle that day. Rezac SOF 64. Rezac has presented sufficient evidence that Leonard acted on Dinsdale Bros.'s behalf and for Dinsdale Bros.'s benefit at the September 29, 2015 auction.

### iii.      Control by the Principal

An agent shall act subject to the principal's control. Golden Rule, 335 P.3d at 1188. Here, Dinsdale Bros. controlled Leonard in all aspects of one isolated transaction. Dinsdale Bros. told Leonard where to go, when to go, what to buy, and where to send it. DB SOF 9, 14; Rezac SOF

19-23, 59-62. Leonard would not have bought any cattle without Dinsdale Bros.'s order. Rezac

SOF 64. Leonard never took possession of the St. Marys Livestock himself.  Rather, the St.

Marys Livestock was shipped directly to Dinsdale Bros.'s feedlots at Dinsdale Bros.'s direction.

Further, Rezac was told that Leonard was acting on Dinsdale Bros.'s behalf before he shipped

the cattle. DB SOF 24; Rezac SOF 27, 61. Leonard was not free to sell the St. Marys Livestock

to anyone else, and, in fact, turned down an offer from at least one other buyer. Rezac SOF 63.

Leonard arranged for shipping to Dinsdale Bros.'s feedlots *before* the auction – indicating that

Leonard knew he had an order before the sale, and – not as Dinsdale Bros.'s suggests – that

Leonard bought the cattle for his own account "hoping" that he could sell them afterward.  Rezac

SOF 61. Rezac has presented sufficient evidence to support Dinsdale Bros.'s control over

Leonard regarding the September 29, 2015 sale.

> **b.    Sufficient Evidence Shows Leonard Acted Within the Scope of His Express Actual Authority on September 29, 2015**.

Actual authority "may be either express or implied." [ECF 55 at 20]. Determining the

scope of an agent's actual authority will often require looking at the same evidence that

established the existence of the relationship in the first place." [Id. (*citing* Golden Rule, 335 P.3d

at 1195)]. Express authority exists when "the principal has delegated authority to the agent by

words which expressly authorize the agent to do a delegable act." [Id. (*citing* Golden Rule, 335

P.3d  at 1189)]. Here, the evidence shows Leonard had express actual authority to purchase the

St. Marys Livestock on Dinsdale Bros.'s behalf. Leonard attended the September 29, 2015

auction at the direction of Dinsdale Bros. DB SOF 9, 14; Rezac SOF 19-23, 59. Dinsdale Bros.

gave Leonard specific orders about what kind of steers and heifers to purchase—"no steers over

900 lbs. and no heifers over 800 lbs." DB SOF 14; Rezac SOF 19-23, 59-60, 62. Leonard had the

St. Marys Livestock shipped directly to Dinsdale Bros. at Dinsdale Bros.'s direction. DB SOF

11925077.5

24; Rezac SOF 27, 61, 65. Dinsdale Bros. thereby gave Leonard express authority to buy the St.

Marys Livestock on Dinsdale Bros.'s behalf. Dinsdale Bros. points to a lack of price and quantity

terms. Kansas, however, allows parties to agree to indefinite terms for price and quantity. *See*

K.S.A. § 84-2-305 (allowing parties to "contract for sale even though the price is not settled");

K.S.A. § 84-2-306 (allowing parties to agree for an indefinite quantity, such as the output of the

seller or the requirements of the buyer). Leonard testified that based on his past dealings with

Dinsdale Bros., he understood that he was authorized to purchase for a reasonable price all the

cattle Rezac offered that fit Dinsdale Bros.'s specifications. Rezac SOF 60.  The reality of an

auction is that an exact price cannot be set or known ahead of time.  Dinsdale Bros. buys

hundreds of thousands of cattle costing millions of dollars. Rezac SOF 2-3. Sophisticated market

participants like Dinsdale Bros. know, within reason, what the market is at all times. Dinsdale

Bros. initiated the call to Leonard in the first place because of a sharp break in the market price.

Rezac SOF 19.  Dinsdale Bros. knows it is simply not true that the lack of an *exact* price and

quantity set before an auction means there was no authority to purchase cattle on its behalf.  That

is not how this industry works. Dinsdale Bros. accepted and retained all of the St. Marys

Livestock without question. *See* Rezac SOF 67. Rezac has presented ample evidence sufficient

for a jury to find express actual authority.

