# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

REZAC LIVESTOCK COMMISSION CO., INC.,

       Plaintiff,

v.

PINNACLE BANK, et al.,

       Defendants.

Case No. 15-4958-DDC-KGS

## MEMORANDUM AND ORDER

Plaintiff Rezac Livestock Commission Company, Inc., has alleged that it sold defendant Dinsdale Bros., Inc., ("Dinsdale") nearly $1 million worth of cattle in September 2015, but that Dinsdale never has paid for them. Plaintiff also contends that defendant Pinnacle Bank ("Pinnacle") acted as Dinsdale's accomplice and wrongfully seized funds belonging to plaintiff. Attempting to recover its funds, plaintiff asserts three claims against Dinsdale (breach of contract, conversion, and quantum meruit), one claim against Pinnacle (conversion), and two claims against Dinsdale and Pinnacle together (unjust enrichment and civil conspiracy).

This matter comes before the court on three motions. Defendant Pinnacle has filed a Motion for Summary Judgment (Doc. 104). Defendant Dinsdale also has filed a Motion for Summary Judgment (Doc. 102). And plaintiff has filed its own Motion for Summary Judgment (Doc. 110).

In its Motion, Pinnacle argues that plaintiff's claims for conversion, civil conspiracy, and unjust enrichment fail as a matter of law, and that plaintiff cannot recover punitive damages. Defendant Dinsdale asserts in its motion that plaintiff's claims against Dinsdale rely on an agency relationship that, Dinsdale argues, is nonexistent as a matter of law. Dinsdale also

contends that plaintiff's claims for breach of contract, conversion, unjust enrichment, and civil conspiracy fail as a matter of law. And finally, plaintiff argues in its motion that it is entitled to summary judgment against Dinsdale's counterclaim asserting that Dinsdale has good title to the cattle at issue. Plaintiff also asserts that the court should grant summary judgment in its favor on plaintiff's conversion and civil conspiracy claims against both Dinsdale and Pinnacle.

For reasons explained below, the court denies defendant Pinnacle Bank's Motion for Summary Judgment (Doc. 104). The court grants defendant Dinsdale's Motion for Summary Judgment (Doc. 102) in part and denies it in part. And the court denies plaintiff's Motion for Summary Judgment (Doc. 110).

## I.    Uncontroverted Facts

The following facts are stipulated by the parties in the Pretrial Order (Doc. 101), or are uncontroverted for purposes of the parties' summary judgment motions. The court divides these summary judgment facts into three sections: (A) the parties involved in this case; (B) Mr. Leonard's relationship with Dinsdale; and (C) Mr. Leonard's relationship with Pinnacle.

### A.  Involved Parties

Plaintiff's business involves selling livestock at auction in St. Marys, Kansas. Defendant Dinsdale's business involves feeding cattle. Dinsdale purchases cattle from sellers, including Charles D. Leonard d/b/a Leonard Cattle Company ("Mr. Leonard"). Chris and John "Sid" Dinsdale, alongside other Dinsdale family members, own Dinsdale. Dinsdale purchases cattle from six or seven dealers, including Mr. Leonard, who are licensed under the Packers & Stockyards Act. And Dinsdale buys about 70,000 cattle per year.

Defendant Pinnacle Bank is a banking organization that is organized and operates under Nebraska law, but it conducts business at several locations in Kansas. Some members of the

Dinsdale family own interests in both Dinsdale and Pinnacle.[1]  Specifically, Chris and Sid Dinsdale are members of the Board of Directors of Pinnacle Bancorp, Pinnacle's holding company.  Sid Dinsdale is Chairman of Pinnacle's board, and Roy Dinsdale—Chris and Sid Dinsdale's father—is Vice Chair of the board.  Mark Hesser is President of Pinnacle Bancorp and a Director of Pinnacle Bank.  Marc Hock is President and a Director of Pinnacle Bank.  Spencer Kimball and Steve Zey are Market Presidents.  And Todd Roth is a Risk Manager.

Mr. Leonard operated as a cattle dealer from 1992 to 2015; his business involved buying and reselling cattle to cattle feeders.  Mr. Leonard had a longstanding business relationship and friendship with the Dinsdale family.  He also had been a long-time customer of Pinnacle.

## B.  Mr. Leonard's Relationship with Dinsdale

Mr. Leonard made "dealer transactions" by purchasing cattle for his own account and reselling them to cattle feeders.  These transactions include cattle purchased on commission.  Mr. Leonard organized and paid for the trucking and insurance used to transport cattle he had purchased to his buyers.  He used the same trucking dispatch service and insurance policy for each cattle transport.  When Dinsdale purchased cattle from Mr. Leonard, Mr. Leonard had purchased the cattle from a sale barn, paid the sale barn for the cattle, and issued a separate

---

[1]    Both Dinsdale and Pinnacle challenge plaintiff's asserted fact that "Dinsdale Bros. and Pinnacle are both owned by the Dinsdale family."  Doc. 111 at 2.  And both defendants and plaintiff cite substantially the same deposition testimony from Chris and John ("Sid") Dinsdale to support their arguments.  Defendants assert that only some Dinsdale family members had ownership of both Dinsdale and Pinnacle.  After reviewing the parties' cited deposition testimony, the court concludes that the record establishes the uncontroverted fact that Dinsdale and Pinnacle both are owned by some members of the Dinsdale family.  *See* Doc. 111-3 at 3 (C. Dinsdale Dep. 13:4–19, 72:14–73:11); 111-4 at 2 (J. Dinsdale Dep. 14:8–15:4, 16:3–24).

invoice to Dinsdale.  In earlier cattle sales, Dinsdale received good title to the cattle it purchased from Mr. Leonard.[2]

On September 28, 2015, Dinsdale employee David Wahlert called Mr. Leonard, and the two spoke briefly over the phone.  They discussed the cattle market, and Mr. Wahlert asked Mr. Leonard which sale he was attending the next day.  Mr. Leonard replied that he planned to attend an auction in St. Marys, Kansas.  The two did not discuss cattle prices.  Mr. Wahlert told Mr. Leonard that Dinsdale was in the cattle market and agreed to talk to Mr. Leonard again the next day.[3]  Before their September 28 conversation, Mr. Wahlert did not know whether Mr. Leonard planned to attend a cattle sale the next day or, if so, which auction he planned to attend.  Though Mr. Wahlert knew where Mr. Leonard had attended auctions in the past, Mr. Wahlert did not know Mr. Leonard had attended one of plaintiff's auctions before.  Mr. Wahlert never had heard of plaintiff's sale barn in St. Marys, Kansas, and he never had communicated with any representative of plaintiff.  Neither Mr. Wahlert nor any Dinsdale representative directed Mr. Leonard to attend the St. Marys auction.  Instead, Mr. Leonard attended the auction in St. Marys

---

[2]    In its Consolidated Reply Memorandum (Doc. 121), plaintiff attempts to controvert Dinsdale's representation that it "received good title to the subject cattle" during earlier transactions with Mr. Leonard.  Doc. 121 at 11.  But the court concludes that plaintiff has failed to controvert Dinsdale's asserted fact because it contends merely that Dinsdale had knowledge of Mr. Leonard's financial status during the transaction.  *See* Doc. 121 at 11 (Pl.'s Response to Dinsdale Bros.'s Statement of Additional Facts ¶ 5).  Plaintiff's challenge does not controvert the factual proposition that Dinsdale received good title to the cattle it had purchased from Mr. Leonard during their earlier transactions.

[3]    In its Memorandum in Support of Defendant Dinsdale Bros., Inc.'s Motion for Summary Judgment (Doc. 103), Dinsdale represents that Mr. Wahlert planned to call Mr. Leonard on September 29, 2015, after checking the market.  Doc. 103 at 8.  But the Exhibits Dinsdale cites to support this proposition provide conflicting information:  in an affidavit, Mr. Wahlert asserts that he planned to call Mr. Leonard on September 29, 2015, but Mr. Leonard testified in his deposition that he told Mr. Wahlert he would call him on September 29, 2015.  Docs. 103-1, 103-5 (Leonard Dep. 17:4–5).  Plaintiff cites Mr. Leonard's deposition and Mr. Wahlert's own deposition to support its representation that Mr. Wahlert asked Mr. Leonard to call him.  Doc. 117 at 4 (first citing Leonard Dep. 15:13–17:10, 17:4–19:2; then citing Wahlert Dep. 23:18–24:18, 25:15–30:22).

almost every Tuesday, and he purchased cattle "[a]bout every time" he attended it. Mr. Leonard only attended the later part of the St. Marys auctions, when yearlings—or young calves—were sold. Doc. 103 at 9 (citing Leonard Dep. 172:20–173:1, 185:11–14, 188:16–189:21).

On September 29, 2015, Mr. Leonard called Mr. Wahlert before the auction, and the two talked again. Mr. Wahlert told Mr. Leonard that Dinsdale was interested in buying heifers under 800 pounds and steers under 900 pounds. The two did not discuss price or quantity during this call.[4] Mr. Leonard turned down an offer from another buyer to purchase some of the cattle Mr. Leonard eventually would buy on September 29, 2015.[5]

That day, Mr. Leonard attended the auction at plaintiff's sale barn in St. Marys, and plaintiff sold Mr. Leonard some cattle. Mr. Leonard purchased some steers weighing more than 900 pounds, and plaintiff memorialized this purchase in a document called "Buyer Recap" and with invoices that identify "Leonard Cattle Co" as the buyer. Doc. 103-2. Neither plaintiff nor Mr. Leonard provided these invoices to Dinsdale. The Packers & Stockyards Act required Mr. Leonard and plaintiff, who both had licenses and bonds under that statute, to memorialize the

---

[4]    In its Memorandum in Opposition to Dinsdale Bros.'s Motion for Summary Judgment (Doc. 117), plaintiff asserts that "Leonard's and Wahlert's testimony shows that each understood that Leonard would purchase Rezac's entire supply of cattle that fit Wahlert's specifications." Doc. 117 at 4. The deposition testimony plaintiff cites as support references Mr. Leonard's understanding that Dinsdale would have purchased as many cattle meeting its specifications as Mr. Leonard could purchase. Doc. 117 at 4, 8 (citing Leonard Dep. 19:19–20:6, 25:20–26:22). But the portions of testimony plaintiff cites provide no support for Mr. Wahlert's understanding about quantity; nor do these portions of testimony support the fact that Mr. Leonard and Mr. Wahlert discussed the quantity of cattle at all. *See* Doc. 111 at 4–5, 8 (Pl.'s Uncontroverted Material Facts ¶¶ 19–23, 60).

[5]    In its Reply in Support of Defendant Dinsdale Bros., Inc.'s Motion for Summary Judgment (Doc. 119), Dinsdale asserts that "[n]othing in the record suggests that Leonard discussed this alleged other offer with Dinsdale Bros., because no such conversation occurred." Doc. 119 at 7. But Dinsdale never directs the court to any summary judgment evidence to support this assertion. And, conversely, plaintiff directs the court to Mr. Leonard's deposition testimony and Alan Neuberger's deposition testimony as support for its assertion. Doc. 117-2 at 3–4 (Leonard Dep. 24:14–25:6); Doc. 117-4 at 2 (Neuberger Dep. 78:2–79:4). These portions of the discovery record support plaintiff's assertion, and the court thus considers this fact uncontroverted.

sale accurately. Plaintiff did not know that Mr. Leonard had spoken with a Dinsdale representative before the sale on September 29. Plaintiff didn't know where Mr. Leonard planned to deliver the cattle until after the sale. And Mr. Leonard did not inform plaintiff in advance of the sale the weight or type of cattle he sought. After the sale, Mr. Leonard instructed plaintiff to send the cattle to D&D, a feedlot in Colorado. Plaintiff's owner, Dennis Rezac, testified that would have sold the cattle in question to Mr. Leonard notwithstanding Mr. Leonard's communication with a buyer before the auction "because he had been doing it over time." Doc. 103 at 11 (citing Rezac Dep. 134:13–135:3). Later in the day on September 29, 2015, Mr. Leonard and Mr. Wahlert spoke on the phone yet again; Mr. Wahlert confirmed that Dinsdale would purchase the cattle from Mr. Leonard.

The morning after the sale, Mr. Leonard's office wrote plaintiff a check for $980,361 from Mr. Leonard's account with Pinnacle for the cattle purchase. Mr. Leonard's office mailed this check to plaintiff. Dinsdale's name is not on the check, and Mr. Leonard never showed the check to Dinsdale. Mr. Leonard did not tell Dinsdale the amount he had paid plaintiff for the cattle, and Dinsdale did not receive an invoice or other documentation about this cattle purchase.[6] Mr. Leonard's office also prepared invoices for Mr. Leonard's cattle sale to Dinsdale. Plaintiff's name does not appear on the invoices, the invoices do not list commissions or orders, and the invoices state that "100% of sales made by Leonard Cattle Company are on a sold to basis." Doc. 103-4. Mr. Leonard listed himself as the only seller shown on these invoices, as he

---

[6]    In its Memorandum in Opposition to Dinsdale Bros.'s Motion for Summary Judgment (Doc. 117), plaintiff attempts to controvert part of this fact. Plaintiff asserts—and properly supports—that Dinsdale knew some details about Mr. Leonard's purchase from plaintiff. These details included knowledge of the check Mr. Leonard wrote to plaintiff when purchasing the cattle and health papers describing the cattle received by the D&D feedlot in Colorado. But plaintiff does not controvert Dinsdale's asserted facts that Mr. Leonard, himself, never told Dinsdale the amount he paid for the cattle or that Dinsdale never received an invoice or other documents about the cattle purchase.

had done for earlier transactions with Dinsdale[7]; the Packers & Stockyards Act required Mr. Leonard to identify the seller on the invoice accurately. Also, Mr. Leonard sent just these invoices to Dinsdale; he didn't send any internal worksheets, and he never suggested to Dinsdale that he had prepared internal worksheets. Mr. Leonard instructed Dinsdale to pay the invoices by wire transfer, as he did with most of his larger deals and as he had done in all his earlier transactions with Dinsdale.[8] Mr. Leonard instructed Dinsdale to wire that amount to his account and did not suggest that Dinsdale should wire those funds anywhere else.[9] The wiring instructions appeared on the invoice to Dinsdale. Mr. Leonard used trucking dispatch and insurance policy he usually used when delivering the cattle to Dinsdale, and Mr. Leonard bore

---

[7]    In its Consolidated Reply Memorandum (Doc. 121), plaintiff attempts to controvert Dinsdale's assertion that "Dinsdale contracted solely with Leonard and Leonard was the only seller" during all their earlier transactions. Doc. 121 at 11. But plaintiff's response fails to controvert Dinsdale's asserted fact because it contends merely that Dinsdale knew Mr. Leonard's financial status during the transaction. *See* Doc. 121 at 11 (Pl.'s Resp. to Dinsdale Bros.'s Statement of Additional Facts ¶ 4). Plaintiff never properly challenges whether Mr. Leonard appeared as the only seller with whom Dinsdale contracted during their earlier transactions.

[8]    In its Consolidated Reply Memorandum (Doc. 121), plaintiff attempts to controvert Dinsdale's assertion that it "paid Leonard Cattle the purchase price by wire transfer" in "those transactions [where] Leonard contracted to sell cattle to Dinsdale Bros." Doc. 121 at 10. But plaintiff's response fails to controvert Dinsdale's asserted fact because it contends merely that Dinsdale knew Mr. Leonard's financial status during the transaction. *See* Doc. 121 at 10–11 (Pl.'s Resp. to Dinsdale Bros.'s Statement of Additional Facts ¶ 3). Plaintiff never properly challenges whether Dinsdale paid Mr. Leonard by wire transfer during their earlier transactions.

