# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

REZAC LIVESTOCK COMMISSION CO., INC.,

      Plaintiff,

v.

      Case No. 15-4958-DDC-KGS

PINNACLE BANK, et al.,

      Defendants.

## MEMORANDUM AND ORDER

This case originated from a substantial cattle transaction gone wrong. In simplest terms, plaintiff sold a million dollars' worth of cattle to an individual who didn't make good on his promise to pay. When plaintiff learned that the buyer's check wouldn't clear, it was too late to recover the cattle. So, plaintiff was out the cattle and didn't receive the payment it was promised. Sensing that it was unlikely to recover against the defaulting cattle buyer, plaintiff has sued two defendants. The first is Pinnacle Bank, the bank of the defaulting cattle buyer. The second defendant is Dinsdale Bros., Inc., the company who purchased the cattle from the individual who defaulted on his promise to pay plaintiff.

After spirited discovery and motion practice, all three parties moved for summary judgment. *See* Docs. 102, 104, & 110. In a Memorandum and Order entered late last year, the court decided all three motions. *See* Doc. 125 (entered December 21, 2018). The court denied plaintiff's summary judgment motion in its entirety. Defendant Pinnacle's motion met the same fate. The ultimate purchaser of the cattle—Dinsdale—fared slightly better. The court granted Dinsdale's summary judgment motion against plaintiff's claim for breach of contract, but denied the rest of the motion. Altogether, these rulings meant that plaintiff's claims for conversion, civil

conspiracy, and unjust enrichment against both defendants would proceed to trial. Plaintiff's claim against Pinnacle for unjust enrichment also survived for trial.

Fourteen days after the summary judgment Order issued, Pinnacle Bank filed a Motion to Reconsider. *See* Doc. 127. This motion asked the court to reconsider its summary judgment ruling on the conversion claim against the bank. Plaintiff responded. *See* Doc. 131. Concluding that Pinnacle's reconsideration motion raised substantial legal questions, the court invited the parties to present oral argument. *See* Docs. 130 & 133. On February 1, 2019, counsel thoughtfully argued the difficult issues that inhere in the conversion claims. Pinnacle's arguments persuaded the court that it was a mistake to begin the trial with such substantial legal questions remaining unresolved. So, the court vacated the approaching trial date on its own motion. *See* Doc. 146.

While preparing for the February 1 oral argument on the reconsideration motion, the court encountered a statute that the summary judgment briefs hadn't discussed, at least not in any detail: Kan. Stat. Ann. § 84-4-303, part of the Uniform Commercial Code ("UCC"), as adopted in Kansas. To be fair, Pinnacle had cited UCC § 4-303 to support the proposition that a bank may "honor checks in any order." Doc. 105 at 19 n.1 (Pinnacle's brief supporting its summary judgment motion). And, plaintiff's Reply cited that portion of Pinnacle's motion and the UCC provision, arguing that Pinnacle had "concede[d] it could have honored the checks in any order." Doc. 121 at 27. But, that was the extent of the discussion. And neither party cited the Kansas version of the statute, any of the UCC Comments, or the Kansas Comments. And, most of all, Pinnacle never argued that UCC § 4-303 supplanted the Kansas conversion cases predating the statute's enactment in Kansas.

Three things about Kan. Stat. Ann. § 84-4-303 captured the court's attention.

*First*, this provision asserts that it governs a bank's "right or duty to pay an item or to charge its customer's account for the item" when presented to a bank for payment. Kan. Stat. Ann. § 84-4-303(a). These rights and duties are at the heart of plaintiff's conversion claim against Pinnacle.

*Second*, the UCC Comments for § 4-303 provide helpful commentary about this provision's role in the UCC's broader regulation of banks, checks, and other commercial paper. One part of this commentary states the obvious: A person who writes checks "should have funds available to meet all of them . . . ." Kan. Stat. Ann. § 84-4-303 UCC cmt. 7. The Comment continues with guidance that is directly pertinent to this dispute. The "drawer" of the check— here, Charles Leonard, the person who purchased the cattle from plaintiff but defaulted on his duty to pay for them—"has no basis for urging one [check] should be paid before another." *Id.* And, the Comment concludes with the most salient point of all: "[T]he holders [of checks] have no direct right against the payor bank in any event" unless that bank has "accepted, certified, or finally paid a particular item, or has become liable for it under Section 4-302." *Id.* In this case, plaintiff is the "holder" of the relevant check. Plaintiff held the check issued by the defaulting buyer, Mr. Leonard, on his checking account with Pinnacle—the "payor bank" referenced in the Comment.

*Third*, timing matters. Kansas adopted § 84-4-303 in 1991. This provision thus postdates almost all the case authorities that the parties had relied on in their summary judgment papers. The prior version of the statute—enacted in 1966—contains almost identical provisions and UCC Comments. But, differences in the Kansas Comments to the 1966 version of the statute and its 1991 counterparts provide insight about "the underlying policies and purposes" of § 84-4-303. *Guar. State Bank & Tr. Co. v. Van Diest Supply Co.*, 55 P.3d 357, 362 (Kan. Ct. App.

2002). Specifically, the current Kansas Comment explains that when checks arrive on the same day and together, they direct payment exceeding the amount the customer has on deposit in his account, the bank may decide how to pay those checks without consulting the customer. *See* Kan. Stat. Ann. § 84-4-303 Kansas cmt. ("[T]he bank need not contact the customer to determine which check should be dishonored in order to mitigate the customer's loss. It may pay either and, if it so chooses, dishonor the other.").

Altogether, these aspects of § 84-4-303 and its Comments persuade the court that the provision has significant consequences for the correct analysis of plaintiff's conversion claim against Pinnacle. The court thus ordered the parties to submit supplemental briefing about this statute, the UCC Comments, and the provision's consequences for the conversion claim. *See* Doc. 146.

The parties now have submitted their briefs—Docs. 147 & 154 (Pinnacle), 148 (Dinsdale), 149 & 155 (plaintiff)—and the court has considered them carefully. The court now is ready to decide Pinnacle's pending Motion to Reconsider (Doc. 127).

The court has decided to grant Pinnacle's motion because the court is convinced that it should have granted part of Pinnacle's Motion for Summary Judgment (Doc. 104). Specifically, this Order vacates the portion of Doc. 125 (Memorandum and Order dated December 21, 2018) denying Pinnacle's summary judgment motion against plaintiff's conversion claim. In place of that ruling, the court now grants Pinnacle's summary judgment motion (Doc. 104) against plaintiff's conversion claim against Pinnacle. In all other respects, the December 21, 2018, Memorandum and Order stands and remains the court's ruling on summary judgment.

The following pages explain why the court has reached this conclusion.

## I.      Uncontroverted Facts

Pinnacle's motion for reconsideration doesn't challenge the statement of uncontroverted material facts identified in the summary judgment Order. *See* Doc. 125 at 2–16. The court thus bases its decision here on the same summary judgment facts it identified in that earlier Memorandum and Order. To simplify review of this Order, the court nonetheless recites those facts again, below.[1]

The summary judgment facts were stipulated by the parties in the Pretrial Order (Doc. 101) or were uncontroverted for purposes of the parties' summary judgment motions. In the summary judgment Order, the court divided the following uncontroverted facts into three sections: (A) the parties involved in this case; (B) Mr. Leonard's relationship with Dinsdale; and (C) Mr. Leonard's relationship with Pinnacle. This Order uses the same convention.

### A.  Involved Parties

Plaintiff's business involves selling livestock at auction in St. Marys, Kansas. Defendant Dinsdale's business involves feeding cattle. Dinsdale purchases cattle from sellers, including Charles D. Leonard d/b/a Leonard Cattle Company. Chris and John "Sid" Dinsdale, alongside other Dinsdale family members, own Dinsdale. Dinsdale purchases cattle from six or seven dealers, including Mr. Leonard, who are licensed under the Packers & Stockyards Act. And Dinsdale buys about 70,000 cattle per year.

Defendant Pinnacle Bank is a banking organization that is organized and operates under Nebraska law, but it conducts business at several locations in Kansas. Some members of the

---

[1]      Not all the summary judgment facts pertain to the conversion claim against Pinnacle. But, for the sake of consistency, the court recites all the summary judgment facts again here.