> **c.**     **Contractual Privity Does Not Apply Because Leonard was Dinsdale Bros.'s Agent, and Rezac Can Enforce the Sale Directly Against Dinsdale Bros.**

Dinsdale Bros.'s motion attempts to convince the Court that there were two separate and

independent transactions – one between Rezac and Leonard, and one between Leonard and

Dinsdale Bros. [ECF 103 at 20]. Rezac has presented sufficient evidence to show that there was

just one sale – from Rezac to Dinsdale Bros. through Dinsdale Bros.'s agent, Leonard. For an

auction sales contract, it is long-settled that when an auction hammer falls in Kansas, and the

11925077.5

auctioneer sells the lot to an agent, the sale may be enforced against the principal – whether or not the principal was disclosed prior to the sale. <u>Grandi v. Thomas</u>, 192 Kan. 741,744, 391 P.2d 35, 38 (1964). When a principal commissions a third-party as its agent to attend an auction and bid on its behalf, a special agency is created and the sale may be enforced both by and against the undisclosed principal. <u>Id.</u> at 745. Dinsdale Bros.'s mere denial that Leonard was its agent does not make it so. Under Kansas law, an agency relationship may exist notwithstanding a denial of the agency by the alleged principal. <u>Appeal of Scholastic Book Clubs, Inc.</u>, 260 Kan. 528, 533, 920 P.2d 947, 951 (1996). Thus, a contract executed by an agent in his own name, but in fact on behalf of his principal, is the principal's contract, and when discovered, the principal is liable to a third party on the contract. <u>C. A. Karlan Furniture</u>, 324 P.2d at 180.

<u>Karlan Furniture</u> is on point. In <u>Karlan Furniture</u>, the Richardsons directed Henderson to go buy a television set for them. <u>Id.</u> at 757. Henderson bought the set in his own name without telling Karlan Furniture that he was buying the set for the Richardsons. <u>Id.</u> at 758. Henderson directed the set be delivered directly to the Richardsons' home. <u>Id.</u> The Richardsons knew from where Henderson purchased the set because it was delivered to them in a Karlan Furniture van. <u>Id.</u> The court found that the Richardsons made Henderson their agent for purposes of buying the set for them, and when they paid the purchase price to Henderson, they made him their agent for the purpose of paying for the set. <u>Id.</u> When Henderson failed to deliver the purchase price to Karlan Furniture, the loss legally fell on the Richardsons and not on Karlan Furniture. <u>Id.</u> at 182.

In this case, even though it is not required for liability, Leonard told Rezac that his order was going to Dinsdale Bros. before the cattle left the St. Marys auction, so Leonard was a disclosed agent for a disclosed principal. DB SOF 24. This is at least indicative that Leonard believed he was buying for Dinsdale Bros. Dinsdale Bros. gave Leonard a specific order to

purchase cattle, and that order directed Leonard's actions at the St. Marys auction.  DB SOF 9, 14; Rezac SOF 19-23, 59-60, 62. Dinsdale Bros. directed delivery of the St. Marys Livestock direct from St. Marys to Dinsdale Bros.'s feedlots. DB SOF 24; Rezac SOF 27, 61.  As with the television in <u>Karlan Furniture</u>, the St. Marys Livestock shipped directly from Rezac at St. Marys to Dinsdale Bros.'s feed lots.  <u>Id.</u> Dinsdale Bros. knew the St. Marys Livestock came directly from Rezac and knew that Rezac was not paid before it sent the wire.  Rezac SOF 65-67. Thus, whether Dinsdale Bros. was a disclosed principal or not makes no legal difference in this case. Dinsdale Bros. made Leonard its agent to purchase the St. Marys Livestock and made Leonard its agent for paying the purchase price to Rezac. Dinsdale knew Rezac's claims to the St. Marys Livestock before, during and after the September 29 auction so any loss is legally borne by Dinsdale Bros. DB SOF 9, 14; Rezac SOF 19-27, 29-44, 52-54, 56, 65-67. Dinsdale Bros.'s motion is based on a claim of lack of privity of contract and its denial of Leonard's agency, but as previously discussed, an auction sales contract is a direct contract with the principal, and agency cannot be so easily denied.  Rezac has presented sufficient evidence to present a claim for breach of an auction sales contract to the jury.