[9]    In its Consolidated Reply Memorandum (Doc. 121), plaintiff attempts to controvert Dinsdale's assertion that "Leonard—the only seller with whom Dinsdale Bros. contracted and the only person with title to the Cattle—instructed Dinsdale Bros. to pay Leonard directly by wire. Leonard never stated or implied that the purchase price should be sent anywhere else." Doc. 121 at 12. But plaintiff's response fails to controvert part of Dinsdale's asserted fact. Plaintiff contends merely that: (1) Dinsdale had knowledge of Mr. Leonard's financial status during the transaction; (2) Dinsdale knew about plaintiff's claim for the cattle and their value; (3) Pinnacle told Dinsdale twice to pay plaintiff directly before Dinsdale sent its wire; and (4) Dinsdale knew plaintiff was not paid and would not be paid when Dinsdale sent its wire. *See* Doc. 121 at 12 (Pl.'s Response to Dinsdale Bros.'s Statement of Additional Facts ¶ 7). Some of these facts themselves are controverted, as discussed elsewhere. But it is uncontroverted that Mr. Leonard directed Dinsdale to wire the purchase price to his account and that he never stated or implied that Dinsdale should send the purchase price anywhere else.

the risk of loss until the cattle arrived at their destination. Mr. Leonard arranged for trucks to transport the cattle he planned to buy on the morning of the auction. Mr. Leonard testified that Dinsdale had a right to reject the cattle.[10] Dinsdale received the cattle on September 30, 2015, and it placed these cattle at D&D Feedlot West in Iliff, Colorado, and OTR Feedlot in Proctor, Colorado.[11]

Mr. Leonard never received: (1) authority to write checks for Dinsdale or a Dinsdale "checkbook"; (2) signatory authority from Dinsdale; (3) vehicles from Dinsdale; (4) Dinsdale letterhead, logos, business cards, or apparel; (5) mileage or fuel reimbursements from Dinsdale; or (6) a 1099 or W-2 form from Dinsdale. Mr. Leonard maintained a separate business from Dinsdale, with his own books and records. Mr. Leonard's business with Dinsdale concluded when he sold cattle to Dinsdale. Mr. Leonard also paid federal income taxes on the September 29, 2015, cattle purchase; it was based on the difference between the price he paid plaintiff for the cattle and the price for which he sold the cattle to Dinsdale. He reported the gain from this transaction as "dealer markup" and not as agent's commission. The Packers & Stockyards Act also required Mr. Leonard to file annual reports with the Packers & Stockyards Administration that included transactions Mr. Leonard undertook as a dealer or agent. Plaintiff reported that Mr. Leonard undertook the September 29, 2015, transaction as a dealer, not a commissioned agent. And Mr. Leonard's 2015 report under the Packers & Stockyards Act listed all his purchases as

---

[10]    In its Memorandum in Opposition to Dinsdale Bros.'s Motion for Summary Judgment (Doc. 117), plaintiff characterizes this fact as "[i]mmaterial and misleading" because Mr. Leonard's testimony responded to a hypothetical question. But plaintiff provides no citation directly controverting this fact and testimony. The court thus considers it uncontroverted that Mr. Leonard testified in this fashion.

[11]    Plaintiff also asserts that the cattle were delivered to the OTR Feedlot located in Proctor, Colorado. Doc. 111 at 5. Though the court finds no support in the document that plaintiff cited for its assertion that the cattle were sent to that location (Doc. 37), the court finds support for this assertion in Doc. 103-4. Doc. 103-4 at 1.

"Livestock Dealer Purchases" and not as purchases "bought on commission for the account of others." Doc. 103 at 14–15 (quoting Doc. 103-7 at 2).

### C. Mr. Leonard's Relationship with Pinnacle

Mr. Leonard maintained a business checking account at Pinnacle for his cattle business, which was how Mr. Leonard made his living; the account was known as Account 161. Spencer Kimball was one of the people at Pinnacle who managed deposit accounts. Mr. Kimball also helped manage Pinnacle's loan relationship with customers such as Mr. Leonard.

Mr. Leonard and his wife maintained multiple accounts at Pinnacle, and Mr. Leonard took out loans from the bank. They were customers of Pinnacle before the fall of 2015. Mr. Leonard used Account 161, which Pinnacle administered in Gretna, Nebraska, to pay for cattle and other business expenses; he also used the account for personal uses. In 2014 and 2015, Mr. Leonard purchased cattle from 150 different sale barns and had 175 to 200 customers. He ran all his purchases and sales through Account 161. Mr. Leonard filed for bankruptcy in 2015 and is not a party in this case.

Generally, checks that Pinnacle customers write on their accounts are presented to Pinnacle as debits against those accounts. The Federal Reserve Bank or other clearing facilities typically present these checks for payment, usually in the evening. If an account lacks sufficient funds to cover the amount of a check or checks presented against the account, Pinnacle learns of this insufficiency the next morning. Pinnacle then decides whether it will honor the checks nonetheless. Specifically, Mr. Kimball was charged with making this decision by 10:00 a.m. the day after such checks were presented to Pinnacle. Pinnacle customers may deposit funds in several ways. These include cash deposits, wire transfers, or third-party checks. Mr. Leonard's deposits in September and October 2015 were primarily wire transfers or third-party checks. His

online bank statements show credits and debits, and the last balance the statements show on a particular date reflects the balance at the end of the corresponding day. This balance includes all checks or other debits that had hit the account and all deposits made to the account, even if those deposits included uncleared checks.

Account 161 lacked sufficient funds to cover the presented checks several times in September and early October 2015. Mr. Kimball, once he was notified of the insufficiency in Account 161, contacted Mr. Leonard, let him know about the insufficiency, and asked how he intended to cover the checks presented. Mr. Leonard responded by describing deposits he intended to make that day to cover the amounts of the checks presented. If Mr. Kimball was satisfied with Mr. Leonard's anticipated deposits, he normally would decide to honor the presented checks. For most of September 2015, Mr. Leonard made deposits into Account 161 that exceeded the deficit created by the checks presented the day before. Pinnacle knew about Mr. Leonard's process of writing checks to purchase cattle before receiving deposits to cover these checks. Pinnacle also knew that Mr. Leonard's account was overdrawn in August 2015.[12] In late summer or early fall 2015, Pinnacle president Marc Hock had informed Chris Dinsdale that Mr. Leonard, along with several other Pinnacle clients, were overdrawing their accounts.[13]

---

[12] Plaintiff asserts that Pinnacle had been "watching Leonard's account since August, 2015, because it was habitually overdrawn." Doc. 111 at 4. Defendants do not appear to controvert this fact. But, in the deposition testimony cited by plaintiff, the court finds support only for the fact that Pinnacle was aware of Mr. Leonard's overdrawn account in August 2015 through bank statements. It finds no support for the assertion that Pinnacle had been monitoring or "watching" Mr. Leonard's overdrawn account during that month. *See* Doc. 111-7 at 5 (Hesser Dep. 50:20–51:23).

[13] Plaintiff represents that "Pinnacle had told Dinsdale Bros. about Leonard's overdrafts well before the Rezac transaction." Doc. 111 at 4. But as Pinnacle argues, the summary judgment record includes no facts establishing the exact date when this conversation occurred. *See* Doc. 114 at 3. The timing of this conversation and the cattle transaction at issue here is unclear, and the court thus declines to determine anything about that relationship as a matter of uncontroverted fact. Nor does the summary judgment record establish that Pinnacle was communicating with Chris Dinsdale in his capacity as an owner of Dinsdale. *See* Doc. 111-5 at 14–15 (Hock Dep. 99:1–101:14). Instead, as defendant Dinsdale argues, the summary judgment records establishes that Pinnacle was communicating with Chris Dinsdale "based on

Pinnacle extended "provisional credit" to Mr. Leonard in Account 161 for checks third parties had deposited in this account. Provisional credit represents a credit for third-party checks that had not yet cleared the Federal Reserve (or other clearing agency). Mr. Leonard or his assistant deposited dozens of checks in Account 161, and one did not clear: a check for $221,818.39 that a third party—Feller Co.—had deposited. This check failed to clear because Feller Co. stopped payment on it. Also, when a Pinnacle customer writes checks on an account exceeding the amount of cleared funds in it, but the account also has uncollected deposited funds, Pinnacle refers to this situation as a "daylight overdraft" or an "intra-day overdraft." This kind of overdraft typically lasts for just one day, and later—usually the next day—the third-party checks clear and are deposited into the account. Notwithstanding the short duration of the overdraft, Pinnacle notifies customers who experience daylight or intra-day overdrafts.

Mr. Leonard attended plaintiff's livestock auction and purchased the cattle at issue in this case. Once Mr. Leonard received paperwork from plaintiff for these cattle, he reported this information to his assistant in Nebraska, Ms. Tammy Nichols. Ms. Nichols prepared and sent a check to plaintiff for the purchase amount: $980,361.45. For simplicity, this order refers to that check as "the Rezac check." Ms. Nichols mailed the Rezac check to plaintiff on September 30, 2015.

On the same day Mr. Leonard purchased the cattle from plaintiff—September 29, 2015—he sold the cattle to Dinsdale. Mr. Leonard prepared an invoice, which included the cost of the

---

hi[s] [position as a] director of [Pinnacle's] holding company." Doc. 111-5 at 15 (Hock Dep. at 101:12–14). The court thus determines it is uncontroverted that Pinnacle, through Marc Hock, told Chris Dinsdale in late summer or early fall 2015 that Mr. Leonard, along with several other Pinnacle clients, were overdrawing their accounts.

cattle, additional costs, and a mark-up, and he billed Dinsdale for the cattle.[14]  This invoicing

process matched the process Mr. Leonard used for his other customers.  Mr. Leonard shipped the

cattle to Dinsdale.  And, as it had done during its past transactions with Mr. Leonard, Dinsdale

wired $1,004,361.49 to Account 161 at Pinnacle on October 1, 2015.[15]  Pinnacle readily could

identify that wire transfer as one originated by Dinsdale.

On September 30, 2015, at 7:30 a.m., Mr. Leonard told Spencer Kimball that he was

going to receive wired funds for the cattle purchase "from of all people Dinsdale Bros."  Doc.

111-8 at 15.  By 10:00 a.m. on September 30, 2015, Mr. Kimball had spoken with Roy Dinsdale,

Chris Dinsdale, Steve Zey, and Marc Hock about Dinsdale's cattle purchase, Mr. Leonard's

check to pay for these cattle, Mr. Leonard's account being $1,000,000 overdrawn, and

Dinsdale's plan to send a $1,000,000 wire to pay for these cattle.[16]  At 10:37 a.m. on September

---

[14]    In its Memorandum in Support of Plaintiff's Motion for Summary Judgment (Doc. 111), plaintiff
asserts that "Leonard charged a commission of .75 cents per hundredweight for performing the service of
buying cattle for Dinsdale Bros."  Doc. 111 at 5.  But the court can find no support in the cited deposition
testimony plaintiff cites classifying this additional charge as a commission.  Both Mr. Leonard and Mr.
Wahlert—the depositions plaintiff cites as support—refer to this charge as a "markup" or "fee."  Doc.
111-2 at 6 (Wahlert Dep. 28:22–30:6); Doc. 111-6 at 4 (Leonard Dep. 21:11–22:6).

[15]    In its Memorandum in Support of Plaintiff's Motion for Summary Judgment (Doc. 111), plaintiff
asserts that Dinsdale "decided to wire the sale proceeds to Pinnacle instead of paying Rezac directly."
Doc. 111 at 9.  But Pinnacle asserts (Doc. 114 at 4) that Dinsdale wired the funds to Mr. Leonard's
account, not Pinnacle.  The cited deposition testimony supports Pinnacle's characterization of this fact,
not plaintiff's.  Doc. 111-3 at 18 (C. Dinsdale Dep. 118:10–16).

[16]    In its "Resistance to Plaintiff's Motion for Summary Judgment" (Doc. 114), Pinnacle argues that this
fact implies that when it received Dinsdale's wire, Mr. Leonard's account was overdrawn.  Doc. 114 at 4.
Also, Pinnacle asserts that it received Dinsdale's wire on October 1, 2015, and that Mr. Leonard's account
was not overdrawn at the end of the day on September 30, 2015, or at any time on October 1, 2015.  *Id.*
Neither of these statements controverts that Mr. Leonard's account was overdrawn at the beginning of the
day on September 30, 2015.  Doc. 111-5 at 47.

Plaintiff's Memorandum in Support of Plaintiff's Motion for Summary Judgment (Doc. 111)
asserts that the September 30, 2015, email anticipating the presentment of Mr. Leonard's check to
plaintiff and Dinsdale's wired funds "shows that [Pinnacle representatives] were told that the Dinsdale
Bros. wire was to pay the check Mr. Leonard had written for the purchase" of cattle from plaintiff.  Doc.
111 at 7.  But defendant Dinsdale properly has controverted this fact, and the court addresses this dispute
in the portion of this order that discusses the parties' summary judgment arguments, *infra*.

30, 2015, Mr. Hock's email informed Chris Dinsdale that Mr. Leonard was $1,000,000 overdrawn on his Pinnacle account and that Pinnacle was returning the checks Mr. Leonard had written for insufficient funds. Mr. Hock copied Roy Dinsdale, Sid Dinsdale, and Mark Hesser on this email. In sum, the following individuals knew about the check Mr. Leonard had written to plaintiff for the cattle purchase: Roy Dinsdale, Sid Dinsdale, Chris Dinsdale, Mark Hesser, Marc Hock, Spencer Kimball, Steve Zey, and Todd Roth. Chris Dinsdale considered paying the sale barn directly because he was aware of Mr. Leonard's financial issues and, by sending plaintiff a direct wire, he would know plaintiff had been paid for the cattle. Dinsdale knew that paying a sale barn directly would convey to Dinsdale clear title for the cattle.

In late September 2015, Pinnacle officers learned of Account 161's activity, including knowledge that Dinsdale planned to pay for the cattle Mr. Leonard had purchased from plaintiff with wired funds. Pinnacle received these wired funds from Dinsdale and credited them to Mr. Leonard's Account 161 on October 1, 2015. At the end of the day on October 1, 2015, Mr. Leonard's account reflected a balance of $762,139.66. Mr. Leonard deposited about $590,000 the next day, October 2, 2015, but nearly $3 million in checks written by Mr. Leonard also were presented against the account on October 2. At the end of the day on October 2, 2015, Mr. Leonard's account reflected a negative balance of $1,755,365.80.

On October 5, 2015, Mr. Leonard provided Pinnacle with a list of outstanding checks he had written. They totaled about $5.8 million. Mr. Leonard did not have sufficient funds to cover his outstanding checks.

On October 6, 2015, the check Mr. Leonard had written to plaintiff was presented against Account 161. The first reported balance on October 6, 2015, in Account 161 was $1,598,433.80. That same day, Pinnacle returned the Rezac check for $980,361.45, reporting that the account

held insufficient funds to cover it. Pinnacle also honored other, smaller checks presented against Account 161 that day, and determined payees and amount for each check. The honored checks totaled $1,344,253.51. By the time the check Mr. Leonard wrote to plaintiff was presented for payment on Account 161, Mr. Leonard already had consumed the funds deposited by Dinsdale's wire. Those funds were consumed by other checks presented on Account 161. Plaintiff never spoke with anyone from Pinnacle about the check Mr. Leonard had written to plaintiff. Mr. Leonard never directed anyone from Pinnacle to wire funds to plaintiff; and he did not attempt to get Pinnacle to issue a cashier's check or certified check to pay plaintiff.