Dinsdale family own interests in both Dinsdale and Pinnacle.[2] Specifically, Chris and Sid Dinsdale are members of the Board of Directors of Pinnacle Bancorp, Pinnacle's holding company. Sid Dinsdale is Chairman of Pinnacle's board, and Roy Dinsdale—Chris and Sid Dinsdale's father—is Vice Chair of the board. Mark Hesser is President of Pinnacle Bancorp and a Director of Pinnacle Bank. Marc Hock is President and a Director of Pinnacle Bank. Spencer Kimball and Steve Zey are Market Presidents. And Todd Roth is a Risk Manager.

Mr. Leonard operated as a cattle dealer from 1992 to 2015; his business involved buying and reselling cattle to cattle feeders. Mr. Leonard had a longstanding business relationship and friendship with the Dinsdale family. He also had been a long-time customer of Pinnacle.

### B. Mr. Leonard's Relationship with Dinsdale

Mr. Leonard made "dealer transactions" by purchasing cattle for his own account and reselling them to cattle feeders. These transactions include cattle purchased on commission. Mr. Leonard organized and paid for the trucking and insurance used to transport cattle he had purchased to his buyers. He used the same trucking dispatch service and insurance policy for each cattle transport. When Dinsdale purchased cattle from Mr. Leonard, Mr. Leonard had purchased the cattle from a sale barn, paid the sale barn for the cattle, and issued a separate invoice to Dinsdale. In earlier cattle sales, Dinsdale received good title to the cattle it purchased from Mr. Leonard.[3]

---

[2]  Both Dinsdale and Pinnacle challenge plaintiff's asserted fact that "Dinsdale Bros. and Pinnacle are both owned by the Dinsdale family." Doc. 111 at 2. And both defendants and plaintiff cite substantially the same deposition testimony from Chris and John ("Sid") Dinsdale to support their arguments. Defendants assert that only some Dinsdale family members had ownership of both Dinsdale and Pinnacle. After reviewing the parties' cited deposition testimony, the court concludes that the record establishes the uncontroverted fact that Dinsdale and Pinnacle both are owned by some members of the Dinsdale family. *See* Doc. 111-3 at 3 (C. Dinsdale Dep. 13:4–19, 72:14–73:11); 111-4 at 2 (J. Dinsdale Dep. 14:8–15:4, 16:3–24).

[3]  In its Consolidated Reply Memorandum (Doc. 121), plaintiff attempts to controvert Dinsdale's representation that it "received good title to the subject cattle" during earlier transactions with Mr. Leonard. Doc. 121 at 11. But the court concludes that plaintiff has failed to controvert Dinsdale's asserted fact because it contends merely that

On September 28, 2015, Dinsdale employee David Wahlert called Mr. Leonard, and the two spoke briefly over the phone. They discussed the cattle market, and Mr. Wahlert asked Mr. Leonard which sale he was attending the next day. Mr. Leonard replied that he planned to attend an auction in St. Marys, Kansas. The two did not discuss cattle prices. Mr. Wahlert told Mr. Leonard that Dinsdale was in the cattle market and agreed to talk to Mr. Leonard again the next day.[4] Before their September 28 conversation, Mr. Wahlert did not know whether Mr. Leonard planned to attend a cattle sale the next day or, if so, which auction he planned to attend. Though Mr. Wahlert knew where Mr. Leonard had attended auctions in the past, Mr. Wahlert did not know Mr. Leonard had attended one of plaintiff's auctions before. Mr. Wahlert never had heard of plaintiff's sale barn in St. Marys, Kansas, and he never had communicated with any representative of plaintiff. Neither Mr. Wahlert nor any Dinsdale representative directed Mr. Leonard to attend the St. Marys auction. Instead, Mr. Leonard attended the auction in St. Marys almost every Tuesday, and he purchased cattle "[a]bout every time" he attended it. Mr. Leonard only attended the later part of the St. Marys auctions, when yearlings—or young calves—were sold. Doc. 103 at 9 (citing Leonard Dep. 172:20–173:1, 185:11–14, 188:16–189:21).

On September 29, 2015, Mr. Leonard called Mr. Wahlert before the auction, and the two talked again. Mr. Wahlert told Mr. Leonard that Dinsdale was interested in buying heifers under

Dinsdale had knowledge of Mr. Leonard's financial status during the transaction. *See* Doc. 121 at 11 (Pl.'s Response to Dinsdale Bros.'s Statement of Additional Facts ¶ 5). Plaintiff's challenge does not controvert the factual proposition that Dinsdale received good title to the cattle it had purchased from Mr. Leonard during their earlier transactions.

[4]    In its Memorandum in Support of Defendant Dinsdale Bros., Inc.'s Motion for Summary Judgment (Doc. 103), Dinsdale represents that Mr. Wahlert planned to call Mr. Leonard on September 29, 2015, after checking the market. Doc. 103 at 8. But the Exhibits Dinsdale cites to support this proposition provide conflicting information: in an affidavit, Mr. Wahlert asserts that he planned to call Mr. Leonard on September 29, 2015, but Mr. Leonard testified in his deposition that he told Mr. Wahlert he would call him on September 29, 2015. Docs. 103-1, 103-5 (Leonard Dep. 17:4–5). Plaintiff cites Mr. Leonard's deposition and Mr. Wahlert's own deposition to support its representation that Mr. Wahlert asked Mr. Leonard to call him. Doc. 117 at 4 (first citing Leonard Dep. 15:13–17:10, 17:4–19:2; then citing Wahlert Dep. 23:18–24:18, 25:15–30:22).

800 pounds and steers under 900 pounds.  The two did not discuss price or quantity during this call.[5]  Mr. Leonard turned down an offer from another buyer to purchase some of the cattle Mr. Leonard eventually would buy on September 29, 2015.[6]

That day, Mr. Leonard attended the auction at plaintiff's sale barn in St. Marys, and plaintiff sold Mr. Leonard some cattle.  Mr. Leonard purchased some steers weighing more than 900 pounds, and plaintiff memorialized this purchase in a document called "Buyer Recap" and with invoices that identify "Leonard Cattle Co" as the buyer.  Doc. 103-2.  Neither plaintiff nor Mr. Leonard provided these invoices to Dinsdale.  The Packers & Stockyards Act required Mr. Leonard and plaintiff, who both had licenses and bonds under that statute, to memorialize the sale accurately.  Plaintiff did not know that Mr. Leonard had spoken with a Dinsdale representative before the sale on September 29.  Plaintiff didn't know where Mr. Leonard planned to deliver the cattle until after the sale.  And Mr. Leonard did not inform plaintiff in advance of the sale the weight or type of cattle he sought.  After the sale, Mr. Leonard instructed plaintiff to send the cattle to D&D, a feedlot in Colorado.  Plaintiff's owner, Dennis Rezac, testified that would have sold the cattle in question to Mr. Leonard notwithstanding Mr. Leonard's communication with a buyer before the auction "because he had been doing it over

---

[5]    In its Memorandum in Opposition to Dinsdale Bros.'s Motion for Summary Judgment (Doc. 117), plaintiff asserts that "Leonard's and Wahlert's testimony shows that each understood that Leonard would purchase Rezac's entire supply of cattle that fit Wahlert's specifications."  Doc. 117 at 4.  The deposition testimony plaintiff cites as support references Mr. Leonard's understanding that Dinsdale would have purchased as many cattle meeting its specifications as Mr. Leonard could purchase.  Doc. 117 at 4, 8 (citing Leonard Dep. 19:19–20:6, 25:20–26:22).  But the portions of testimony plaintiff cites provide no support for Mr. Wahlert's understanding about quantity; nor do these portions of testimony support the fact that Mr. Leonard and Mr. Wahlert discussed the quantity of cattle at all.  *See* Doc. 111 at 4–5, 8 (Pl.'s Uncontroverted Material Facts ¶¶ 19–23, 60).