> **4.  Genuine Issues of Material Fact Preclude Summary Judgment on Counts III for Quantum Meruit and Count V for Unjust Enrichment.**

Rezac pursues these quasi-contractual claims in the alternative to its breach of contract claim. Similar to its arguments regarding breach of contract, Dinsdale Bros. attempts to establish that it is the innocent third-party purchaser of Leonard.  The facts show otherwise. To establish a quantum meruit claim against Dinsdale Bros., Rezac must show that it delivered the St. Marys Livestock in good faith to Dinsdale Bros., which accepted them, and that Rezac expected to be compensated in the reasonable value of the St. Marys Livestock provided.  <u>Brakensiek v. Shaffer</u>, 203 Kan. 817, 821, 457 P.2d 511, 514 (1969).  Recovery under express contract for

compensation and recovery for quantum meruit may be pursued in the same action. Id. at 820.

To establish an unjust enrichment claim Rezac must establish: (1) a benefit conferred upon the

defendant by the plaintiff; (2) an appreciation or knowledge of the benefit by the defendant; and

(3) acceptance or retention by the defendant of the benefit under such circumstances as to make

it inequitable for the defendant to retain the benefit without payment of its value.  The

Superlative Grp., Inc. v. WIHO, L.L.C., No. 12-1468-JWL, 2014 WL 1385533 (D. Kan. Apr. 9,

2014).

  Quantum meruit and unjust enrichment as to Dinsdale Bros. should go to the jury because

of (i) Dinsdale Bros.'s actual knowledge that the St. Marys Livestock came from Rezac,

(ii) Dinsdale Bros.'s acknowledged recognition that Rezac needed to get paid in order for

Dinsdale Bros. to get clear title, and (iii) Dinsdale Bros.'s actual knowledge that Rezac was

never paid.  Rezac SOF 65-67. Dinsdale Bros. chose Leonard, the sale date, and the weight and

quantities of St. Marys Livestock. DB SOF 9, 14; Rezac SOF 19-23, 59-62. Dinsdale Bros. took

possession of the St. Marys Livestock directly from Rezac and knew it should pay Rezac

directly. DB SOF 24; Rezac SOF 43, 54, 56, 61, 65-67. Before, during, and after the September

29, 2015 auction, Dinsdale Bros. communicated directly with Pinnacle about Leonard and the

payment owed to Rezac. Rezac SOF 16-18, 29-44, 52-54, 56, 65-67. Dinsdale Bros. knew in

advance from Pinnacle that Leonard was overdrawn and did not have his own funds to pay

Rezac. Id. Dinsdale Bros. thereby obtained the St. Marys Livestock with advance knowledge that

Rezac would not be paid, and Dinsdale Bros. did not care. Rezac SOF 54.[6] The circumstances of

Dinsdale Bros.'s and Pinnacle's communications about the payment owed to Rezac, but never

---

[6]  Chris Dinsdale:  "I'm sure I was wondering if Rezac's check had ever come through. … I was hoping so, but…I had the cattle, yeah. … I wasn't thinking about Rezacs at this point. ... I was thinking about Leonard Cattle Company." Chris Dinsdale Dep. 99:4-100:13.

paid, makes it inequitable for Dinsdale Bros. to retain the St. Marys Livestock without payment of its value to Rezac.

<u>**CONCLUSION**</u>

Dinsdale Bros. could have either paid Rezac directly or returned the St. Marys Livestock to Rezac. Instead, Dinsdale Bros. kept the St. Marys Livestock even though it had advance notice of Rezac's claims. For the reasons set forth above, Defendant Dinsdale Bros.'s Motion for Summary Judgment should be denied in its entirety and judgment entered in favor of Plaintiff Rezac Livestock Commission Company, Inc. on Count II as to liability for Dinsdale Bros.'s conversion and on Count VI for conspiracy to convert, with punitive damages to be determined at trial.

**Respectfully submitted,**

**BRYAN CAVE LEIGHTON PAISNER LLP**

By:___/s/ Michelle M. Masoner_____
Robert M. Thompson      KS #14673
Michelle M. Masoner      KS #18424
Stephanie C. Bradshaw      KS #26716
1200 Main Street, Suite 3800
Kansas City, Missouri 64105
Telephone:   (816) 374-3200
Facsimile:    (816) 374-3300
rmthompson@bclplaw.com
michelle.masoner@bclplaw.com
stephanie.bradshaw@bclplaw.com

Attorneys for Plaintiff

11925077.5

## <u>CERTIFICATE OF SERVICE</u>

This certifies that, on July 13, 2018, the foregoing was served via the Court's Electronic Case Filing System to all counsel of record:

s/ Michelle M. Masoner
**Attorney for Plaintiff**

11925077.5