Emails from Pinnacle that include Chris Dinsdale show it knew that: (1) the Dinsdale wire was related to Mr. Leonard's purchase of cattle from plaintiff; (2) Pinnacle was expecting the check Mr. Leonard wrote to plaintiff to be presented against Account 161 soon; and (3) Mr. Leonard was having difficulty maintaining a positive balance in his account.[17] Pinnacle expected the check Mr. Leonard wrote to plaintiff on Account 161 to be presented several days before it actually was presented. After talking with Chris Dinsdale on October 1, 2015, Marc Hock also emailed Spencer Kimball, Steve Zey, and Mark Hesser to inform them that "Dinsdale . . . [was] going to wire in approximately $1mm to the Leonard Cattle Co account . . . to cover cattle

---

[17]    In its Memorandum in Support of Plaintiff's Motion for Summary Judgment (Doc. 111), plaintiff asserts that Dinsdale "knew Rezac was not paid for the St. Marys Livestock at the time it took possession of the St. Marys Livestock." Doc. 111 at 11. Dinsdale challenges this assertion in its Memorandum in Opposition to Plaintiff's Motion for Summary Judgment (Doc. 115), contending that after Dinsdale took possession of the cattle at issue, Chris Dinsdale learned merely that Mr. Leonard had "financial concerns." Doc. 115 at 9. Plaintiff responds in its Consolidated Reply Memorandum (Doc. 121) that Chris Dinsdale "knew Leonard was insolvent before the transaction" because Spencer Kimball had informed him, on September 30, 2015, that Mr. Leonard had written a check to plaintiff for the cattle and Mr. Leonard's account at Pinnacle was overdrawn. Doc. 121 at 9. The summary judgment facts establish only that Chris Dinsdale knew plaintiff had not been paid for the cattle on the day Dinsdale received the cattle because plaintiff's check had not yet been presented against Mr. Leonard's account by then, *i.e.*, September 30. *See* Doc. 111-3 at 16 (C. Dinsdale Dep. 98:4–100:13); Doc. 111-5 at 24 (Dep. Ex. 84).

purchases from the St. Mary's [sic] Livestock auction." Doc. 111-5 at 27. Two emails[18] sent on September 30, 2015, and October 1, 2015, refer to suggestions from Mr. Hock that Dinsdale pay plaintiff directly. Jeff Whitham, Pinnacle's banking expert, testified that, to him, communications such as those between Dinsdale and Pinnacle were highly unusual. Doc. 111-10 (Whitham Dep. 37:7–21). Some of Pinnacle's representatives also testified that they never before had participated in conversations about the timing of wired funds. Mr. Hock testified that this transaction was unique because a Pinnacle director was involved in wiring funds. And Mr. Kimball testified that he could not ever recall reporting to the Dinsdales.[19]

Because Mr. Leonard could not maintain sufficient funds to cover checks he had written, and because of the volume of checks Pinnacle returned for insufficient funds, Pinnacle decided to close Account 161. But Pinnacle did not close Mr. Leonard's account until October 15 because checks were presented against it and Mr. Leonard continued to deposit funds, though these funds were insufficient to cover all his debits. When Pinnacle closed Account 161, it had a negative balance of $159,484.39 because Feller Co. had stopped payment on a check deposited

---

[18]    Pinnacle's Brief in Support of Motion for Summary Judgment and Statement of Material Facts (Doc. 105) represents that "[o]ne email referred to a suggestion that Dinsdale Bros. might want to wire the money to Rezac instead of wiring it to Leonard." Doc. 105 at 11. But Marc Hock's deposition testimony and plaintiff's Exhibits 84 and 86 demonstrate that Mr. Hock's suggestion that Dinsdale send funds directly to plaintiff appeared in two separate emails. Doc. 111-5 at 5–6 (Hock Dep. 47:22–50:4), 6–8 (Hock Dep. 50:2–58:6), 24, 26.

[19]    In its Memorandum in Opposition to Plaintiff's Motion for Summary Judgment (Doc. 115), Dinsdale asserts that its cattle purchase from Mr. Leonard "was normal and consistent with hundreds of other transactions with Leonard." Doc. 115 at 8. Also, Dinsdale argues that it "was not on 'both sides of the transaction,'" as plaintiff asserts. *Id.* at 9. Instead, Dinsdale argues that it acted only as the cattle buyer. But Dinsdale has not controverted the fact asserted by plaintiff, *i.e.*, that some of Pinnacle's representatives found Pinnacle's communications with Dinsdale unusual. Plaintiff properly supports that factual assertion and Dinsdale has not controverted it with any citation to admissible evidence. And Pinnacle does not address these facts in its Resistance to Plaintiff's Motion for Summary Judgment (Doc. 114), even though it responds to other facts plaintiff asserts. The court thus considers these portions of plaintiff's asserted facts—*i.e.*, those facts that describe testimony by Pinnacle representatives about the bank's communications with Dinsdale—as uncontroverted.

in Account 161.  To close that account, Pinnacle wrote off this negative balance to close Account 161; this write-off appears as a credit made to the account on October 13, 2015.  Mr. Leonard's lack of funds, and not the account's closing, kept him from paying his creditors.  Pinnacle also assessed fees on incoming wire deposits as well as overdraft fees that totaled about $230. Pinnacle charged overdraft interest of $30,525.30 on September 30, 2015, but most of that interest charge was refunded later.

On October 12, 2015, plaintiff demanded possession of the cattle from D&D Feedlot West.[20]

## II.    Parties' Cross-Motions for Summary Judgment (Docs. 102, 104, & 110)

### A.  Legal Standard

Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When it applies this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party.  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).  "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense."  *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

---

[20]    In its Consolidated Reply Memorandum (Doc. 121), plaintiff asserts that D&D Feedlot is a "Dinsdale-affiliated entity" and that Dinsdale refused plaintiff's demand to return the cattle, but plaintiff failed to cite any portion of the record that supports this fact.  *See* Doc. 111-11 at 4 (Rezac Dep. 187:11–17), 5 (Dep. Ex. 142); *see also* Doc. 121 at 10 (citing Doc. 37 at 7 ("On September 30, 2015 the Cattle were delivered to Dinsdale Bros.[]  Dinsdale Bros. placed the Cattle in the care of Pacific Edge Land And Cattle, L.L.C. d/b/a D&D Feedlot West ("D&D") for the purpose of feed and care.")).

The moving party bears "both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (citing *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). To meet this burden, the moving party "need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim." *Id.* (citing *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof." *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 670 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)).

The court applies this same standard to cross-motions for summary judgment. Each party bears the burden of establishing that no genuine issue of material fact exists and that it is entitled, as a matter of law, to the judgment sought by its motion. *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000). Cross-motions for summary judgment "are to be treated separately; the denial of one does not require the grant of another." *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979). But where the cross-motions overlap, the court may address the legal arguments together. *Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1155 (D. Kan. 2010) (citation omitted).

Summary judgment is not a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. Instead, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

## III.  Analysis

### A.  Choice of Law

Because the court exercises diversity subject matter jurisdiction here, the court "appl[ies] the substantive law of the forum state, including its choice of law rules." *Pepsi-Cola Bottling Co. of Pittsburgh, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005) (first citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 495–97 (1941); then citing *New York Life Ins. Co. v. K N Energy, Inc.*, 80 F.3d 405, 409 (10th Cir. 1996)).  Kansas is the forum state, so the court thus applies the substantive law of Kansas to evaluate plaintiff's claims.  This includes that state's choice of law rules.  In this section, the court discusses which state's law governs the parties' motions.

Pinnacle raises an argument that particular aspects of Nebraska law should apply to plaintiff's banking-related claims because the claims involve activity at a Nebraska-based bank. Doc. 105 at 13.  But Pinnacle contends that Kansas and Nebraska law agree on most aspects of the applicable law, except the law governing punitive damages.  *Id.*  Pinnacle's briefing also relies on both Kansas and Nebraska law on all of plaintiff's claims against it, including—in part—plaintiff's punitive damages claim.  *See* Doc. 105 at 13–31.  "'[I]f the law of Kansas [is] not in conflict with any of the other jurisdictions connected to the suit, then there [is] no injury in applying the law of Kansas.'"  *Brenner v. Oppenheimer & Co.*, 44 P.3d 364, 372 (Kan. 2002) (quoting *Shutts v. Phillips Petroleum Co.*, 732 P.2d 1286, 1291 (Kan. 1987)).  The court thus concludes that it properly can apply Kansas law to each claim Pinnacle raises in its briefing except plaintiff's punitive damages claim because, as Pinnacle concedes, the court's application

of Kansas and Nebraska law would not result in conflicting outcomes. The court also provides

citations to governing Nebraska law to highlight the alignment between Kansas and Nebraska

law on each claim Pinnacle discusses in its motion.

The court next analyzes the choice of law issue Pinnacle raises about plaintiff's punitive

damages claim. Plaintiff's claim for punitive damages rests on its conversion claim—a tort

claim. "'When addressing choice-of-law issues, the Kansas [appellate] courts follow the

Restatement (First) of Conflict of Laws.'" *Brenner*, 44 P.3d at 374 (quoting *Layne Christensen*

*Co. v. Zurich Canada*, 38 P.3d 757, 766 (Kan. Ct. App. 2002)). And the First Restatement of

Conflict of Laws provides that "the law that creates the [tort] right determines what items of loss

are to be included in the damages. Since the right is created by the law of the place of wrong, it

is measured by that law." Restatement (First) of Conflict of Laws § 412 (Am. Law Inst. 1934).

Put more explicitly, "[t]he right to exemplary damages is determined by the law of the place of

wrong." *Id.* at § 421.

The court previously concluded—and Pinnacle Bank acknowledges—that Nebraska and

Kansas conversion law contain "little or no" difference in the law of conversion. Docs. 20 at 2,

105 at 13. But more narrowly, the court concludes that Kansas law controls the punitive

damages analysis because, "[i]n Kansas, tort actions are governed by the law of the state in

which . . . the wrong was felt," and in cases alleging financial harm, the court looks to "the state

in which . . . [plaintiff] felt that financial injury." *Doll v. Chicago Title Ins. Co.*, 246 F.R.D. 683,

690 (D. Kan. 2007) (first citing *Ling v. Jan's Liquors*, 703 P.2d 731, 735 (Kan. 1985); then citing

*Fusion, Inc. v. Neb. Aluminum Castings, Inc.*, No. 95-2366-JWL, 1997 WL 51227, at *24 (D.

Kan. Jan. 23, 1997)). Here, Kansas law is the appropriate law to apply because plaintiff is in the

business of selling livestock in Kansas, and sold cattle to Mr. Leonard in Kansas. And plaintiff

thus "felt" its alleged financial injury in Kansas. Kansas law thus determines whether plaintiff's claim for punitive damages will survive for trial. *See infra* Section B.4.

The court next turns to the law that governs plaintiff's claims against Dinsdale. The Pretrial Order reports that Dinsdale reserves the right to assert that Colorado's agency law applies. Doc. 101 at 2. But Dinsdale's briefing never cites Colorado law, and instead, it relies almost exclusively on Kansas law. Also, Dinsdale makes no argument that Colorado law should apply to any of plaintiff's claims against it. And in its Memorandum in Opposition to Dinsdale's summary judgment motion, plaintiff agrees that Kansas law should apply. Because the parties have made the deliberate choice to rely on Kansas law, the court thus applies Kansas law to the claims Dinsdale discusses in its motion. *See Dr Pepper Co. v. Adams Inv. Co.*, No. 90-6078, 1991 WL 148876, at *1 (10th Cir. Aug. 5, 1991) (finding that parties had waived a choice-of-law argument when both relied on Texas law in their briefs); *McCammond v. Schwan's Home Serv., Inc.*, 791 F. Supp. 2d 1010, 1012 n.1 (D. Colo. 2011) ("The Court notes that the Motion was briefed pursuant to Colorado law and, at the hearing on the Motion, neither party argued that Minnesota law applies to this issue. Accordingly, any right to assert Minnesota law was arguably waived by the parties." (citing *Air Liquide Am. Corp. v. Cont'l Cas. Co.*, 217 F.3d 1272, 1275 n.2 (10th Cir. 2000))).

The court now turns to each party's summary judgment motion, beginning with Pinnacle's motion.

### B. Pinnacle's Motion for Summary Judgment (Doc. 104)

Pinnacle asserts the court should grant summary judgment in its favor on each of the three claims plaintiff asserts against it—conversion, unjust enrichment, and civil conspiracy. For

each claim, the court first discusses the governing Kansas law and then evaluates the parties' arguments.

### 1. Plaintiff's conversion claim against Pinnacle

### a. Governing law

The court begins with plaintiff's conversion claim and provides a framework for analysis of the parties' arguments. As the court recognized in its Memorandum and Order granting Pinnacle's Motion to Dismiss plaintiff's original conversion claim (Doc. 30), conversion is "the unauthorized assumption or exercise of the right of ownership over goods or personal chattels belonging to another." *Moore v. State Bank of Burden*, 729 P.2d 1205, 1210 (Kan. 1986) (citing *Carmichael v. Halstead Nursing Ctr., Ltd.*, 701 P.2d 934, 938 (Kan. 1985)). When money is deposited with a bank, those funds typically become the bank's property. *Id.* And "[i]t is well recognized that the relationship between a general depositor and [the depositor's] bank is that of creditor and debtor, and money deposited, unless segregated into a special account and designated to be kept separate, becomes the property of the bank." *Id.* (citing *Chilson v. Capital Bank of Miami*, 701 P.2d 903 (Kan. 1985)). In other words, when a bank customer deposits funds with a bank, the customer becomes a creditor and the bank becomes the debtor. The Kansas Supreme Court has described the general duty banks owe their depositors in this fashion:

> Generally it is the duty of a bank to honor checks drawn on it by a depositor if the drawer has on deposit sufficient funds when the check is presented which are not subject to some lien or claim, and for an improper refusal to honor the check the depositor has an action against the bank for any damage which may have been sustained by reason of such refusal. However, the same liability does not inure to the benefit of a holder or payee of a check and the bank is generally not liable to the [check's] holder unless and until it accepts or certifies the check.

*Torkelson v. Bank of Horton*, 491 P.2d 954, 957 (Kan. 1971).

But the Kansas Supreme Court has explained that a check's payee may nonetheless hold a bank liable for refusing to pay on the check if "the defendant bank was . . . informed" about the purpose of certain funds "before it devoted that money to the payment of [a customer's] overdrafts or otherwise disposed of it." *Scoby v. Bird City State Bank*, 211 P. 110, 113 (Kan. 1922). "[I]t must be kept in mind that if, by virtue of special circumstances in addition to the mere issuance of the check, the check is deemed to be an assignment pro tanto of the funds called for, the holder may sue the drawee bank for its payment if there are sufficient funds to meet the check, even though it was not accepted or certified." *Torkelson*, 491 P.2d at 957–58.[21]

The general rule against liability to a check's holder also does not apply where funds have been "segregated into a special account and designated to be kept separate." *Moore*, 729 P.2d at 1210 (first citing *Chilson*, 701 P.2d at 906; then citing *Baker v. Brial*, 341 P.2d 987 (Kan. 1959)); *see also Bloomheart v. Foster*, 221 P. 279, 280 (Kan. 1923) (recognizing that "[a] special deposit of money in a bank is made where moneys, such as bills in packages or specie in boxes, are intrusted to the bank, not to be used, but to be kept safely, and specifically returned" (internal quotations omitted)).

The Kansas Supreme Court discussed agreements between banks and their customers more extensively in *Drumm-Standish Commission Co. v. Farmers' State Bank of Neosho Falls*, 297 P. 725, 725–26 (Kan. 1931). There, the Supreme Court affirmed as a matter of law a judgment for plaintiff in a case where a cattle dealer had opened a special account to manage

---

[21]  The court concludes that Nebraska law also recognizes a plaintiff may bring a conversion claim against a bank when the bank "exercis[es] a wrongful act of dominion over . . . proceeds" deposited into a customer account. *PWA Farms, Inc. v. N. Platte State Bank*, 371 N.W.2d 102, 105 (Neb. 1985) ("The defendant was not instructed as to the disposition of the check but should have been on notice that the check should not have been negotiated until further instructions were received from [the drawer of the check]. By applying the proceeds of the check against [a third party's] personal loan, the bank was clearly exercising a wrongful act of dominion over the proceeds of [the drawer's] check.").

business funds.  A dealer had purchased cattle from plaintiff and sold those cattle to a third party

in exchange, plaintiff alleged, for "something less than the cost" of the cattle.  *Id.* at 725.

Plaintiff introduced uncontroverted testimony during trial demonstrating that the cattle dealer

had

> inform[ed] [a bank] cashier that the money represented by [the funds from the cattle
> dealer's sale of the cattle] did not belong to him but to the plaintiff after the cashier
> has asked him why he had not deposited the [funds], and that the cashier said to
> him:  "Well, you put that money in here so we will get the use of it. . . .  You take
> and deposit that money here, and I will give you my word of honor that it will never
> be molested."

*Id.* at 726–27.  The Kansas court upheld the judgment for plaintiff because the bank had

presented no evidence controverting plaintiff's evidence of the customer's agreement with the

bank.  The Supreme Court thus concluded that, because the bank had applied the customer's

funds to "pay[] . . . claims against [the] depositor," the trial court correctly had concluded that

the bank had converted the funds.  *Id.* at 725, 728.