[6]    In its Reply in Support of Defendant Dinsdale Bros., Inc.'s Motion for Summary Judgment (Doc. 119), Dinsdale asserts that "[n]othing in the record suggests that Leonard discussed this alleged other offer with Dinsdale Bros., because no such conversation occurred."  Doc. 119 at 7.  But Dinsdale never directs the court to any summary judgment evidence to support this assertion.  And, conversely, plaintiff directs the court to Mr. Leonard's deposition testimony and Alan Neuberger's deposition testimony as support for its assertion.  Doc. 117-2 at 3–4 (Leonard Dep. 24:14–25:6); Doc. 117-4 at 2 (Neuberger Dep. 78:2–79:4).  These portions of the discovery record support plaintiff's assertion, and the court thus considers this fact uncontroverted.

time." Doc. 103 at 11 (citing Rezac Dep. 134:13–135:3). Later in the day on September 29, 2015, Mr. Leonard and Mr. Wahlert spoke on the phone yet again; Mr. Wahlert confirmed that Dinsdale would purchase the cattle from Mr. Leonard.

The morning after the sale, Mr. Leonard's office wrote plaintiff a check for $980,361 from Mr. Leonard's account with Pinnacle for the cattle purchase. Mr. Leonard's office mailed this check to plaintiff. Dinsdale's name is not on the check, and Mr. Leonard never showed the check to Dinsdale. Mr. Leonard did not tell Dinsdale the amount he had paid plaintiff for the cattle, and Dinsdale did not receive an invoice or other documentation about this cattle purchase.[7] Mr. Leonard's office also prepared invoices for Mr. Leonard's cattle sale to Dinsdale. Plaintiff's name does not appear on the invoices, the invoices do not list commissions or orders, and the invoices state that "100% of sales made by Leonard Cattle Company are on a sold to basis." Doc. 103-4. Mr. Leonard listed himself as the only seller shown on these invoices, as he had done for earlier transactions with Dinsdale[8]; the Packers & Stockyards Act required Mr. Leonard to identify the seller on the invoice accurately. Also, Mr. Leonard sent just these invoices to Dinsdale; he didn't send any internal worksheets, and he never suggested to Dinsdale that he had prepared internal worksheets. Mr. Leonard instructed Dinsdale to pay the invoices

---

[7]  In its Memorandum in Opposition to Dinsdale Bros.'s Motion for Summary Judgment (Doc. 117), plaintiff attempts to controvert part of this fact. Plaintiff asserts—and properly supports—that Dinsdale knew some details about Mr. Leonard's purchase from plaintiff. These details included knowledge of the check Mr. Leonard wrote to plaintiff when purchasing the cattle and health papers describing the cattle received by the D&D feedlot in Colorado. But plaintiff does not controvert Dinsdale's asserted facts that Mr. Leonard, himself, never told Dinsdale the amount he paid for the cattle or that Dinsdale never received an invoice or other documents about the cattle purchase.

[8]  In its Consolidated Reply Memorandum (Doc. 121), plaintiff attempts to controvert Dinsdale's assertion that "Dinsdale contracted solely with Leonard and Leonard was the only seller" during all their earlier transactions. Doc. 121 at 11. But plaintiff's response fails to controvert Dinsdale's asserted fact because it contends merely that Dinsdale knew Mr. Leonard's financial status during the transaction. *See* Doc. 121 at 11 (Pl.'s Resp. to Dinsdale Bros.'s Statement of Additional Facts ¶ 4). Plaintiff never properly challenges whether Mr. Leonard appeared as the only seller with whom Dinsdale contracted during their earlier transactions.

by wire transfer, as he did with most of his larger deals and as he had done in all his earlier transactions with Dinsdale.[9]  Mr. Leonard instructed Dinsdale to wire that amount to his account and did not suggest that Dinsdale should wire those funds anywhere else.[10]  The wiring instructions appeared on the invoice to Dinsdale.  Mr. Leonard used trucking dispatch and insurance policy he usually used when delivering the cattle to Dinsdale, and Mr. Leonard bore the risk of loss until the cattle arrived at their destination.  Mr. Leonard arranged for trucks to transport the cattle he planned to buy on the morning of the auction.  Mr. Leonard testified that Dinsdale had a right to reject the cattle.[11]  Dinsdale received the cattle on September 30, 2015, and it placed these cattle at D&D Feedlot West in Iliff, Colorado, and OTR Feedlot in Proctor, Colorado.[12]

---

[9]     In its Consolidated Reply Memorandum (Doc. 121), plaintiff attempts to controvert Dinsdale's assertion that it "paid Leonard Cattle the purchase price by wire transfer" in "those transactions [where] Leonard contracted to sell cattle to Dinsdale Bros."  Doc. 121 at 10.  But plaintiff's response fails to controvert Dinsdale's asserted fact because it contends merely that Dinsdale knew Mr. Leonard's financial status during the transaction.  *See* Doc. 121 at 10–11 (Pl.'s Resp. to Dinsdale Bros.'s Statement of Additional Facts ¶ 3).  Plaintiff never properly challenges whether Dinsdale paid Mr. Leonard by wire transfer during their earlier transactions.

[10]     In its Consolidated Reply Memorandum (Doc. 121), plaintiff attempts to controvert Dinsdale's assertion that "Leonard—the only seller with whom Dinsdale Bros. contracted and the only person with title to the Cattle—instructed Dinsdale Bros. to pay Leonard directly by wire.  Leonard never stated or implied that the purchase price should be sent anywhere else."  Doc. 121 at 12.  But plaintiff's response fails to controvert part of Dinsdale's asserted fact.  Plaintiff contends merely that:  (1) Dinsdale had knowledge of Mr. Leonard's financial status during the transaction; (2) Dinsdale knew about plaintiff's claim for the cattle and their value; (3) Pinnacle told Dinsdale twice to pay plaintiff directly before Dinsdale sent its wire; and (4) Dinsdale knew plaintiff was not paid and would not be paid when Dinsdale sent its wire.  *See* Doc. 121 at 12 (Pl.'s Response to Dinsdale Bros.'s Statement of Additional Facts ¶ 7).  Some of these facts themselves are controverted, as discussed elsewhere.  But it is uncontroverted that Mr. Leonard directed Dinsdale to wire the purchase price to his account and that he never stated or implied that Dinsdale should send the purchase price anywhere else.

[11]     In its Memorandum in Opposition to Dinsdale Bros.'s Motion for Summary Judgment (Doc. 117), plaintiff characterizes this fact as "[i]mmaterial and misleading" because Mr. Leonard's testimony responded to a hypothetical question.  But plaintiff provides no citation directly controverting this fact and testimony.  The court thus considers it uncontroverted that Mr. Leonard testified in this fashion.

[12]     Plaintiff also asserts that the cattle were delivered to the OTR Feedlot located in Proctor, Colorado.  Doc. 111 at 5.  Though the court finds no support in the document that plaintiff cited for its assertion that the cattle were sent to that location (Doc. 37), the court finds support for this assertion in Doc. 103-4.  Doc. 103-4 at 1.

Mr. Leonard never received:  (1) authority to write checks for Dinsdale or a Dinsdale "checkbook"; (2) signatory authority from Dinsdale; (3) vehicles from Dinsdale; (4) Dinsdale letterhead, logos, business cards, or apparel; (5) mileage or fuel reimbursements from Dinsdale; or (6) a 1099 or W-2 form from Dinsdale.  Mr. Leonard maintained a separate business from Dinsdale, with his own books and records.  Mr. Leonard's business with Dinsdale concluded when he sold cattle to Dinsdale.  Mr. Leonard also paid federal income taxes on the September 29, 2015, cattle purchase; it was based on the difference between the price he paid plaintiff for the cattle and the price for which he sold the cattle to Dinsdale.  He reported the gain from this transaction as "dealer markup" and not as agent's commission.  The Packers & Stockyards Act also required Mr. Leonard to file annual reports with the Packers & Stockyards Administration that included transactions Mr. Leonard undertook as a dealer or agent.  Plaintiff reported that Mr. Leonard undertook the September 29, 2015, transaction as a dealer, not a commissioned agent.  And Mr. Leonard's 2015 report under the Packers & Stockyards Act listed all his purchases as "Livestock Dealer Purchases" and not as purchases "bought on commission for the account of others."  Doc. 103 at 14–15 (quoting Doc. 103-7 at 2).

### C.  Mr. Leonard's Relationship with Pinnacle

Mr. Leonard maintained a business checking account at Pinnacle for his cattle business, which was how Mr. Leonard made his living; the account was known as Account 161.  Spencer Kimball was one of the people at Pinnacle who managed deposit accounts.  Mr. Kimball also helped manage Pinnacle's loan relationship with customers such as Mr. Leonard.