Kansas common law also recognizes a second exception:  that banks have a "legal right

. . . to appropriate the deposit of its customer upon the customer's default and apply those funds

against the customer's debts to the institution."  *Four Circle Co-op v. Kan. State Bank & Tr. Co.*,

771 F. Supp. 1144, 1149 (D. Kan. 1991) (citing *Tuloka Affiliates, Inc. v. Sec. State Bank*, 627

P.2d 816 (1981)).  A Kansas statute also establishes this right.  Kan. Stat. Ann. § 9-1206 ("Any

bank shall have the right to set off any obligation or claim which it has, when the same is

matured against any depositor.").  Kansas courts also have outlined several prerequisites that a

bank must satisfy before exercising its right to set off funds.  *Four Circle Co-op*, 771 F. Supp. at

1149.  But Kansas courts have carved out an exception to a bank's set off rights.  This exception

applies when a bank has taken funds from a customer account to pay a debt owed to the bank if

the bank knows—or should know—that those funds belong to a third party. *Iola State Bank v.*

*Bolan*, 679 P.2d 720, 732 (Kan. 1984); *see also generally Ballard v. Home Nat. Bank of Ark. City*, 136 P. 935 (Kan. 1913). Finally, the Kansas Court of Appeals has adopted reasoning used by the Eighth Circuit when it decided whether a bank's "allowance of withdrawal of uncollected funds is a loan"—a loan that would constitute a debt to the bank. *Exch. State Bank v. Kan. Bankers Sur. Co.*, 177 P.3d 1284, 1288 (Kan. Ct. App. 2008) (citing *Laws v. United Mo. Bank of Kan. City N.A.*, 98 F.3d 1047, 1050–51 (8th Cir. 1996)). The Kansas Court of Appeals concluded that categorically classifying "*any* [such] allowance" as a loan "would seem unwise as a matter of public policy." *Id.*

### b. Parties' arguments

Here, Pinnacle asserts that deposits in Mr. Leonard's account at Pinnacle Bank became Pinnacle's property once deposited. Thus, Pinnacle asserts, it cannot be held liable for converting those funds because it owns them. Pinnacle characterizes Mr. Leonard's deposit as an "ordinary" one that did not create a duty for Pinnacle to "watch over the funds." Doc. 105 at 15. And—Pinnacle contends—unless deposits are "segregated into a special account and designated to be kept separate," the bank owns the funds in the account. Doc. 105 at 15 (citing *Chilson*, 701 P.2d at 903). Broadly, Pinnacle argues, a depositor may bring an action against a bank for the bank's refusal to honor a check—but the check's payee cannot bring an action "unless and until [the bank] accepts or certifies the check." *Id.* at 16 (citing *Torkelson*, 491 P.2d at 954).

First, Pinnacle contends, as relevant here, that: (1) it assessed wire transfer fees and insufficient funds fees totaling $231 during the first week of October 2015; and (2) it assessed interest on Mr. Leonard's account at the end of September 2015. Pinnacle argues that it collected the interest before the Dinsdale wire transfer arrived and was deposited into Mr.

Leonard's account. And Pinnacle argues that it made no other withdrawals in its own favor, "except for ordinary wire and NSF fees." Doc. 105 at 18–19. Pinnacle also asserts that it followed its policy of honoring checks arriving on the same day, by starting with the check with the smallest amount and moving upward to the check with the largest amount. After following this policy on the day Mr. Leonard's check to plaintiff was presented for payment, Pinnacle contends, Mr. Leonard's account contained insufficient funds to pay plaintiff. In short, Pinnacle categorically distinguishes the facts of this case from those of *Four Circle Co-op* and *Iola State Bank*, where our court and the Kansas Supreme Court characterized certain bank activity as setting off funds in a customer's account.

Next, Pinnacle asserts that the funds in Mr. Leonard's account were not special funds or otherwise designated for separate keeping. Pinnacle directs the court to the fact that the funds plaintiff alleges belong to it were "commingled with Leonard deposits from many different sources." Doc. 105 at 21. Pinnacle contends that Mr. Leonard used the account at issue for personal purposes, among others. And, it argues, "Leonard never told [Pinnacle] which of the many outstanding checks he had written that he wanted paid when the Dinsdale funds came into the Bank." *Id.* at 22 (citing Leonard Dep. 135:22–136:19).[22] Pinnacle recognizes that some of

---

[22]    Mr. Leonard testified as follows:

> Q. And so as of September 30, you had $5.3 million in outstanding checks when you wrote the Rezac check. How was it that—who on that list did you not want to have paid?
>
> A. I didn't get to make that decision.
>
> Q. Well, you didn't have enough money to cover those checks, so you knew someone wasn't going to get paid, right?
>
> A. Again, I didn't get to make that decision. It was a decision made at the bank.
>
> Q. And how was the bank to know who you wanted to pay? Out of this list of all the checks outstanding as of 9/30/2015, how was the bank to know how many of those people you wanted to pay? You didn't tell them that, did you?

its bankers expected the Dinsdale wire and knew that those funds would pay for Mr. Leonard's cattle purchase from plaintiff, but their knowledge created no affirmative duty to direct the funds transferred by Dinsdale to pay plaintiff.

Finally, Pinnacle asserts that its practice allowing "daylight overdrafts"—that is, allowing a Pinnacle customer to write checks on an account exceeding the amount of cleared funds in it when the account also has uncollected deposited funds —did not constitute a loan to Mr. Leonard. *Id.* at 23 (citing *Laws*, 98 F.3d at 1051). Rather, Pinnacle contends, this practice was a "'service decision, driven by laws such as the [federal] Expedited Funds Availability Act, and by the financial demands of bank customers.'" Doc. 105 at 24 (citing *Laws*, 98 F.3d at 1051).

Conversely, plaintiff asserts that Pinnacle knew the Dinsdale wire was intended to pay for the cattle Mr. Leonard had purchased from plaintiff, and Pinnacle thus knew that the wired funds belonged to plaintiff. And because Pinnacle knew about plaintiff's rights to the wired funds, plaintiff argues, this knowledge rebutted "[t]he presumption of a debtor-creditor relationship between a depositor and a bank." Doc. 116 at 7 (citing *Four Circle Co-op*, 771 F. Supp. at 1149); *see also id.* at 6 (first citing *Iola State Bank*, 679 P.2d at 732; then citing *Scoby*, 211 P. at 113); *id.* at 10 (citing *Torkelson*, 491 P.2d at 958). Essentially, plaintiff contends, "[w]hen a deposit and a check are complementary, and the bank knows it, the check is deemed to be an assignment pro tanto of the funds called for." *Id.* at 10 (citing *Torkelson*, 491 P.2d at 958).

Plaintiff argues that it may prevail on its conversion claim against Pinnacle in more than one way—*i.e.*, Pinnacle's liability for conversion does not rest solely on its decision to set off funds, which, Pinnacle contends, it did not do. To hold Pinnacle liable for conversion, plaintiff

_____

A. No, I did not.

Doc. 111-6 at 9 (Leonard Dep. 135:22–136:19).

asserts, plaintiff must prove only that Pinnacle knew about plaintiff's interest in the funds. Plaintiff argues that, to prevail, it need not demonstrate that Pinnacle itself benefited from using the Dinsdale wired funds for purposes other than paying plaintiff. Plaintiff also rebuts Pinnacle's argument that, because the funds transferred by Dinsdale's wire were not segregated into a separate account, these funds were not special deposits. Plaintiff contends it has shown enough by showing that Pinnacle knew the Dinsdale wire "was coming for this specific cattle purchase" to argue that this knowledge was sufficient to categorize the funds as a special deposit. *Id.* at 14.

### c. Analysis

The court concludes that it cannot grant Pinnacle summary judgment on plaintiff's conversion claim. The parties controvert a material fact that is central to that claim, *i.e.*, did Pinnacle and Mr. Leonard reach an agreement about the use of the funds transferred by Dinsdale's wire to Pinnacle for Mr. Leonard's Account 161?

On one hand, plaintiff cites testimony by Pinnacle President Marc Hock. Plaintiff contends that Mr. Hock's testimony establishes that the funds Dinsdale wired were intended to pay the check issued by Mr. Leonard to plaintiff. *See* Doc. 116 at 3–4 (citing Hock Dep. 59:16–60:10, 68:2–69:14, 130:3–15).[23] Plaintiff also invokes Mr. Leonard's testimony to the effect that

---

23 Mr. Hock testified as follows:

Q. When you say in the top e-mail later that morning, 10:08 a.m., we are right in the spot we didn't want to be in with the St. Marys wire, and you're reporting that to Chris Dinsdale, Mark Hesser and Sid Dinsdale. What did you mean?

A. Well, back to my suggestion of the—of paying directly with the wire, which they decided to not pay that way because they had bought the cattle from Charlie [Leonard]. My opinion was that that money was going to be used in other purchases, other checks that were outstanding that we didn't know about.

Q. Okay. And that's not what you wanted to happen if things had worked out the way you preferred?

he intended for Dinsdale's wired funds to cover the check he had written to plaintiff on Account 161. Doc. 116 at 4 (citing Leonard Dep. at 104:24–106:20, 133:9–134:7).[24]

But this is not the only admissible evidence on this subject.

Pinnacle has adduced evidence that it received no special instructions about how to use the funds deposited in Account 161. It cites Mr. Leonard's testimony that he never instructed Pinnacle how to pay the many checks issued on that account on September 30, 2015.[25] The

---

A. It's not what I wanted to happen. It was—it—we treated the Dinsdales in this case like every other client: The money came in, the money went out.

Doc. 111-5 at 10 (Hock Dep. 68:2–69:14).

[24]  Mr. Leonard testified as follows:

Q: Okay. So at the—before the check was actually written, you said I'm getting ready to pay, I'm getting ready to pay for these cattle; you told [Pinnacle's Market President] Spencer Kimball that?

A. Yes.

Q: And you said and that will be covered—

A: Yes.

Q: —by a wire from Dinsdale, D&D?

A: Yes, D&D.

Doc. 111-6 at 8 (Leonard Dep. 105:24–106:7).

In its Consolidated Reply Memorandum (Doc. 121), plaintiff also argues that Pinnacle never controverted plaintiff's asserted fact that "Pinnacle gathered all the checks presented on Mr. Leonard's account and determined to whom they were payable and the amount of each check." Doc. 111 at 10 (Pl.'s Uncontroverted Material Facts ¶ 48). But Pinnacle's act of gathering and identifying the checks presented against Mr. Leonard's account does not properly controvert Pinnacle's rationale for paying the presented checks in the order it chose to do so.

[25]  Leonard Dep. 135:22–136:19 (cited in Doc. 105 at 11). Mr. Leonard testified as follows:

Q: And so as of September 30, you had $5.3 million in outstanding checks when you wrote the Rezac check. How was it that—who on that list did you not want to have paid?

A: I didn't get to make that decision.

evidence also shows that Pinnacle—lacking any special instructions about which checks to pay—followed bank policy. That is, Pinnacle paid the smallest check first, then moved to the next smallest check, and so on until the checks presented had consumed the available funds. Following this policy, the funds in Account 161 were consumed before Pinnacle reached the check written by Mr. Leonard presented for payment by plaintiff.

Under Kansas law, Pinnacle is liable to plaintiff for conversion if the factfinder determines that the bank knew the purpose of the funds transferred by Dinsdale. This is the rule that *Torkelson* and *Scoby* established. The court concludes that a reasonable jury could reach either outcome. Namely, based on the evidence summarized above, the factfinder reasonably could find that Pinnacle knew Mr. Leonard had issued "special instructions" governing the use of the Dinsdale wire. Conversely, it could answer that decisive question in the opposite fashion: that Pinnacle properly defaulted to its standard policy because it hadn't received "special instructions." The summary judgment standards do not permit the court to decide this seminal factual question, and this conclusion precludes summary judgment against the conversion claim. *See* Fed. R. Civ. P. 56(c) (Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to a judgment as a matter of law.").

---

Q: Well, you didn't have enough money to cover those checks, so you knew someone wasn't going to get paid, right?

A: Again, I didn't get to make that decision. It was a decision made at the bank.

Q: And how was the bank to know who you wanted to pay? Out of this list of all the checks outstanding as of 9/30/2015, how was the bank to know how many of those people you wanted to pay? You didn't tell them that, did you?

A: No, I did not.

Doc. 111-6 at 9 (Leonard Dep. 136:3–19).

Finally, the court concludes that this case does not fall within the exception Kansas courts recognize allowing banks to set off funds to pay debts their customers owe them. Here, under the summary judgment facts, the only debts Mr. Leonard owed Pinnacle were fees and charges based on Mr. Leonard's overdrafts and wire transfers. Plaintiff does not controvert Pinnacle's assessment of "ordinary course wire transfer fees and insufficient funds fees . . . amounting to about $231 in the first week of October of 2015." Doc. 105 at 18. Nor does plaintiff argue that these fees constituted a set off. Plaintiff also does not argue that Pinnacle's practice of allowing customers to use "provisional credit"—or expected deposits that had not yet cleared—can place this case within the set off exception. The court thus limits its discussion to the crux of the parties' arguments: their dispute over Pinnacle's knowledge about the Dinsdale wire's purpose. And because a material, controverted fact issue exists on that question—construing all facts and inferences in a light most favorable to plaintiff—the court denies Pinnacle's Motion for Summary Judgment on plaintiff's conversion claim.

### 2. Plaintiff's civil conspiracy claim against Pinnacle

A plaintiff alleging a civil conspiracy claim must satisfy the following requirements: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof." *Citizens State Bank, Moundridge v. Gilmore*, 603 P.2d 605, 613 (Kan. 1979). Put differently, "[a] civil conspiracy claim generally requires a plaintiff to establish concert of action or other facts and circumstances from which the natural inference arises that the unlawful, overt acts were committed in furtherance of a common design, intention, or purpose of the alleged conspirators." *Aeroflex Wichita, Inc. v. Filardo*, 275 P.3d 869, 881–82 (Kan. 2012) (internal quotations omitted). "Conspiracy is not actionable without commission of some wrong giving

rise to a cause of action independent of the conspiracy." *Stoldt v. City of Toronto*, 678 P.2d 153, 161 (Kan. 1984). And "[b]ecause direct evidence is rarely available, a civil conspiracy may be proved by circumstantial evidence. Consequently, the existence of the conspiracy may be proved by proving the acts of the various defendants." *Vetter v. Morgan*, 913 P.2d 1200, 1206 (Kan. Ct. App. 1995) (citing *Nardyz v. Fulton Fire Ins. Co.*, 101 P.2d 1045 (Kan. 1940)).[26]

Trying to defeat plaintiff's civil conspiracy claim on summary judgment, Pinnacle invokes the arguments deployed against plaintiff's conversion claim. It asserts that because plaintiff cannot satisfy an essential element of its civil conspiracy claim—*i.e.*, demonstrating that Pinnacle engaged in one or more unlawful overt acts—Pinnacle is entitled to summary judgment against the civil conspiracy claim as well. Pinnacle characterizes the emails between Pinnacle employees and the Dinsdales as mere communication; Pinnacle contends that "there is no evidence that Dinsdale Bros. or [Pinnacle] Bank took any unlawful actions based on or in relation to those conversations." Doc. 105 at 26.

Plaintiff's response is similar. Plaintiff also relies on its conversion arguments, contending that "[e]vidence of communications between conspiracy defendants is sufficient to create an inference that they agreed to deprive plaintiff of his rights." Doc. 116 at 16 (citing *Wilson v. City of Chanute*, 43 F. Supp. 2d 1202, 1216 (D. Kan. 1999) (evaluating a conspiracy claim plaintiffs brought under 28 U.S.C. § 1983)). Plaintiff asserts that Pinnacle and Dinsdale, through their communications, "agreed to [a] course of action" that deprived plaintiff of its

---

[26]     Nebraska law provides essentially the same elements and requirements for civil conspiracy claims. *See Koster v. P & P Enters., Inc.*, 539 N.W.2d 274, 279 (Neb. 1995) ("A civil conspiracy is a combination of two or more persons to accomplish by concerted action an unlawful or oppressive object, or a lawful object by unlawful or oppressive means . . . . A civil conspiracy need not be established by direct evidence of the acts charged, but may, and generally must, be proved by a number of indefinite acts, conditions, and circumstances which vary according to the purpose to be accomplished." (internal quotations and citations omitted)).

property, *i.e.*, the funds wired by Dinsdale.  Doc. 116 at 18.  Plaintiff directs the court to

Dinsdale and Pinnacle's communication about Mr. Leonard's account and the transaction in

question.  The content of these communications involves Chris Dinsdale's knowledge about the

overdraft problems in Mr. Leonard's account.  These communications include discussion and

decisions about where Dinsdale should send its wired funds, and when.  And they incorporate

Chris Dinsdale's knowledge that returning checks on Mr. Leonard's account would "effectively

shut[] down Leonard Cattle."  Doc. 117 at 14 (citing Kimball Dep. 30:21–31:2).

    The holding that plaintiff's conversion claim survives summary judgment resolves half of

the civil conspiracy equation.  That ruling means plaintiff has established a submissible claim for

"some wrong giving rise to a cause of action independent of the conspiracy."  *Stoldt*, 678 P.2d at

161; *see also Citizens State Bank*, 603 P.2d at 613 (fourth element of civil conspiracy claim

requires "one or more unlawful overt acts").