Mr. Leonard and his wife maintained multiple accounts at Pinnacle, and Mr. Leonard took out loans from the bank.  They were customers of Pinnacle before the fall of 2015.  Mr. Leonard used Account 161, which Pinnacle administered in Gretna, Nebraska, to pay for cattle

and other business expenses; he also used the account for personal uses. In 2014 and 2015, Mr. Leonard purchased cattle from 150 different sale barns and had 175 to 200 customers. He ran all his purchases and sales through Account 161. Mr. Leonard filed for bankruptcy in 2015 and is not a party in this case.

Generally, checks that Pinnacle customers write on their accounts are presented to Pinnacle as debits against those accounts. The Federal Reserve Bank or other clearing facilities typically present these checks for payment, usually in the evening. If an account lacks sufficient funds to cover the amount of a check or checks presented against the account, Pinnacle learns of this insufficiency the next morning. Pinnacle then decides whether it will honor the checks nonetheless. Specifically, Mr. Kimball was charged with making this decision by 10:00 a.m. the day after such checks were presented to Pinnacle. Pinnacle customers may deposit funds in several ways. These include cash deposits, wire transfers, or third-party checks. Mr. Leonard's deposits in September and October 2015 were primarily wire transfers or third-party checks. His online bank statements show credits and debits, and the last balance the statements show on a particular date reflects the balance at the end of the corresponding day. This balance includes all checks or other debits that had hit the account and all deposits made to the account, even if those deposits included uncleared checks.

Account 161 lacked sufficient funds to cover the presented checks several times in September and early October 2015. Mr. Kimball, once he was notified of the insufficiency in Account 161, contacted Mr. Leonard, let him know about the insufficiency, and asked how he intended to cover the checks presented. Mr. Leonard responded by describing deposits he intended to make that day to cover the amounts of the checks presented. If Mr. Kimball was satisfied with Mr. Leonard's anticipated deposits, he normally would decide to honor the

presented checks.  For most of September 2015, Mr. Leonard made deposits into Account 161 that exceeded the deficit created by the checks presented the day before.  Pinnacle knew about Mr. Leonard's process of writing checks to purchase cattle before receiving deposits to cover these checks.  Pinnacle also knew that Mr. Leonard's account was overdrawn in August 2015.[13]  In late summer or early fall 2015, Pinnacle president Marc Hock had informed Chris Dinsdale that Mr. Leonard, along with several other Pinnacle clients, were overdrawing their accounts.[14]

Pinnacle extended "provisional credit" to Mr. Leonard in Account 161 for checks third parties had deposited in this account.  Provisional credit represents a credit for third-party checks that had not yet cleared the Federal Reserve (or other clearing agency).  Mr. Leonard or his assistant deposited dozens of checks in Account 161, and one did not clear:  a check for $221,818.39 that a third party—Feller Co.—had deposited.  This check failed to clear because Feller Co. stopped payment on it.  Also, when a Pinnacle customer writes checks on an account exceeding the amount of cleared funds in it, but the account also has uncollected deposited funds, Pinnacle refers to this situation as a "daylight overdraft" or an "intra-day overdraft."  This kind of overdraft typically lasts for just one day, and later—usually the next day—the third-party

---

[13]    Plaintiff asserts that Pinnacle had been "watching Leonard's account since August, 2015, because it was habitually overdrawn."  Doc. 111 at 4.  Defendants do not appear to controvert this fact.  But, in the deposition testimony cited by plaintiff, the court finds support only for the fact that Pinnacle was aware of Mr. Leonard's overdrawn account in August 2015 through bank statements.  It finds no support for the assertion that Pinnacle had been monitoring or "watching" Mr. Leonard's overdrawn account during that month.  *See* Doc. 111-7 at 5 (Hesser Dep. 50:20–51:23).

[14]    Plaintiff represents that "Pinnacle had told Dinsdale Bros. about Leonard's overdrafts well before the Rezac transaction."  Doc. 111 at 4.  But as Pinnacle argues, the summary judgment record includes no facts establishing the exact date when this conversation occurred.  *See* Doc. 114 at 3.  The timing of this conversation and the cattle transaction at issue here is unclear, and the court thus declines to determine anything about that relationship as a matter of uncontroverted fact.  Nor does the summary judgment record establish that Pinnacle was communicating with Chris Dinsdale in his capacity as an owner of Dinsdale.  *See* Doc. 111-5 at 14–15 (Hock Dep. 99:1–101:14).  Instead, as defendant Dinsdale argues, the summary judgment records establishes that Pinnacle was communicating with Chris Dinsdale "based on hi[s] [position as a] director of [Pinnacle's] holding company."  Doc. 111-5 at 15 (Hock Dep. at 101:12–14).  The court thus determines it is uncontroverted that Pinnacle, through Marc Hock, told Chris Dinsdale in late summer or early fall 2015 that Mr. Leonard, along with several other Pinnacle clients, were overdrawing their accounts.

checks clear and are deposited into the account. Notwithstanding the short duration of the overdraft, Pinnacle notifies customers who experience daylight or intra-day overdrafts.

Mr. Leonard attended plaintiff's livestock auction and purchased the cattle at issue in this case. Once Mr. Leonard received paperwork from plaintiff for these cattle, he reported this information to his assistant in Nebraska, Ms. Tammy Nichols. Ms. Nichols prepared and sent a check to plaintiff for the purchase amount: $980,361.45. For simplicity, this order refers to that check as "the Rezac check." Ms. Nichols mailed the Rezac check to plaintiff on September 30, 2015.

On the same day Mr. Leonard purchased the cattle from plaintiff—September 29, 2015— he sold the cattle to Dinsdale. Mr. Leonard prepared an invoice, which included the cost of the cattle, additional costs, and a mark-up, and he billed Dinsdale for the cattle.[15] This invoicing process matched the process Mr. Leonard used for his other customers. Mr. Leonard shipped the cattle to Dinsdale. And, as it had done during its past transactions with Mr. Leonard, Dinsdale wired $1,004,361.49 to Account 161 at Pinnacle on October 1, 2015.[16] Pinnacle readily could identify that wire transfer as one originated by Dinsdale.

On September 30, 2015, at 7:30 a.m., Mr. Leonard told Spencer Kimball that he was going to receive wired funds for the cattle purchase "from of all people Dinsdale Bros." Doc.

---

[15]    In its Memorandum in Support of Plaintiff's Motion for Summary Judgment (Doc. 111), plaintiff asserts that "Leonard charged a commission of .75 cents per hundredweight for performing the service of buying cattle for Dinsdale Bros." Doc. 111 at 5. But the court can find no support in the cited deposition testimony plaintiff cites classifying this additional charge as a commission. Both Mr. Leonard and Mr. Wahlert—the depositions plaintiff cites as support—refer to this charge as a "markup" or "fee." Doc. 111-2 at 6 (Wahlert Dep. 28:22–30:6); Doc. 111-6 at 4 (Leonard Dep. 21:11–22:6).

[16]    In its Memorandum in Support of Plaintiff's Motion for Summary Judgment (Doc. 111), plaintiff asserts that Dinsdale "decided to wire the sale proceeds to Pinnacle instead of paying Rezac directly." Doc. 111 at 9. But Pinnacle asserts (Doc. 114 at 4) that Dinsdale wired the funds to Mr. Leonard's account, not Pinnacle. The cited deposition testimony supports Pinnacle's characterization of this fact, not plaintiff's. Doc. 111-3 at 18 (C. Dinsdale Dep. 118:10–16).