    That conclusion, while a necessary part of the civil conspiracy analysis, is not, by itself,

sufficient.  The question still remains whether plaintiff has met its burden to establish the other

elements of a civil conspiracy claim—at least one that will survive summary judgment.

Pinnacle's briefing attacks this second half of the civil conspiracy analysis, addressing the

"meeting of the minds on the object or course of action" of the putative conspiracy.  *See* Doc.

105 at 23.

    When viewed in a light most favorable to it, plaintiff has provided sufficient

"'significantly probative'" facts demonstrating a genuine issue for trial whether Pinnacle

conspired with Dinsdale to convert the funds at issue.  *See Cone v. Longmont United Hosp.

Ass'n*, 14 F.3d 526, 533 (10th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

249–50 (1986)).  A reasonable trier of fact could find that the communications between Pinnacle

and Dinsdale show that they acted together and decided to use the Dinsdale wire to maintain Mr. Leonard's account. Also, the trier of fact reasonably could conclude that the defendants' communications and joint decision-making produced Pinnacle's use of the Dinsdale wired funds for purposes other than paying Mr. Leonard's check to plaintiff for the cattle—which, plaintiff asserts, was its proper purpose. The court thus denies Pinnacle's Motion for Summary Judgment against plaintiff's civil conspiracy claim.

### 3. Plaintiff's unjust enrichment claim against Pinnacle

Under Kansas law, "[t]o establish an unjust enrichment claim, a plaintiff must establish (1) the plaintiff conferred a benefit on the defendant; (2) the defendant appreciated and has knowledge of the benefit; and (3) the defendant accepted and retained the benefit under circumstances that make the retention unjust." *Univ. of Kan. Hosp. Auth. v. Bd. of Comm'rs*, 327 P.3d 430, 441 (Kan. 2014) (citing *Nelson v. Nelson*, 205 P.3d 715 (Kan. 2009)) (other citations omitted); *J.W. Thompson Co. v. Welles Prods. Corp.*, 758 P.2d 738, 745 (Kan. 1988); *Haz-Mat Response, Inc. v. Certified Waste Servs. Ltd.*, 910 P.2d 839, 846–47 (Kan. 1996).

The Kansas Supreme Court has construed portions of this rule broadly. *Walsh v. Weber*, No. 113,972, 2016 WL 4750102, at *20–21 (Kan. Ct. App. Sept. 9, 2016). Specifically, *Walsh* explained, "a plaintiff may sue a defendant for unjust enrichment and recover by means of a constructive trust so long as the defendant has 'an equitable duty to convey [certain property] to [the plaintiff] on the ground that he would be unjustly enriched if he were permitted to retain it.'" *Id.* (quoting *Nelson*, 205 P.3d at 720). The Court concluded that "the fact that the property is in the hands of a third party does not erase the need to establish an equitable duty to return the property." *Nelson*, 205 P.3d at 724.[27]

---

[27] Nebraska law also recognizes the "flexib[ility]" of the doctrine of unjust enrichment. *City of Scottsbluff v. Waste Connections of Neb., Inc.*, 809 N.W.2d 725, 743 (Neb. 2011) (concluding that "[t]o

Pinnacle argues that the court should award summary judgment against plaintiff's unjust enrichment claim because plaintiff conferred no benefit on Pinnacle. It also contends that it did not take plaintiff's funds because it did not set off any funds in the Leonard account. In response, plaintiff argues that genuine issues of material fact preclude summary judgment because Pinnacle "had been floating Leonard for weeks in exchange for fees and interest in the tens of thousands of dollars." Doc. 116 at 20. Plaintiff thus argues that Dinsdale knew about Pinnacle's float and that the two entities "conferred and agreed to keep Leonard operating." *Id.* (citing Kimball Dep. 30:21–31:2 ("Q: All right. So if you go to the next page, second paragraph, were Chris—it says, Chris commented that if we returned checks, we were effectively shutting down Leonard Cattle. Do you recall having that discussion with Chris Dinsdale? A: I do after reading my notes, yes.")). So, plaintiff asserts, "Pinnacle accepted the Dinsdale Bros. wire and diverted it away from [plaintiff] to pay Leonard's other checks on October 1 and 2[,] thereby perpetuating the float." *Id.*

The issue is a close one because the evidence that plaintiff conferred some kind of benefit on Pinnacle is, on its best day, thin. But construing the summary judgment record in plaintiff's most favorable light—and giving plaintiff the benefit of all reasonable inferences—plaintiff has directed the court to sufficient "'significantly probative'" facts demonstrating a genuine issue for trial whether Pinnacle benefited from Dinsdale's wired funds. *See Cone*, 14 F.3d at 533 (quoting *Anderson*, 477 U.S. at 249–50); *see also Nelson*, 205 P.3d at 720, 724. Pinnacle concedes that it

---

recover under a theory of unjust enrichment, [a] plaintiff must allege facts that the law of restitution would recognize as unjust enrichment"); *see also Wrede v. Exch. Bank of Gibbon*, 531 N.W.2d 523, 530–31 (Neb. 1995) (recognizing implied promise in law "whenever one has received money which in equity and good conscience one should pay to another" in a case where bank properly set off funds from customer account to satisfy customer's debt on certificates of deposit, but concluding that because customer had failed to read setoff provision in certificate of deposit contract, customer could not recover these funds).

assessed wire transfer fees and insufficient funds fees against Mr. Leonard's account. And plaintiff cites summary judgment evidence giving rise to a reasonable inference that returning checks would have closed Mr. Leonard's account at Pinnacle and his business, thus harming Pinnacle. The court concludes sufficient evidence existed to support a finding that Pinnacle benefited from Dinsdale's wired funds. *See Hammad v. Bombardier Learjet, Inc.*, 192 F. Supp. 2d 1222, 1227 (D. Kan. 2002) ("If the evidence offered in opposition to summary judgment is merely colorable or is not significantly probative, summary judgment may be granted.").

Finally, the court premises its decision, at least in part, on the role played by unjust enrichment. Unjust enrichment serves as something of an equitable gap filler. It is an equitable theory designed to confer authority to rectify "circumstances that make the retention [by the defendant of a benefit] unjust." *Univ. of Kan. Hosp. Auth.*, 327 P.3d at 441. In the contract setting, for example, the theory allows the court to impose a contract on a quantum meruit basis where, the court has concluded, no legally enforceable contract exists. *Lindsey Masonry Co. v. Murray & Sons Constr. Co.*, 390 P.3d 56, 69 (Kan. Ct. App. 2017).

While the court is skeptical that unjust enrichment ultimately will apply, it preserves the claim for now. Doing so will enable the court to assess plaintiff's theory in the full evidentiary context of a trial. And it will not enlarge the burden of trial because plaintiff's equitable theories rely on the same facts as plaintiff's conversion claim. The court denies this aspect of Pinnacle's summary judgment motion.

### 4. Plaintiff's claim for punitive damages against Pinnacle

Plaintiff premises its claim for punitive damages on its conversion claim—a tort claim. As the court previously discussed, Kansas law applies here because plaintiff "felt" the financial injury it claims in Kansas. *See supra*, Section III.A.

"[P]laintiff[s] . . . have the burden of proving, by clear and convincing evidence in the initial phase of the trial, that the defendant acted toward the plaintiff with willful conduct, wanton conduct, fraud or malice." Kan. Stat. Ann. § 60-3702(c); *see also Temmen v. Kent-Brown Chevrolet Co.*, 605 P.2d 95, 100 (Kan. 1980) ("Proper allegations of fraud, malice, gross negligence, oppression or wanton disregard of plaintiff's rights are needed in order to recover punitive damages" for independent tort claims.). "An award of punitive damages, which generally requires an award of actual damages, is not designed to compensate the plaintiff for the wrong." *Moore*, 729 P.2d at 1212–13 (citing *McDermott v. Kan. Pub. Serv. Co.*, 712 P.2d 1199 (Kan. 1986)). Malice is "a state of mind characterized by an intent to do a harmful act without a reasonable justification or excuse." *Werdann v. Mel Hambelton Ford, Inc.*, 79 P.3d 1081, 1090 (Kan. Ct. App. 2003). Wanton conduct "is more than ordinary negligence but less than a willful act. For an act to be wanton, the actor must realize the imminence of danger and recklessly disregard and be indifferent to the consequences of his or her act." *Reeves v. Carlson*, 969 P.2d 252, 313–14 (Kan. 1998) (citing *Gould v. Taco Bell*, 722 P.2d 511 (Kan. 1986)). "Wantonness refers to the mental attitude of the wrongdoer rather than a particular act of negligence." *Id.* And willful conduct "is defined as conduct performed with a designed purpose or intent on the part of a person to do wrong or to cause injury." *Deere & Co. v. Zahm*, 837 F. Supp. 346, 352 (D. Kan. 1993) (citing *Lawrence v. Phillips Petroleum Co.*, 627 P.2d 1168, 1169 (Kan. Ct. App. 1981)).

Pinnacle focuses its arguments, in part, on Nebraska law. But it also asserts that, under Kansas law, plaintiff has presented no evidence of "malicious, oppressive or wanton intent that is a prerequisite to an award of punitive damages." Doc. 105 at 30. Pinnacle claims that plaintiff bases its punitive damages arguments on email correspondence between Pinnacle and Dinsdale.

Those emails, Pinnacle argues, merely establish Pinnacle's efforts to avoid impropriety. Ultimately, Pinnacle contends, plaintiff has failed to adduce specific facts warranting submission of punitive damages. Plaintiff responds, directing the court to facts about Mr. Leonard's overdrafts; Pinnacle and Dinsdale's knowledge about these overdrafts; defendants' knowledge about the Dinsdale wire's purpose; defendants' knowledge about insufficient funds to cover Mr. Leonard's check to plaintiff; and defendants' intentional control over the Dinsdale wire "to keep Leonard's account afloat at [plaintiff's] expense." Doc. 116 at 19. Plaintiff argues that these facts satisfy Kansas law and suffice to require submission to a jury.

While the court retains a healthy skepticism that, ultimately, plaintiff's evidence will warrant a punitive damages submission, three things convince the court to deny Pinnacle's motion for now. First, construing all facts and inferences in plaintiff's favor, plaintiff has adduced sufficient "specific facts showing that there is a genuine issue for trial." *Whittenburg v. L.J. Holding Co.*, 830 F. Supp. 557, 565 (D. Kan. 1993). The mental state of Pinnacle's employees involved in this transaction is central to the punitive damages issue, whether plaintiff proceeds on a theory of willful or wanton conduct. And Pinnacle's knowledge about the purpose of the Dinsdale wire is controverted directly by testimony. The admissible evidence in the summary judgment record might permit a reasonable trier of fact to find that Pinnacle had the requisite mental state to justify a punitive damages award. Second, conversion is an intentional tort, and the court has decided that claim must survive summary judgment. Finally, the court has concluded that a trial is necessary to resolve plaintiff's conversion claim. Naturally, the court can assess the punitive damages issue more adeptly on a full trial record. The court declines to grant summary judgment against plaintiff's claim for punitive damages.

In sum, and for all the reasons explained above, the court denies Pinnacle's Motion for Summary Judgment on each of the four claims asserted against it.

### C. Dinsdale's Motion for Summary Judgment (Doc. 102)

Dinsdale asserts that the court should grant summary judgment against all four claims—claims for breach of contract, conversion, civil conspiracy, and unjust enrichment—that plaintiff asserts against Dinsdale. Dinsdale argues that, since plaintiff never alleges it had a direct contractual relationship with Dinsdale, all of plaintiff's claims rise and fall with plaintiff's assertion that Mr. Leonard acted as Dinsdale's agent. Because plaintiff bears the burden of proof as the proponent of the contract claim, Dinsdale "need not 'support its motion with affidavits or other similar materials *negating* the [plaintiff's]' claims or defenses." *Hammad*, 192 F. Supp. 2d at 1227 (citing *Celotex Corp.*, 477 U.S. at 323 (emphasis in original)). Instead, Dinsdale only must "point[] out the absence of evidence on an essential element of plaintiff's claim." *Id.* (citing *Adler*, 144 F.3d at 671) (further citations omitted).

The court evaluates each of the parties' arguments on each claim, below.

### 1. Plaintiff's breach of contract claim against Dinsdale

Plaintiff asserts that Mr. Leonard and Dinsdale had an agency relationship when Mr. Leonard purchased the cattle at issue. Specifically, plaintiff argues that Mr. Leonard was Dinsdale's agent and so, he formed a contract between plaintiff and Dinsdale and Dinsdale breached that contract. Because plaintiff's breach of contract claim rests on the premise that Mr. Leonard was Dinsdale's agent, the court first discusses the principles of Kansas agency law.

In an earlier order, the court provided a fulsome discussion about Kansas agency law. That order adopted the Kansas Supreme Court's reasoning in *Golden Rule Insurance Co. v. Tomlinson*, 335 P.3d 1178 (Kan. 2014). *See* Doc. 55. *Golden Rule* recognized and resolved some imprecise language in earlier Kansas agency cases and provided clearer guidelines to

determine whether an agency relationship exists. Specifically, the Kansas Supreme Court explained that a court should ask two questions when determining whether someone acted as another's agent and thus possessed the authority to bind the putative principal to a contract. Those questions ask: (1) "whether the evidence . . . supported the existence of an agency relationship between [the defendant] as principal and [the alleged agent] as agent"; and (2) "whether [the agent's] acts were within the scope of his authority as agent or were otherwise binding on" the principal. *Golden Rule*, 335 P.3d at 1186–87. "[T]he party relying on agency to establish his claim has the burden of establishing its existence by clear and convincing evidence, and whether there is any competent evidence tending to prove the relationship is a question of law for the court." *AgriStor Leasing v. Meuli*, 634 F. Supp. 1208, 1215 (D. Kan. 1986) (citing *C.I.T. Fin. Servs., Inc. v. Gott*, 615 P.2d 774 (Kan. Ct. App. 1980)). "Where the existence of an agency is disputed, its existence or non-existence is ordinarily a question of fact for the jury to be determined on proper instructions." *C.I.T. Fin. Servs., Inc.*, 615 P.2d at 779 (citing *Graham v. Buesche*, 215 P. 272 (Kan. 1923)).

An agency relationship arises "when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." *Id.* at 1188 (quoting Restatement (Third) of Agency § 1.01 (Am. Law Inst. 2005)). A principal-agent relationship also requires the agent to act for the principal's benefit. *See Merchant v. Foreman*, 322 P.2d 740, 745 (Kan. 1958) (explaining the duties of an agent to a principal, requiring an agent "to act with the utmost good faith and loyalty for the furtherance and advancement of the interests of his principal" (citations omitted)); 2A C.J.S. *Agency* § 5 (December 2018 update) ("[T]here are three elements that are integral to an agency relationship: the agent is subject to

the principal's right of control; the agent has a duty to act, as a fiduciary, primarily for the benefit of the principal; and the agent holds the power to alter the legal relations of the principal."). A principal-agent relationship thus has three requirements: the principal's control, the principal's benefit, and both parties' assent. For reasons that will become evident, the court discusses two of these three elements, below.

### a. Control

Dinsdale argues that the uncontroverted facts show it lacked control over Mr. Leonard, and that absence is a "glaring shortcoming" in plaintiff's proof. Doc. 103 at 17. The controlling facts, Dinsdale argues, show that it never controlled Mr. Leonard's decision to attend plaintiff's auction or his decisions which livestock to buy, if any. Dinsdale also notes that Mr. Leonard purchased some cattle that did not meet Dinsdale's specifications.[28] Dinsdale argues that Mr. Leonard—not Dinsdale—made decisions about trucking and transportation, insurance, and dealer markups, which demonstrate that Mr. Leonard controlled the transaction.

Plaintiff responds with arguments claiming that Dinsdale told Mr. Leonard "where to go, when to go, what to buy, and where to send it." Doc. 117 at 18. Plaintiff also asserts that Mr. Leonard would not have purchased any cattle without Dinsdale's order. Plaintiff contends that Mr. Leonard's direct shipment of the cattle to Dinsdale, and the shipping arrangements he made before the auction, demonstrate that Mr. Leonard "knew he had an order before the sale."[29] *Id.* at

---

[28] Dinsdale argues that Mr. Leonard resold some cattle he bought that day to other sellers. Doc. 103 at 12. For support, Dinsdale cites Mr. Leonard's deposition testimony that he "took off" some cattle that "didn't fit and didn't send them," but rather "resold them [and] got rid of them." *Id.* (citing Leonard Dep. 309:6–310:13). Plaintiff controverts this fact, also citing Mr. Leonard's deposition testimony to the effect that he "transported to Dinsdale the same 668 head that [he] bought at Rezac" on September 29, 2015. Doc. 117 at 6 (citing Leonard Dep. 309:23–25).