111-8 at 15.  By 10:00 a.m. on September 30, 2015, Mr. Kimball had spoken with Roy Dinsdale, Chris Dinsdale, Steve Zey, and Marc Hock about Dinsdale's cattle purchase, Mr. Leonard's check to pay for these cattle, Mr. Leonard's account being $1,000,000 overdrawn, and Dinsdale's plan to send a $1,000,000 wire to pay for these cattle.[17]  At 10:37 a.m. on September 30, 2015, Mr. Hock's email informed Chris Dinsdale that Mr. Leonard was $1,000,000 overdrawn on his Pinnacle account and that Pinnacle was returning the checks Mr. Leonard had written for insufficient funds.  Mr. Hock copied Roy Dinsdale, Sid Dinsdale, and Mark Hesser on this email.  In sum, the following individuals knew about the check Mr. Leonard had written to plaintiff for the cattle purchase:  Roy Dinsdale, Sid Dinsdale, Chris Dinsdale, Mark Hesser, Marc Hock, Spencer Kimball, Steve Zey, and Todd Roth.  Chris Dinsdale considered paying the sale barn directly because he was aware of Mr. Leonard's financial issues and, by sending plaintiff a direct wire, he would know plaintiff had been paid for the cattle.  Dinsdale knew that paying a sale barn directly would convey to Dinsdale clear title for the cattle.

In late September 2015, Pinnacle officers learned of Account 161's activity, including knowledge that Dinsdale planned to pay for the cattle Mr. Leonard had purchased from plaintiff with wired funds.  Pinnacle received these wired funds from Dinsdale and credited them to Mr. Leonard's Account 161 on October 1, 2015.  At the end of the day on October 1, 2015, Mr.

---

[17]     In its "Resistance to Plaintiff's Motion for Summary Judgment" (Doc. 114), Pinnacle argues that this fact implies that when it received Dinsdale's wire, Mr. Leonard's account was overdrawn.  Doc. 114 at 4.  Also, Pinnacle asserts that it received Dinsdale's wire on October 1, 2015, and that Mr. Leonard's account was not overdrawn at the end of the day on September 30, 2015, or at any time on October 1, 2015.  *Id.*  Neither of these statements controverts that Mr. Leonard's account was overdrawn at the beginning of the day on September 30, 2015.  Doc. 111-5 at 47.

Plaintiff's Memorandum in Support of Plaintiff's Motion for Summary Judgment (Doc. 111) asserts that the September 30, 2015, email anticipating the presentment of Mr. Leonard's check to plaintiff and Dinsdale's wired funds "shows that [Pinnacle representatives] were told that the Dinsdale Bros. wire was to pay the check Mr. Leonard had written for the purchase" of cattle from plaintiff.  Doc. 111 at 7.  But defendant Dinsdale properly has controverted this fact, and the court addresses this dispute in the portion of this order that discusses the parties' summary judgment arguments, *infra*.

Leonard's account reflected a balance of $762,139.66. Mr. Leonard deposited about $590,000 the next day, October 2, 2015, but nearly $3 million in checks written by Mr. Leonard also were presented against the account on October 2. At the end of the day on October 2, 2015, Mr. Leonard's account reflected a negative balance of $1,755,365.80.

On October 5, 2015, Mr. Leonard provided Pinnacle with a list of outstanding checks he had written. They totaled about $5.8 million. Mr. Leonard did not have sufficient funds to cover his outstanding checks.

On October 6, 2015, the check Mr. Leonard had written to plaintiff was presented against Account 161. The first reported balance on October 6, 2015, in Account 161 was $1,598,433.80. That same day, Pinnacle returned the Rezac check for $980,361.45, reporting that the account held insufficient funds to cover it. Pinnacle also honored other, smaller checks presented against Account 161 that day, and determined payees and amount for each check. The honored checks totaled $1,344,253.51. By the time the check Mr. Leonard wrote to plaintiff was presented for payment on Account 161, Mr. Leonard already had consumed the funds deposited by Dinsdale's wire. Those funds were consumed by other checks presented on Account 161. Plaintiff never spoke with anyone from Pinnacle about the check Mr. Leonard had written to plaintiff. Mr. Leonard never directed anyone from Pinnacle to wire funds to plaintiff; and he did not attempt to get Pinnacle to issue a cashier's check or certified check to pay plaintiff.

Emails from Pinnacle that include Chris Dinsdale show it knew that: (1) the Dinsdale wire was related to Mr. Leonard's purchase of cattle from plaintiff; (2) Pinnacle was expecting the check Mr. Leonard wrote to plaintiff to be presented against Account 161 soon; and (3) Mr. Leonard was having difficulty maintaining a positive balance in his account.[18] Pinnacle expected

---

[18]    In its Memorandum in Support of Plaintiff's Motion for Summary Judgment (Doc. 111), plaintiff asserts that Dinsdale "knew Rezac was not paid for the St. Marys Livestock at the time it took possession of the St. Marys

16

the check Mr. Leonard wrote to plaintiff on Account 161 to be presented several days before it actually was presented. After talking with Chris Dinsdale on October 1, 2015, Marc Hock also emailed Spencer Kimball, Steve Zey, and Mark Hesser to inform them that "Dinsdale . . . [was] going to wire in approximately $1mm to the Leonard Cattle Co account . . . to cover cattle purchases from the St. Mary's [sic] Livestock auction." Doc. 111-5 at 27. Two emails[19] sent on September 30, 2015, and October 1, 2015, refer to suggestions from Mr. Hock that Dinsdale pay plaintiff directly. Jeff Whitham, Pinnacle's banking expert, testified that, to him, communications such as those between Dinsdale and Pinnacle were highly unusual. Doc. 111-10 (Whitham Dep. 37:7–21). Some of Pinnacle's representatives also testified that they never before had participated in conversations about the timing of wired funds. Mr. Hock testified that this transaction was unique because a Pinnacle director was involved in wiring funds. And Mr. Kimball testified that he could not ever recall reporting to the Dinsdales.[20]

---

Livestock." Doc. 111 at 11. Dinsdale challenges this assertion in its Memorandum in Opposition to Plaintiff's Motion for Summary Judgment (Doc. 115), contending that after Dinsdale took possession of the cattle at issue, Chris Dinsdale learned merely that Mr. Leonard had "financial concerns." Doc. 115 at 9. Plaintiff responds in its Consolidated Reply Memorandum (Doc. 121) that Chris Dinsdale "knew Leonard was insolvent before the transaction" because Spencer Kimball had informed him, on September 30, 2015, that Mr. Leonard had written a check to plaintiff for the cattle and Mr. Leonard's account at Pinnacle was overdrawn. Doc. 121 at 9. The summary judgment facts establish only that Chris Dinsdale knew plaintiff had not been paid for the cattle on the day Dinsdale received the cattle because plaintiff's check had not yet been presented against Mr. Leonard's account by then, *i.e.*, September 30. *See* Doc. 111-3 at 16 (C. Dinsdale Dep. 98:4–100:13); Doc. 111-5 at 24 (Dep. Ex. 84).

[19] Pinnacle's Brief in Support of Motion for Summary Judgment and Statement of Material Facts (Doc. 105) represents that "[o]ne email referred to a suggestion that Dinsdale Bros. might want to wire the money to Rezac instead of wiring it to Leonard." Doc. 105 at 11. But Marc Hock's deposition testimony and plaintiff's Exhibits 84 and 86 demonstrate that Mr. Hock's suggestion that Dinsdale send funds directly to plaintiff appeared in two separate emails. Doc. 111-5 at 5–6 (Hock Dep. 47:22–50:4), 6–8 (Hock Dep. 50:2–58:6), 24, 26.

[20] In its Memorandum in Opposition to Plaintiff's Motion for Summary Judgment (Doc. 115), Dinsdale asserts that its cattle purchase from Mr. Leonard "was normal and consistent with hundreds of other transactions with Leonard." Doc. 115 at 8. Also, Dinsdale argues that it "was not on 'both sides of the transaction,'" as plaintiff asserts. *Id.* at 9. Instead, Dinsdale argues that it acted only as the cattle buyer. But Dinsdale has not controverted the fact asserted by plaintiff, *i.e.*, that some of Pinnacle's representatives found Pinnacle's communications with Dinsdale unusual. Plaintiff properly supports that factual assertion and Dinsdale has not controverted it with any citation to admissible evidence. And Pinnacle does not address these facts in its Resistance to Plaintiff's Motion for Summary Judgment (Doc. 114), even though it responds to other facts plaintiff asserts. The court thus considers these portions of plaintiff's asserted facts—*i.e.*, those facts that describe testimony by Pinnacle representatives about the bank's communications with Dinsdale—as uncontroverted.