[29] Dinsdale argues that Mr. Wahlert placed no order with Mr. Leonard for the cattle at issue. Doc. 103 at 7–9 (citing Wahlert Decl. ¶ 11 ("Dinsdale Bros. never indicated to Leonard that he was obligated to purchase cattle for Dinsdale Bros.")); Doc. 115 at 7 (citing Wahlert Dep. 25:15–26:19 ("[Mr. Leonard]

19. And plaintiff asserts that Mr. Leonard told plaintiff he was acting on Dinsdale's behalf before he shipped the cattle. In plaintiff's view, Mr. Leonard "was not free to sell the St. Marys Livestock to anyone else, and, in fact, turned down an offer from at least one other buyer." *Id.*

This court previously has recognized that an alleged principal's control over a putative agent's business affairs and policies is one fact tending to establish a principal-agent relationship. But this kind of control is not essential to the "control" element of an agency relationship. Doc. 55 at 18–19 (citing *AgriStor Leasing*, 634 F. Supp. at 1215). The "Kansas Supreme Court . . . has defined an 'agent' as one who 'act[s] on [a] principal's behalf and subject to the principal's control." *Brady Campaign to Prevent Gun Violence v. Brownback*, 110 F. Supp. 3d 1086, 1101, 1101 n.73 (D. Kan. 2015) (first citing *Golden Rule Ins. Co.*, 335 P.3d at 1188; then citing 3 Am. Jur. 2d Agency § 2 ("Indeed, the essential feature of agency is the right of control, which right includes the right to dictate the means and details of the agent's performance.")). The central tenet of these Kansas authorities is clear: the agent must be subject to *some* type of control from the principal.

Here, even construing the facts and all inferences in plaintiff's favor, no summary judgment evidence can support a finding that Dinsdale possessed the right to control Mr. Leonard. The undisputed facts demonstrate that Mr. Leonard already had planned to attend plaintiff's cattle auction—an auction Mr. Leonard attended nearly every week. The summary judgment facts also show that Mr. Wahlert, in a second phone call with Mr. Leonard the morning

---

was going to buy cattle that day. Not necessarily had to be for us.")). But plaintiff asserts that Mr. Leonard received an order from Mr. Wahlert. *See* Doc. 111 at 5; Doc. 117 at 2–9 (first citing Leonard Dep. 17:4–19:2, 21:10–22:6 ("[W]hen somebody's giving you an order before the sale, you have to charge a fee that is within the realm of what's justified in the industry."), 27:9–28:20 ("If they hadn't given me that order, I would not have bought [the cattle]."); then citing C. Dinsdale Dep. 45:15–24 ("Dave [Wahlert] gave [Mr. Leonard] an order to buy cattle.")).

of the auction, informed Mr. Leonard of the types of cattle in which Dinsdale had expressed an interest.[30]  Mr. Wahlert and Mr. Leonard never discussed price or quantity terms.

In a light most favorable to plaintiff, the court carefully considers the following uncontroverted facts:  (1) Mr. Leonard made arrangements to transport the cattle the morning of the auction, before he had purchased any; and (2) Mr. Leonard turned down a sale of these cattle to a third party because, he testified, "[he] told [the third party] . . . [he] had an order and [he] was bound by [his] responsibility to give [the cattle] to the guy that gave [him] the order."  Doc. 111-6 at 5 (Leonard Dep. 25:1–6).  The court considers the parties' dispute whether Mr. Leonard resold some of the cattle he purchased on September 29, 2015, and, in turn, whether he purchased any cattle that did not meet Dinsdale's specifications.  The court also considers the

---

[30]    The court focuses its analysis on two aspects of deposition testimony in the record:  one from Mr. Wahlert, and one from Mr. Leonard.  Mr. Leonard testified that he

> got to the car and I called Dave [Wahlert] and I said, "Well, I'm here and they got 23 or 400 cattle.["]  And again, the next shock he said, "Well, we want to try to do something." And I said, "Really, what do you want to do?"  And he said, "Well, don't buy any calfs [sic]," . . . .  He said, "Don't buy any calves, and don't buy any big nine weight steers or big eight weight heifers."  He says, "Try to stay under a nine weight steer and stay under an eight weight heifer, but we want to try to get something done."  I said, "Well, what do you want to give?"  Never mentioned a price, another shock to me.

Doc. 111-6 at 3 (Leonard Dep. 17:16–18:6).  Mr. Wahlert testified as follows:

> Q.  And so did Mr. Leonard in fact call you that day?
>
> A.  Yes.
>
> Q.  And did you tell him that you were in and to go ahead?
>
> A.  I told him we could—if he could source some cattle, we could use them.
>
> Q.  Okay.  And so you expected if he was able to buy good cattle at a reasonable price, he was going to buy you cattle that day?
>
> A.  He was going to buy cattle that day.  Not necessarily had to be for us.

Doc. 111-2 at 5 (Wahlert Dep. 26:8–9).

parties' dispute over whether Mr. Wahlert actually placed an order with Mr. Leonard for the cattle.

Construing all these facts and related inferences in plaintiff's favor, no summary judgment facts demonstrate that Dinsdale exercised a right to control the decisions Mr. Leonard made. No summary judgment evidence from Mr. Wahlert's conversations with Mr. Leonard—the only communications between Dinsdale and Mr. Leonard before Mr. Leonard's cattle purchase—supports a finding that Dinsdale had the right to control Mr. Leonard's decision to purchase the cattle or sell them only to Dinsdale. Though Mr. Leonard described Mr. Wahlert's specifications as an order, both in his deposition testimony and to prospective third-party buyers, this characterization does not mean that Dinsdale controlled Mr. Leonard's activities. The court returns to the contents of Mr. Leonard's conversations with Mr. Wahlert. Mr. Wahlert offered no specific instructions about price or quantity; instead, he provided directions about the weights of cattle Dinsdale was interested to buy and told Mr. Leonard that Dinsdale "want[ed] to try to get something done." Doc. 111-6 at 3 (Leonard Dep. 17:16–18:6). This discussion established Mr. Leonard and Dinsdale's relationship for the purposes of this transaction and, in turn, this case. No reasonable juror could conclude from it that Dinsdale exercised control over Mr. Leonard's cattle purchasing activities from plaintiff.

Finally, plaintiff draws comparisons to two additional cases: *Grandi v. Thomas*, 391 P.2d 35 (Kan. 1964), and *C.A. Karlan Furniture Co. v. Richardson*, 324 P.2d 180 (Kan. 1958). In *Grandi*, the Kansas Supreme Court considered a case where the plaintiff had contacted a "very good friend [of his] for thirty years . . . and explained to [the friend] that [the plaintiff] would not be able to attend [a horse sale] and asked [the friend] to bid the horse in for him." *Grandi*, 391 P.2d at 35–36. The Kansas Supreme Court held that "[e]ither plaintiff or his friend was qualified

as a bidder at the auction sale and the rule is that after the auctioneer's hammer fell, either could have been liable for the purchase price of the horse." *Id.* at 38. And in *C.A. Karlan Furniture Co.*, the Kansas Supreme Court held that an agency relationship existed where an alleged agent purchased a television set for the putative principal at the principal's request and had the set delivered directly to the principal's home. *C.A. Karlan Furniture Co.*, 324 P.2d at 182–83.

The court disagrees with the parallels plaintiff tries to draw between the facts of *Grandi* and *C.A. Karlan Furniture Co.* and the request Dinsdale made to Mr. Leonard. As the court discussed above, Mr. Leonard already had planned to attend plaintiff's cattle auction. And the evidence shows that Mr. Wahlert provided no specific instructions about price or quantity; instead, he provided instructions about the weights of cattle Dinsdale sought to buy and told Mr. Leonard merely that Dinsdale "want[ed] to try to get something done." Doc. 111-6 at 3 (Leonard Dep. 17:16–18:6). Expressions of interest like these are materially different from the principal's explicit request to purchase a particular horse (*Grandi*) and the principal's explicit request to purchase a television set (*C.A. Karlan Furniture Co.*). While there are some factual similarities between these cases and the facts here, those similarities do not extend to the essential element of control. The summary judgment facts do not provide any basis to find that Dinsdale exercised control over Mr. Leonard's cattle purchase.

### b. Benefit

Dinsdale next argues that Mr. Leonard generally purchased cattle for his own account as a dealer—not for Dinsdale's benefit. In other words, Dinsdale claims the summary judgment facts show Mr. Leonard buying cattle with the hope he could sell them to Dinsdale (and possibly, others) at a gain.

On September 29, 2015, Dinsdale asserts, Mr. Leonard purchased cattle outside of Dinsdale's specifications and resold some of those cattle to other buyers. Mr. Leonard provided no information to Dinsdale about how much he bid or how much he marked up his price for the cattle, which, Dinsdale argues, is information that would have benefited Dinsdale. Plaintiff argues that the cattle Mr. Leonard bought fit Dinsdale's specifications, and that he purchased no other cattle that day. By making such a purchase, plaintiff asserts, Mr. Leonard acted on Dinsdale's behalf and for its benefit.

Agents take on a fiduciary duty to their principals at the start of the agency relationship. *West v. Prairie State Bank*, 436 P.2d 402, 406 (Kan. 1968). Under this duty, an agent "must give the principal the benefit of all his knowledge and skill and cannot withhold or conceal information from the principal." *George v. Bolen*, 580 P.2d 1357, 1360 (Kan. Ct. App. 1978). This information includes "the value of the property" at issue. *West*, 436 P.2d at 406. And, "[i]t is well settled that an agent cannot deal with the subject matter of the agency for his own profit or advantage." *Id.* (citing *Merchant*, 322 P.2d at 740). "[I]f it appears that the agent has been guilty of any concealment or unfairness, or if he has taken any advantage of his confidential relation, the transaction will not be allowed to stand." *Id.* at 407.

Here, the summary judgment facts establish that Mr. Leonard's business operations themselves—as well as Mr. Leonard's relationship with Dinsdale via Mr. Wahlert—fall well short of the benefit requirement imposed by Kansas law. It is uncontroverted that Mr. Leonard never told Dinsdale the amount he had paid plaintiff for the cattle; Dinsdale also received no invoice or other documentation about Mr. Leonard's cattle purchase from plaintiff. Doc. 103 at 11 (citing Leonard Dep. 281:2–15); *see also* Doc. 103-5 at 70 (Leonard Dep. 280:19–22 ("Q. Okay. But it wouldn't have been part of your normal practice to send them a check to tell the

Dinsdale Brothers how much you had paid Rezac— A. No, it wouldn't be my normal practice.")). Mr. Leonard represented in his federally mandated annual reports that he added dealer markups to his cattle prices. Doc. 103-7. He only provided Dinsdale with invoices, and didn't provide internal worksheets referencing or tabulating those dealer markups. Doc. 103-4; *see also* Doc. 103 at 12 (citing Leonard Dep. 249:9–250:12).

Viewing the summary judgment facts in plaintiff's favor, Mr. Leonard's entire cattle dealing business falls outside the confines of a principal-agent relationship. Mr. Leonard's business operations allowed him to profit for his own benefit from the "subject matter of the agency"—the cattle. Mr. Leonard had knowledge and skills related to his business, such as his pricing model, that he normally did not share—and here, in fact, did not share—with Dinsdale or other cattle purchasers. Plaintiff argues that Mr. Leonard conferred a benefit on Dinsdale because he sent Dinsdale cattle he had purchased in conformity with its specifications. Certainly, plaintiff has adduced evidence that Mr. Leonard indeed purchased cattle satisfying the guidelines Mr. Wahlert outlined. And, as the court has discussed above, the issue whether Mr. Leonard resold some of the cattle he purchased on September 29, 2015—and, in turn, whether he purchased cattle that did not meet Dinsdale's specifications—is controverted. But this single disputed fact, in the light of all facts and inferences viewed most favorably to plaintiff, is immaterial in light of the summary judgment facts establishing that Mr. Leonard's overall business activity was conducted to benefit himself—not Dinsdale.

The evidence plaintiff provides is insufficient to nullify the summary judgment facts establishing Mr. Leonard's status as a dealer who independently profited from his cattle purchases and sales. Plaintiff's arguments sidestep the complex business dealings between Mr. Leonard and Dinsdale as putative agent and principal. Even construing all facts and inferences

in a light most favorable to plaintiff, the court concludes plaintiff has failed to adduce sufficient evidence to support a jury finding that Mr. Leonard acted primarily to benefit Dinsdale when he purchased cattle from plaintiff.

The court holds that the summary judgment facts present no triable issue over the question whether an agency relationship existed between Dinsdale and Mr. Leonard. First, no reasonable jury could find Mr. Leonard acted primarily to benefit Dinsdale when he purchased the cattle from plaintiff. And second, no reasonable jury could conclude that Dinsdale exercised control over Mr. Leonard's activities as a cattle purchaser on September 29, 2015. The court thus concludes that no agency relationship existed between Dinsdale and Mr. Leonard.[31] And because plaintiff has failed to provide sufficient evidence to survive summary judgment on these elements, the court need not proceed to the third step of analyzing Mr. Leonard and Dinsdale's agency relationship: "whether [the agent's] acts were within the scope of his authority as agent or were otherwise binding on" the principal. *Golden Rule*, 335 P.3d at 1186–87.

Having construed all facts and inferences in plaintiff's favor, the court concludes that plaintiff has not produced "'significantly probative'" facts in response to Dinsdale's Motion against its breach of contract claim. *See Cone*, 14 F.3d at 533 (quoting *Anderson*, 477 U.S. at 249–50). Plaintiff has failed to establish that Mr. Leonard functioned as Dinsdale's agent when he purchased cattle on September 29, 2015. Without that agency relationship, he was powerless to bind Dinsdale to a contract. And, of course, Dinsdale could not breach a contract that wasn't its contract. The court thus grants Dinsdale's Motion for Summary Judgment against that claim—Count I of plaintiff's Amended Complaint (Doc. 46).

---

[31]  Kansas law requires a plaintiff to satisfy a third element to support an agency relationship: by demonstrating both the principal and agent's assent to the relationship. But because the summary judgment facts show neither benefit nor control, the court need not discuss assent.

## 2. Plaintiff's conversion claim against Dinsdale

Dinsdale's motion asserts that it is entitled to summary judgment as a matter of law against plaintiff's conversion claim. When a contract governs rights in property that serves as the basis for a conversion claim, Dinsdale argues, the plaintiff must sue in contract—and not for conversion. *See* Doc. 103 at 24 (first citing *Regal Ware, Inc. v. Vita Craft Corp.*, 653 F. Supp. 2d 1146, 1152 (D. Kan. 2006); then citing *Bomhoff v. Nelnet Loan Servs., Inc.*, 109 P.3d 1241, 1246 (Kan. 2005)). Dinsdale premises its summary judgment argument here on the uncontroverted fact that plaintiff transferred the cattle in question to Mr. Leonard under a valid sales contract. This contract, Dinsdale argues, prevents plaintiff from suing Dinsdale in tort for conversion. *Id.* at 24–25.

Dinsdale also argues that it deserves summary judgment for a second, independent reason. Dinsdale contends that plaintiff has no admissible evidence capable of supporting a reasonable finding that "'Dinsdale exercised ownership over [the cattle] without authorization.'" *Id.* at 25 (citing Doc. 55 at 31 (Memorandum & Order denying Dinsdale's Motion to Dismiss dated June 6, 2017)). Dinsdale asserts that there is no dispute: it validly contracted with Mr. Leonard to purchase cattle from Mr. Leonard after he had purchased those same cattle from plaintiff. Because plaintiff had transferred property rights in the cattle to Mr. Leonard, Dinsdale contends, plaintiff no longer can prevail on a conversion claim that is premised on those cattle.

Plaintiff opposes the motion, arguing, principally, that Dinsdale had actual notice plaintiff never was paid for the cattle at issue and, thus, Dinsdale knew a defect existed in the cattle's chain of title. Thus, plaintiff contends, its conversion claim does not "rely[] on conversion to avoid the consequences of a contract." Doc. 117 at 11. Instead, plaintiff argues that the conversion claim against Dinsdale survives for trial because: (1) Dinsdale knew the cattle sale

"violated [plaintiff's] rights because [plaintiff] was never paid"; (2) Dinsdale received the cattle

with knowledge that Pinnacle was dishonoring Mr. Leonard's checks; (3) when Dinsdale

received the cattle, Dinsdale knew Mr. Leonard had written a check to plaintiff to cover the

purchase; (4) Pinnacle told Dinsdale to pay plaintiff directly; (5) Chris Dinsdale considered

paying plaintiff directly; and (6) Dinsdale knew the check Mr. Leonard had written plaintiff "had

not been presented for payment and would not get paid when it sent the wire to Pinnacle on

October 1, 2015." Doc. 117 at 11–12. These facts, plaintiff asserts, demonstrate that Dinsdale

knew it had acquired, at best, voidable title in the cattle and thus was not a good faith purchaser.