Because Mr. Leonard could not maintain sufficient funds to cover checks he had written, and because of the volume of checks Pinnacle returned for insufficient funds, Pinnacle decided to close Account 161. But Pinnacle did not close Mr. Leonard's account until October 15 because checks were presented against it and Mr. Leonard continued to deposit funds, though these funds were insufficient to cover all his debits. When Pinnacle closed Account 161, it had a negative balance of $159,484.39 because Feller Co. had stopped payment on a check deposited in Account 161. To close that account, Pinnacle wrote off this negative balance to close Account 161; this write-off appears as a credit made to the account on October 13, 2015. Mr. Leonard's lack of funds, and not the account's closing, kept him from paying his creditors. Pinnacle also assessed fees on incoming wire deposits as well as overdraft fees that totaled about $230. Pinnacle charged overdraft interest of $30,525.30 on September 30, 2015, but most of that interest charge was refunded later.

On October 12, 2015, plaintiff demanded possession of the cattle from D&D Feedlot West.[21]

## II.    Legal Standard

Pinnacle brings its reconsideration motion under D. Kan. Rule 7.3(a), asserting that the court should reconsider its December 21 Memorandum and Order "to correct error regarding the application of *Scoby v. Bird City State Bank* and *Torkelson v. Bank of Horton*[.]"  Doc. 127 at 2 (citations omitted).  Rule 7.3(a) provides that "[p]arties seeking reconsideration of dispositive orders or judgments must file a motion pursuant to" Federal Rules of Civil Procedure 59(e) or

---

[21]    In its Consolidated Reply Memorandum (Doc. 121), plaintiff asserts that D&D Feedlot is a "Dinsdale-affiliated entity" and that Dinsdale refused plaintiff's demand to return the cattle, but plaintiff failed to cite any portion of the record that supports this fact. *See* Doc. 111-11 at 4 (Rezac Dep. 187:11–17), 5 (Dep. Ex. 142); *see also* Doc. 121 at 10 (citing Doc. 37 at 7 ("On September 30, 2015 the Cattle were delivered to Dinsdale Bros.[]  Dinsdale Bros. placed the Cattle in the care of Pacific Edge Land And Cattle, L.L.C. d/b/a D&D Feedlot West ("D&D") for the purpose of feed and care.")).

60. Rules 59(e) and 60 apply only after a court enters judgment, but not all dispositive orders require the court to enter judgment. So, "[n]either the Federal Rules of Civil Procedure nor this court's local rules recognize a motion for reconsideration,"—such as Pinnacle's Motion to Reconsider here—"when it contemplates a dispositive order" that precedes entry of the judgment. *Ferluga v. Eickhoff*, 236 F.R.D. 546, 548–49 (D. Kan. 2006) (citing *Nyhard v. U.A.W. Int'l*, 174 F. Supp. 2d 1214, 1216 (D. Kan. 2001)). In this situation—one that has arisen in this case before (*see* Doc. 44)—the court has exercised its "discretion to revise an interlocutory order at any time prior to the entry of final judgment" and treated the motion as one for reconsideration. *Id.* at 549 (citations omitted). The court thus applies "the legal standards applicable to a Rule 59(e) motion to alter or amend and/or a motion to reconsider a non-dispositive order under D. Kan. Rule 7.3, which are essentially identical." *Id.*

D. Kan. Rule 7.3(b) requires a movant to base its motion for reconsideration on: "(1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error or prevent manifest injustice." A motion to reconsider "is not appropriate to revisit issues already addressed or advance arguments that could have been raised in prior briefing." *Ferluga*, 236 F.R.D. at 549 (citing *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000)). So, "a motion for reconsideration is appropriate [only] where the court has misapprehended the facts, a party's position, or the controlling law." *Id.* (citing *Servants of Paraclete*, 204 F.3d at 1012). "The decision whether to grant a motion to reconsider is committed to the district court's discretion." *Coffeyville Res. Ref. & Mktg., LLC v. Liberty Surplus Ins. Corp.*, 748 F. Supp. 2d 1261, 1264 (D. Kan. 2010) (citing *In re Motor Fuel Temperature Sales Practices Litig.*, 707 F. Supp. 2d 1145, 1166 (D. Kan. 2010)); *Brumark Corp. v. Samson Res. Corp.*, 57 F.3d 941, 944 (10th Cir. 1995).

Here, Pinnacle contends that one part of Rule 7.3(b) requires the court to reconsider its December 21 Order: the need to correct a clear error. The court evaluates Pinnacle's arguments to that effect, and plaintiff's arguments as well, below.

## III. Analysis

The parties' briefs responding to the court's February 7, 2019, Order argue some of the same points the parties raised in their summary judgment papers. But, they also address the issues emanating from Kan. Stat. Ann. § 84-4-303. The court focuses on these arguments, and not the ground the parties have covered before.

### A. Kan. Stat. Ann. § 84-4-303 and Comments

Section 4-303 of the Kansas Uniform Commercial Code provides the following:

(a) Any knowledge, notice, or stop-payment order received by, legal process served upon, or setoff exercised by a payor bank comes too late to terminate, suspend, or modify the bank's right or duty to pay an item or to charge its customer's account for the item if the knowledge, notice, stop-payment order or legal process is received or served and a reasonable time for the bank to act thereon expires or the setoff is exercised after the earliest of the following:

(1) The bank accepts or certifies the item;

(2) the bank pays the item in cash;

(3) the bank settles for the item without having a right to revoke the settlement under statute, clearinghouse rule, or agreement;

(4) the bank becomes accountable for the amount of the item under K.S.A. 84-4-302 and amendments thereto dealing with the payor bank's responsibility for late return of items; or

(5) with respect to checks, a cutoff hour no earlier than one hour after the opening of the next banking day after the banking day on which the bank received the check and no later than the close of that next banking day or, if no cutoff hour is fixed, the close of the next banking day after the banking day on which the bank received the check.

*(b) Subject to subsection (a), items may be accepted, paid, certified or charged to the indicated account of its customer in any order.*

Kan. Stat. Ann. § 84-4-303 (emphasis added).

The UCC Comments for this provision explain several circumstances when knowledge about an "item presented for payment," *id.* at UCC cmt. 1, among other events, can affect "the bank's right or duty to pay [that] item." *Id.* at § 84-4-303(a). "[I]f any one of several things has been done to the item or if it has reached any one of several stages in its processing at the time the knowledge . . . is received . . . and a reasonable time for the bank to act thereon expires[,] . . . the knowledge . . . comes too late, the item has priority and a charge to the customer's account may be made and is effective." *Id.* at UCC cmt. 2. But, as UCC Comment 7 explains, "[a]s between one item and another[,] no priority rule is stated." *Id.* at UCC cmt. 7. The UCC Comment then continues:

> This is justified because of the impossibility of stating a rule that would be fair in all cases, having in mind the almost infinite number of combinations of large and small checks in relation to the available balance on hand in the drawer's account; the possible methods of receipt; and other variables . . . . [T]he drawer has drawn all the checks, the drawer should have funds available to meet all of them and has no basis for urging one should be paid before another; and *the holders have no direct right against the payor bank in any event, unless of course, the bank has accepted, certified or finally paid a particular item, or has become liable for it under Section 4-302.*[22]

*Id.* (emphasis added).

Finally, the 1996 Kansas Comment for § 84-4-303 explains that if a bank receives knowledge, among other types of notice, "within a reasonable time before the bank has made any final decision regarding [an] account, the [knowledge] has priority and wins." Kan. Stat. Ann.

---

[22] The Kansas version of the UCC also includes § 4-302, the provision referenced at the end of Comment 7 to § 4-303. *See* Kan. Stat. Ann. § 84-4-302. Section 4-302 holds a payor bank "accountable for the amount of" an item accepted, paid, returned, or dishonored after the deadlines set out in the statute. Kan. Stat. Ann. § 84-4-302(a)–(b).

§ 84-4-303 Kansas cmt.  But, this Kansas Comment reinforces a point made by the UCC Comment emphasizing that § 84-4-303(b) "allows the drawee bank to pay incoming items in any order."  *Id.*  Then, the Kansas Comment offers the following example:

> [I]f the account contains only $1200 and two checks arrive on the same day through the clearings, one for $900 and the other for $700, the bank need not contact the customer to determine which check should be dishonored in order to mitigate the customer's loss.  It may pay either and, if it so chooses, dishonor the other.