Plaintiff also contends Mr. Leonard had voidable title because the check he wrote to plaintiff to

pay for the cattle was returned for insufficient funds. *Id.* at 13 (citing Kan. Stat. Ann. § 84-2-

403).

In its Reply (Doc. 119), Dinsdale asserts that plaintiff fails to connect conversion liability

to plaintiff's assertion that Dinsdale did not qualify as a good faith purchaser. Dinsdale argues

that it received title to the cattle under its purchase contract with Mr. Leonard, and its

"authorization [did not] somehow vanish when [it] learned of [plaintiff's] problems with

Leonard." Doc. 119 at 19. Dinsdale also contends that plaintiff is not entitled to an immediate

right of possession—an essential element of a conversion claim—simply because of a "payment

dispute." *Id.*

Earlier motions in this case raised this issue. In its Memorandum and Order denying

Dinsdale's Motion to Dismiss (Doc. 55), the court recognized earlier Kansas holdings that,

"when parties enter into a contract which defines their respective rights and duties, tort causes of

action concerning the same subject matter as the contract are precluded." Doc. 55 at 28 (citing

*Regal Ware Inc.*, 653 F. Supp. 2d at 1152) (further citations omitted). But these cases also have

warned courts to construe this rule narrowly.  *Id.* (citing *Burcham v. Unison Bancorp., Inc.*, 77 P.3d 130, 145 (Kan. 2003)).  Dinsdale, in its Motion to Dismiss, appeared to premise its contract-based argument on invoices issued by Mr. Leonard to Dinsdale, claiming that they demonstrate that Dinsdale was party to a "lawful sales contract."  Doc. 55 at 29.  Here again, Dinsdale directs the court to the same invoices and asserts essentially the same argument—*i.e.*, that the invoice contract bars plaintiff from prevailing on a conversion claim.  *See* Doc. 103 at 24 (citing Doc. 103-2).

The court applies the same reasoning now as it did in its Order denying Dinsdale's Motion to Dismiss:  plaintiff never argues that it is a party to a contract between Mr. Leonard and Dinsdale.  So, the invoice contract (or contracts) on which Dinsdale's argument relies—an agreement between Dinsdale and Mr. Leonard—cannot exclusively define the rights and duties between Dinsdale and plaintiff because plaintiff isn't a party to the Dinsdale/Leonard contract. The court thus agrees with plaintiff.  On the summary judgment facts, at least, plaintiff's conversion claim is not barred by the existence of a contract.

Kansas law defines "[c]onversion [as] the 'unauthorized assumption or exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights.'"  *Armstrong v. Bromley Quarry & Asphalt, Inc.*, 378 P.3d 1090, 1095 (Kan. 2016) (quoting *Bomhoff*, 109 P.3d at 1246).  A "payment by check complete[s] a sale except [the purchaser's] title could be defeated by the [seller] upon dishonor of [the purchaser's] checks." *Iola State Bank*, 679 P.2d at 726.  "A defaulting buyer has the power to transfer greater title than it can claim" under Kansas law:  "when goods have been delivered under a transaction of purchase the purchaser has power to transfer good title even though the delivery was in exchange for a check which is later dishonored."  *Dick Hatfield Chevrolet, Inc. v. Bob Watson Motors,*

*Inc.*, 708 P.2d 494, 497 (Kan. 1985). A defaulting buyer "could [thus] transfer good title to a 'good faith purchaser for value.'" *Dick Hatfield Chevrolet, Inc.*, 708 P.2d at 497 (quoting Kan. Stat. Ann. §§ 84-2-403, 84-1-201). A Kansas statute defines the "good faith" component of "good faith purchaser" as "honesty in fact and the observance of reasonable commercial standards of fair dealing." Kan. Stat. Ann. § 84-1-201(b)(20); *see also Dick Hatfield Chevrolet, Inc.*, 708 P.2d at 497 (defining "good faith" as "honesty in fact in the conduct or transaction concerned").

The question whether Dinsdale took good title to the cattle turns on its status as a good faith purchaser under Kansas law. If Dinsdale was indeed a good faith purchaser of the cattle, plaintiff has no recognizable right of ownership in the cattle—and thus, no capacity to make a conversion claim because Dinsdale held good title to them. Conversely, if Dinsdale is not a good faith purchaser of the cattle, plaintiff has a right to claim a right in ownership that it can exercise over the cattle—and thus, a sufficient basis for its conversion claim because Dinsdale does not hold good title to them.

Several facts—or at least the version of the facts viewed in plaintiff's favor—place Dinsdale's status as a "good faith purchaser" in question. By morning of September 30, 2015— the day when Dinsdale took possession of the cattle from Mr. Leonard—Pinnacle's representatives had shared several pertinent facts with Dinsdale. Namely: (1) Mr. Leonard had written a check to pay plaintiff for the cattle; (2) Mr. Leonard's account with Pinnacle was $1,000,000 overdrawn as September 30 began; and (3) Pinnacle was returning Mr. Leonard's checks for insufficient funds. Also, Pinnacle's President Marc Hock suggested in two emails to Chris Dinsdale, among others, that Dinsdale pay plaintiff directly. And Chris Dinsdale testified that he considered paying plaintiff directly. He knew Mr. Leonard was having difficulty

maintaining a positive balance in his bank account.  Chris Dinsdale also knew plaintiff had not

been paid for the cattle on September 30, 2015—the day when Dinsdale took possession of the

cattle, and Mr. Leonard's check to plaintiff had not yet been presented for payment.  Several

Pinnacle representatives testified that previously, they had not had conversations with the

Dinsdale family about the timing of wired funds.  Specifically, Pinnacle's Mr. Hock testified that

the cattle transaction at issue here was unique because a member of Pinnacle's Board of

Directors was involved in wiring funds to the bank.

Construing all facts and inferences in plaintiff's favor, plaintiff has articulated

"'significantly probative'" facts in response to Dinsdale's motion on the conversion claim.  *See*

*Cone*, 14 F.3d at 533 (quoting *Anderson*, 477 U.S. at 249–50).  Chris Dinsdale's knowledge

about the problems in Mr. Leonard's account, decisions about when and where to wire funds,

and communications with Pinnacle representatives give rise to a "genuine issue for trial" about

Dinsdale's status as a good faith purchaser.  *Hammad*, 192 F. Supp. 2d at 1227 (citing *Muck v.*

*United States*, 3 F.3d 1378, 1380 (10th Cir. 1993)).  From these facts, a reasonable jury could

conclude that Dinsdale was less than "honest[] in fact" or that it failed to observe "reasonable

commercial standards of fair dealing."  Kan. Stat. Ann. § 84-1-201(b)(20).  The trier of fact

would have to resolve these factual disputes to decide the questions about Dinsdale's honesty

and adherence to reasonable commercial standards of fair dealing.  Given these material factual

disputes, the court denies Dinsdale's Motion for Summary Judgment on plaintiff's conversion

claim.

### 3.  Plaintiff's civil conspiracy claim against Dinsdale

As already discussed elsewhere, a civil conspiracy claim requires proof of the

"commission of some wrong giving rise to a cause of action independent of the conspiracy."

*Stoldt*, 678 P.2d at 161.  Plaintiff here has met this requirement—for summary judgment purposes, that is—by establishing a conversion claim against Dinsdale that has survived summary judgment.

This conclusion leads the analysis to the rest of the requisites for a submissible civil conspiracy claim.  As already explained, Kansas law requires a civil conspiracy plaintiff to satisfy the following elements:  "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof."  *Citizens State Bank, Moundridge*, 603 P.2d at 613.  In other words, the Kansas Supreme Court has explained, "[a] civil conspiracy claim generally requires a plaintiff to establish concert of action or other facts and circumstances from which the natural inference arises that the unlawful, overt acts were committed in furtherance of a common design, intention, or purpose of the alleged conspirators."  *Aeroflex Wichita, Inc.*, 275 P.3d at 881–82 (internal quotations omitted).  "Conspiracy is not actionable without commission of some wrong giving rise to a cause of action independent of the conspiracy."  *Stoldt*, 678 P.2d at 161.  And "[b]ecause direct evidence is rarely available, a civil conspiracy may be proved by circumstantial evidence.  Consequently, the existence of the conspiracy may be proved by proving the acts of the various defendants."  *Vetter*, 913 P.2d at 1206 (citing *Nardyz*, 101 P.2d at 1045).

The summary judgment version of the facts show this much:  Dinsdale and Pinnacle communicated about Mr. Leonard's account and the transaction in question.  The content of these communications involved Chris Dinsdale's knowledge about problems with Mr. Leonard's account.  Also, their communications with one another involved discussion and decisions about when and where Dinsdale should send its wired funds.  And Chris Dinsdale knew that returning

checks on Mr. Leonard's account would "effectively shut[] down Leonard Cattle." Doc. 117 at 14 (first citing Kimball Dep. 30:21–31:2; then citing Doc. 111-8 at 16 (Dep. Ex. 82)). Also, plaintiff has directed the court to testimony by Pinnacle representatives conceding the unusual nature of the transaction at issue. Construing the facts and the inferences they will support most favorably to plaintiff, they present a "genuine issue for trial" about the second (an object for a conspiracy), third (meeting of minds on that object), fourth (at least one unlawful act), and fifth (proximately caused damages) elements of a civil conspiracy claim. *Hammad*, 192 F. Supp. 2d at 1227 (citing *Muck*, 3 F.3d at 1380). These factual disputes require the trier of fact to decide whether Dinsdale and Pinnacle formed an objective and agreed to act together unlawfully to affect plaintiff's putative interest in the property—*i.e.*, the cattle—and whether damages proximately resulted from any such actions.

In sum, a reasonable trier of fact, evaluating the communications between Dinsdale and Pinnacle, properly could infer that Dinsdale sought to maintain Mr. Leonard's account based on Dinsdale's knowledge of the account problems and subsequent decisions about when and where to send its wire. The trier of fact also reasonably could conclude that Dinsdale was not a good faith purchaser, and that it participated in a conspiracy to deprive plaintiff of the payment for the cattle. Plaintiff has adduced "significantly probative" facts, *Cone*, 14 F.3d at 533, and the court thus denies Dinsdale's motion against plaintiff's civil conspiracy claim.

### 4. Plaintiff's unjust enrichment and quantum meruit claims against Dinsdale

Next, Dinsdale argues that plaintiff's unjust enrichment and quantum meruit claims stem from Mr. Leonard's failure, as a third party, to perform his contract with plaintiff. Dinsdale directs the court to the Kansas Court of Appeals's reference to Restatement of Restitution § 110. It provides, "[a] person who has conferred a benefit upon another as the performance of a

contract with a third person is not entitled to restitution from the other merely because of the failure of performance by the third person." Doc. 103 at 27 (citing *J.W. Thompson Co.*, 758 P.2d at 745) (internal quotations omitted). Dinsdale argues that plaintiff has conferred no benefit on Dinsdale; Mr. Leonard provided the benefit—*i.e.*, the cattle—at issue under plaintiff's theory. And Dinsdale argues that "no inequitable circumstances" exist, such as plaintiff's changing position to its detriment based on a promise implied by law on Dinsdale's part. *Id.* at 28.

Responding, plaintiff asserts that genuine issues of material fact preclude summary judgment against plaintiff's unjust enrichment and quantum meruit claims. Specifically, it argues that Dinsdale: (1) knew the cattle at issue came from plaintiff; (2) acknowledged that plaintiff needed to be paid for Dinsdale to get clear title to the cattle; and (3) knew plaintiff never was paid. Plaintiff also asserts that Dinsdale received the cattle "with advance knowledge that [plaintiff] would not be paid, and Dinsdale Bros. did not care." Doc. 117 at 23.

As previously discussed, "[w]hen a court resolves a case based on quantum meruit, it finds that no contract existed. In such a case, the law creates a contract to prevent unjust enrichment." *Lindsey Masonry Co.*, 390 P.3d at 69. "To establish an unjust enrichment claim, a plaintiff must establish (1) the plaintiff conferred a benefit on the defendant; (2) the defendant appreciated and has knowledge of the benefit; and (3) the defendant accepted and retained the benefit under circumstances that make the retention unjust." *Univ. of Kan. Hosp. Auth.*, 327 P.3d at 441 (citing *Nelson*, 205 P.3d at 715) (other citations omitted); *Haz-Mat Response, Inc.*, 910 P.2d at 846–47.

But the Kansas Supreme Court has construed portions of this rule broadly. *Walsh*, 2016 WL 4750102, at *20–21. Specifically, *Walsh* explained, "a plaintiff may sue a defendant for unjust enrichment and recover by means of a constructive trust so long as the defendant has 'an

equitable duty to convey [certain property] to [the plaintiff] on the ground that he would be unjustly enriched if he were permitted to retain it.'" *Id.* (quoting *Nelson*, 205 P.3d at 720). The Kansas Court of Appeals concluded, "the fact that the property is in the hands of a third party does not erase the need to establish an equitable duty to return the property." *Nelson*, 205 P.3d at 724. "[T]here must exist some special circumstances that would justify requiring . . . [defendant] to pay. . . . [A]n essential prerequisite to such liability is the acceptance by . . . [defendant] of benefits rendered under such circumstances as reasonably notify . . . [defendant] that the one performing such services expected to be compensated therefor by . . . [defendant]." *Haz-Mat Response, Inc.*, 910 P.2d at 847.

Construing all facts and inferences favorably to plaintiff, plaintiff has directed the court to sufficient "'significantly probative'" facts demonstrating a genuine issue for trial whether Dinsdale had reasonable notice of plaintiff's expectation of payment. *See Cone*, 14 F.3d at 533 (quoting *Anderson*, 477 U.S. at 249–50). Plaintiff directs the court to communications between Pinnacle and Dinsdale, ones the court already has summarized. A reasonable factfinder could view these communications to establish Chris Dinsdale's knowledge of problems with Mr. Leonard's account. And they involved discussion and decisions about when and where Dinsdale should send its wired funds. Also, a rational trier of fact could consider Dinsdale's knowledge about the source of the cattle, the problems with Mr. Leonard's account, and the fact that plaintiff had not been paid on the day Dinsdale accepted the cattle and find that Dinsdale had reasonable notice of plaintiff's payment expectation. *See Hammad*, 192 F. Supp. 2d at 1227 (citing *Adler*, 144 F.3d at 670).

As with plaintiff's equitable claims against Pinnacle, the court concludes that an evidentiary record will help the court assess the full range of factors that influence plaintiff's

equitable theories.  Also, leaving these equitable theories in the case for now is unlikely to expand the trial materially.  The court denies Dinsdale's motions against plaintiff's quantum meruit and unjust enrichment claims.

In sum, the court grants Dinsdale's motion for summary judgment against plaintiff's breach of contract claim.  And the court denies Dinsdale's motion for summary judgment against plaintiff's claims for conversion, civil conspiracy, and unjust enrichment and quantum meruit.

### D.  Plaintiff's Motion for Summary Judgment (Doc. 110)

Plaintiff makes its own motion for summary judgment.  Summarized, it asserts that the court should grant summary judgment in its favor on five issues or claims.  They are: (1) Dinsdale's Counterclaim asserting that it has good title to the cattle in question; (2) plaintiff's conversion claims against Dinsdale and Pinnacle; and (3) plaintiff's civil conspiracy claims against Dinsdale and Pinnacle.

The court denies each aspect of plaintiff's motion.  It explains why, in the following sections.