*Id.*  Also, the Kansas Comment notes that "[p]re-UCC Kansas decisional law was in accord with the basic policy of . . . subsection [(a)]" of § 84-4-303.[23]  *Id.*  The current Kansas Comment articulates the most substantial change between the current version of § 84-4-303 and the prior version, enacted in 1966.  The 1966 Kansas Comment merely provided that § 84-4-303(b)— which allows banks to pay items "in any order"—was then a "[n]ew" section with "[n]o Kansas authority directly in point."  Kan. Stat. Ann. § 84-4-303 Kansas cmt. 2 (1966).

Kansas courts rely on comments such as UCC Comment 7 and the Kansas Comment to § 84-4-303 to articulate "the underlying policies and purposes" of the provision.  *Guar. State Bank & Tr. Co.*, 55 P.3d at 362.  Kansas courts have utilized comments to help:  (1) understand the circumstances where a particular statutory provision applies; and (2) align interpretation of certain statutes with the drafters' intent or existing common law, or to fill a gap in common law.  *See, e.g.*, *Hurst Enters., LLC v. Crawford*, 197 P.3d 882, 884–85 (Kan. 2008) (using a UCC

---

[23]    Plaintiff notes that the Kansas Comments to the current version of § 84-4-303 reference *Moravek v. First Nat'l Bank*, 237 P. 921 (1925).  Plaintiff argues that *Moravek* mirrors the summary judgment facts here.  In *Moravek*, the Kansas Supreme Court affirmed a jury verdict holding a bank liable to holders of dishonored checks.  The jury found that an oral contract existed between the defendant bank and an account holder who had written the checks.  They had agreed that the bank would honor the account holder's checks "in payment for live stock."  *Moravek*, 237 P. at 921.  But, a critical difference exists between the summary judgment facts here and the facts of *Moravek*.  In *Moravek*, the defendant bank applied funds it knew to be livestock proceeds to a demand note that the account holder owed the bank.  *See id.* at 922–23 (quoting *Scoby*, 211 P. at 111).  Here, it is uncontroverted that Pinnacle did not apply the funds it knew to be proceeds of Mr. Leonard's livestock sale to a debt Mr. Leonard owed to Pinnacle.  Rather, Pinnacle used the funds to pay other checks that Mr. Leonard had written on his account at Pinnacle.  In short, this case is not a setoff case, and plaintiff's reliance on *Moravek* is not persuasive.

comment to highlight "an illustration as to the type of situation to which [a statutory provision] applies"); *Guar. State Bank & Tr. Co.*, 55 P.3d at 362–63 (finding no Kansas cases on point, Kansas Court of Appeals turned to Kansas comment adopted after state had enacted a UCC provision).

**B. Application of Kan. Stat. Ann. § 84-4-303 to Plaintiff's Conversion Claim Here**

**1. Parties' arguments**

Pinnacle asserts that the first part of § 84-4-303—subsection (a)—doesn't apply to the summary judgment facts here because none of the "four legals"—*i.e.*, the four events listed in § 84-4-303(a)—occurred when plaintiff presented the check that the cattle's buyer, Mr. Leonard, wrote on his Pinnacle account. Kan. Stat. Ann. § 84-4-303 UCC cmt. 3. Specifically, Pinnacle explains, "'[k]nowledge' is not just any knowledge—it is knowledge affecting the item, such as knowledge that the drawer has filed [for] bankruptcy or made an assignment for the benefit of creditors." Doc. 147 at 2. And, Pinnacle argues, nothing in the summary judgment record suggests that Pinnacle accepted or certified the check; paid the check; settled the check; or waited to act on the check until after the deadlines established in §§ 84-4-302 and 84-4-303. Instead, Pinnacle contends, § 84-4-303(b) underscores the rule that a bank can pay checks drawn on its customers' accounts in any order it chooses. Finally, Pinnacle argues, Comment 7 serves to "insulate . . . [Pinnacle] from claims made by [plaintiff[ that it should have paid [plaintiff's] check on the day it was presented, instead of paying all the other checks that were presented that day." *Id.* at 3.

Plaintiff responds, arguing that § 84-4-303 imposes liability on Pinnacle because "Pinnacle knowingly paid out [plaintiff's] sale proceeds on October 1–2, 2015, to Leonard's other payees in furtherance" of Pinnacle's continuing "float" of Mr. Leonard's account. Doc.

155 at 2. Plaintiff contends that Pinnacle's knowledge about the relationship between the funds that Dinsdale wired to Pinnacle for deposit in Mr. Leonard's account to pay his check to plaintiff "imposed a legal obligation of good faith and fair dealing upon Pinnacle to act with honesty of . . . known facts." *Id.* Plaintiff's argument continues, asserting that Pinnacle—when it used Dinsdale's wired funds to pay other checks written by Mr. Leonard—rendered itself liable to plaintiff for the amount of the check Mr. Leonard had written to plaintiff. And, according to plaintiff, "[t]he holder of a rejected item clearly has a right of action against the bank if the bank wrongfully refuses its check." *Id.* at 3.

Plaintiff also directs the court to other UCC provisions adopted in Kansas. *Id.* (first citing Kan. Stat. Ann. § 84-3-408; then citing Kan. Stat. Ann. § 84-1-103). Section 84-3-408 provides that a drawee bank "is not liable on [an] instrument until the drawee accepts it." But, this provision also explains that "a bank that has not certified a check may engage in other conduct that might make it liable to a holder . . . . Section 1-103 is adequate to cover those cases." Kan. Stat. Ann. § 84-3-408 UCC cmt. 1. Section 1-103 provides, in turn, that the UCC's purpose is "[t]o simplify, clarify, and modernize the law governing commercial transactions." Kan. Stat. Ann. § 84-1-103(a)(1). And so, "[u]nless displaced by the particular provisions of the uniform commercial code, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, and other validating or invalidating cause supplement its provisions." *Id.* at § 84-1-103(b). Finally, plaintiff notes, Kansas law has adopted the UCC's definitions of "good faith," *see* Kan. Stat. Ann. § 84-1-201(b)(2); "ordinary care," *id.*, § 84-3-103 UCC cmt. 4; and "knowledge," *id.*, § 84-1-202.

### 2. As a matter of law, does Kan. Stat. Ann. § 84-4-303 preclude plaintiff from prevailing on its conversion claim?

Plaintiff correctly argues that a payor bank—the role Pinnacle occupies here—can acquire knowledge that affects its right and duty to pay an item drawn on its customer's account. Plaintiff's problem here, however, is two-fold. First, § 84-4-303(a) identifies specific events that displace a payor bank's right or duty to pay an item. And second, none of the summary judgment facts suggest that any of the events specified in § 84-4-303(a) ever materialized. To be sure, the summary judgment facts establish that Pinnacle acquired some knowledge that Dinsdale had purchased the cattle plaintiff sold to Mr. Leonard—Pinnacle's account holder and drawer of the check at issue here. Also, the summary judgment facts demonstrate that Pinnacle had some knowledge that there was a connection between the funds wired to Pinnacle for deposit into Mr. Leonard's account and the check Mr. Leonard had written to plaintiff. Pinnacle knew this background information before the wired funds arrived in Mr. Leonard's account and several days before plaintiff presented the check Mr. Leonard issued to plaintiff on his Pinnacle account. *See* Doc. 125 at 12–15. And, a factual dispute exists whether Mr. Leonard ever instructed Pinnacle how to pay the many outstanding checks issued on his account at Pinnacle as of September 30, 2015. *Id.* at 27–29. But, as a matter of law, none of these facts creates a genuine issue of material fact requiring a trial. Three related conclusions produce this holding.

*First*, the court predicts[24] the Kansas Supreme Court would hold that Pinnacle's account holder—Mr. Leonard—had no legal right to instruct Pinnacle to pay the check he issued to plaintiff ahead of the other checks he had written. To the contrary, § 84-4-303(b) "allow[ed] [Pinnacle, as] the drawee bank[,] to pay incoming items in any order." That, the Kansas

---

[24] *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 666 (10th Cir. 2007) ("Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In doing so, it may seek guidance from decisions rendered by lower courts in the relevant state." (internal citations and quotations omitted)).