### 1.  Dinsdale's Counterclaim

Plaintiff asserts that Dinsdale's knowledge that plaintiff had not been paid when it received the cattle at issue precludes Dinsdale from establishing it was a good faith purchaser.  In its Consolidated Reply Memorandum (Doc. 121), plaintiff directs the court to *Kaw Valley State Bank & Trust Co. v. Riddle*, 549 P.2d 927 (Kan. 1976).  There, the Kansas Supreme Court evaluated the Kansas statute defining "good faith purchasers" to decide whether a bank was a holder in due course of an instrument.  *Id.* at 932–33.  Specifically, the Supreme Court concluded that "a holder in due course [must] take the instrument without notice of any defense to the instrument."  *Id.* at 933.  And "notice" encompasses "actual knowledge," "recei[pt] [of] a notice

or notification of it," or "reason to know" based on "all the facts and circumstances known . . . at the time in question." *Id.*

Here, plaintiff argues, Dinsdale knew Mr. Leonard had purchased the cattle with a check and that he lacked sufficient funds to pay for the cattle. Plaintiff also contends Dinsdale "knew [plaintiff] would not get paid for the St. Marys Livestock unless Dinsdale Bros. paid [plaintiff] directly." Doc. 111 at 17 (additionally arguing that Dinsdale "knew when it sent the sale proceeds to Pinnacle that [plaintiff] would not get paid for the St. Marys Livestock"). Plaintiff bases its argument on Marc Hock's two suggestions to Chris Dinsdale to wire the purchasing funds directly to plaintiff. *See* Doc. 111-5 at 5–6 (Hock Dep. 47:22–50:4), 6–8 (Hock Dep. 50:2–58:6), 24, 26. Dinsdale's knowledge, plaintiff argues, suffices to establish notice of plaintiff's rights in the cattle. And plaintiff asserts Dinsdale had a legal duty to deliver the value of the cattle to plaintiff because Dinsdale cannot deliver the cattle itself.

Dinsdale's response contends that its subjective intent was to comport with "a course of dealing in the written sale contract and cemented by hundreds of prior transactions." Doc. 115 at 14–15 (citing *Hammer v. Thompson*, 129 P.3d 609, 617 (Kan. Ct. App. 2006)). Dinsdale argues that "[l]ater notice of [Mr.] Leonard's financial troubles did not entitle Dinsdale Bros. to back out of its purchase agreement, and it certainly did not somehow negate Dinsdale Bros.' good faith." *Id.* Finally, Dinsdale asserts, it purchased the cattle from Mr. Leonard; it did not have an entrustment relationship with Mr. Leonard. Dinsdale thus "acquired all title to the Cattle which Leonard had the power to transfer."

When discussing Dinsdale's motion for summary judgment on plaintiff's conversion claim, above, the court explained that "[a] defaulting buyer has the power to transfer greater title than it can claim" under Kansas law: "when goods have been delivered under a transaction of

purchase the purchaser has power to transfer good title even though the delivery was in exchange for a check which is later dishonored." *Dick Hatfield Chevrolet, Inc.*, 708 P.2d at 497. A defaulting buyer "could [thus] transfer good title to a 'good faith purchaser for value.'" *Id.* (citing Kan. Stat. Ann. §§ 84-2-403, 84-1-201). Kansas statutes define "good faith" as "honesty in fact and the observance of reasonable commercial standards of fair dealing." Kan. Stat. Ann. § 84-1-201(b)(20); *see also Dick Hatfield Chevrolet, Inc.*, 708 P.2d at 497 (defining "good faith" as "honesty in fact in the conduct or transaction concerned"). This "good faith purchaser" standard "includ[es] both the subjective element of honesty in fact and the objective element of the observance of reasonable commercial standards of fair dealing." Kan. Stat. Ann. § 84-1-201 cmt. 20. Whether Dinsdale took good title to the cattle thus turns on its status as a good faith purchaser.

Construing all facts and inferences in a light most favorable to Dinsdale, the court concludes Dinsdale has identified sufficient "'significantly probative'" facts demonstrating a genuine issue for trial whether Dinsdale was a good faith purchaser from Mr. Leonard. *See Cone*, 14 F.3d at 533 (quoting *Anderson*, 477 U.S. at 249–50). Relevant to the good faith purchaser inquiry, Dinsdale directs the court to its subjective intent to conform its actions to a course of dealing that Dinsdale and Mr. Leonard previously had established. By the same token, Dinsdale points to its earlier transactions with Mr. Leonard and its conformity with those transactions as something of an established yardstick showing that it complied with "'reasonable commercial standards.'" Doc. 115 at 14–15 (citing *Hammer*, 129 P.3d at 617).

A reasonable trier of fact could find from Dinsdale's view of the summary judgment facts—the version of the facts, of course, that governs plaintiff's motion—that Dinsdale had insufficient notice of plaintiff's claim to the cattle. On the day Dinsdale received the cattle—

September 30, 2015—Chris Dinsdale was receiving information about Mr. Leonard's $1,000,000 overdraft, Pinnacle's decision to return checks presented against Mr. Leonard's account for insufficient funds, Mr. Leonard's check written to plaintiff, and Marc Hock's emailed suggestion that Chris Dinsdale pay plaintiff directly. Chris Dinsdale testified that: (1) he "wasn't sure [Mr. Leonard] was having problems"; (2) he "didn't know if [plaintiff was] going to get paid"; and (3) he thought "there was a possibility" Mr. Leonard's account would have insufficient funds to cover the check Mr. Leonard wrote to plaintiff. Doc. 111-3 at 9 (C. Dinsdale Dep. 61:1–62:2). But Mr. Dinsdale's testimony does not clearly establish when he formulated concerns about Mr. Leonard's account. Chris Dinsdale also was told on September 30, 2015, that the check Mr. Leonard wrote plaintiff had not been presented against Mr. Leonard's account yet.

The trier of fact reasonably might find that this snapshot of Mr. Leonard's account on September 30, 2015, did not provide sufficient information to rise to the level of notice—as the *Kaw Valley State Bank* court defined it—of "any defense" against Dinsdale's transaction with Mr. Leonard. *See Kaw Valley State Bank*, 549 P.2d at 933. And a reasonable trier of fact also could determine that Dinsdale lacked notice that Mr. Leonard's account still would be overdrawn when Mr. Leonard's check to plaintiff eventually was presented for payment. Certainly, the uncertainties about Mr. Leonard's account when Dinsdale received the cattle makes the question of summary judgment on the "good faith purchaser" question something of a close call. But still, it presents a fact issue that the court is not permitted to decide. Also, a trier of fact could find for either Dinsdale or plaintiff on the question whether Dinsdale satisfied both components for a good faith purchaser when it bought these cattle.

The court denies plaintiff's motion for summary judgment against Dinsdale's counterclaim.

### 2. Plaintiff's conversion claims

Next, the court considers plaintiff's motion for summary judgment in its favor on the conversion claims against Dinsdale and Pinnacle.

### a. Plaintiff's conversion claim against Dinsdale

Plaintiff's arguments supporting its motion for summary judgment on the conversion claim largely track its arguments opposing Dinsdale's motion for summary judgment on this claim. Likewise, Dinsdale's arguments reprise the ones it made to support its motion for summary judgment against the conversion claim. Plaintiff adds one new twist, *i.e.*, that it demanded reclamation of the cattle from Dinsdale on October 12, 2015. Plaintiff also contends that Dinsdale was not a good faith purchaser, but nonetheless "continued to exercise ownership over and dispose of the St. Marys Livestock to the exclusion of [plaintiff's] rights." Doc. 111 at 19.

Some pieces of deposition testimony hint at some form of common ownership between Dinsdale and D&D Feedlot—the place where plaintiff sent its letter demanding return of the cattle. *See* Doc. 111-11 at 4 (Rezac Dep. 187:11–17), 5 (Dep. Ex. 142). But plaintiff has not adduced evidence establishing that Dinsdale owned or was affiliated with D&D Feedlot West as an uncontroverted fact.[32] So, the court cannot find that it is uncontroverted that D&D Feedlot West was affiliated with Dinsdale. Nonetheless, the central issue with plaintiff's summary judgment motion on the conversion claim is plaintiff's argument that Dinsdale exercised

---

[32]     As noted in Section I.C, *supra*, plaintiff asserts in its Consolidated Reply Memorandum (Doc. 121) that D&D Feedlot is a "Dinsdale-affiliated entity" and that Dinsdale refused plaintiff's demand to return the cattle. The problem is that plaintiff has failed to cite any portion of the summary judgment record to support this fact. *See* Doc. 111-11 at 4 (Rezac Dep. 187:11–17), 5 (Dep. Ex. 142); *see also* Doc. 121 at 10 (citing Doc. 37 at 7 ("On September 30, 2015 the Cattle were delivered to Dinsdale Bros.[] Dinsdale Bros. placed the Cattle in the care of Pacific Edge Land And Cattle, L.L.C. d/b/a D&D Feedlot West ("D&D") for the purpose of feed and care.")).

unauthorized ownership rights over the cattle because Dinsdale was not a good faith purchaser. The court already has discussed the close issue whether Dinsdale qualified as a good faith purchaser. *See* Section III.D.1, *supra*. And the court concludes here, too, that a trier of fact must determine whether Dinsdale qualified as a good faith purchaser. Because plaintiff's theory of its conversion claim turns on Dinsdale's status as a good faith purchaser, and because the court has concluded that it must submit that issue to the trier of fact, the court denies plaintiff's motion for summary judgment on its conversion claim against Dinsdale.

### b. Plaintiff's conversion claim against Pinnacle

Plaintiff's arguments on its conversion claim against Pinnacle mirror the contentions plaintiff made when opposing Pinnacle's summary judgment motion on the same claim. And Pinnacle's responsive arguments largely replicate those it made in its own motion for summary judgment against plaintiff's conversion claim. Essentially, plaintiff focuses on the actual, documented knowledge that Pinnacle possessed about Dinsdale's wire. Plaintiff underscores that Dinsdale's wired funds were "[s]pecifically [i]dentifiable and [t]raceable," and that those funds amounted to a special deposit. Doc. 121 at 25. Pinnacle also argues that because it did not set off these funds against debts Mr. Leonard owed Pinnacle or otherwise hold these funds in trust, it is not liable to plaintiff. Pinnacle argues that Kansas law will not permit plaintiff to show Pinnacle is liable under either of those two exceptions to the general rule.

The same controverted fact the court discussed when considering Pinnacle's summary judgment motion precludes summary judgment in plaintiff's favor. The court briefly summarizes that dispute in this section, as it already has discussed it in more detail.

Plaintiff asserts that Pinnacle "decided to pay the St. Marys Livestock sale proceeds to holders of others['] checks drawn on Leonard's account." Doc. 111 at 9–10. Plaintiff also cites

excepts from Marc Hock's deposition.  Plaintiff argues that those excerpts show that the

Dinsdale wire was intended to cover the check Mr. Leonard had written to plaintiff.  Doc. 116 at

3–4 (citing Hock Dep. 59:16–60:10, 68:2–69:14, 130:3–15).  And plaintiff notes that Mr.

Leonard testified he had told Pinnacle that the Dinsdale wire was intended to cover the check he

had written to plaintiff.  Doc. 116 at 4 (citing Leonard Dep. 104:24–106:20, 133:9–134:7).

Pinnacle responds, emphasizing the record evidence showing that Mr. Leonard's account

contained insufficient funds to cover the check Mr. Leonard wrote to plaintiff.  Doc. 105 at 11

(citing Kimball Decl. ¶ 16); Doc. 118 at 1–2.  Pinnacle argues that its policy to honor checks in

order, smallest amount to largest, and Mr. Leonard's check to plaintiff as the largest one

presented against the Leonard account on October 6, 2015, establish that the account contained

insufficient funds to honor this check.  Pinnacle also notes that Mr. Leonard testified he provided

Pinnacle with no instructions about the order in which to pay the checks presented against his

account.  Doc. 105 at 11 (citing Leonard Dep. 135:22–136:19).  For the same reasons already

discussed, the court considers this fact—*i.e.*, whether Pinnacle knew the Dinsdale wire was

intended to pay the check Mr. Leonard had written to plaintiff—controverted for purposes of

plaintiff's motion.  Because the summary judgment record presents a genuine issue of material

fact, the court denies plaintiff's motion for summary judgment on this claim.

Plaintiff's motion also asserts that it deserves summary judgment on the amount of loss it

sustained.  Plaintiff contends the value of the property Dinsdale converted is undisputed, and

conversion is a strict liability tort.  *See Millenium Fin. Servs., L.L.C. v. Thole*, 74 P.3d 57, 64

(Kan. Ct. App. 2003) ("Under Kansas law, '[c]onversion is a strict liability tort.'").  But the court

has decided it must deny plaintiff's summary judgment motion on its conversion claim, and the

court cannot decide its arguments about damages recoverable on this claim. The court denies plaintiff's motion on the issue of damages.

### 3. Plaintiff's civil conspiracy claims

Last, the court turns to plaintiff's argument that it is entitled to judgment on its civil conspiracy claims against Dinsdale and Pinnacle. To avoid repetition, the court evaluates these together, since this claim melds the two defendants together.

Plaintiff, Pinnacle, and Dinsdale all assert remarkably similar arguments in their briefing on plaintiff's motion as they did in their papers addressing Pinnacle and Dinsdale's motions. Plaintiff underscores that it need not "prove an actual agreement occurred to show a meeting of the minds—only that the separate acts taken by the conspirators operated under common objectives." Doc. 111 at 25 (citing *Nardyz*, 101 P.2d at 1048). To that end, plaintiff again argues that the unusual communications between Pinnacle and Dinsdale provide the lynchpin to prevail on a civil conspiracy claim.

For its part, Pinnacle asserts that neither Dinsdale nor Pinnacle owed any duty to "share information with [plaintiff] about the status of Leonard's account." Doc. 114 at 13. Pinnacle also argues that it did not know when Mr. Leonard's check to plaintiff would be presented against his account; nor did Pinnacle "orchestrate matters relating to . . . [plaintiff's] check." *Id.* And, Dinsdale contends, Pinnacle communicated with Chris Dinsdale in his capacity as a director of Pinnacle's holding company—not as a Dinsdale representative. This means, Dinsdale says, plaintiff's conspiracy claim accuses Pinnacle of conspiring with itself. Pinnacle was incapable of conspiring with itself, Dinsdale argues. Dinsdale also argues that Chris Dinsdale declined to follow Pinnacle President and Director Marc Hock's suggestion that he wire the

purchase funds directly to plaintiff; this decision, Dinsdale contends, shows the "*absence* of [a] meeting of minds."  Doc. 115 at 20.

Finally, in its Consolidated Reply Memorandum (Doc. 121), plaintiff responds that Chris Dinsdale's dual role with Dinsdale and Pinnacle simply bolsters its civil conspiracy claim. Plaintiff asserts that defendants' agreement to withhold information about Mr. Leonard's problems sufficed to further their conspiracy's goals.  And plaintiff characterizes Mr. Hock's suggestion as "one dissenting voice" that cannot "defeat" the broader conspiracy between Pinnacle and Dinsdale.  Doc. 121 at 31.

No lengthy analysis is required.  The court already has concluded that a genuine issue of material fact—*i.e.*, whether Pinnacle knew the Dinsdale wire was intended to pay the check Mr. Leonard wrote to plaintiff—precludes plaintiff's summary judgment motion on its conversion claim against Pinnacle.  The court also has concluded that Dinsdale raises a genuine fact issue— central to plaintiff's conversion claim against it—about its status as a good faith purchaser.  The court must submit those factual disputes to a jury, so it cannot decide this claim on summary judgment.  Because genuine, material fact issues preclude summary judgment on one element of plaintiff's civil conspiracy claims against each defendant, the court denies plaintiff's Motion for Summary Judgment on these claims.

## IV.    Conclusion

For reasons explained above, the court denies defendant Pinnacle Bank's Motion for Summary Judgment (Doc. 104) in its entirety.  The court grants defendant Dinsdale's Motion for Summary Judgment (Doc. 102) in part and denies it in part.  Specifically, the court grants summary judgment against plaintiff's breach of contract claim but denies summary judgment

against plaintiff's conversion, civil conspiracy, and unjust enrichment claims. And the court denies plaintiff's Motion for Summary Judgment (Doc. 110) in its entirety.

**IT IS THEREFORE ORDERED THAT** defendant Pinnacle Bank's Motion for Summary Judgment (Doc. 104) is denied in its entirety.

**IT IS FURTHER ORDERED THAT** defendant Dinsdale Bros., Inc.'s Motion for Summary Judgment (Doc. 102) is granted in part and denied in part, as set forth in this order.

**IT IS FURTHER ORDERED THAT** plaintiff Rezac Livestock Commission Co., Inc.'s Motion for Summary Judgment (Doc. 110) is denied in its entirety.

**IT IS SO ORDERED.**

**Dated this 21st day of December, 2018, at Kansas City, Kansas.**

s/ Daniel D. Crabtree
**Daniel D. Crabtree**
**United States District Judge**