Comment provides, is what § 4-303(b) means. Indeed, this Comment even gave an example that replicates, in principle, the situation presented by Mr. Leonard's account: too many checks and not enough money. Faced with that circumstance, Pinnacle—in the Comment's words—was free to pay any of the checks Mr. Leonard had written "in any order" and, "if it so [chose], dishonor the other." That is precisely what Pinnacle did.

*Second*, the court predicts that the Kansas Supreme Court would hold that Kansas law precludes plaintiff—the holder of the dishonored check—from suing the bank on which the check was drawn. Section 84-4-303(b) says exactly that, and UCC Comment 7 to this provision drives home the point. Mr. Leonard, as "the drawer [of the check given to plaintiff as payment] has drawn all the checks, . . . [and he] should have funds available to meet all of them . . . ." Kan. Stat. Ann. § 84-4-303 UCC cmt. 7. But, where the drawer failed this responsibility—as Mr. Leonard did—"the holders [of the insufficiently funded checks] have no direct right against the payor bank in any event . . . ." *Id.*

*Third*, no evidence suggests that circumstances here could qualify for any one of the exceptions to these general rules. As outlined in detail earlier, the Kansas version of the UCC recognizes several exceptions to these rules. That is the import of the introductory language in § 84-4-303(b), *i.e.*, "subject to subsection (a) . . . ." *Id.* But, here, as a matter of law, plaintiff can't qualify for any of the exceptions recognized in subsection (a) of that provision.

The kinds of knowledge that can modify a bank's "right or duty to pay an item or to charge its customer's account," the UCC Comments explain, include "knowledge or notice that the drawer has filed a petition in bankruptcy or made an assignment for the benefit of creditors." Kan Stat. Ann. § 84-4-303(a), UCC cmt. 2. Here, the summary judgment facts show that Pinnacle knew the wired funds from Dinsdale corresponded with the check Mr. Leonard had

written to plaintiff.  But, UCC Comment 7 addresses the effect this type of knowledge has on a bank's rights and duties.  Comment 7 explains that "no priority rule" exists "between one item and another."  Kan. Stat. Ann. § 84-4-303 UCC cmt. 7.  Put more succinctly, a bank's knowledge that a check—like the one Mr. Leonard wrote—corresponds with a deposit—such as Dinsdale's wired funds—doesn't qualify as knowledge affecting the bank's rights or duties recognized in § 84-4-303(a) and UCC Comment 1.

Finally, the Kansas statutes that plaintiff cites—ones defining "good faith," "ordinary care," and "knowledge"—do not override § 84-4-303 or its Comments.  The Comments to § 84-4-303 reflect that this provision explicitly bars account holders from dictating the order in which a bank must honor checks.  The Comments also recognize that § 84-4-303 bars check holders from asserting causes of action against a payor bank.  Though Comments to other Kansas statutes recognize that "a bank that has not certified a check may engage in other conduct that might make it liable to a holder," *see* Kan. Stat. Ann. § 84-3-408 UCC cmt. 1, the Comments to § 84-4-303 preclude Pinnacle's liability under the summary judgment facts.

### 3.  The "clear error of law" corrected by this Memorandum and Order

In its Order on the parties' summary judgment motions, the court declined to grant summary judgment because "Pinnacle is liable to plaintiff for conversion if the factfinder determines that the bank knew the purpose of the funds transferred by Dinsdale."  Doc. 125 at 29.  Concluding that a reasonable jury could find that Pinnacle knew the reason the Dinsdale funds were transferred into Mr. Leonard's account at Pinnacle, the court denied summary judgment because of this factual dispute.  *Id.*  But, after hearing the parties' oral arguments and reviewing their supplemental briefing, the court concludes that this factual dispute is not a material one.

The court's earlier Order held this dispute was material based on the Kansas Supreme Court's holding in *Scoby v. Bird City State Bank*, 211 P. 110 (Kan. 1922), and *Torkelson v. Bank of Horton*, 491 P.2d 954 (Kan. 1971). Both cases recognized that a drawee bank could be liable to a check's holder, *i.e.*, the payee, where "the defendant bank was . . . informed" about the purpose of a deposit into the account "before [the bank] devoted that money to the payment of [the drawer's] overdrafts or otherwise disposed of it." *Scoby*, 211 P. at 113; *see also Torkelson*, 491 P.2d at 957 –58 ("[I]f, by virtue of special circumstances in addition to the mere issuance of the check, the check is deemed to be an assignment pro tanto of the funds called for, the holder may sue the drawee bank for its payment if there are sufficient funds to meet the check, even though it was not accepted or certified.").

But, the most important feature of these two cases is the year when the Kansas Supreme Court decided them: in 1922 (*Scoby*) and 1971 (*Torkelson*). Both cases predated 1991, when the Kansas legislature adopted the current version of Kan. Stat. Ann. § 84-4-303. And, one of the cases predated 1966, when the Kansas legislature first adopted the UCC and the original version of § 84-4-303. That provision hasn't changed materially since 1966, but some of the interpretive Comments have changed. In 1966, UCC Comment 6 to § 84-4-303 explained that "the drawer [of a check] has drawn all the checks, [and he] should have funds available to meet all of them . . . ." Kan. Stat. Ann. § 84-4-303 UCC cmt. 6 (1966). This Comment continued, explaining that "the holders [of the insufficiently funded checks] have no direct right against the payor bank in any event . . . ." *Id.* But, the Kansas Comment to § 84-4-303 expanded between 1966 and 1991. The 1966 version didn't contain an illustration explaining that a bank had the right to pay checks arriving on the same day in any order it chooses. Indeed, the 1966 Kansas Comment provided little guidance. It advised merely that § 84-4-303(b)—the subsection allowing banks to pay

checks in any order—was "[n]ew" with "[n]o Kansas authority directly in point."  *Id.* at Kansas cmt. 2.

The example provided in the current Kansas Comment mirrors the facts here—*i.e.*, Mr. Leonard had written multiple checks that arrived on the same day as the check he had written to plaintiff, and his account at Pinnacle contained insufficient funds to pay them all.  The current Kansas Comment recognizes that Pinnacle had the right to pay the checks in any order it chose and dishonor checks for which insufficient funds remained in Mr. Leonard's account.

In this diversity case, "the federal court's task is not to reach its own judgment regarding the substance of the common law, but simply to 'ascertain and apply the state law.'"  *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003) (quoting *Huddleston v. Dwyer*, 322 U.S. 232, 236 (1944)).  But, "[w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do," *id.*, if presented with the question today.

The court concludes that the gravamen of § 84-4-303—and particularly the Kansas Comment updated since 1991—precludes *Scoby*, *Torkelson*, and like-minded cases from serving as "controlling" state decisions.  The court predicts that the Kansas Supreme Court would hold, instead, that Kansas law does not permit plaintiff to prevail on a claim for conversion under the circumstances presented by these summary judgment facts.  The court predicts the Kansas court would hold that § 84-4-303 establishes the general rule of law governing plaintiff's claim, and this rule precludes plaintiff from prevailing on a conversion claim against Pinnacle.  The court likewise predicts the Kansas Supreme Court would hold that plaintiff's claim does not qualify for any of the exceptions to this general rule in § 84-4-303(a).  The court thus vacates its earlier

ruling and holds, instead, that Pinnacle is entitled to summary judgment as a matter of law against plaintiff's claim for conversion.

## IV. Conclusion

For reasons explained above, the court grants Pinnacle's Motion to Reconsider (Doc. 127). The court vacates the portion of Doc. 125 (Memorandum and Order dated December 21, 2018) denying Pinnacle's Motion for Summary Judgment against plaintiff's conversion claim. In its place, the court now grants that portion of Pinnacle's summary judgment motion and enters summary judgment against plaintiff's conversion claim against Pinnacle. In all other respects, the December 21, 2018, Memorandum and Order stands and remains in effect.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Pinnacle Bank's Motion to Reconsider (Doc. 127) is granted.

**IT IS FURTHER ORDERED THAT** the portion of the court's December 21, 2018, Memorandum and Order (Doc. 125) denying Pinnacle Bank's Motion for Summary Judgment against plaintiff Rezac Livestock Commission Co., Inc.'s conversion claim is vacated.

**IT IS SO ORDERED.**

**Dated this 26th day of June, 2019, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**